## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

State Farm Mutual Automobile Insurance Company
and State Farm Fire and Casualty Company,

Plaintiffs,

v.

Metro Pain Specialists P.C., Leonid Shapiro, M.D., Mohamed Sayed Ahmed Hassan, P.T., Nile Rehab Physical Therapy, P.C., Mohamed Elsayed Khallaf, P.T., Handy Physical Therapy P.C., Irina Kataeva, P.T., Cityworks Physical Therapy P.C., Mahmoud Ezz Eldeen Shalaby, P.T., Physical Therapy of New York P.C., Amro Mahmoud Barakat, P.T., Barakat PT, P.C., Mohamed Mahmoud Elmandouh, P.T., Protection Physical Therapy P.C., Raouf Akl, P.T., Primavera Physical Therapy, P.C., Ahmed Mahmoud Abdelshafy Elmansy, P.T., Sky Limit Physical Therapy, P.C., Geoffrey Allerton Cushman, P.T., PI Physical Therapy, P.C., Sherwin Catugda Paller, P.T., Floral Park Physical Therapy, P.C., Alpeshkumar Manughai Patel, P.T., A. M. Patel Physical Therapy P.C., Leonard Luna, D.C., Kings Chiropractic Wellness, P.C., Jongdug Park, D.C., All About Chiropractic P.C., J Park Chiropractic P.C., Giulio Caruso, D.C., Brook Chiropractic of NY P.C., Integrated Chiropractic of NY P.C., Peter Albis, D.C., PDA NY Chiropractic P.C., Paul Victor Scarborough, D.C., A.O.T. Chiropractic P.C., Evolution Chiropractic P.C., Stacy Juyoung Moon, L.Ac., SJM Acupuncture P.C., Lyudmila Krupnova, L.Ac., LK Acupuncturist P.C., Hyeongsock Choi, L.Ac., Choice Acupuncture PLLC, Choi-Go Acupuncture PLLC, Peter Kopach, L.Ac., First Alternative PLM Acupuncture P.C., Edwin Castillo, L.Ac., Edcas Acupuncture P.C., Longyu Ma, L.Ac., Hidden Dragon Acupuncture P.C., Xia Guan, L.Ac., Rebound Acupuncture P.C., Reuven Alon (a/k/a Rob Alon), Columbus Imaging Center LLC, Medaid Radiology LLC, Regina Moshe, M.D., Yan Moshe (a/k/a Yan Leviev), Citimedical I, PLLC, Hackensack Specialty ASC LLC (f/k/a Dynamic Surgery Center LLC), Integrated Specialty ASC LLC (f/k/a HealthPlus Surgery Center LLC), Vladimir Nazarov, and Right Aid Medical Supply Corp.,

Defendants.

Case No.

**COMPLAINT**

PLAINTIFFS DEMAND TRIAL BY JURY

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") (collectively, the "State Farm Companies"), for their Complaint against defendants Metro Pain Specialists P.C., Leonid Shapiro, M.D., Mohamed Sayed Ahmed Hassan, P.T., Nile Rehab Physical Therapy, P.C., Mohamed Elsayed Khallaf, P.T., Handy Physical Therapy P.C., Irina Kataeva, P.T., Cityworks Physical Therapy P.C., Mahmoud Ezz Eldeen Shalaby, P.T., Physical Therapy of New York P.C., Amro Mahmoud Barakat, P.T., Barakat PT, P.C., Mohamed Mahmoud Elmandouh, P.T., Protection Physical Therapy P.C., Raouf Akl, P.T., Primavera Physical Therapy, P.C., Ahmed Mahmoud Abdelshafy Elmansy, P.T., Sky Limit Physical Therapy, P.C., Geoffrey Allerton Cushman, P.T., PI Physical Therapy, P.C., Sherwin Catugda Paller, P.T., Floral Park Physical Therapy, P.C., Alpeshkumar Manughai Patel, P.T., A. M. Patel Physical Therapy P.C., Leonard Luna, D.C., Kings Chiropractic Wellness, P.C., Jongdug Park, D.C., All About Chiropractic P.C., J Park Chiropractic P.C., Giulio Caruso, D.C., Brook Chiropractic of NY P.C., Integrated Chiropractic of NY P.C., Peter Albis, D.C., PDA NY Chiropractic P.C., Paul Victor Scarborough, D.C., A.O.T. Chiropractic P.C., Evolution Chiropractic P.C., Stacy Juyoung Moon, L.Ac., SJM Acupuncture P.C., Lyudmila Krupnova, L.Ac., LK Acupuncturist P.C., Hyeongsock Choi, L.Ac., Choice Acupuncture PLLC, Choi-Go Acupuncture PLLC, Peter Kopach, L.Ac., First Alternative PLM Acupuncture P.C., Edwin Castillo, L.Ac., Edcas Acupuncture P.C., Longyu Ma, L.Ac., Hidden Dragon Acupuncture P.C., Xia Guan, L.Ac., Rebound Acupuncture P.C., Reuven Alon (a/k/a Rob Alon), Columbus Imaging Center LLC, Medaid Radiology LLC, Regina Moshe, M.D., Yan Moshe (a/k/a Yan Leviev), Citimedical I, PLLC, Hackensack Specialty ASC LLC (f/k/a Dynamic Surgery Center LLC), Integrated Specialty ASC LLC (f/k/a HealthPlus Surgery Center LLC), Vladimir Nazarov, and Right Aid Medical Supply Corp. (collectively, "Defendants"), allege as follows:

## I.    NATURE OF THE ACTION

1.    This action seeks to recover money fraudulently obtained from State Farm Mutual and State Farm Fire through the submission of fraudulent bills and supporting documentation for examinations, treatment, medical imaging ("MRIs"), testing, orthotic devices and durable medical equipment ("DME," and together with orthotics, "Supplies"), and pain management and orthopedic procedures and related services provided to individuals involved in motor vehicle accidents and eligible for No-Fault benefits under State Farm Mutual or State Farm Fire insurance policies ("No-Fault Benefits").  The bills and supporting documentation Defendants submitted or caused to be submitted to State Farm Mutual and State Farm Fire were fraudulent because the services were ineligible for reimbursement and/or medically unnecessary.

2.    The bills and supporting documentation are the product of a fraudulent scheme orchestrated by Dr. Leonid Shapiro ("Shapiro"), Reuven Alon (a/k/a Rob Alon) ("Alon"), and Yan Moshe (a/k/a Yan Leviev) ("Moshe").  Shapiro is an anesthesiologist who purports to own and control Metro Pain Specialists P.C. ("Metro Pain"), a medical practice that operates at as many as 30 multidisciplinary clinics in the New York area that cater to individuals who have been in automobile accidents, and other businesses including anesthesia providers Premier Anesthesia Associates P.A. ("Premier Anesthesia") and PMR Medical P.C. ("PMR Medical").  Alon is a layperson businessman who owns Beshert Corp. ("Beshert"), a purported "advertising" and "marketing" company directed at No-Fault medical providers, attorneys, and individuals who have been in automobile accidents, other purported marketing and consulting companies, and at least two MRI companies, Columbus Imaging Center LLC ("Columbus Imaging") and Medaid Radiology LLC ("Medaid Radiology").  Moshe is Alon's cousin and also a layperson businessman who secretly owns and controls, among other things, treatment and MRI providers Citimedical I, PLLC ("Citimedical I"), Citimedical Services P.C. ("Citimedical Services"), and Citimed

3

Complete Medical Care P.C. ("Citimed Complete," and together with Citimedical I and Citimedical Services, "Citimedical"), and an anesthesia provider, Citimed Services P.A. ("Citimed Services").  Each of these entities was owned on paper by Moshe's sister, Dr. Regina Moshe ("Dr. Moshe"), and because Dr. Moshe is not qualified to perform services they render, including MRIs, they employ independent contractors to do so.  Moshe also owns and controls a purported medical receivables financing company, Med Capital LLC ("Med Capital"), a billing company Star Solution Services Inc, and a series of ambulatory surgery centers ("ASCs"), including Excel Surgery Center LLC ("Excel Surgery"), Hackensack Specialty ASC LLC, f/k/a Dynamic Surgery Center LLC ("Dynamic Surgery"), Integrated Specialty ASC LLC, f/k/a HealthPlus Surgery Center LLC ("HealthPlus Surgery"), SCOB LLC d/b/a SurgiCare of Brooklyn ("Surgicare"), NJMHMC LLC d/b/a Hudson Regional Hospital ("Hudson Regional"), and Citimed Surgery Center, LLC ("Citimed Surgery") (which was owned on paper by Moshe's sister Dr. Moshe).

3.      Shapiro, Alon, and Moshe have a symbiotic relationship in which each fulfills different but necessary roles, providing benefits to and obtaining benefits from each other.

4.      Shapiro has purported to serve as medical director of at least three Moshe-owned ASCs beginning as early as February 2014:  Excel Surgery, Dynamic Surgery, and HealthPlus Surgery.  Shapiro became medical director of Excel Surgery in February 2014, after its purported medical director came under investigation by the New Jersey Department of Health ("NJDOH") and the New Jersey State Board of Medical Examiners (the "NJ State Board") for, among other things, failing to fulfill his obligations as a medical director.  Shapiro also became the medical director of Dynamic Surgery and HealthPlus Surgery after they commenced operations in 2017. While Shapiro could not have fulfilled his responsibilities as a medical director at multiple facilities at the same time, particularly during a time when Metro Pain was expanding, Moshe paid

Shapiro at least approximately $400,000 in salary.  In addition to these payments, Moshe allowed Shapiro's Premier Anesthesia to provide anesthesia services at Moshe's ASCs beginning in January 2018 and to become the primary, if not exclusive, provider beginning July 2018, and then allowed Shapiro's PMR Medical to provide anesthesia services at Surgicare and Citimed Surgery beginning in November and December 2020.  Moreover, in September 2013, Moshe's receivables financing company Med Capital agreed to lend Metro Pain and PMR Medical up to $2.5 million. Pursuant to the revolving loan and security agreement, any borrowed amounts would be secured against Metro Pain's accounts receivable and would accrue interest at the rate of 24.99% per annum.  Metro Pain also gave Med Capital and its agents the power of attorney over Metro Pain assets, including the authority to endorse Metro Pain's name on "any notes, acceptances, checks, drafts, money orders, instruments or other evidences of Collateral that may come into [Med Capital's] possession."

5.     Alon's entity Beshert, beyond its purported role as a "marketing" and "advertising" business, functions as a referral network among No-Fault providers and attorneys.  As set forth in its "Participation Agreement," Beshert requires its members to refer patients to other members of its network.  That network, at a minimum, includes (a) Metro Pain, (b) likely Alon's two MRI businesses Columbus Imaging and Medaid Radiology, (c) Moshe's secretly owned treatment and MRI business Citimedical, (d) Moshe's ASCs, and (e) Moshe's and Shapiro's anesthesia businesses, Citimed Services, Premier Anesthesia, and PMR Medical.  Shapiro testified at an examination under oath in November 2018 that Metro Pain paid Beshert $10,000 each month for marketing to help it secure patients, though Metro Pain's financial records indicate slightly different payments of at least $300,000 in 2017, 2018, and 2019.  Moshe separately testified that

Dynamic Surgery and HealthPlus Surgery each also paid Beshert $50,000 a month ($100,000 total per month) during this period.

6.    Moshe's ASCs cater to individuals who have been in automobile accidents and, although virtually all of Metro Pain's patients are insured under New York No-Fault insurance policies, Metro Pain performs almost all procedures at Moshe's ASCs in New Jersey:  Dynamic Surgery and HealthPlus Surgery.  New York patients are transported to New Jersey for these procedures because the purported treatment could be billed under the New Jersey fee schedule, thus affording significantly higher reimbursement, avoiding New York fee schedule limitations, and allowing Moshe's ASCs to bill tens of thousands of dollars for facility fees per procedure.

7.    Between August 2013 and January 2020, NJDOH cited Excel Surgery, Dynamic Surgery, HealthPlus Surgery, and Hudson Regional on multiple occasions for regulatory and health and safety violations, the most egregious of which occurred in September 2018, when NJDOH ordered HealthPlus Surgery to temporarily close based on public health violations that may have exposed patients to hepatitis B, hepatitis C, and human immunodeficiency virus ("HIV").  The failure of Dynamic Surgery and HealthPlus Surgery to hire a qualified medical director to perform specific duties enumerated under New Jersey law, and to instead retain nominal, disengaged medical directors, including Shapiro, constitute licensing violations that rendered them ineligible to obtain reimbursement.

8.    Shapiro, Alon, and Moshe together established a scheme to profit from patients' No-Fault Benefits through the submission of fraudulent claims.

9.    Shapiro operated numerous multidisciplinary clinics through Metro Pain in and around Queens, Brooklyn, and Bronx, New York, directed at individuals who have been in automobile accidents.  Among these locations are *four* at which Metro Pain has operated as the

"gatekeeper," rendering predetermined examinations to justify additional treatment and services, and then deciding what additional care patients receive and who would provide additional care in exchange for payment:

    (a)    105-10 Flatlands Ave., Brooklyn, NY 11236 ("105-10 Flatlands");
    (b)    204-12 Hillside Ave., Hollis, NY 11423 ("204-12 Hillside");
    (c)    717 Southern Blvd., Bronx, NY 10455 ("717 Southern"); and
    (d)    2451 E. Tremont Ave., Bronx, NY 10461 ("2451 E. Tremont").

    10.    Metro Pain acquired control of office space where patients could be treated, often through lease agreements, and engaged lay office staff and administrators to run the locations and direct patient medical treatment.  At each location, individuals working for Metro Pain and others purport to perform initial examinations to diagnose and treat the patients' conditions.  In fact, these examinations are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed as a pretext to justify unnecessary treatment and services.  The examinations virtually always conclude patients require a treatment plan consisting of a combination of physical therapy, chiropractic care, and acupuncture, as well as other services. These services are then performed by physical therapists, chiropractors, and acupuncturists in the clinics, not because they are necessary, but pursuant to "pay to play" financial arrangements with Metro Pain and others who are working with Metro Pain.  In particular, some providers are permitted to treat patients of Metro Pain because they make payments to Metro Pain in exchange for patient referrals, typically disguised as "rent" pursuant to a sublease for space in the clinic.

    11.    In addition to physical therapy, chiropractic treatment, and acupuncture, Metro Pain refers virtually every patient who receives more than one office visit for MRIs.  Based on the financial arrangements and relationships between and among Shapiro, Alon, and Moshe, a majority of these MRIs, out of at least these four locations, are performed by Alon's Columbus Imaging and Medaid Radiology or by Moshe's lay-controlled Citimedical.  Such MRIs, the vast

majority of which involve at least two regions, are medically unnecessary, expensive (up to $936.23 per MRI), and do not lead to an alteration in treatment.

12.     Metro Pain also orders other treatment and services, not because they are necessary but because they allowed providers to profit from patients' No-Fault Benefits as part of pay to play arrangements.  Metro Pain orders and allows virtually every patient who receives more than one office visit to receive unnecessary cervical collars and/or lumbar orthoses and at least five, and sometimes as many as 21, other Supplies.  Metro Pain orders or allows its patients to be subjected to diagnostic tests performed by various providers, including Metro Pain, and physical therapists and chiropractors with whom it has financial arrangements.  These diagnostic tests include Outcome Assessment Tests, nerve conduction studies and electromyography tests ("NCV and EMG Tests"), computerized range of motion ("ROM") and muscle tests, functional capacity tests, and pain fiber nerve conduction studies ("Pf-NCS Tests").  These tests are unnecessary, do not lead to an alteration in treatment, and for some tests are duplicative of information obtained during the purported examinations.

13.     Metro Pain also prescribes and allows its patients to receive expensive and unnecessary prescription gels and patches.  Additionally, some patients undergo medically unnecessary pain management and orthopedic consultations followed by procedures performed by Metro Pain at Moshe's ASCs, where they also receive anesthesia from Citimed Services, Premier Anesthesia, or PMR Medical.

14.     Alon advances the scheme by providing Metro Pain with access to patients though Beshert and is able to profit by, among other things, Metro Pain's payments to Beshert and referral of patients for highly profitable MRIs performed at Columbus Imaging and Medaid Radiology.

15.     Moshe profits through Metro Pain's referral of patients for MRIs performed at Citimedical and for anesthesia performed by Citimed Services, both of which he secretly owns and controls, as well as procedures performed at his ASCs.  He compensates Shapiro through, at least, payment for Shapiro's role as medical director of his ASCs, including Dynamic Surgery and HealthPlus Surgery, granting Shapiro primary, if not exclusive, ability to perform and bill for anesthesia at Moshe's ASCs, and a loan against Metro Pain's receivables of $2.5 million.

16.     As a result, patients were subjected to a predetermined treatment protocol (the "Predetermined Treatment Protocol") at, at least, four locations at which Metro Pain acted as gatekeeper:   105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont.   This Predetermined Treatment Protocol included:

(a)     initial examinations that are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed as a pretext to justify a variety of unnecessary treatment and services;

(b)     a treatment plan involving physical therapy, chiropractic care, acupuncture, and other services rendered by providers who have financial arrangements with Metro Pain;

(c)     physical therapists and their professional corporations who have entered into financial arrangements with Metro Pain and who purportedly examine patients and provide medically unnecessary physical therapy services and sometimes diagnostic testing at:

(i)     105-10 Flatlands through Mohamed Sayed Ahmed Hassan, P.T. ("Hassan"), Nile Rehab Physical Therapy, P.C. ("Nile Rehab PT"), Mohamed Elsayed Khallaf, P.T. ("Khallaf"), Handy Physical Therapy P.C. ("Handy PT"), Irina Kataeva, P.T. ("Kataeva"), and Cityworks Physical Therapy P.C. ("Cityworks PT");

(ii)     204-12 Hillside through Mahmoud Ezz Eldeen Shalaby, P.T. ("Shalaby"), Physical Therapy of New York P.C. ("Physical Therapy of NY"), Kataeva, and Cityworks PT;

(iii)     717 Southern through Amro Mahmoud Barakat, P.T. ("Barakat"), Barakat PT, P.C. ("Barakat PT"), Mohamed Mahmoud Elmandouh, P.T. ("Elmandouh"), Protection Physical Therapy P.C. ("Protection PT"), Raouf

Akl, P.T. ("Akl"), and Primavera Physical Therapy, P.C. ("Primavera PT"); and

(iv)   2451 E. Tremont through Ahmed Mahmoud Abdelshafy Elmansy, P.T. ("Elmansy"), Sky Limit Physical Therapy, P.C. ("Sky Limit PT"), Geoffrey Allerton Cushman, P.T. ("Cushman"), PI Physical Therapy, P.C. ("PI PT"), Sherwin Catugda Paller, P.T. ("Paller"), Floral Park Physical Therapy, P.C. ("Floral Park PT"), Alpeshkumar Manughai Patel, P.T. ("Patel"), and A. M. Patel Physical Therapy P.C. ("AM Patel PT") (physical therapists identified in Paragraphs 16(c)(i) through 16(c)(iv) collectively referred to as the "Physical Therapy Defendants");

(d)   chiropractors and their professional corporations who have entered into financial arrangements with Metro Pain and who purportedly examine patients, diagnose injuries to support additional treatment, and provide medically unnecessary chiropractic care and sometimes diagnostic tests at:

(i)   105-10 Flatlands through Leonard Luna, D.C. ("Luna") and Kings Chiropractic Wellness, P.C. ("Kings Chiropractic");

(ii)   204-12 Hillside through Jongdug Park, D.C. ("Park"), All About Chiropractic P.C. ("All About Chiropractic"), and J Park Chiropractic P.C. ("J Park Chiropractic");

(iii)   717 Southern through Giulio Caruso, D.C. ("Caruso"), Brook Chiropractic of NY P.C. ("Brook Chiropractic"), Integrated Chiropractic of NY P.C. ("Integrated Chiropractic"), Peter Albis, D.C. ("Albis"), and PDA NY Chiropractic P.C. ("PDA Chiropractic"); and

(iv)   2451 E. Tremont through Paul Victor Scarborough, D.C. ("Scarborough"), A.O.T. Chiropractic P.C. ("AOT Chiropractic"), and Evolution Chiropractic P.C. ("Evolution Chiropractic") (chiropractors identified in Paragraphs 16(d)(i) through 16(d)(iv) collectively referred to as the "Chiropractor Defendants");

(e)   acupuncturists and their professional corporations who have entered into financial arrangements with Metro Pain and who purportedly examine patients, diagnose injuries to support treatment, and provide medically unnecessary acupuncture treatment at:

(i)   105-10 Flatlands through Stacy Juyoung Moon, L.Ac. ("Moon"), SJM Acupuncture P.C. ("SJM Acupuncture"), Lyudmila Krupnova, L.Ac. ("Krupnova"), and LK Acupuncturist P.C. ("LK Acupuncturist");

(ii)   204-12 Hillside through Hyeongsock Choi, L.Ac. ("Choi"), Choice Acupuncture PLLC ("Choice Acupuncture"), and Choi-Go Acupuncture PLLC ("Choi-Go Acupuncture");

(iii)     717 Southern through Edwin Castillo, L.Ac. ("Castillo"), Edcas Acupuncture P.C. ("Edcas Acupuncture"), Peter Kopach, L.Ac. ("Kopach"), and First Alternative PLM Acupuncture P.C. ("First Alternative Acupuncture"); and

(iv)     2451 E. Tremont through Longyu Ma, L.Ac. ("Ma"), Hidden Dragon Acupuncture P.C. ("Hidden Dragon Acupuncture"), Xia Guan, L.Ac. ("Guan"), and Rebound Acupuncture P.C. ("Rebound Acupuncture") (acupuncturists identified in Paragraphs 16(e)(i) through 16(e)(iv) collectively referred to as the "Acupuncture Defendants");

(f)     unnecessary MRIs by providers either owned by Alon or secretly owned and controlled by Moshe, including patients of:

(i)     105-10 Flatlands through Citimedical I, owned on paper by Regina Moshe, M.D. ("Dr. Moshe"), who is Moshe's sister;

(ii)     204-12 Hillside through Citimedical I, owned on paper by Dr. Moshe;

(iii)     717 Southern through Columbus Imaging and Medaid Radiology, owned by Alon; and

(iv)     2451 E. Tremont through Columbus Imaging and Medaid Radiology, owned by Alon (MRI providers identified in Paragraphs 16(f)(i) and 16(f)(iv) collectively referred to as the "MRI Defendants");

(g)     medically unnecessary Supplies, including those provided by Vladimir Nazarov ("Nazarov") and Right Aid Medical Supply Corp. ("Right Aid Medical Supply") (collectively, the "DME Defendants");

(h)     medically unnecessary diagnostic tests, including Outcome Assessment Tests, NCV and EMG Tests, computerized ROM and muscle tests, functional capacity tests, and Pf-NCS Tests;

(i)     medically unnecessary prescription gels and patches; and

(j)     for some patients, pain management and orthopedic consultations followed by procedures performed by Metro Pain at Dynamic Surgery or HealthPlus Surgery in New Jersey (collectively, the "ASC Defendants"), and with anesthesia provided by Citimed Services or Premier Anesthesia.

17.     To further the scheme, Defendants submitted or caused to be submitted to State Farm Mutual and State Farm Fire bills and supporting documents falsely representing the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures

and related services purportedly rendered were medically necessary and reimbursable when, in fact, they were performed to exploit patients' No-Fault Benefits and not because they were medically necessary or reimbursable.

18.     In addition, Citimedical I, Dynamic Surgery, and HealthPlus Surgery submitted or caused to be submitted to State Farm Mutual and State Farm Fire bills and supporting documents falsely representing they were eligible for reimbursement under the No-Fault Laws.   In fact, Citimedical I's MRIs services were rendered by independent contractors, and thus were ineligible for reimbursement, and Citimedical I was at all times owned and controlled by Moshe, a layperson, in violation of New York licensing laws, and thus any charges Citimedical I submitted for any services were ineligible for reimbursement.   Furthermore, Dynamic Surgery and HealthPlus Surgery failed to adhere to licensing requirements governing the operation of ASCs in New Jersey during any period Shapiro served as a nominal medical director.   As a result, any charges submitted for any services when the ASCs did not have true, qualified medical directors fulfilling the duties enumerated by law were ineligible for reimbursement.

19.     As a result of the Predetermined Treatment Protocol and the improper conduct described above:  (a) patients were not legitimately examined, diagnosed, and/or appropriately treated for conditions they may have had; (b) patients were subjected to treatment for conditions they may not have had; and (c) patients' limited No-Fault Benefits were reduced and therefore not available for legitimate treatment they may have needed as a result of their automobile accident.

20.     Defendants' scheme began at least as early as November 2016 and has continued uninterrupted since that time.   As a result of their scheme, State Farm Mutual and State Farm Fire have incurred damages in amounts paid for (a) examinations by Metro Pain; (b) examinations and treatment by the Physical Therapy Defendants; (c) examinations and treatment by the Chiropractor

Defendants; (d) examinations and treatment by the Acupuncture Defendants; (e) MRIs by the MRI Defendants; (f) Supplies ordered by Metro Pain or dispensed by the DME Defendants; (g) diagnostic tests performed by Metro Pain, the Physical Therapy Defendants, and the Chiropractor Defendants; (h) professional fees and facility fees for procedures performed by Metro Pain at the ASC Defendants; (i) all services rendered by Citimedical I, including MRI services rendered by independent contractors; and (j) all services rendered by Dynamic Surgery and HealthPlus Surgery during the period when Shapiro served as a nominal medical director.  Damages total more than $15.4 million.

## II.    JURISDICTION AND VENUE

21.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO"), because they arise under the laws of the United States.  Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state law and declaratory judgment claims because they are so related to the RICO claims as to form part of the same case and controversy.

22.    In addition, pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over State Farm Mutual's and State Farm Fire's claims based on state law and for declaratory relief because the matter is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  Defendants who rendered services at common locations acted in concert pursuant to a common plan to commit the fraud alleged herein and are jointly and severally liable for the damages caused to State Farm Mutual and State Farm Fire in the amount of at least $4.21 million.  Defendants Moshe, Dr. Moshe, and Citimedical I acted in concert pursuant to a common plan to commit the fraud alleged herein and in the Twenty-Fourth and Twenty-Fifth Claims for Relief and are jointly and severally liable for the damages caused to State Farm Mutual and State Farm Fire in the amount of at least $6.46 million.

Defendants Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro acted in concert pursuant to a common plan to commit the fraud alleged herein and in the Twenty-First, Twenty-Second, and Twenty-Third Claims for Relief and are jointly and severally liable for the damages caused to State Farm Mutual and State Farm Fire in the amount of at least $4.74 million.

23.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

## III.     PARTIES

### A.     Plaintiffs

24.     State Farm Mutual is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

25.     State Farm Fire is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

### B.     Defendants

#### 1.     Shapiro and Metro Pain

26.     Shapiro resides in and is a citizen of New Jersey.  He is a licensed anesthesiologist in New York and New Jersey.  Shapiro purportedly owns Metro Pain.  Shapiro is also the owner of numerous other medical and anesthesia professional corporations closely associated with Metro Pain, including Neurological Diagnostics P.C. ("Neurological Diagnostics"), PMR Medical, Premier Anesthesia, Hudson Premier Healthcare Partners LLC, and Tri-Borough NY Medical Practice P.C. ("Tri-Borough Medical").   Shapiro also incorporated and/or has an ownership interest in at least two businesses providing services to attorneys and medical clinics, LegalMDConsult.com LLC ("LegalMDConsult") and Scan to Data LLC ("Scan to Data"). LegalMDConsult describes its services as providing no-fault attorneys with medical documentation to support their cases.  Scan to Data purportedly provides technology services, and

its members include Shapiro and Dimitri Ivanovski ("Ivanovski").  Metro Pain has paid substantial sums to Scan to Data and at least three other entities Ivanovski purportedly owns, including iNJured Magazine LLC ("iNJured Magazine"), which is alleged to have served as a vehicle through which Ivanovski and others conducted an illegal kickback scheme for the referral of patients for medical treatment and attorney services.

27.     Shapiro served as medical director of Excel Surgery after Moshe's initial medical director came under investigation and was ultimately suspended from the practice of medicine, and Shapiro has since served as medical director of Dynamic Surgery and HealthPlus Surgery and Director of Anesthesiology for Hudson Regional.  In addition, in November 2017, Shapiro incorporated Premier Anesthesia, which was the exclusive provider of anesthesia services for procedures performed at Dynamic Surgery and HealthPlus Surgery between July 2018 and August 2020.  Subsequently, Shapiro's PMR Medical became the primary, if not exclusive, provider of anesthesia services at Surgicare and Citimed Surgery.  Shapiro thus profited not only from procedures Metro Pain performed at these ASCs, but also from anesthesia services Premier Anesthesia and PMR Medical performed at these ASCs beginning in at least May 2018.

28.     Metro Pain is a domestic professional corporation organized under the laws of New Jersey with its principal place of business at 790 Bloomfield Avenue, Clifton, NJ.  Metro Pain was formed on January 2, 2012.  Shapiro is the sole original shareholder, director, officer, and incorporator of Metro Pain.  Metro Pain has submitted bills to State Farm Mutual and State Farm Fire for services purportedly performed at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont, as well as procedures performed at the ASC Defendants.

29.     Metro Pain has been involved in soliciting patients through information obtained from motor vehicle accident reports in at least New Jersey.  In particular, between 2013 and 2019,

Ahmed Alkum ("Alkum") regularly submitted record requests for motor vehicle accident reports from various municipalities in New Jersey. The address Alkum identified on many requests, 330-332 Palisade Avenue, Jersey City, NJ, is the same address that appears on Metro Pain checks and is the office address for numerous entities Shapiro owns or controls, including Neurological Diagnostics and Mazal Marketing Inc. ("Mazal Marketing"), a business incorporated by Shapiro's wife in April 2012 (three months after Shapiro formed Metro Pain). Indeed, on some requests for police reports, Alkum identifies Mazal Marketing as the entity on whose behalf he is retrieving the reports. During that same period, Alkum's entity Snokardo LLC received payments from Shapiro's entity Scan to Data, as well as Ivanovski's entities iNJured Magazine, Benico LLC, and Smart Direct LLC.

### 2.    The Physical Therapy Defendants

30.    Hassan resides in and is a citizen of New York. He is a licensed physical therapist in New York. Hassan purportedly owns Nile Rehab PT.

31.    Nile Rehab PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 30 Bay 17th Street, Brooklyn, NY 11214. It was formed on July 31, 2015. Hassan is the sole original shareholder, director, officer, and incorporator of Nile Rehab PT. Nile Rehab PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 105-10 Flatlands.

32.    Khallaf resides in and is a citizen of New York. He is a licensed physical therapist in New York. Khallaf purportedly owns Handy PT.

33.    Handy PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 6768 Clyde Street, Forest Hills, NY 11375. It was formed on September 13, 2017. Khallaf is the sole original shareholder, director, officer, and

incorporator of Handy PT.  Handy PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 105-10 Flatlands.

34.     Shalaby resides in and is a citizen of New York.  He is a licensed physical therapist in New York.  Shalaby purportedly owns Physical Therapy of NY.

35.     Physical Therapy of NY is a domestic professional corporation organized under the laws of New York with its principal place of business at 815 Gravesend Neck Road, Ste. 1B, Brooklyn, NY 11223.  It was formed on November 30, 2017.  Shalaby is the sole original shareholder, director, officer, and incorporator of Physical Therapy of NY.  Physical Therapy of NY has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 204-12 Hillside.

36.     Kataeva resides in and is a citizen of New York.  She is a licensed physical therapist in New York.  Kataeva purportedly owns Cityworks PT.

37.     Cityworks PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 8815 63rd Avenue, Rego Park, NY 11374.  It was formed on March 12, 2019.  Kataeva is the sole original shareholder, director, officer, and incorporator of Cityworks PT.  Cityworks PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 105-10 Flatlands and 204-12 Hillside.

38.     Barakat resides in and is a citizen of New York.  He is a licensed physical therapist in New York.  Barakat purportedly owns Barakat PT.

39.     Barakat PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 3702 Shore Pkwy, Apt. 1, Brooklyn, NY 11235.  It was formed on February 9, 2016.  Barakat is the sole original shareholder, director, officer, and

incorporator of Barakat PT.  Barakat PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 717 Southern.

40.     Elmandouh resides in and is a citizen of New York.  He is a licensed physical therapist in New York.  Elmandouh purportedly owns Protection PT.

41.     Protection PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 4226 Third Ave., Bronx, NY 10457.  It was formed on March 30, 2010.  Elmandouh is the sole original shareholder, director, officer, and incorporator of Protection PT.  Protection PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 717 Southern.

42.     Akl resides in and is a citizen of New York.  He is a licensed physical therapist in New York.  Akl purportedly owns Primavera PT.

43.     Primavera PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 245 Atlantic Ave., Apt. 182, Long Branch, NJ 07740.  It was formed on December 12, 2016.  Akl is the sole original shareholder, director, officer, and incorporator of Primavera PT.  Primavera PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 717 Southern.

44.     Elmansy resides in and is a citizen of New York.  He is a licensed physical therapist in New York.  Elmansy purportedly owns Sky Limit PT.

45.     Sky Limit PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 8523 Fort Hamilton Pkwy., Apt. 3F, Brooklyn, NY 11209.  It was formed on December 18, 2015.  Elmansy is the sole original shareholder, director, officer, and incorporator of Sky Limit PT.  Sky Limit PT has submitted bills to State Farm

Mutual and State Farm Fire for physical therapy services purportedly performed at 2451 E. Tremont.

46.     Cushman resides in and is a citizen of New York.  He is a licensed physical therapist in New York.  Cushman purportedly owns PI PT.

47.     PI PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 45-11 158th Street, Flushing, NY 11358.  It was formed on February 2, 2015.  Cushman is the sole original shareholder, director, officer, and incorporator of PI PT.  PI PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 2451 E. Tremont.

48.     Paller resides in and is a citizen of New York.  He is a licensed physical therapist in New York.  Paller purportedly owns Floral Park PT.

49.     Floral Park PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 51 Atlantic Ave., 3rd Fl., Ste. 317, Floral Park, NY 11001.  It was formed on August 19, 2016.  Paller is the sole original shareholder, director, officer, and incorporator of Floral Park PT.  Floral Park PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 2451 E. Tremont.

50.     Patel resides in and is a citizen of New Jersey.  He is a licensed physical therapist in New York.  Patel purportedly owns AM Patel PT.

51.     AM Patel PT is a domestic professional corporation organized under the laws of New York with its principal place of business at 16 Sumner Place, Brooklyn, NY 11206.  It was formed on December 15, 2014.  Patel is the sole original shareholder, director, officer, and

incorporator of AM Patel PT.  AM Patel PT has submitted bills to State Farm Mutual and State Farm Fire for physical therapy services purportedly performed at 2451 E. Tremont.

### 3.    The Chiropractor Defendants

52.    Luna resides in and is a citizen of New York.  He is a licensed chiropractor in New York.  Luna purportedly owns Kings Chiropractic.

53.    Kings Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 105-10 Flatlands.  It was formed on July 13, 2017.  Luna is the sole original shareholder, director, officer, and incorporator of Kings Chiropractic.  Kings Chiropractic has submitted bills to State Farm Mutual and State Farm Fire for chiropractic services purportedly performed at 105-10 Flatlands.

54.    Park resides in and is a citizen of New York.  He is a licensed chiropractor in New York.  Park purportedly owns All About Chiropractic and J Park Chiropractic.

55.    All About Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 204-12 Hillside.  It was formed on September 14, 2017.  Park is the sole original shareholder, director, officer, and incorporator of All About Chiropractic.  All About Chiropractic has submitted bills to State Farm Mutual and State Farm Fire for chiropractic services purportedly performed at 204-12 Hillside.

56.    J Park Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 204-12 Hillside.  It was formed on June 11, 2016.  Park is the sole original shareholder, director, officer, and incorporator of J Park Chiropractic.  J Park Chiropractic has submitted bills to State Farm Mutual and State Farm Fire for chiropractic services purportedly performed at 204-12 Hillside.

57.    Caruso resides in and is a citizen of New York.  He is a licensed chiropractor in New York.  Caruso purportedly owns Brook Chiropractic and Integrated Chiropractic.

58.     Brook Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 951 Brook Avenue, Ste. 203, Bronx, NY 10451. It was formed on December 9, 2016.  Caruso is the sole original shareholder, director, officer, and incorporator of Brook Chiropractic.  Brook Chiropractic has submitted bills to State Farm Mutual and State Farm Fire for chiropractic services purportedly performed at 717 Southern.

59.     Integrated Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 1 Maiden Lane, 5th Fl., New York, NY 10038.  It was formed on June 14, 2017.  Caruso is the sole original shareholder, director, officer, and incorporator of Integrated Chiropractic.  Integrated Chiropractic has submitted bills to State Farm Mutual and State Farm Fire for chiropractic services purportedly performed at 717 Southern.

60.     Albis resides in and is a citizen of New York.  He is a licensed chiropractor in New York.  Albis purportedly owns PDA Chiropractic.

61.     PDA Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 57 Thistle Lane, Hopewell Junction, NY 12533. It was formed on May 3, 2016.  Albis is the sole original shareholder, director, officer, and incorporator of PDA Chiropractic.  PDA Chiropractic has submitted bills to State Farm Mutual and State Farm Fire for chiropractic services purportedly performed at 717 Southern.

62.     Scarborough resides in and is a citizen of New York.  He is a licensed chiropractor in New York.  Scarborough purportedly owns AOT Chiropractic.

63.     AOT Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 2 Prospect Street, Saugerties, NY 12477.  It was formed on December 5, 2006.  Scarborough is the sole original shareholder, director, officer, and incorporator of AOT Chiropractic.  AOT Chiropractic has submitted bills to State Farm Mutual

and State Farm Fire for chiropractic services purportedly performed at 717 Southern and 2451 E. Tremont.

64.     Evolution Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 2 Prospect Street, Saugerties, NY 12477. It was formed on June 28, 2004.  Scarborough is the sole original shareholder, director, officer, and incorporator of Evolution Chiropractic.  Evolution Chiropractic has submitted bills to State Farm Mutual and State Farm Fire for chiropractic services purportedly performed at 2451 E. Tremont.

### 4.     The Acupuncture Defendants

65.     Moon resides in and is a citizen of New York.  She is a licensed acupuncturist in New York.  Moon purportedly owns SJM Acupuncture.

66.     SJM Acupuncture is a domestic professional corporation organized under the laws of New York with its principal place of business at 149-15 25th Ave., Apt. 1A, Whitestone, NY 11357.  It was formed on March 16, 2017.  Moon is the sole original shareholder, director, officer, and incorporator of SJM Acupuncture.  SJM Acupuncture has submitted bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 105-10 Flatlands.

67.     Krupnova resides in and is a citizen of New York.  She is a licensed acupuncturist in New York.  Krupnova purportedly owns LK Acupuncturist.

68.     LK Acupuncturist is a domestic professional corporation organized under the laws of New York with its principal place of business at 2621 Brown Street, Apt. 1, Brooklyn, NY 11235.  It was formed on February 5, 2019.  Krupnova is the sole original shareholder, director, officer, and incorporator of LK Acupuncturist.  LK Acupuncturist has submitted bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 105-10 Flatlands.

69.     Choi resides in and is a citizen of New Jersey.  He is a licensed acupuncturist in New York.  Choi purportedly owns Choice Acupuncture and Choi-Go Acupuncture, which rendered acupuncture services to patients at 204-12 Hillside.  Choi also owns nonparty Choi Acupuncture P.C. ("Choi Acupuncture"), through which he rendered acupuncture treatment to patients at 204-12 Hillside prior to Metro Pain becoming a gatekeeper at that location.

70.     Choice Acupuncture is a domestic professional limited liability corporation organized under the laws of New York with its principal place of business at 105-10 Flatlands.  It was formed on February 14, 2017.  Choi is the sole original shareholder, director, officer, and incorporator of Choice Acupuncture.  Choice Acupuncture has submitted bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 204-12 Hillside.

71.     Choi-Go Acupuncture is a domestic professional limited liability corporation organized under the laws of New York with its principal place of business at 204-12 Hillside.  It was formed on August 14, 2019.  Choi is the sole original shareholder, director, officer, and incorporator of Choi-Go Acupuncture.  Choi-Go Acupuncture has submitted bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 204-12 Hillside.

72.     Kopach resides in and is a citizen of New York.  He is a licensed acupuncturist in New York.  Kopach purportedly owns First Alternative Acupuncture.

73.     First Alternative Acupuncture is a domestic professional corporation organized under the laws of New York with its principal place of business at 379 Kings Highway, Apt. 2A, Brooklyn, NY 11223.  It was formed on May 29, 2007.  Kopach is the sole original shareholder, director, officer, and incorporator of First Alternative Acupuncture.  First Alternative Acupuncture has submitted bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 717 Southern.

74.     Castillo resides in and is a citizen of New York.  He is a licensed acupuncturist in New York.  Castillo has submitted bills to State Farm Mutual and State Farm Fire under his individual social security number for acupuncture services purportedly performed at 717 Southern. Castillo is also the purported owner of Edcas Acupuncture.

75.     Edcas Acupuncture is a domestic professional corporation organized under the laws of New York with its principal place of business at 772 9th Ave., Apt. 2N, New York, NY 10019. It was formed on March 13, 2019.  Castillo is the sole original shareholder, director, officer, and incorporator of Edcas Acupuncture.  Edcas Acupuncture has submitted bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 717 Southern.

76.     Ma resides in and is a citizen of New York.  He is a licensed acupuncturist in New York.  Ma purportedly owns Hidden Dragon Acupuncture.

77.     Hidden Dragon Acupuncture is a domestic professional corporation organized under the laws of New York with its principal place of business at 4532 Smart St., Fl. 1, Flushing, NY 11355.  It was formed on March 17, 2017.  Ma is the sole original shareholder, director, officer, and incorporator of Hidden Dragon Acupuncture.  Hidden Dragon Acupuncture has submitted bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 2451 E. Tremont.

78.     Guan resides in and is a citizen of New York.  He is a licensed acupuncturist in New York.  Guan purportedly owns Rebound Acupuncture.

79.     Rebound Acupuncture is a domestic professional corporation organized under the laws of New York with its principal place of business at 41-05 College Point Blvd., Apt. 7A, Flushing, NY 11355.  It was formed on October 10, 2017.  Guan is the sole original shareholder, director, officer, and incorporator of Rebound Acupuncture.  Rebound Acupuncture has submitted

bills to State Farm Mutual and State Farm Fire for acupuncture services purportedly performed at 2451 E. Tremont.

### 5.    The MRI Defendants

80.    Alon resides in and is a citizen of New Jersey.  He is neither a physician nor a radiologist.  Alon purportedly owns Columbus Imaging and Medaid Radiology.  Alon is a cousin, and business associate of Moshe.  Alon also owns nonparty Beshert, a purported advertising and marketing company to which Metro Pain has made substantial payments.

81.    Columbus Imaging is a domestic limited liability corporation organized under the laws of New Jersey with its principal place of business at 481 N. 13th Street, Newark, NJ 07107. When Columbus Imaging was formed on July 23, 2009, Alon and Shoshana Chanimov each held a 50% interest in the company.  In or about 2014, Alon acquired a 100% ownership interest. Columbus Imaging has submitted bills to State Farm Mutual and State Farm Fire for MRI services purportedly performed for patients Metro Pain treated at 2451 E. Tremont and 717 Southern.

82.    Medaid Radiology is a domestic limited liability corporation organized under the laws of New Jersey with its principal place of business at 481 N. 13th Street, Newark, NJ 07107. Alon formed Medaid Radiology on June 13, 2018.  On August 1, 2018, Alon caused Columbus Imaging and Medaid Radiology to enter into a Bill of Sale and Assignment Agreement pursuant to which Columbus Imaging transferred and assigned all of its assets to Medaid Radiology except for its cash and accounts receivable.  Columbus Imaging also transferred its facility license to Medaid Radiology.  Thus, Medaid Radiology and Columbus Imaging (a) are owned by Alon, (b) used and/or are using the same MRI equipment, (c) operated and/or operate at the same physical address, (d) operated and/or operate under the same facility license issued by NJDOH, and (e) performed and/or perform the same MRI services.  Medaid Radiology has submitted bills to State

Farm Mutual and State Farm Fire for MRI services purportedly performed for patients Metro Pain treated at 2451 E. Tremont and 717 Southern.

83.     Dr. Moshe resides in and is a citizen of New York.  She is a physician licensed in New Jersey on March 26, 2012, and licensed in New York on September 25, 2012.  Dr. Moshe purportedly owns Citimedical I, Citimed Services, Citimedical Services, and Citimed Complete. She is also Moshe's sister.

84.     Moshe resides in and is a citizen of New York.  Moshe is not a licensed physician or other health care professional.  He is Dr. Moshe's brother.  At all relevant times, Moshe effectively owned, controlled, and was in a position to derive economic benefit from Citimedical I, Citimed Services, Citimedical Services, and Citimed Complete.  Moshe also owns ASCs Excel Surgery, Dynamic Surgery, HealthPlus Surgery, and Surgicare, as well as Hudson Regional.

85.     Citimedical I is a domestic professional limited liability corporation organized under the laws of New York with its principal places of business at 1963 Grand Concourse, Bronx, NY 10453.  While Dr. Moshe is the paper owner of Citimedical I, she unlawfully permitted Moshe to use her license to submit, or cause to be submitted, bills to State Farm Mutual and State Farm Fire for MRI services purportedly performed for patients Metro Pain treated at 105-10 Flatlands and 204-12 Hillside.  Indeed, Dr. Moshe admitted in an examination under oath ("EUO") that Moshe owned three buildings out of which Citimedical I operated, arranged and paid for construction necessary to prepare one location for operation, owned the MRI and CAT equipment used by Citimedical I for radiology services, and collected $50,000 each month from Citimedical I in purported rent, equipment leasing, and financing payments.

### 6.     The ASC Defendants

86.     Dynamic Surgery is a New Jersey limited liability corporation organized under the laws of New Jersey with its principal place of business at 321 Essex Street, Hackensack, NJ 07601.

It was formed on or about November 23, 2016.  Moshe and his wife Margarita Moshe purportedly own Dynamic Surgery.  Dynamic Surgery has submitted bills to State Farm Mutual and State Farm Fire for services purportedly performed for patients Metro Pain treated at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont.

87.     HealthPlus Surgery is a New Jersey limited liability corporation organized under the laws of New Jersey with its principal place of business at 190 Midland Avenue, Saddle Brook, NJ 07026.  It was formed on or about August 25, 2016.  Moshe and Margarita Moshe purportedly own HealthPlus Surgery.  HealthPlus Surgery has submitted bills to State Farm Mutual and State Farm Fire for services purportedly performed for patients Metro Pain treated at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont.

### 7.     The DME Defendants

88.     Nazarov resides in and is a citizen of New York.  He is not a licensed physician or other health care professional.  Nazarov purportedly owns Right Aid Medical Supply.

89.     Right Aid Medical Supply is a New York corporation organized under the laws of New York with its principal place of business at 777 Westchester Ave., Ste. 101, White Plains, NY 10604.  Right Aid Medical Supply was formed on or about August 20, 2008, and is owned by Nazarov.  Right Aid Medical Supply has submitted bills to State Farm Mutual and State Farm Fire for Supplies purportedly provided to patients Metro Pain treated at 2451 E. Tremont.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.    The New York No-Fault Laws

#### 1.    Claims for Payment Under the No-Fault Laws

90.     State Farm Mutual and State Farm Fire underwrite automobile insurance in New York.

91.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, *et seq.*) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, *et seq.*) (collectively, the "No-Fault Laws"), automobile insurers are required to provide No-Fault Benefits to insureds.

92.     No-Fault Benefits include up to $50,000 per insured for necessary expenses incurred for healthcare goods and services.

93.     An insured can assign his or her right to No-Fault Benefits to healthcare providers in exchange for those services.  Pursuant to a duly executed assignment, providers may submit claims directly to insurance companies and receive payment for medically necessary services.

94.     New York has established fee schedules for reimbursement of healthcare services under the No-Fault Laws.  11 N.Y.C.R.R. § 68.1(a).  Charges for services may not exceed the charges permissible under the schedules prepared and established by the Chair of the New York Workers' Compensation Board for industrial accidents — *i.e.*, the Workers' Compensation Board Fee Schedules.  11 N.Y.C.R.R. § 68.1(b).

95.     Pursuant to Section 403 of the New York State Insurance Law, the verification of treatment form submitted by healthcare providers to State Farm Mutual, State Farm Fire, and all other insurers must be signed by the healthcare providers subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

### 2.     The No-Fault Laws Prohibit Ownership of Professional Service Corporations by Unlicensed Laypersons

96.     The New York Legislature has established a comprehensive statutory framework, including the Business Corporation, Education, and Public Health Laws, to ensure professional

healthcare services are rendered only by individuals who are duly licensed to practice those professions and that such individuals are employed only by entities that are themselves lawfully licensed or otherwise legally authorized to provide such services.  This legal framework bars individuals who are not subject to state professional licensing requirements and ongoing regulatory oversight from controlling, exercising undue influence over, or deriving economic benefit from the practice of a profession.

97.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they are fraudulently incorporated.  In New York, only a licensed healthcare professional may practice an applicable healthcare profession; own and control a professional service corporation authorized to practice healthcare services including medicine, chiropractic, acupuncture, and physical therapy; employ and supervise other healthcare professionals; and, absent statutory exceptions, derive economic benefit from the services.

98.     Recognizing the fundamental importance of these laws prohibiting the corporate practice of medicine in safeguarding the public health, safety, and welfare, the New York Legislature has made it a felony offense for anyone to deliberately circumvent these laws, as well as an act of professional misconduct for any licensed individual or professional service corporation to do so.  *See* N.Y. Bus. Corp. Law §§ 1203(b), 1503(b), 1507, 1508, 1511; N.Y. Educ. Law §§ 6507(4)(c), 6512, 6530(1) & (21); 8 N.Y.C.R.R. § 29.1(b)(6); Penal Law Article 175; N.Y. Ltd. Liab. Co. Law § 1201 *et seq.*

99.     Consistent with the public policies underlying New York's ban on the corporate practice of medicine, the No-Fault Laws also prohibit professional corporations that are secretly owned and controlled by laypersons from receiving No-Fault Benefits for professional health services.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

### 3.     The No-Fault Laws Prohibit Kickbacks

100.     Under New York law, it is unlawful for any physician, chiropractor, acupuncturist, or physical therapist, directly or indirectly, to offer, give, solicit, receive, or agree to receive any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services.  *See* N.Y. Educ. Law § 6530(18); 8 N.Y.C.R.R. § 29.1(b)(3).

101.     Under New York law, it is unlawful for a licensed physician, chiropractor, acupuncturist, or physical therapist to exercise undue influence on a patient, including the promotion or sale of goods or services in such a manner as to exploit the patient for the financial gain of the physician or of a third party.  *See* N.Y. Educ. Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

102.     Under New York law, it is unlawful for a physician, chiropractor, acupuncturist, or physical therapist to share professional fees, including arrangements involving payments for space, facilities, equipment, or personal services, where the payment amounts are dependent upon the income or receipts of the licensee from such practice.  *See* N.Y. Educ. Law § 6530(19); 8 N.Y.C.R.R. § 29.1(b)(4).

### 4.     The No-Fault Laws Prohibit Financial Arrangements and Referrals

103.     Under New York Public Health Law Section 238-a, a practitioner authorized to order physical therapy, MRIs, laboratory services, and prescription drugs may not make a referral for such goods or services to a healthcare provider authorized to provide them where such practitioner has a financial relationship with such healthcare provider.  *See* N.Y. Pub. Health Law § 238(6) (the term "'Health care provider' shall mean a practitioner in an individual practice, group practice, partnership, professional corporation or other authorized form of association, . . . and any other purveyor of health or health related items or services including but not limited to . . . a

physiological laboratory, a pharmacy, a purveyor of x-ray or imaging services, a purveyor of physical therapy services, [or] a purveyor of health or health related supplies, appliances or equipment . . . ."); 10 N.Y.C.R.R. § 34-1.3 (prohibiting referral for pharmacy or radiation therapy services pursuant to financial relationship).  A prohibited financial relationship includes a rental or lease agreement for office space with a healthcare provider that fails to meet any of the following criteria:  (a) the agreement be in writing, (b) signed by the parties, (c) specifies the space covered under the agreement, (d) the space is dedicated for the use of the lessee, (e) for a term of rental or lease of at least one year, (f) provides for an amount of aggregate payments that is not in excess of fair market value and does not vary directly or indirectly based on the volume or value of any referrals or business between the parties, and (g) would be commercially reasonable even if no referrals were made between the parties.  *See* N.Y. Pub. Health Law §§ 238(3), 238-a(5)(b).

104.    Under New York law, it is unlawful for a physician, chiropractor, or physical therapist to make a referral for certain services to a healthcare provider where the physician or chiropractor has a compensation arrangement with the healthcare provider that either exceeds fair market value or that provides compensation that varies directly or indirectly on the value of referrals without disclosing the relationship to the patient.  *See id.* § 238-d(1)(b).  Any disclosure must not only reveal to the patient the existence of the financial relationship, but must also inform the patient of her right to use a "specifically identified alternative" healthcare provider.  *See id.* § 238-d(2).  Any violation of Public Health Law Section 238-d by physicians also constitutes professional misconduct under New York Education Law Section 6530(48).

**5.    Services Rendered in Violation of New York Law Are Not Reimbursable**

105.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), states in relevant part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

106.    Thus, if any Defendant violated any of the licensing laws described above in connection with the services at issue in the claims described herein, then such Defendant would be ineligible for reimbursement under the No-Fault Laws, and under the circumstances, it would be unlawful and inequitable to allow such Defendant or person who was a party to such arrangement to retain any benefits from such arrangement. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

### 6.    Reimbursement for Services Rendered in New Jersey

107.    Prior to January 23, 2018, providers rendering treatment under a New York automobile insurance policy outside of New York State were permitted to bill at the prevailing fee in the geographic location of the health provider.  In May 2017, the New York Department of Financial Services ("NYDFS") announced amendments to the No-Fault Laws to limit out-of-state charges for medical treatment rendered pursuant to a New York automobile insurance policy. These amendments, which became effective on January 23, 2018, limited such out-of-state treatment to the lowest of (a) the amount of the fee in the region in New York State that has the highest applicable amount in the fee schedule for that service; (b) the amount charged by the provider; or (c) the prevailing fee in the geographic location of the provider.  *See* 11 N.Y.C.R.R. 68.6(b).  The "prevailing fee" is defined as "the amount prescribed in that jurisdiction's fee schedule."  11 N.Y.C.R.R. 68.6(c).

108.    As NYDFS explained, these amendments were promulgated to "address the ongoing exploitation of New York's no-fault system by out-of-state providers who, taking advantage of current provisions in the regulation, submit grossly inflated bills for services rendered, thus quickly depleting the $50,000 no-fault coverage limit available to an eligible injured

party."  N.Y. Dep't of Fin. Servs. Assessment of Public Cmts. to 33rd Amend. to 11 N.Y.C.R.R. 68.

### B. Relationships Between and Among Shapiro, Alon, Moshe, and Providers at Clinic Locations Further the Scheme to Defraud

#### 1. Metro Pain's Formation and Operation as Gatekeeper at Clinic Locations

##### a. Metro Pain's Formation and Method of Operations

109.    From at least its formation in 2012 until approximately late 2016, Metro Pain provided pain management services primarily on a transient basis, treating patients at numerous clinics throughout the New York area that catered to individuals injured in automobile accidents. Generally, it provided pain management consultations, determined patients would benefit from injections, and then performed epidural steroid injections or facet injections on patients at Excel Surgery.  In order to obtain patients, Metro Pain and Shapiro entered into financial arrangements with providers at the clinics and others, including arrangements disguised as rent.

110.    Shapiro did not treat the patients himself.  Rather, Metro Pain and Shapiro hired physicians, directed them to travel to specific clinics on specific days to perform consultations, and then directed them to perform injections and related procedures on patients at the ASCs.  As Shapiro testified in an EUO, Metro Pain's practice "Administrator" coordinated with Metro Pain doctors and clinics to determine which days doctors appeared to perform consultations.  According to Metro Pain, neither its pain management doctors nor its orthopedists performed any procedures at the clinic locations — only consultations and evaluations.

111.    Leveraging the financial and business relationships it developed during its time as a transient provider of pain management and orthopedic services in New York, and commensurate with Moshe expanding his ASC network to include Dynamic Surgery and HealthPlus Surgery, beginning in late 2016, Metro Pain transitioned from providing services on a transient basis to a

full-time basis at certain clinic locations.  In these instances, Metro Pain typically entered into a lease agreement for control of the space and either assumed or entered into subleases with other providers for the use of space to treat patients.  At these locations, Metro Pain serves as the "gatekeeper," in that it examines patients and has the ability to prescribe and refer those patients for additional treatment.  Providers who enter into sublease agreements with Metro Pain do so because the purported "rent" payments are actually payments made in exchange for the referral of patients for treatment to be performed by the subleasing provider.

112.    Metro Pain admits to operating as a gatekeeper at locations it controls, deciding what care is provided and who will provide that care based on financial arrangements with providers.  Shapiro himself testified in an EUO that Metro Pain staffs its locations with "general practitioners who see patients initially and [during] follow-ups, so they provide general medical services.  They are gatekeepers who refer patients as necessary for conservative treatment, physical therapy, acupuncture, [and] chiropractors.  They also refer patients.  They look at the MRIs, EMG results, all tests and studies.  Send [the patients] to an orthopedic consultation, pain management consultation and so forth and so on."  Shapiro describes the arrangements with other providers at the clinics as involving payment for providers' "use of the premises, the tables, the waiting room, everything and anything, but basically they are there to see our patients and to provide services."  According to Shapiro, Metro Pain staffs its "gatekeeper" locations with medical doctors three days a week and pain management and orthopedists twice a month, which is "pretty much the rule for most offices where we cover all services."

113.    When sublessees who render conservative care do not renew their sublease with Metro Pain or vacate a location for some other reason, Shapiro testified that it is his

"responsibility" to find new healthcare providers to fill that space, which he does by consulting his contacts at other offices and locations.

### b.       Metro Pain's Operations at Four Clinic Locations

114.     Among the addresses at which Metro Pain operates or has operated as a gatekeeper are 105-10 Flatlands, 204-12 Hillside, 2451 E. Tremont, and 717 Southern.  Metro Pain purports to operate and control each of these locations, render predetermined examinations and testing to justify additional treatment and services, and decide what additional care patients require and who would provide it.  Providers perform those additional services not because they are necessary, but pursuant to financial arrangements with Metro Pain and others with whom Metro Pain works and/or has financial arrangements

### i.       105-10 Flatlands

115.     Since December 2017, Metro Pain has operated as a gatekeeper at 105-10 Flatlands.

116.     Even before Metro Pain became the gatekeeper at 105-10 Flatlands, patient care at the location was determined not by patient need, but by financial relationships and at the direction of nonphysician laypersons.  Prior to December 2017, medical services were rendered through Starrett City Medical P.C. ("Starrett City"), which was owned on paper by Azu Ajudua M.D. ("Dr. Ajudua").  The location was in fact secretly owned and controlled by laypersons, including Peter Khaim ("Khaim") and his associates Aleksandr Gulkarov ("Gulkarov") and Roman Israilov ("Israilov").  A Khaim-owned company leased the building from owner 105 Flatlands LLC and collected enormous sums from Starrett City as purported "rent."  Starrett City also paid significant sums to companies owned by Khaim, Gulkarov, Israilov, their family members, and others, and Dr. Ajudua testified in a September 2019 deposition that these payments were made without his knowledge or permission.  After receiving proceeds from Starrett City, Gulkarov and Israilov diverted them to shell companies owned or controlled by Khaim and others.  No documents reflect

any goods or services these shell companies provided in exchange for the enormous sums they received. Dr. Ajudua further testified in deposition that Gulkarov was the office administrator who "took care of practically almost everything" at the clinics, including supervising the non-healthcare professionals, hiring office staff, working with the accountant, maintaining the ledgers, and presenting checks to Dr. Ajudua for his signature. Israilov supervised the front desk and "ma[de] sure that everything is being done." Gulkarov's and Israilov's wives, sisters Regina (Gulkarov's wife) and Viktoria (Israilov's wife) Shakarova, worked the front desk and helped with billing at the clinics. A doctor who worked at 105-10 Flatlands, Dr. Andre Duhamel ("Dr. Duhamel"), swore in an affidavit dated March 28, 2017, that he was installed as a physician at 105-10 Flatlands by "Peter" [*i.e.*, Khaim], who arranged for him to treat patients at that location. Dr. Duhamel stated in his affidavit that the "staff" at 105-10 Flatlands directed him to render treatment to patients that he had never prescribed before working at the clinic, including prescribing specific medications.

117. As early as June 2015, Metro Pain examined patients at 105-10 Flatlands one or two days each month for possible pain management procedures. Metro Pain generally referred patients for pain management injections performed at Moshe-owned ASCs in New Jersey. Metro Pain obtained access to these patients not because they needed pain management consultations, but pursuant to financial relationships with those who controlled 105-10 Flatlands at the time. Metro Pain executed a "licensing agreement" with Starrett City pursuant to which it purported to lease a "portion of the building . . . located at 10510 Flatland Ave, Brooklyn" for $1,000 per month. This payment was actually for patient referrals, and any sums paid to Starrett City were not for the benefit of Dr. Ajudua, but siphoned to the laypeople who secretly owned and controlled Starrett City (*i.e.*, Khaim and his associates).

118.     In early 2018, the State of New York charged Dr. Ajudua with two criminal counts of grand larceny for submitting claims to New York Medicaid programs for medically unnecessary services and for fraudulently referring patients for diagnostic and other services in exchange for kickbacks.  Dr. Ajudua pleaded guilty to these charges in May 2018, and surrendered his license to practice medicine in June 2018.

119.     On December 1, 2017, Dr. Ajudua ceased practicing medicine and transferred his Starrett City medical practice to Metro Pain, including the medical records of all patients who had received treatment at Starrett City.  Neither Metro Pain nor Shapiro provided any compensation to Dr. Ajudua for this acquisition.  Metro Pain also assumed control of the physical space at 105-10 Flatlands.  In January 2018, Metro Pain entered into a written lease agreement with 105 Flatlands LLC providing for monthly rental payments of approximately $8,700 during the first year, approximately $9,000 during the second year, approximately $9,300 during the third year, and approximately $9,500 during the fourth year.  Starrett City's front desk personnel, Viktoria Shakarova (Israilov's wife) and David Davidov ("Davidov"), continued working at 105-10 Flatlands as office managers when Metro Pain acquired Dr. Ajudua's medical practice.

120.     When Metro Pain assumed control of the space at 105-10 Flatlands, providers who had been operating there either reorganized their corporate existence or moved out and were replaced by others.  For example, Luna had been rendering chiropractic care at 105-10 Flatlands through Flatlands Chiropractic Wellness P.C.  That entity treated its last patient at 105-10 Flatlands on November 30, 2017, when Luna formed a new entity, Kings Chiropractic, and Luna began treating patients at 105-10 Flatlands through Kings Chiropractic.  At about the same time, the physical therapist who had been treating patients at 105-10 Flatlands stopped treating patients, and a new provider, Hassan and his entity Nile Rehab PT, began treating patients on December 4,

2017.  There was no legitimate reason why Luna would need to form a new corporate entity to continue to treat patients or why the physical therapy provider would change simply because a new medical provider, Metro Pain, took control of 105-10 Flatlands.

121.    Rather, the timing of these changes reflects Metro Pain's transition to gatekeeper at the location.  In particular, while prior entities may have had financial arrangements with Starrett City, new providers could enter into new, different relationships with Metro Pain.  Moreover, creating new entities through which treatment could be rendered and billed and substituting providers was part of the scheme in that it permitted new providers to render treatment free and clear of insurers' challenges to prior providers' claims submitted before Metro Pain became gatekeeper.  The changes also reduced the number of claims submitted by any one provider, which helped each provider avoid detection and conceal the scheme.

122.    As part of its control, Metro Pain entered into arrangements with providers who sought to treat patients at 105-10 Flatlands whereby providers paid kickbacks for patient referrals.  Some arrangements were disguised as rent payments pursuant to leases for the purported use of space.  At least Nile Rehab PT, Kings Chiropractic, Northern Medical Care P.C. ("Northern Medical"), and Spine Care of NJ P.C. ("Spine Care") purported to enter into License Agreements with Metro Pain for the use of space at 105-10 Flatlands.  The form of each agreement is identical, and the forms of these agreements were, in fact, identical to the form of lease Metro Pain entered into with Starrett City when the location was directly controlled by Khaim and his associates.  That this form of lease was simply reused is reflected in the fact the "licensee" or tenant on each lease is identified as Metro Pain, even though Metro Pain had become the lessor to Nile Rehab PT, Kings Chiropractic, Northern Medical, and Spine Care, and thus should have been identified as the "licensor" on these agreements.  The License Agreements granted to Nile Rehab PT, Kings

Chiropractic, Northern Medical, and Spine Care the "right to license a portion of the Building including an examining room located in the Leased Premises and currently occupied by the Licensee on an exclusive basis and for those periods delineated on Schedule 'A' attached hereto."

123.    While providers purportedly paid rent to use the space, licensing agreements reveal those payments were actually for patient referrals.  Nile Rehab PT's agreement describes the fee explicitly as "$1500 for ROM [range of motion] Testing, $1500 for Functional Capacity [Testing], $1500 rent for PT" (*i.e.*, $4,500 total rent each month).  King Chiropractic's agreement provided for $1,500 per month, Northern Medical for $1,500 per month, and Spine Care for $500 per month.[1]  These four License Agreements entitled Metro Pain to payments totaling $8,000 per month, but there is no indication these sums represent all amounts these and other providers paid to Metro Pain.  Rather, billing records reflect 10 other healthcare providers rendered services to Metro Pain patients at 105-10 Flatlands in 2018, including defendant SJM Acupuncture.  Even if the $8,000 per month was the total rent all providers paid to Metro Pain, Metro Pain only paid monthly rent of about $8,700 during its first year for the entire space, and thus Metro Pain would have received as purported "rent" from providers amounts close to, and almost certainly well in excess of, its monthly rental obligations to the property owner.  As a result, there can be no question that providers' payments to Metro Pain were not tied to the fair market value of space, but rather were for patient referrals.

124.    Even after Metro Pain became the gatekeeper at 105-10 Flatlands, Khaim and his associates continued to play a role and there may have been arrangements between Metro Pain and

---

[1] Although Spine Care and Northern Medical utilized the space at 105-10 Flatlands for the approximate same number of days each month, Spine Care likely paid less in rent than Northern Medical because it operated for a singular purpose:  examining and referring patients for manipulation under anesthesia to be performed at Moshe's Dynamic Surgery and HealthPlus Surgery.  Northern Medical did not perform any services at Moshe's ASCs and typically charged thousands of dollars for the services it rendered to each Metro Pain patient on a single date.

Khaim and his associates concerning activity at 105-10 Flatlands. For example, nine months after Metro Pain acquired Dr. Ajudua's practice, Khaim wired $9,300 to Davidov who was serving as Metro Pain's office manager. Similarly, after Metro Pain became the gatekeeper at 105-10 Flatlands, Luna's new chiropractic entity, Kings Chiropractic, not only made payments to Metro Pain but also to Khaim, Gulkarov, and Israilov.

### ii.    204-12 Hillside

125.    Since December 2017, Metro Pain has operated as a gatekeeper at 204-12 Hillside.

126.    Even before Metro Pain became the gatekeeper at 204-12 Hillside, patient care at the location was determined not by patient need, but by financial relationships and at the direction of nonphysician, laypersons. Prior to December 2017, medical services were rendered through Hillcrest Medical Care P.C. ("Hillcrest Medical"), which Dr. Ajudua owned on paper. The location was in fact secretly owned and controlled by laypersons, including Khaim and his associates Gulkarov, Israilov, and Viktoria Shakarova. Hillcrest Medical paid significant sums to companies owned by Khaim, Gulkarov, Israilov, Viktoria Shakarova, their family members, and others, and Dr. Ajudua testified in a September 2019 deposition these payments were made without his knowledge or permission. After receiving proceeds from Hillcrest Medical, Gulkarov and Israilov diverted them to shell companies owned or controlled by Khaim and others. No documents reflect any goods or services these companies provided in exchange for the enormous sums they received. As at Starrett City, Gulkarov was the office administrator who took care of everything, Israilov supervised the front desk, and Gulkarov's and Israilov's wives, sisters Regina Shakarova (Gulkarov's wife) and Viktoria Shakarova (Israilov's wife), worked the front desk and helped with billing at the clinics.

127.    As early as March 2016, Metro Pain examined patients at 204-12 Hillside one or two days each month for possible pain management procedures. Metro Pain generally referred

patients for pain management injections that it performed at Moshe-owned ASCs located in New Jersey. Metro Pain obtained access to these patients not because they needed pain management consultations, but pursuant to financial relationships with those who controlled 204-12 Hillside Flatlands at the time. Metro Pain executed a "licensing agreement" with Hillcrest Medical pursuant to which it purported to lease a "portion of the building . . . located at 204-12 Hillside Ave., Hollis, New York" for $1,000 per month. This payment was actually for patient referrals, and any sums paid to Hillcrest Medical were not for the benefit of Dr. Ajudua, but siphoned to the laypeople who secretly owned and controlled Hillcrest Medical (*i.e.*, Khaim and his associates).

128. On December 1, 2017, Dr. Ajudua ceased practicing medicine and transferred his Hillcrest Medical practice to Metro Pain, including the medical records of all patients who received treatment at Hillcrest Medical. Neither Metro Pain nor Shapiro provided any compensation to Dr. Ajudua for this acquisition. Metro Pain also assumed control of the physical space at 204-12 Hillside. On November 1, 2017, Metro Pain entered into a written lease agreement with Hillside 2626 LLC providing for monthly rental payments of approximately $8,500 during the first year, approximately $8,800 during the second year, and approximately $9,200 during the third year. Hillcrest Medical's front desk personnel, Viktoria Shakarova and Davidov, continued working at 204-12 Hillside as office managers when Metro Pain acquired Dr. Ajudua's medical practice.

129. When Metro Pain assumed control of the space at 204-12 Hillside, providers who had been operating there either reorganized their corporate existence or moved out and were replaced by others. For example, Park had been rendering chiropractic care at 204-12 Hillside through Your Choice Chiropractic P.C., and Choi had been rendering acupuncture treatment through Choi Acupuncture. In early December 2017, those entities treated their last patients at 204-12 Hillside, and on December 1, 2017, Park began treating patients through a newly formed

entity, All About Chiropractic, and Choi began treating patients exclusively through Choice Acupuncture. At about the same time, the physical therapist who had been treating patients at 204-12 Hillside stopped treating patients, and a new provider, Shalaby and his entity Physical Therapy of NY, began treating patients on December 1, 2017. There was no legitimate reason why Park would need to form a new corporate entity or why the physical therapy and acupuncture providers would change simply because a new medical provider, Metro Pain, took control of 204-12 Hillside.

130.    Rather, the timing of these changes reflects Metro Pain's transition to gatekeeper at the location. In particular, while prior entities may have had financial arrangements with Hillcrest Medical, new providers could enter into new, different relationships with Metro Pain. Moreover, creating new entities through which treatment could be rendered and billed and substituting providers was part of the scheme in that it permitted new providers to render treatment free and clear of insurers' challenges to prior providers' claims submitted before Metro Pain became gatekeeper. The changes also reduced the number of claims submitted by any one provider, which helped each provider avoid detection and conceal the scheme.

131.    As part of its control, Metro Pain entered into arrangements with providers who sought to treat patients at 204-12 Hillside whereby providers paid kickbacks for patient referrals. Some arrangements were disguised as rent payments pursuant to leases for the purported use of space. On December 4, 2017, at least All About Chiropractic, Choice Acupuncture, Northern Medical, and Physical Therapy of NY purported to enter into License Agreements with Metro Pain for the use of space at 204-12 Hillside. Spine Care entered into such a License Agreement on November 9, 2018. The form of each agreement is identical, and the forms of these agreements were, in fact, identical to the form of lease Metro Pain entered into with Hillcrest Medical when the location was directly controlled by Khaim and his associates. That this form of lease was

simply reused is reflected in the fact the "licensee" or tenant on each lease is identified as Metro Pain, even though Metro Pain had become the lessor to All About Chiropractic, Choice Acupuncture, Northern Medical, Physical Therapy of NY, and Spine Care, and thus should have been identified as the "licensor" on these agreements.  The License Agreements granted to All About Chiropractic, Choice Acupuncture, Northern Medical, Physical Therapy of NY, and Spine Care the "right to license a portion of the Building including an examining room located in the Leased Premises and currently occupied by the Licensee on an exclusive basis and for those periods delineated on Schedule 'A' attached hereto."

132.    While providers purportedly paid rent to use the space, the Licensing Agreements demonstrated that those payments were actually for patient referrals.  Physical Therapy of NY's agreement describes the fee explicitly as "1500$ [sic] for Functional Capacity Testing, 1500$ [sic] for ROM Testing, 1500$ for rent" (*i.e.*, $4,500 total each month).  The agreements with All About Chiropractic, Choice Acupuncture, and Northern Medical each provided for $1,500 per month, and Spine Care's agreement provided for $500 per month.[2]  These five License Agreements entitled Metro Pain to payments totaling $9,500 per month, but there is no indication that these sums represent all amounts these and other providers paid to Metro Pain.  Rather, billing records reflect 10 other healthcare providers rendered services to Metro Pain patients at 204-12 Hillside in 2018.  Even if the $9,500 per month was the total rent all providers paid to Metro Pain, Metro Pain only paid monthly rent of about $8,500 during its first year for the entire space, and thus Metro Pain would have received "rent" from providers totaling more than, and almost certainly well in

---

[2] As noted supra n. 2, Spine Care likely paid less in rent because it examined patients at 204-12 Hillside for the sole purpose of recommending they receive manipulations under anesthesia to be performed at Moshe's Dynamic Surgery and HealthPlus Surgery, and Northern Medical typically charged thousands of dollars for the services it rendered to each Metro Pain patient on a single date.

excess of, its rental obligations to the property owner.  As a result, there can be no question providers' payments to Metro Pain were not tied to the fair market value of space.

133.    Even after Metro Pain became the gatekeeper at 204-12 Hillside, Khaim and his associates continued to play a role and there may have been arrangements between Metro Pain and Khaim and his associates concerning activity at 204-12 Hillside.  For example, after Metro Pain became the gatekeeper at 204-12 Hillside, Park's new chiropractic entity, All About Chiropractic, and Choi's acupuncture entity Choice Acupuncture not only made payments to Metro Pain, but also to a Khaim-owned shell company.  Furthermore, as noted above, Khaim wired $9,300 to Metro Pain's office manager at 204-12 Hillside, Davidov.  Indeed, the current chiropractor at 204-12 Hillside, Marcelo Quiroga and his entity Comfort Choice Chiropractic P.C., paid substantial sums to Gulkarov, Israilov, and companies they own throughout 2020.

### iii.    717 Southern

134.    Beginning in at least November 2016, Metro Pain operated as a gatekeeper at 717 Southern.

135.    Even before Metro Pain became the gatekeeper at 717 Southern, patient care at the location was determined by financial relationships and at the direction of nonphysician, laypersons.  Prior to November 2016, medical services were rendered through Morris Park Primary Medical P.C. ("Morris Park"), which Dr. Duhamel owned on paper.  The location was in fact secretly owned and controlled by laypersons.  According to a sworn affidavit dated March 28, 2017, Dr. Duhamel did not own or control his medical practice, but worked for "Kate." Dr. Duhamel accepted an arrangement in which Kate paid him $1,000 per day as an employee to examine patients two days per week, plus $5,000 per month to open a medical professional corporation, Morris Park, that would operate from the location.  According to the affidavit, Dr. Duhamel had no role in hiring or firing staff for Morris Park and no control over its finances.

Rather, Kate was in charge.  Dr. Duhamel stated patient care was ordered and performed without his knowledge.  Morris Park billed insurance companies for many different kinds of testing that he never performed, never hired anyone to perform, and of which he was unaware, including Outcome Assessment Tests, ROM testing, manual muscle testing, and functional capacity testing. Further, examination reports were altered to reflect referrals for other testing, other professional services, and Supplies that he did not, in fact, make.

136.    As early as June 2015, Metro Pain examined patients at 717 Southern one or two days each month for possible pain management procedures.  Metro Pain generally referred patients for pain management injections performed at Moshe-owned ASCs located in New Jersey.  Metro Pain obtained access to these patients not because they needed pain management consultations, but pursuant to financial relationships with those who controlled 717 Southern at the time.

137.    By November 2016, Metro Pain assumed greater control over 717 Southern and became a gatekeeper at the location.  Metro Pain assumed control of the physical space.  In February 2017, Metro Pain entered into a written lease agreement with Semaj LLC providing for monthly rental payments of approximately $8,000 during the first year, approximately $8,600 during the second year, approximately $9,300 during the third year, approximately $10,000 during the fourth year, and approximately $10,900 during the fifth year.

138.    Metro Pain also hired the front desk personnel and office manager who previously worked at the location.  Shapiro testified in an EUO the front desk manager, Lolita Dasheusky, had worked there "[a]s long as I can remember," but he could not recall who employed her, guessing that it was "one of the providers, either chiropractor or acupuncture.  I don't know."

139.    When Metro Pain assumed control of the space at 717 Southern, providers who had been operating there moved out and were replaced by others.  For example, on Friday, January 27,

2017, defendant Scarborough, his chiropractic entity AOT Chiropractic, and the physical therapist stopped treating patients at 717 Southern. They were replaced the following Monday with newly formed Brook Chiropractic owned by Caruso and Barakat PT owned by Barakat. Before arriving at 717 Southern, Caruso had been treating patients through Full Spine Chiropractic of NY P.C. at another location then coming under Metro Pain control, 2451 E. Tremont. As discussed in the next section, Scarborough and AOT Chiropractic moved to 2451 E. Tremont and began treating patients in January 2017, essentially swapping chiropractic roles with Caruso. There was no legitimate reason why the chiropractor and physical therapist would turn over simply because a new medical provider, Metro Pain, took control of 717 Southern.

140.    Rather, the timing of these changes reflects Metro Pain's transition to gatekeeper at the location. In particular, while prior entities may have had financial arrangements with those previously in control, new providers could enter into new, different relationships with Metro Pain. Moreover, creating new entities through which treatment could be rendered and billed and substituting providers was part of the scheme in that it permitted new providers to render treatment free and clear of insurers' challenges to prior providers' claims submitted before Metro Pain became gatekeeper. The changes also reduced the number of claims submitted by any one provider, which helped avoid detection and conceal the scheme.

141.    As part of its control, Metro Pain entered into arrangements with providers who sought to treat patients at 717 Southern whereby providers paid kickbacks for patient referrals. Some arrangements were disguised as rent payments pursuant to leases for the purported use of space. At least Barakat PT, Brook Chiropractic, Andrew Nicholas Demas, L.Ac., and Classic Medical Diagnostic Rehab P.C. ("Classic Medical") purported to enter into lease agreements with Metro Pain for the use of space at 717 Southern. The form of three of these leases is identical to

each other and to the forms of lease Metro Pain entered into with providers at 105-10 Flatlands and 204-12 Hillside. The Licensing Agreements granted to Barakat PT, Brook Chiropractic, and Andrew Nicholas Demas, L.Ac. the "right to license a portion of the Building including an examining room located in the Leased Premises and currently occupied by the Licensee on an exclusive basis and for those periods delineated on Schedule 'A' attached hereto," whereas the agreement with Classic Medical grants "the non-exclusive use of examination rooms and common area . . . in the premises." Moreover, the Classic Medical lease defines the lease as the "Paramount Lease," which appears to be a reference to a healthcare provider with which Metro Pain entered into a lease arrangement for the use of space at 332 E. 149th Street in the Bronx.

142.    While providers purportedly paid rent to use the space, the agreements demonstrate that those payments were actually for patient referrals. Brook Chiropractic's agreement required monthly rent payments of $1,000, Andrew Nicholas Demas's agreement required payments of $1,500 per month, and Classic Medical's agreement provided for $5,000 per month. Barakat PT's agreement did not include a rental amount. These four agreements entitled Metro Pain to payments totaling $7,500 per month without consideration of Barakat PT's rent, and billing records reflect that over 20 other healthcare providers rendered services to Metro Pain patients at 717 Southern in 2017. Even if the $7,500 per month was the total rent all providers paid to Metro Pain, Metro Pain only paid about $8,000 during its first year for the entire space, and thus Metro Pain would have received "rent" from providers almost certainly well in excess of its rental obligations to the property owner. As a result, there can be no question the providers' payments to Metro Pain were not tied to the fair market value of space, but rather were for patient referrals.

### iv.    2451 E. Tremont

143.    Beginning in at least November 2016, Metro Pain operated as a gatekeeper at 2451 E. Tremont.

144.     Shortly after Metro Pain began treating patients at 2451 E. Tremont in October 2016, it became a gatekeeper at that location and took over control of the physical space.  Metro Pain did not have a written lease for the space with the property owner, C2 Development Corp., and Shapiro testified "[i]t's not even oral agreement," and the property owner "sent me statement with the rent and utilities, pay them, and when I tried to negotiate, he said, 'We don't negotiate.'" According to financial records, Metro Pain's monthly payments for rent to C2 Development Corp. increased year to year; Metro Pain paid $7,900 in rent on February 13, 2017, $8,548.97 in rent on May 1, 2018, and $8,890.92 in rent on May 2, 2019.

145.     Shapiro testified front desk personnel and the office manager who worked at the location previously became employees of Metro Pain after it took over the space.  Clarissa Tavarez (a/k/a Clarissa Felix) served as Metro Pain's office manager at 2451 E. Tremont.

146.     At about the time Metro Pain assumed control of the space at 2451 E. Tremont, providers operating at the location moved out of the space and were replaced by others.  For example, Caruso and his entity Full Spine Chiropractic of NY P.C. stopped providing chiropractic treatment in January 2017, Friendly Acupuncture P.C. stopped providing acupuncture in April 2017, and AM Patel PT stopped providing physical therapy in April 2017.  In Caruso's place, Scarborough and AOT Chiropractic began rendering chiropractic treatment in January 2017, and Caruso moved to the location at which AOT Chiropractic had operated, 717 Southern.  On April 3, 2017, Hidden Dragon Acupuncture began providing acupuncture services and Sky Limit PT began providing physical therapy.  Moreover, on the date Metro Pain took over as gatekeeper, November 1, 2016, Dr. Michael George Alleyne ("Dr. Alleyne"), who had until that time operated as a medical doctor at 2451 E. Tremont, formed Michael George Alleyne MD P.C. and began rendering NCV and EMG Tests to Metro Pain patients at 2451 E. Tremont and 717 Southern.  On

September 7, 2017, Dr. Alleyne also began rendering examinations and Outcome Assessment Tests as a medical doctor through Metro Pain at 2451 E. Tremont and 2940 Grand Concourse in the Bronx.

147.     There was no legitimate reason why these providers would need to form new entities or move locations simply because a new medical provider, Metro Pain, took control of 2451 E. Tremont.  Rather, the timing of these changes reflects Metro Pain's transition to gatekeeper at the location.  In particular, while prior entities may have had financial arrangements with those previously in control, new providers could enter into new, different relationships with Metro Pain.  Moreover, creating new entities through which treatment could be rendered and billed and substituting providers was part of the scheme in that it permitted new providers to render treatment free and clear of insurers' challenges to prior providers' claims submitted before Metro Pain became gatekeeper.  The changes also reduced the number of claims submitted by any one provider, which helped each provider avoid detection and conceal the scheme.

148.     As part of its control, Metro Pain entered into arrangements with providers who sought to treat patients at 2451 E. Tremont whereby providers paid kickbacks for patient referrals.  Some arrangements were disguised as rent payments pursuant to leases for the purported use of space.  At least AOT Chiropractic, Hidden Dragon Acupuncture, and Sky Limit PT purported to enter into lease agreements with Metro Pain for the use of space at 2451 E. Tremont.  The form of lease with AOT Chiropractic is identical to the forms of lease Metro Pain entered into with providers at 105-10 Flatlands, 204-12 Hillside, and 717 Southern.  The January 17, 2017 Licensing Agreement granted to AOT Chiropractic the "right to license a portion of the Building including an examining room located in the Leased Premises and currently occupied by the Licensee on an exclusive basis and for those periods delineated on Schedule 'A' attached hereto."  The other two

agreements were executed in April 2017 and utilized different forms. The lease with Hidden Dragon Acupuncture defines the leased space only as "the portion of the demised premises on the 2451 E Tremont Ave, Bronx, NY 10461," whereas the lease with Sky Limit PT provided for "the non-exclusive use of examination rooms and common area . . . in the premises." Like Metro Pain's lease with Classic Medical at 717 Southern, the Sky Limit PT sublease defines the lease as the "Paramount Lease," which appears to be a reference to a healthcare provider with which Metro Pain entered into a lease arrangement for the use of space at 332 E. 149th Street in the Bronx.

149. While providers purportedly paid rent to use the space, the agreements demonstrate that those payments were actually for patient referrals. AOT Chiropractic's agreement required monthly rent payments of $1,000, while the Sky Limit PT agreements required a "net minimum rent" of $24,000 each year paid in monthly installments of $2,000, and the Hidden Dragon Acupuncture agreement required monthly payments of $1,500. These three agreements entitled Metro Pain to monthly payments totaling $4,500, but there is no indication these sums represent all amounts paid to Metro Pain for the use of space at 2451 E. Tremont, including amounts Dr. Alleyne paid to Metro Pain. Indeed, billing records reflect over 15 other healthcare providers rendered services to Metro Pain patients at 2451 E. Tremont in 2017. Metro Pain only paid about $7,900 during its first year for the entire space, and thus Metro Pain would have received "rent" from providers close to, and almost certainly well in excess of, its rental obligations to the property owner. As a result, there can be no question providers' payments to Metro Pain were not tied to the fair market value of space, but rather were for patient referrals.

### c.   Metro Pain Referred Patients Pursuant to Financial Arrangements

150. During the period Metro Pain operated as the gatekeeper at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont, its patients received care from providers who

paid for the referrals of such patients.  The documented existence of such arrangements makes

clear that no provider would have been granted access to these patients without paying to play.

While some providers rendered treatment at these locations based on purported "rent" agreements,

such as chiropractic, acupuncture, and physical therapy treatment, others rendered treatment based

on referrals, orders, justifications, and/or access obtained through Metro Pain at other locations

and/or based on other arrangements.  Based on arrangements with Metro Pain, the Physical

Therapy Defendants, Chiropractor Defendants, and Acupuncture Defendants, among others,

obtained patient referrals from Metro Pain to provide examinations, treatment, MRIs, Supplies,

tests, and other services that were not medically necessary or eligible for reimbursement.  These

Defendants rendered such treatment at the following locations:

(a)   at 105-10 Flatlands, (i) chiropractor Luna and Kings Chiropractic; (ii) acupuncturists Moon, SJM Acupuncture, Krupnova, and LK Acupuncturist; and (iii) physical therapists Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, and Cityworks PT;

(b)   at 204-12 Hillside, (i) chiropractors Park, All About Chiropractic, and J Park Chiropractic; (ii) acupuncturists Choi, Choice Acupuncture, and Choi-Go Acupuncture; and (iii) physical therapists Shalaby, Physical Therapy of NY, Kataeva, and Cityworks PT;

(c)   at 717 Southern, (i) chiropractors Caruso, Brook Chiropractic, and Integrated Chiropractic; (ii) acupuncturists Kopach, First Alternative Acupuncture, Castillo, and Edcas Acupuncture; and (iii) physical therapists Barakat, Barakat PT, Elmandouh, Protection PT, Akl, and Primavera PT;

(d)   at 2451 E. Treatment, (i) chiropractor Scarborough and AOT Chiropractic; (ii) acupuncturists Ma, Hidden Dragon Acupuncture, Guan, and Rebound Acupuncture; and (iii) physical therapists Elmansy, Sky Limit PT, Cushman, PI PT, Paller, and Floral Park PT.

### d. Shapiro Forms and Begins Billing Through Tri-Borough Medical to Further the Scheme

151.   Beginning in May 2021, Shapiro began submitting bills to the State Farm

Companies for services purportedly rendered through Tri-Borough Medical.   The services

purportedly rendered through Tri-Borough Medical are the same or similar to those rendered through Metro Pain, are rendered at the same locations at which Metro Pain treats patients, including at 105-10 Flatlands and 204-12 Hillside, rendered through the same employees of Metro Pain, and involve the same Metro Pain patients.  Shapiro appears to operate Tri-Borough Medical as a successor entity to Metro Pain to induce insurance carriers, such as the State Farm Companies, to remit payment for fraudulent services they would not otherwise pay to Metro Pain.  Shapiro thus devised Tri-Borough Medical to extend the scheme to defraud insurance companies alleged herein as to Metro Pain.

### 2.    Alon and the Beshert Network

152.    Alon's entity Beshert is a purported "marketing" and "advertising" business, but it functions as a referral network among No-Fault providers and attorneys and a source of patients.

153.    Beshert's website states its "unique and far-reaching network enables assistance to patients of varying medical needs from all geographic locations throughout the New York and New Jersey area."  It includes a link titled, "Beshert providers network sign up" that directs visitors to its "Membership Application."  The "application" is titled "Beshert Corp. Participation Agreement," and prominently states Beshert's slogan at the top: "Your Network Is Your Net Worth."  The agreement includes numerous provisions governing patient referrals and requires provider-members to exclusively use participant ASCs (*i.e.,* Dynamic Surgery and HealthPlus Surgery).  For example, the agreement states that, "[i]f a consulting doctor recommends services or goods that other Beshert participants provide, Participant agrees to provide the patient with the option of obtaining such services or goods first from other Beshert participants."  It also requires provider members "to utilize the Beshert preferred providers of goods and services that are part of the Beshert Network as the first source for the goods and services needed for their practice."  The agreement further governs how providers may refer patients of other Beshert providers, including

that the participant "recommend that the patient return to such [referring] participant if they require continued care in such specialty, and not recommend or refer such patient to another health care provider in such specialty unless the patient requests same in writing." Member providers who perform surgical or special procedures must use "an ambulatory surgical center that is also part of the Beshert network," and if the member provider "subleases any practice office space to other providers that are qualified to perform surgical or special procedures, to require such sublessee as a term of the sublease to utilize the ambulatory surgical centers in the Beshert network."

154. Based on bills and data available to the State Farm Companies, Beshert members have adhered to these provisions in the participation agreement. In particular, numerous Beshert providers appear to exclusively perform pain management, orthopedic, and/or chiropractic procedures at Excel Surgery, Dynamic Surgery, and HealthPlus Surgery. Those providers also referred patients as a matter of course for MRIs at Citimedical, Columbus Imaging, and Medaid Radiology. Notably, Shapiro and Metro Pain, Albis and his company Advanced Spinal and Rehabilitation Center P.A., and Diana Beynin and her company Spine Care all paid Beshert monthly dues as high as $10,000, exclusively used Moshe's ASCs for their procedures, and routinely referred patients for MRIs at other member facilities, including Citimedical, Columbus Imaging, and Medaid Radiology.

155. Shapiro testified in an EUO on November 5, 2018, that Metro Pain has engaged Beshert for purported marketing, advertising, and networking services for the last five years, and paid Beshert $10,000 per month for these services. Financial records reflect Metro Pain paid Beshert at least $300,000 for purported marketing services rendered in 2017, 2018, and 2019.

156. Moshe similarly admitted Dynamic Surgery and HealthPlus Surgery engaged Beshert and paid it $100,000 each month for its services ($50,000 per month for each ASC).

Moshe also testified there was no written agreement between his ASCs and Beshert, but Beshert was prohibited from working with any ASC other than Dynamic Surgery and HealthPlus Surgery during the period he engaged its services.  Moshe testified: "So, of course, if I'm the client, I would not want to use a marketing entity that mark[et]s for more than one surgery center.  That defeats the purpose.  So I always ask for exclusively [*i.e.*, exclusivity]."  Beshert's Participation Agreement provisions regarding "ambulatory surgical centers in the Beshert network" could thus only refer to Dynamic Surgery and HealthPlus Surgery.

157.    Moreover, Beshert openly advertises on behalf of Dynamic Surgery, HealthPlus Surgery, and Citimedical, among others, and lists them as "advertisers" on its website.  The Beshert website also includes a page called "Meet Our Doctors" that lists physicians who are or were Citimedical and Metro Pain employees.  It offers for download applications for privileges to perform procedures at Dynamic Surgery and HealthPlus Surgery, surgery booking forms, and promotes Citimedical's services, physicians, and brand through its website and at various industry events.  Beshert also lists Metro Pain physicians under the "Find a Specialist" webpage, including Shapiro

158.    Alon and Beshert collected substantial amounts, provided a source of patients, and established a cross-referral arrangement within the network.

### 3.    Moshe's Ownership and Control of Citimedical and the ASC Defendants

159.    In early 2011, Moshe bought the assets of a two-operating room ASC at 321 Essex Street, Hackensack, New Jersey and formed Excel Surgery.  As required under New Jersey licensing regulations, an ASC must hire a medical director to develop policies and protocols and to supervise patient care, and so he hired Dr. Navrajan Kukreja, M.D. ("Kukreja") to serve as Excel

Surgery's purported medical director.  From October 2011 through December 2016, Excel Surgery billed for facility fees and anesthesia services for procedures performed at the surgery center.

160.     By late 2012, Moshe was ready to expand and decided to enlist his sister Dr. Moshe. Dr. Moshe obtained a license to practice medicine in New Jersey and New York in March and September 2012, respectively.  Dr. Moshe completed a residency in internal medicine, but had no other specialty, and as of the fall of 2012 never operated a medical practice of any kind on her own.   Nevertheless, Dr. Moshe supposedly formed Citimedical I on November 30, 2012. Dr. Moshe testified Citimedical I was her first job out of medical school and she had never previously worked in a private medical practice.  While Dr. Moshe purported to own Citimedical I on paper, she admitted her brother Moshe owned three buildings out of which Citimedical operated, arranged and paid for construction necessary to prepare one location for operation, owned the MRI and CAT equipment used for radiology services, and collected $50,000 each month from Citimedical I for rent, equipment leasing, and financing charges.  Although Dr. Moshe had no experience or certification as a radiologist or in pain management or orthopedics, Dr. Moshe created a Citimedical I radiology department, which performed MRIs using the equipment owned by Moshe, and hired pain management and orthopedic physicians who began performing procedures at Excel Surgery.  Moshe and Excel Surgery also arranged and paid for transportation of Citimedical patients from New York to New Jersey for their pain management and orthopedic procedures.

161.     Between August 2013 and May 2015, NJDOH investigated a series of complaints against Excel Surgery.  These investigations concluded Excel Surgery was "not in substantial compliance with [New Jersey] Licensing Standards for Ambulatory Care Facilities."  Among other things, NJDOH cited Excel Surgery for violations based on Kukreja's failure to comply with his

medical director obligations.  Based on these violations, among other things, by late 2015, the NJ State Board ordered Kukreja to cease and desist from the practice of medicine.  While Kukreja and Excel Surgery were under investigation, Moshe replaced Kukreja with Shapiro.  At the time, Shapiro was also supposedly operating numerous other medical clinics in many different locations throughout New York and New Jersey.  Nevertheless, beginning in February 2014, Moshe paid Shapiro at least approximately $400,000 in salary.  NJDOH continued to cite Excel Surgery for regulatory violations while under Shapiro's "direction."

162.    While Excel Surgery faced increasing regulatory scrutiny, Moshe reaped substantial financial benefits from the procedures performed there.  In fact, Excel Surgery's gross charges increased over 100% in two years:  from approximately $42,000,000 in 2014 to over $86,000,000 in 2016.

163.    To avoid further regulatory scrutiny, Moshe sought to rebrand Excel Surgery under a new name.  In particular, Moshe formed Dynamic Surgery in November 2016 as a new legal entity, which was at the same 321 Essex Street location.  By January 2017, Excel Surgery had ceased billing for services and Dynamic Surgery had taken over all billings in its place.  Moreover, despite Kukreja's suspension from the practice of medicine, Dynamic Surgery initially identified him as its medical director on its website, though by mid-2017, he was replaced by Shapiro.  Although the name had changed, prior practices continued.  Shapiro was still in no position to perform his regulatory duties as a medical director because his own professional corporations were significantly expanding, and Dynamic Surgery, like Excel Surgery before it, received numerous regulatory violations.

164.    Nevertheless, with demand increasing, in mid-2016 Moshe acquired a second ASC located at 190 Midland Avenue in Saddle Brook, New Jersey that would operate as HealthPlus

Surgery.  Despite the burdens of his growing practice, and his simultaneous role as the purported medical director of Dynamic Surgery, Shapiro was again identified as the purported medical director of HealthPlus Surgery.

165.   Shortly thereafter, in late 2016, Moshe also changed his business model for administering anesthesia at his surgery centers because payors began to question whether an ASC owned by a layperson could bill directly for anesthesia.  Rather than employ anesthesiologists to administer anesthesia, Moshe shifted the anesthesia services to a new medical entity, Citimed Services, which was purportedly owned on paper by his sister, Dr. Moshe.  Although Dr. Moshe had no specialty or certification in anesthesia, she supposedly formed Citimed Services on October 13, 2016 to render anesthesia services at the two ASCs owned and controlled by her brother — Dynamic Surgery and HealthPlus Surgery.  Citimed Services listed 321 Essex Street on its incorporation papers as the address for its Board of Directors — the same address as Dynamic Surgery — and 190 Midland Avenue on its bills as the address to which payment should be directed — the same address as HealthPlus Surgery.  Between January 2017 and mid-July 2018, Citimed Services billed for anesthesia services rendered at Dynamic Surgery and HealthPlus Surgery.

166.   In approximately January 2018, Premier Anesthesia began to provide services at Hudson Regional.  Then, in approximately May 2018, anesthesia services at Dynamic and HealthPlus were shifted to Premier Anesthesia, owned at the time by Shapiro.  Beginning in approximately July 2018, Premier Anesthesia became the exclusive provider of anesthesia services at Dynamic Surgery and HealthPlus Surgery.

167.   Serious and potentially life-threatening conditions continued to plague operations at Moshe's rebranded surgery center, Dynamic Surgery, and the new facility, HealthPlus Surgery.

For example, on September 7, 2018, NJDOH ordered HealthPlus Surgery to immediately cease operations after an investigation into the facility found that patients treated at HealthPlus Surgery may have been exposed to blood-borne pathogens, including hepatitis B, hepatitis C, and HIV as a result of the facility's failure to properly sterilize surgical instruments between procedures.  In January 2019, a class action was filed against HealthPlus Surgery and Moshe for alleged injuries relating to their exposure to the pathogens.  In June 2019, Moshe changed the names of the surgery centers — thus, Dynamic Surgery became Hackensack Specialty ASC, LLC, and HealthPlus Surgery became Integrated Specialty ASC, LLC.

### 4.    Moshe's Financing Arrangements with Shapiro

168.    Between at least April 2013 and February 2019, Metro Pain entered into a series of financing arrangements in which it purported to borrow money secured by its receivables.  Among these funding arrangements was an agreement dated September 15, 2013, with Moshe's company Med Capital, pursuant to which Med Capital agreed to lend Metro Pain and another Shapiro entity, PMR Medical, up to $2.5 million.  Pursuant to the revolving loan and security agreement, any borrowed amounts would be secured against Metro Pain's accounts receivable and would accrue interest at the rate of 24.99% per annum.  Similarly, in December 2017, Metro Pain entered into a financing arrangement with Moshe's long-time friend and business associate Vadim Dolsky and his company All Star Services, Inc.  Pursuant to that arrangement, Metro Pain could borrow up to $5 million secured against Metro Pain's accounts receivables for NCV and EMG Tests at a financing fee of 50% of the borrowed amount.  Financing documents contemplated that during the pendency of the agreement Metro Pain's receipts would be deposited into an escrow account under the control of a third party who would disburse repayments of the principal and substantial interest to All Star Services, Inc.  The agreement with All Star Services, Inc. even dictates Metro Pain's cooperation in standard claims handling procedures, including requiring Metro Pain's appearance,

retention of counsel, and designation of specific witnesses to testify at EUOs. Metro Pain's financial records reflect it borrowed from All Star Services, Inc. over $51,000 in 2017, over $517,000 in 2018, and over $2,488,014 in 2019.

169.     As a result of financing arrangements, Shapiro and Metro Pain obtained a financial benefit from Moshe and/or Moshe secured significant portions of Metro Pain proceeds providing the ability to control and direct Metro Pain's affairs.

### C.     The Legitimate Treatment of Patients with Strains and Sprains

170.     Defendants purport to examine, diagnose, and treat patients who have been in motor vehicle accidents and complain of neck and back pain.

171.     For patients who have been in motor vehicle accidents and have complaints of neck and back pain, a detailed patient history and a legitimate examination must be performed to arrive at a legitimate diagnosis.

172.     Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan tailored to the unique circumstances of each patient. During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

173.     Legitimate treatment plans for patients with strains and sprains may involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

174.     Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities including hot and cold packs, ultrasound, diathermy, manual therapy, massage, and traction. Active modalities require patients to affirmatively

participate in their treatment and include many different kinds of stretching, exercising, and strengthening therapies.

175.    In legitimate treatment plans, active modalities are necessary to rehabilitate and heal soft-tissue injuries, while passive modalities are typically used only to the extent necessary to reduce pain and to facilitate the patient's ability to perform active modalities, which should be introduced into a patient's treatment plan as soon as practicable.

176.    While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the same combination of passive modalities on nearly every visit regardless of whether the patient improved would rarely be appropriate for one patient, let alone almost every patient, on almost every visit.

177.    The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the unique circumstances of each patient, including: (a) the patient's age, social, family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

178.    Treatment plans should be periodically reassessed and modified based upon the progress of the patient, or the lack thereof.

179.    Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

180.    The above-described process of examination, diagnosis, and treatment must be documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently;

(c) the patients themselves whose care and condition necessarily depends on the documentation of this information; and (d) payers such as State Farm Mutual and State Farm Fire so that they can pay for reasonable and necessary treatment.

### D.   Defendants' Predetermined Treatment Protocol

181.   At each of the locations at which Metro Pain became the gatekeeper, including 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont, Metro Pain controlled not only the space, but the patients.   Metro Pain determined what care patients would receive and who would provide it based on payments from the providers.   As a result, patients were subjected to a Predetermined Treatment Protocol designed to exploit patients' No-Fault Benefits and enrich Defendants, not to legitimately treat patients according to their true needs.   As detailed below, the Predetermined Treatment Protocol includes medically unnecessary and fraudulent: (1) examinations performed by Metro Pain purportedly to determine patient conditions, but that in fact report similar findings to justify unnecessary services and treatment; (2) treatment plans including physical therapy, chiropractic care, and acupuncture rendered by providers who have financial arrangements with Metro Pain; (3) physical therapy examinations and treatment; (4) chiropractic examinations and treatment; (5) acupuncture examinations and treatment; (6) MRIs by providers either owned by Alon or secretly owned and controlled by Moshe; (7) Supplies; (8) diagnostic tests, including Outcome Assessment Tests, NCV and EMG Tests, ROM tests, muscle tests, functional capacity tests, and Pf-NCS Tests; (9) prescription gels and patches; and (10) for some patients, pain management and orthopedic consultations followed by procedures performed by Metro Pain at the ASC Defendants in New Jersey.

182.   The medically unnecessary treatment often continues for months without improvement or resolution.   In instances in which records for patients treated at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont contain references to discharges they indicate

at least one of the following:  (a) patients decided to stop treating; (b) patients exhausted their No-Fault Benefits; (c) patients purportedly reached maximum medical improvement based on findings that were inconsistent with other, contemporaneously generated medical reports regarding those patients' conditions; (d) patients continuing to undergo treatment even after the date of the purported discharge; or (e) patients whose treatment ended after one of the State Farm Companies requested an EUO or attempted in some other way to verify the medical necessity of the patient's treatment.

183.    Treatment and the number and selection of modalities reflect an intention to maximize the amount that can be collected and to exploit the New York fee schedule governing No-Fault claims.  The New York fee schedule imposes limits on the amount of physical therapy, chiropractic, and acupuncture treatment that can be provided to a patient on any single date of service.  Under the New York fee schedule, certain medical services are assigned "relative values." During the period in effect prior to October 1, 2020, a provider could not bill for more than eight "relative units" of identified physical therapy modalities and chiropractic manipulations for an individual patient on a single date of service.  Beginning October 1, 2020, changes to the No-Fault fee schedule became effective that (a) raised the maximum relative value units that could be billed for an individual patient on a single date for specific services to 12 (excluding office visits); (b) added acupuncture services to the 12-unit cap on any single date; and (c) explicitly provided the 12-unit cap applied to covered services rendered by all providers combined on any single date (*i.e.*, physicians, physical therapists, chiropractors, and acupuncturists).  The modalities provided by Defendants allowed them to bill for the permissible relative units per day, bill for additional services not subject to those limitations, and simultaneously exploit patients' No-Fault Benefits.

184.     In a legitimate medical setting, healthcare providers rendering treatment to the same patient would coordinate patient care according to each patient's response to treatment and unique circumstances.   Although Metro Pain patients receive physical therapy, chiropractic care, and acupuncture from different Defendants in the same location on the same visit, there is no record provided to the State Farm Companies of communications among the professionals rendering these services or an attempt to coordinate their treatment.

### 1.     Metro Pain's Examinations and Treatment Plans

185.     As the gatekeeper who granted access to patients in exchange for payments, Metro Pain's initial step in treating patients was to conduct examinations and formulate treatment plans that could be used to justify additional treatment and services from providers who had paid Metro Pain for access to patients.   Metro Pain performed these services at 105-10 Flatlands from approximately December 1, 2017 through the present; 204-12 Hillside from approximately December 1, 2017 through the present; 717 Southern from approximately November 1, 2016 through October 31, 2019; and 2451 E. Tremont from approximately November 1, 2016 through July 19, 2019.[3]   Metro Pain's services were billed to State Farm Mutual or State Farm Fire.

186.     Metro Pain and the physicians and physician assistants with whom it is associated purport to conduct legitimate examinations.   These examinations diagnose patients with sprains or strains in the cervical and/or lumbar regions of the spine as well as other conditions.   Based on these predetermined diagnoses, Metro Pain usually concludes patients require the Predetermined Treatment Protocol — a treatment plan that includes at least physical therapy, chiropractic care,

---

[3] Beginning in May 2021, Shapiro began to submit bills through Tri-Borough Medical.  Patients whose treatment transitioned from Metro Pain to Tri-Borough Medical testified to having no knowledge of the change in professional corporations rendering their care.

acupuncture, MRIs, Supplies, diagnostic tests, prescription drugs, as well as referrals for pain management and orthopedic consultations.

187.    Metro Pain's documentation of examinations, diagnoses, and treatment plans is not credible and is fraudulent.  While initial examination reports and related documentation vary slightly among Metro Pain locations, there are significant similarities among the reports.  Initial examination reports (the "Initial Examination Reports") are template preprinted forms in which an examining physician can underline or circle preprinted items or enter information in a blank space to record a specific finding or conclusion.  Recorded information is cursory and includes template histories and general nonspecific diagnoses.  The Initial Examination Reports generally find patients present with the following complaints: (a) neck pain; (b) low back pain; (c) pain in an upper or lower extremity, such as the shoulder or knee; and (d) pain of "7" or higher on a scale of 1 to 10.  *See* Ex. 1 (patient survey).

188.    Based on findings and diagnoses in the Initial Examination Reports, Metro Pain subjects its patients to identical treatment plans.  These treatment plans are sometimes described in the Initial Examination Reports themselves.  For example, Metro Pain physicians at 105-10 Flatlands generally handwrite on Initial Examination Reports the treatment plan, "Start Conservative Management" of "3 to 4 times a wk x 4 wks," and place checkmarks next to preprinted Supplies and medications prescribed.  *See, e.g.*, Ex. 2A.  At 204-12 Hillside, Metro Pain uses Initial Examination Reports that include a checklist "Diagnostic and Treatment Plan" with listings that physicians can and do check for MRIs, "Start/Continue physical therapy," "Chiropractic Evaluation Recommended," "Acupuncture evaluation recommended," "Range of Motion and Muscle strength test to determine and monitor progress or dysfunction," "FCE [functional capacity evaluation test] to determine patient's degree of disability and readiness to

return to work," "CPT tests," and "VSNCT tests." *See, e.g.*, Ex. 2B. Metro Pain's Initial Examination Reports for 2451 E. Tremont include a list of up to 16 items physicians can and do check to formulate a treatment plan, including a physical therapy and rehabilitation program with specific modalities, MRIs, ROM and muscle tests, acupuncture, chiropractic, functional capacity tests, and a list of Supplies that can be ordered. *See, e.g.*, Ex. 2C. At 717 Southern, Metro Pain uses Initial Examination Reports that include a similar checklist involving physical therapy, pain consultation, neurological consultation, chiropractic, acupuncture, MRI, ROM and muscle tests, functional capacity test, and a list of Supplies that can be ordered. *See, e.g.*, Ex. 2D.

189.    On other occasions, Metro Pain prepares separate documents ordering specific services, such as physical therapy referral forms, orders for Supplies or medications, or referrals for additional testing such as computerized ROM and muscle strength testing. *See, e.g.*, Exs. 3–6. On some occasions, Metro Pain documentation may not specify or refer to a particular service or treatment, but the patient still receives the same services from providers located at the address at which Metro Pain performed its examination.

190.    Regardless of the form of the documentation, Metro Pain's patients are generally subjected to a treatment plan that includes at least physical therapy, chiropractic care, acupuncture, MRIs of at least two or more regions, and Supplies, and very often diagnostic testing, including NCV and EMG Tests, computerized ROM and muscle tests, functional capacity tests, and Pf-NCS Tests; commonly prescribed medications; as well as consultations for pain management and orthopedic treatment. *See* Ex. 1.

191.    As Shapiro admits, "I think most patients receive the same treatment plan because most of these patients have the same problems and the same diagnosis . . . . All these patients you see the same treatment for the same diagnosis."

192.     Approximately four weeks after initial examinations, Metro Pain purportedly performs follow-up examinations.   Like initial examinations, these follow-up examinations involve, at most, cursory examinations of patients — the purpose of which appears to be supporting the continuation of the Predetermined Treatment Protocol — and are documented using preprinted forms (the "Follow-Up Reports").   While some Follow-Up Reports purport to comment on MRI results, there is no reported indication of a change in treatment based on these studies or that findings are communicated to other providers involved in the treatment.

193.     The Follow-Up Reports, regardless of the patient's documented clinical status at the time of the follow-up examination, regularly order the continuation of physical therapy, chiropractic care, acupuncture, and often additional services, including additional diagnostic testing, additional Supplies, and pain management and orthopedic consultations.  *See, e.g.*, Ex. 7. Follow-Up Reports for three of the four locations include lists of Supplies and medications that can be and are ordered, as well as identical typed language to describe the continuation of a treatment plan:

> Given the extent of the continued symptoms and physical therapy finding, I have advised patient to continue Physical Therapy at the frequency of ____ times per week with goals to decrease muscle spasm/hypertonicity/pain and soft tissue inflammation, and to improve mobility and function.

*See, e.g.*, Exs. 7.A, 7.C., 7.D.

### 2.     Physical Therapy Treatment

194.     Metro Pain orders physical therapy as part of its treatment plan, which the Physical Therapy Defendants then perform and bill to the State Farm Companies.

195.     Metro Pain refers patients for physical therapy treatment on the date of the initial examination using the Initial Examination Report and/or through a preprinted physical therapy referral form ("Physical Therapy Referral Forms").  *See, e.g.*, Exs. 2–3.  Although the Physical

Therapy Referral Forms used at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont differ slightly, they share significant characteristics. All such forms state "Metro Pain Specialists PC" in the header, identify the address at which a patient is receiving care, and list physical therapy modalities the physician may recommend by checking or circling entries on the form. *See, e.g.*, Ex. 3. Depending on the form used, the list of treatments includes between 15 and 24 options. *See, e.g.*, *id.* Metro Pain physicians or physician assistants choose a significant number of treatment options, sometimes as many as 17, and recommend patients receive such treatment three or more times per week for between four and six weeks. *See, e.g.*, *id.* In Follow-Up Reports, regardless of the patient's documented complaints, symptoms, or noted improvement, Metro Pain recommends physical therapy continue for at least another three to four weeks. *See, e.g.*, Ex. 7.

196.    The physical therapy treatment patients purportedly receive at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont follows a predetermined plan. Nearly every patient is subjected to the same physical therapy services purportedly performed on nearly every visit: application of hot and cold packs, electronic muscle stimulation, and either therapeutic massage or manual therapy. *See* Exs. 8-11. Some patients sometimes also receive therapeutic exercise either in addition to or in lieu of other physical therapy treatment. These modalities generally do not change regardless of whether patients purportedly improve or get worse. Performing physical therapy in this way is not intended to benefit the patients but to maximize the amount charged. While any one of these treatments may conceivably be medically necessary for a particular patient on a particular day, the aggregate combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone for every patient on almost every visit. At a minimum, in a legitimate setting, treatment should vary among patients or vary for particular patients over the course of care depending on how particular patients improve or worsen.

197.    Moreover, the physical therapy treatment provided to Metro Pain patients consists of predominately passive modalities.  In a legitimate treatment plan, passive modalities are typically used only to the extent necessary to reduce pain and to facilitate the patient's ability to perform active therapies, which should be introduced into a patient's treatment as soon as practicable.  But three of the four therapies provided to Metro Pain patients are passive, with the only active therapy consisting of therapeutic exercise provided to some patients on some visits. Even when therapeutic exercise is purportedly provided, records do not indicate what exercises are provided, how long the exercises are performed, or the patients' response in any meaningful way.

198.    As discussed above in Paragraph 183, the New York fee schedule imposes limits on the amount of physical therapy and chiropractic treatment that can be provided to a patient on any single date of service.  To exploit patients' No-Fault Benefits to the greatest extent possible, while seeking to avoid the limitations imposed by the fee schedule, the Physical Therapy Defendants provided particular physical therapy modalities because that combination of modalities allowed each provider to bill for close to eight relative units per day.  For example, the total relative value of the hot and cold packs, electronic muscle stimulation, and therapeutic massage the Physical Therapy Defendants provided is 7.65.  When manual therapy is substituted for therapeutic massage, the relative value increases to 9.26.  During the period prior to October 1, 2020, the total relative value units a provider could bill was 8; on and after October 1, 2020, the cap was 12, but new rules explicitly provided the 12-unit cap applied to covered services rendered by all providers on any single date, including both physical therapists and chiropractors.  Modalities were provided to maximize the amount that could be billed to any one patient on any one day.  Prior to October 1, 2020, the Physical Therapy Defendants billed close to the 8 relative value units allowed.   After

October 1, 2020, the Physical Therapy Defendants continued to provide the same pre-determined physical therapy protocol, but because all services rendered on the same day including chiropractic services now counted towards the cap, chiropractors reduced the treatment they provided in some cases to between 4 and 6 relative value units per day, and in other cases chiropractors no longer billed.  While treatment records contain no indication care was coordinated or discussed among professionals, or that a reduction or even elimination of chiropractic care was medically appropriate, after October 1, 2020, physical therapy and chiropractic services appear to have provided a pre-determined protocol representing less than the 12 relative value units allowed per day.  In other words, treatment was dictated by providers' financial interest in what they could bill, rather than the needs of any patient.

199.    To support the physical therapy provided and billed, physical therapists working for the Physical Therapy Defendants create reports of purported examinations and purport to document daily notes.  Both examination reports and daily notes are form documents that are not credible and reflect patient complaints and treatment manufactured to support further treatment. The documents consist of preprinted forms with checkboxes that lack any meaningful description of treatment, such as the location of the body where hot packs were applied or massages provided. For example, Defendant Handy PT and Physical Therapy of NY PT operated at 105-10 Flatlands and 204-12 Hillside, respectively.  However, the forms each used to document patient examinations are entirely typewritten and contain the same fields to be completed, including "Problem List," "Short Term Goals," "Long Term Goals," and "Plan of Care."  The purported "problem list" and "goals" identified on these forms generally remain unchanged during a patient's course of treatment and, in some instances, the forms state at the end the "Note has not been signed."

### 3.    Chiropractic Treatment

200.    Chiropractic care is provided to every Metro Pain patient as part of the Predetermined Treatment Protocol.

201.    The predetermined chiropractic treatment patients purportedly receive is virtually identical.  Patients receive chiropractic manipulations of the spine, most frequently for three to four spinal regions, but sometimes five spinal regions, and often either manual therapy or therapeutic massage.  *See* Exs. 8–11.  This combination of treatments is identical and does not change regardless of whether the patient improves or gets worse.  Metro Pain patients receive these chiropractic manipulations three to four times per week.

202.    Among other things, the number and selection of modalities reflects an intention to maximize the amount collected and exploit the applicable fee schedule governing No-Fault claims.  As discussed above in Paragraph 183, the New York fee schedule imposes limits on the amount of physical therapy and chiropractic treatment that can be provided to a patient on any single date of service.  To exploit patients' No-Fault Benefits to the greatest extent possible, while seeking to avoid the limitations imposed by the fee schedule, prior to October 1, 2020, the Chiropractor Defendants provided modalities with a total relative value of either 8.62 or 8.89, depending on whether manual therapy or therapeutic massage was rendered in combination with three-to-four region chiropractic manipulation.  Thus the modalities represented slightly more than could be billed for any one patient on any one day.  Patients were often subjected on the same day to physical therapy services and to chiropractic manipulations, and although all such treatment should have been limited to a total of eight units per day, Defendants billed the physical therapy and chiropractic care separately to maximize the amount billed while hiding the fact excessive treatment was provided.  As discussed above, on and after October 1, 2020, the cap on relative value units was increased to 12, but new rules explicitly applied that cap to all covered services

70

rendered by all providers on any single date and the Physical Therapy Defendants were continuing to provide close to 8 relative value units of treatment to patients.  Accordingly, on and after October 1, 2020, at the two addresses which continued to operate, chiropractors at 105-10 Flatlands stopped treating patients, and chiropractors at 204-12 Hillside rendered only one-to-two region or three-to-four region chiropractic manipulations with a total relative value of either 4.57 or 6.  Thus, chiropractic treatment changed not because of any individualized health care decision about what would be in the best interests of the patients, but because Defendants designed a protocol to deliver under the 12 relative value units allowed and between them maximize the amount charged per patient.

203.    To support the chiropractic treatment provided and billed, the Chiropractor Defendants create initial examination reports, purportedly documenting initial examinations ("Chiropractic Initial Reports"), and daily chiropractic progress or treatment notes ("Chiropractic Daily Notes").  Both the Chiropractic Initial Reports and Chiropractic Daily Notes are form documents that are not credible and reflect patient complaints and treatment manufactured to support further treatment.

204.    Chiropractic Initial Reports reflect:  (a) complaints of pain in the cervical, thoracic, and lumber spine; (b) pain levels that are either not recorded or reported as 6 or higher on a scale of 1 to 10; (c) positive findings on at least one of a variety of orthopedic tests; and (d) patients' prognosis as guarded.  *See, e.g.*, Ex. 12.  Based upon these purported histories, examinations, and findings, Chiropractic Initial Reports record diagnoses of multiple spinal conditions, including sprains in the cervical, thoracic, and/or lumbar regions of the spine, muscle spasms, and/or segmented joint dysfunction in one or more spinal regions.  *See, e.g., id.*  These findings that

patients purportedly suffer from conditions in so many regions serve to justify more extensive

manipulations for which Defendants can submit a higher charge under the applicable fee schedule.

205.    Chiropractic Initial Reports also contain a preprinted treatment plan with either a

boilerplate narrative description of the treatment plan or a limited number of treatment "options"

that can be checked.  Notably, although Chiropractor Defendants Kings Wellness Chiropractic,

All About Chiropractic, J Park Chiropractic, and AOT Chiropractic treat patients at different

locations (*i.e.*, 105-10 Flatlands, 204-12 Hillside, and 2451 E. Tremont), their Chiropractic Initial

Reports include the identical boilerplate treatment plan, which states verbatim:

> Chiropractic Manipulation (CMT) is a form of manual treatment that influences
> joints and neurological function.  This treatment may be accomplished using a
> variety of techniques.  Treatment will be consisted [sic] of gentle chiropractic
> manipulation to the appropriate parts of the spine.  Various soft tissue techniques
> such as ischemic compression to myofascial trigger point, stretching and manual
> release therapy will be utilized.  The frequency of treatment will be modified as
> appropriate.  Chiropractic manipulative therapy places emphasis on a correction of
> the joint segmental dysfunction of vertebra, which are resistant to normal segmental
> joint motion.  This treatment protocol has been proven to be effective in eventual
> correction of intercasesus disrelationships to remove nerve interference and restore
> function.  No other discipline renders this treatment.

*See, e.g.*, *id.*

206.    Chiropractic Daily Notes purport to reflect chiropractic manipulations provided to

each patient and assessments of the patients' conditions; but, at most, they reflect cursory

evaluations of patients.  Chiropractic Daily Notes consist of pre-typed worksheets with spaces to

circle findings and treatment rendered.  *See* Ex. 13.  Most of the Chiropractor Defendants'

Chiropractic Daily Notes report on each visit patients' complaints of neck pain, upper or mid back

pain, and low back pain and that the patients present with purported objective findings, including

misalignment, tenderness, and/or spasms in multiple regions of the spine.  AOT Chiropractic's

notes do not even document patient complaints or other findings, recording only the treatment

rendered and the spinal segments treated.  *See* Ex. 13C.  While a variety of potential chiropractic manipulation options and techniques are potentially available in a legitimate setting, the Chiropractor Defendants' documentation does not describe the kind of chiropractic manipulations purportedly provided, and thus does not indicate there is any variation in the time, frequency, or type of chiropractic manipulations regardless of whether the patients improve or get worse.

### 4.     Acupuncture Treatment

207.    The Acupuncture Defendants purport to perform acupuncture treatment on most Metro Pain patients on the same days the patients also receive physical therapy and chiropractic manipulations.   This acupuncture treatment is medically unnecessary and not legitimately provided.

208.    Acupuncture services are premised upon the theory there are 12 primary meridians with matching sinew channels and 10 extraordinary meridians ("the Meridians") in the human body through which energy flows.  Under the principles of acupuncture or Chinese medicine, every individual has a unique energy flow, also referred to as "Chi."  When that Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and thereby restore the patient's Chi.

209.    Legitimate acupuncture treatment begins with an examination of the patient.  In addition to taking a detailed patient history and general medical history, a physical examination is also performed.  Two critical components of this examination are the appearance of the patient's tongue (*i.e.*, color, shape, texture, etc.) including the veins underneath the tongue, and various measurements of the patient's pulse (*i.e.*, rate, rhythm, strength, etc.).  The information gleaned from the physical examination is necessary to accurately diagnose the patient and determine an

individualized acupuncture treatment plan designed to benefit the patient by restoring their unique Chi.

210.    Next, a patient-specific acupuncture treatment plan is developed.  This generally requires the insertion of needles into particular Acupuncture Points along the Meridians.  There are over 360 Meridian Acupuncture Points, numerous "extra" points, and countless "Ah Shi" points from which an acupuncturist may choose.  Ah Shi points can only be detected by touch and palpation, often feel like a pea-size nodule under the skin, and are treated similarly to an Acupuncture Point.  The location of Ah Shi points will necessarily vary from patient to patient and can often vary in a single patient over the course of multiple visits.  This requires the practitioner to conduct a thorough examination and to properly document the location of the Ah Shi points in the particular patient.  Any legitimate acupuncture treatment plan should typically include local points at the injury sites, proximal points (*i.e.*, near the affected areas of the involved Meridian(s)), distal Acupuncture Points (*i.e.*, distant from the affected areas of the involved Meridian(s)), and also address any Ah Shi points.

211.    Finally, an acupuncture treatment plan is implemented.  Treatment involves insertion of generally 10, but more typically 20 or more acupuncture needles, for a minimum of approximately 20 minutes into each of the selected Acupuncture Points.  The number and location of the Acupuncture Points generally varies based on each patient's unique circumstances and the patient's documented therapeutic response to each prior acupuncture treatment.  Generally, more severe conditions are treated with greater frequency and more Acupuncture Points.  As patients improve, treatment frequency and the number of points used should decrease.

212.    The goal of legitimate acupuncture treatment is to effectively treat and benefit patients by restoring their unique Chi, relieving symptoms, and returning them to normal activity.

Legitimate acupuncture therapy requires continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments.  Acupuncture treatment plans, like most treatments, are fluid and should evolve over time as a patient responds to care.  The goal of any legitimate acupuncture treatment plan is to return the patient to maximum health by restoring his or her unique Chi.

213.    The Acupuncture Defendants' protocol treatment does not comport with any of the above basic tenets of legitimate acupuncture treatment.  Rather, it consists of inserting needles and cupping in an assembly line fashion and is not designed to effectively treat or otherwise benefit patients.  As such, the acupuncture services are not medically necessary, but rather are designed to enrich the Acupuncture Defendants through the submission of fraudulent charges.

214.    Patients receive the same acupuncture treatment regardless of their condition or complaints.  On virtually every visit, charges include two units of acupuncture, plus codes reflecting cupping.  Patients treated at 2451 E. Tremont also typically receive infrared therapy. *See* Exs. 8-11.

215.    Acupuncture involving the insertion of needles is typically billed under a combination of CPT Codes that include either 97810 and 97811 (treatment without electronic stimulation) or 97813 and 97814 (treatment with electronic stimulation).  The New York fee schedule limits reimbursement for this treatment to one charge for the first 15 minutes of treatment and a second charge for the next 15 minutes of treatment, respectively, regardless of the number of needles inserted.  Charges for two units of acupuncture therapy on virtually every visit indicate the areas into which needles were inserted could not both be done during a single 15-minute interval and that a second 15-minute interval is required to insert new needles.  However,

examination reports and treatment notes provide no explanation for needing to reinsert needles, and it is improbable that virtually every patient would require reinsertion.

216.     Another component of the Acupuncture Defendants' fraudulent acupuncture treatment is "cupping."  Cupping involves the application of suction to the skin using a small, open-mouth vacuum, jar, "cup," or pneumatic device to create a vacuum over the skin.  Cupping is premised on the theory that suction at appropriate locations removes pain-inducing stagnant blood by bringing it to the surface.  During cupping, the cup is usually applied to the lower back, shoulders and neck, and then left on the skin for about 10 minutes.  While cupping may be appropriate for some patients in some circumstances, in a legitimate acupuncture setting it is performed infrequently as it usually produces noticeably visible bruises or welts on the skin.  Also, due to the high likelihood of bruising, cupping is generally contraindicated for people who bruise easily or are obese.  Moreover, even when cupping is indicated, it should not be repeated on the same patient regularly and it would be highly unusual to include cupping as part of each acupuncture session.  Contrary to legitimate uses of cupping, however, the Acupuncture Defendants performed cupping for most acupuncture patients on most dates acupuncture is provided.  *See* Exs. 8–11.  In some cases, cupping was the only acupuncture service provided.  *See, e.g.*, Ex. 14.

217.     The Acupuncture Defendants' documentation provides no justification for cupping or any explanation as to why it is being used as opposed to, or in addition to, routine acupuncture. There is also no indication anyone inquires whether a patient would bruise easily or considers whether patients' weight or body characteristics might render them inappropriate candidates for the procedure.

218.    Among the reasons the Acupuncture Defendants administered cupping and did so with such frequency is because they know cupping is not a listed treatment modality under the fee schedule applicable to New York No-Fault claims.   The Acupuncture Defendants billed for cupping under CPT Code 97799 as an unlisted physical medicine or rehabilitation service or procedure, which enables the Acupuncture Defendants to set their own reimbursement charges, increase the amount they charge on a daily visit, and circumvent the fee schedules applicable to more common acupuncture treatments.

219.    Contrary to legitimate treatment, the frequency with which the Acupuncture Defendants render acupuncture treatment does not change or diminish over the course of care, with patients consistently receiving treatment two to three days per week.   Acupuncture treatment is also consistently provided on the same dates as physical therapy and chiropractic care.

220.    To support the acupuncture treatment provided and billed, the Acupuncture Defendants create initial examination reports, purportedly documenting initial examinations, and daily treatment or SOAP notes, purportedly documenting treatment provided.   Both the initial examination reports and daily notes are form documents, are not credible, and reflect patient complaints manufactured to support treatment.   Initial examination reports indicate:  (a) patients present with neck and/or back pain and pain in another region of the body; (b) patients diagnosed with Qi-blood stagnation or obstruction, and in some instances the diagnosis is preprinted on the boilerplate form, even though this diagnosis is so general as to be of almost no clinical value; and, in some instances, (c) in preprinted, boilerplate language that the injuries reported during the examination, including Qi-blood stagnation, were caused by the motor vehicle accident. *See, e.g.*, Ex. 15.  Daily treatment notes indicate:  (a) patients presenting with pain, tenderness, stiffness, and/or spasms in their cervical and/or lumbar spine; (b) despite the importance of tongue

characteristics and pulse in evaluating a patient's condition and Qi, no mention of the condition of the tongue or pulse; and, (c) when recorded, patients' response to treatment is designated by no more than a checked box with no discussion of patients' conditions or responses. *See, e.g.*, Ex. 16.

221.  Amendments to the New York fee schedule effective October 1, 2020, substantially limited the services for which acupuncturists were entitled to reimbursement. First, the amended fee schedule eliminated acupuncturists' ability to receive reimbursement for any services other than patient examinations and needle treatment with or without electronic stimulation. Acupuncturists could therefore bill for only four services after October 1, 2020. Moreover, the amendments expressly included acupuncture services within the daily limitation on relative values billable for a patient on a single date of service, further restricting the scope and extent to which physical therapists, chiropractors, and acupuncturists could treat the same patient on the same date. So while acupuncture was claimed to be a necessary component of treatment when it did not count against the daily limitation on relative value units, by October 2020, Metro Pain patients ceased receiving acupuncture services altogether.

### 5.  MRI Testing

222.  Another component of Defendants' scheme is that Metro Pain refers virtually every patient who receives more than one office visit for MRIs. Based on the financial arrangements and relationships between and among Shapiro, Alon, and Moshe, a majority of the MRIs for patients of 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont are performed by Alon's Columbus Imaging and Medaid Radiology or Moshe's lay-controlled Citimedical I. Such MRIs are medically unnecessary, almost always involve two or more regions, do not lead to an alteration in treatment, and are expensive, typically from $631.02 to $936.23 per MRI.

223.  MRI is an imaging technique that can produce high-quality images of the muscle, bone, tissue, and nerves inside the human body. MRIs can be used following automobile accidents

to diagnose abnormalities in the peripheral nerves and nerve roots through images of the nerves, nerve roots, and surrounding areas. MRIs should only be performed after an individualized determination is made on each patient that it is medically necessary. For example, MRIs may be ordered when a patient's diagnostic picture is particularly unclear, response to treatment is atypical or not significant, or there are legitimate concerns about structural damage or internal injuries to the patient. Additionally, one primary purpose of obtaining an MRI is to guide treatment decisions. When MRIs are ordered, they should be limited to the targeted body part or area of interest, as the findings would affect treatment decisions. It is thus typically inappropriate to order MRIs on multiple regions of the spine, particularly for injuries sustained in automobile accidents.

224. When MRIs are clinically indicated and ordered, the prescribing provider should evaluate the significance of the MRI interpretations and incorporate those findings into ongoing diagnoses and future treatment plans. Prescribing providers should seek clinical corroboration as to whether any of the identified abnormalities in the MRI interpretations are symptomatic and/or present any clinical significance to the patient. For instance, it is well-established most abnormalities identified by MRIs have no clinical significance, result in no identified symptoms for the patient, and are related to patients' normal aging process or are of a historical nature and have no correlation with any acute injury. As a result, it is important for the health care professional treating a patient for an acute injury to differentially determine which, if any, abnormalities identified by MRIs may be related to the presenting symptoms and/or any acute injury, and then to factor that information into the differential diagnosis and future treatment plan.

225. Metro Pain's patients routinely received MRIs within 60 days of their motor vehicle accidents. The only Metro Pain patients who do not receive MRI testing had either (a) already

been referred for MRI testing by a provider prior to treating with Metro Pain; (b) were aged 14 or younger; or (c) received only a single office visit with Metro Pain.

226.    The MRI Defendants perform MRIs on at least two regions for virtually every patient.  *See* Ex. 17.  Regardless of the MRI findings, Defendants' treatment of patients does not change.  After receiving MRIs, patients continue with the same Predetermined Treatment Protocol in place before the MRIs were ordered.

227.    The MRIs are not medically necessary because (a) Defendants do not alter treatment based on the MRI findings; (b) it is improbable so many patients required an MRI; and (c) even if every patient required an MRI, it is improbable virtually every MRI patient required an MRI of at least two regions of the spine and/or extremities.

228.    The MRIs performed by the MRI Defendants are not only unnecessary, but the result of improper relationships and arrangements between and among Shapiro, Alon, and Moshe. Metro Pain and Shapiro were members of Alon's "Beshert network," pursuant to which providers sent patients to other members and would have obtained patients through Beshert's "marketing" and "advertising," which amounted to solicitation of No-Fault patients.   As discussed in Paragraphs 152 to 158, Metro Pain paid Beshert $10,000 each month presumably to acquire patients and, while Metro Pain financial records indicate it paid Beshert different amounts in different years, the records reflect payments of at least $300,000 over three years from 2017 to 2019.  Participation in the "network" and access to patients almost certainly required Metro Pain to send patients to the MRI Defendants.  Shapiro and Metro Pain were similarly incentivized to send patients to Moshe's Citimedical I.  Moshe paid Shapiro at least $400,000 in salary for a job at Excel Surgery, paid Shapiro for similar medical directorships at Dynamic Surgery and HealthPlus Surgery, gave Shapiro's Premier Anesthesia and PMR Medical primary, if not

exclusive, rights to perform and bill for anesthesia at Moshe's ASCs, paid Shapiro through Citimed Services at least $74,000, and loaned Metro Pain $2.5 million against its receivables.

229.     Metro Pain's referrals of patients to the MRI Defendants were thus the result of (a) a kickback relationship between Moshe, Alon, Beshert, and Shapiro pursuant to which Metro Pain obtained access to patients in exchange for an agreement to refer patients to the MRI Defendants; and (b) a kickback relationship pursuant to which Moshe compensated Shapiro in exchange for patient referrals to the MRI Defendants.  Based on such financial arrangements, the MRI Defendants were not eligible to collect No-Fault Benefits in New York, and it is inequitable and contrary to the public policy of New York to allow the MRI Defendants to retain any benefits obtained.

### 6.     Durable Medical Equipment and Orthotics

230.     Metro Pain orders and allows most patients treated at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont to receive unnecessary Supplies.  Physicians and physician assistants treating through Metro Pain order for most patients who have more than one office visit unnecessary cervical and/or lumbar collars and at least five, and as many as 21, other Supplies.  *See* Exs. 1, 8-11.  Supplies are purposely prescribed in a way that allows suppliers of DME and orthotics ("DME Suppliers") to circumvent applicable fee-schedule limitations and inflate their charges.  Nazarov and Right Aid Medical Supply were among the DME Suppliers to Metro Pain's patients, providing Supplies to the majority of Metro Pain patients at 2451 E. Tremont.  Ex. 18.

231.     DME generally consists of items that can withstand repeated use and are primarily used for medical purposes by individuals in their homes.  Orthotic devices generally consist of supports for the neck, back, and other body parts, such as cervical collars and lumbar supports ("LSOs").

232.    Since October 2004, the fee schedule applicable to New York No-Fault claims for DME and orthotic devices has provided, in pertinent part, "the maximum permissible charge for the purchase of [DME], . . . and orthotic . . . appliances shall be the fee payable . . . under the New York State Medicaid program at the time such equipment and supplies are provided. . . [I]f the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of: (1) the acquisition cost (i.e., the line item costs from a manufacturer or wholesaler, net of any rebates, discounts, or other valuable consideration, mailing, shipping, handling, insurance costs, or any sales tax) to the provider plus 50%, or (2) the usual and customary price charged to the public." 12 N.Y.C.R.R. § 442.2.

233.    Metro Pain's Initial Examination Reports and/or Follow-Up Examination Reports include predetermined lists of Supplies physicians can check to prescribe and order particular items. *See, e.g.*, Exs. 2, 7. Metro Pain also has separate form documents with lists of Supplies physicians can check to order. *See, e.g.*, Ex. 4. None of these documents contain an option for "other" or a blank for the physician to prescribe any Supplies not on the list.

234.    Metro Pain's prescriptions were written in a way that helped to conceal the true volume and nature of Supplies prescribed and provided, and allowed DME Suppliers to charge substantial amounts. Orders for Supplies were sometimes separated between initial and follow-up visits. Spreading prescriptions over time served to hide the significant volume.

235.    Metro Pain's documentation also described Supplies in generic terms. The use of generic descriptions helped DME Suppliers hide what they were actually providing and allowed DME Suppliers to claim the physician had ordered expensive items they purported to provide and bill.

236.    Moreover, the particular items Metro Pain prescribed were items it knew DME Suppliers routinely provided to patients and could use to exploit the No-Fault Laws and charge substantial amounts.  In particular, Metro Pain prescribed items on the fee schedule (for which there was a "fee payable . . . under the New York State Medicaid program") reimbursable at very high rates depending on how the item was described and coded.

237.    Among the expensive Supplies Metro Pain regularly prescribed were cervical collars, often describing them in prescriptions as "Cervical Collar 2 pc."  Cervical collars are among the most common orthotic devices.  They are worn around the neck to restrict movement and relieve muscle tension.  Various types of cervical collars are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $6.80 to $357 for specific types of cervical collars, each of which is described by a particular HCPCS Code ranging from L0120 to L0180.  Absent some express indication in a prescription form or other documentation that a more sophisticated cervical collar is necessary, prescriptions for a cervical collar should be filled with a flexible, nonadjustable foam cervical collar and billed under HCPCS Code L0120 at $6.80 (a "basic cervical collar").  Metro Pain's ordering of cervical collars and generic descriptions of them allowed DME Suppliers to purport to provide cervical collars under HCPCS Code L0130 and bill $183.99 and also under HCPCS Code L0180 and bill $233.  The use of the applicable HCPCS Code L0130 indicated the device was purportedly "molded to patient[s]."  Charges for these cervical collars, which Metro Pain's prescriptions supported, were fraudulent because:  (a) the devices were not medically necessary; (b) the charges are substantially more than the amount to which the DME Supplies would have been entitled under the No-Fault Laws for the basic orthotics; and (c) it is unlikely any molding

was medically necessary because there is little, if any, indication anyone performed the necessary fitting or adjustments for molding or had the expertise to do so.

238.    Metro Pain also prescribed LSOs, often ordering that they be "custom" LSOs or "custom fit."  LSOs are a common orthotic device worn around the torso that extend below and above the waist to restrict movement and relieve muscle tension in the lower back.  Various types of LSOs are available depending on each patient's unique circumstances.  During the relevant period, the fee schedule established prices ranging from $43 to $1,150 for specific types of LSOs, each of which is described by a particular HCPCS Code ranging from L0625 to L0650.  Absent some express indication in a prescription form or other documentation that a more sophisticated LSO is necessary, prescriptions for an LSO should be filled with a flexible LSO and billed under HCPCS Code L0625 at $43 (a "basic LSO").  Metro Pain's ordering of LSOs and generic descriptions of them allowed DME Suppliers to purport to provide LSOs under various HCPCS Codes for amounts ranging from $322.98 to $1,150.  Again, some of these HCPCS codes indicated the device was "customized to fit a specific patient by an individual with expertise."  Other HCPCS codes indicated the device was "custom fabricated."  Charges for these LSOs, which Metro Pain's prescriptions supported, were fraudulent because:  (a) the devices were not medically necessary; (b) the charges are substantially more than the amount the DME Suppliers would have been entitled under the No-Fault Laws for the basic orthotics; (c) it is unlikely any custom fitted LSOs were medically necessary because there is little, if any, indication anyone performed the necessary fitting or adjustments for custom fittings or had the expertise to do so; and (d) it is unlikely any LSOs were custom fabricated from scratch.

239.     Moreover, many patients received two expensive LSOs, including patients of Right Aid Medical Supply.  It is unlikely any one patient would need two such expensive devices, and improbable that so many would.

240.     Metro Pain also prescribed items that were not on the fee schedule it knew DME Suppliers could obtain very cheaply and falsely claim they purchased at a high cost to justify a high markup under the reimbursement rules.  Patients typically received a package of Supplies that included foam rubber mattresses, lumbar cushions, bed boards, heat pads, water circulating pumps, and cervical traction units.  Charges for these Supplies were typically at least $1,100.

241.     Metro Pain's patients typically receive five or more Supplies, with some patients prescribed as many as 21 Supplies.  Many patients receive at least one cervical collar and one LSO, along with the other items.

242.     It is improbable so many patients would need so many Supplies and would need the same types of Supplies.  Metro Pain's patient population consists of fully ambulatory individuals who purportedly suffered relatively minor soft-tissue injuries and are sent by their healthcare providers for, among other things, physical therapy, acupuncture, and chiropractic manipulations.  Among the purposes of lower back supports, LSOs, cervical collars, and knee, wrist, elbow, and shoulder orthoses is to restrict and limit movement.  Physicians typically prescribe such devices to restrict movement when a patient is in intense pain aggravated by movement or there is a concern about stability.  Appropriate treatment for patients trying to heal and rehabilitate soft-tissue injuries, however, requires movement of the injured tissues, and even the Predetermined Treatment Protocol purports to include treatment for precisely that purpose, including physical therapy and chiropractic manipulations.  Under such circumstances, it should

be unnecessary, and in fact contraindicated, to provide restrictive orthotics for any region of the body, yet Metro Pain routinely prescribes multiple orthotics for multiple regions.

243.    Based on the prescriptions issued by Metro Pain, DME Suppliers were in a position to (1) purport to deliver and bill for expensive Supplies on the New York fee schedule and (2) fraudulently inflate certain charges for items not identified under the fee schedule.  There is no legitimate reason for Metro Pain's patients to receive the Supplies they did or for Metro Pain to write prescriptions in the way it did.  Given the existence of improper financial arrangements between Metro Pain and providers of services at the locations at which it operated, it is almost certain such arrangements existed between Metro Pain and DME Suppliers, including the DME Defendants.  The DME Suppliers would not have been eligible to collect No-Fault Benefits in New York, and it would be inequitable and contrary to the public policy of New York to allow the DME Suppliers or Metro Pain to retain any benefits obtained from such arrangements.

244.    Metro Pain's prescription of these Supplies caused them to be provided and fraudulent claims for them to be submitted.

### 7.    Diagnostic Testing

245.    Metro Pain and some of the Physical Therapy Defendants and Chiropractor Defendants often prescribed, referred, and in some instances preformed medically unnecessary diagnostic tests on patients of 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont, including Outcome Assessment Tests, NCV and EMG Tests, computerized ROM and muscle tests, functional capacity tests, and Pf-NCS Tests that are unnecessary, do not lead to an alteration in treatment, and, for some tests, are duplicative of information obtained during the purported examinations.  Such tests are ordered because they allowed providers to profit from patients' No-Fault Benefits as part of pay to play arrangements with Metro Pain.

### a.      Fraudulent Outcome Assessment Tests

246.     Metro Pain almost always conducts one or more rounds of medically unnecessary Outcome Assessment Tests on its patients.  These tests are generally performed on the same dates Metro Pain performs follow-up examinations, are separately billed to State Farm Mutual or State Farm Fire, and are medically useless.  Indeed, those patients who do not consistently receive Outcome Assessment Tests are typically patients who have only an initial exam and one date of service with Metro Pain.

247.     Outcome Assessment Tests involve multiple-choice questionnaires patients complete by reporting their complaints and the impact of those complaints on their lives.  Metro Pain administers up to six different questionnaires, each of which corresponds to a body part or condition and are titled (1) Headache Disability Index; (2) Roland Morris Disability Questionnaire (to measure spinal disability); (3) Subjective Knee Score Questionnaire; (4) Shoulder Pain and Disability Index; (5) Neck Disability Index; and (6) Oswestry Low Back Pain Disability Questionnaire.  According to Metro Pain's documentation, each questionnaire can involve at least 13 and as many as 25 questions, thus totaling more than 100 questions.  Patients complete the questionnaires on iPads in Metro Pain's waiting room, and Metro Pain then uses a software program to convert patients' answers to a single numeric score for each questionnaire representing a level of disability for the body part at issue, along with a graph.  Indeed, when asked whether patients complete the questionnaires in front of a doctor or in the waiting room, Shapiro testified, "It's done in the waiting room."  Thus, the tests require virtually no effort from any health care professional or interaction between healthcare professionals and patients.

248.     While Outcome Assessment Tests can have value in clinical studies or in circumstances in which a provider seeks to track patients' subjective reports of their conditions over time, the manner and method in which Metro Pain employs the tests does not provide any

benefit.  Metro Pain subjects its patients to multiple tests, and in many cases all six tests, regardless of whether patients present with conditions covered by the separate tests.

249.    In support of the Outcome Assessment Tests, Metro Pain submits boilerplate letters of medical necessity attached to the computer generated results.  These letters state the tests "are invaluable for documenting the response of patients to the medical care they are receiving" and "significantly help in clinical decision making by focusing the physician on issues, which influence the choice of therapy for our patients."  Ex. 19.  There is no indication any Metro Pain physician reviews or administers the test, discusses the results with the patient, or considered the results in developing or modifying the patient's treatment plan.  In fact, Shapiro testified, "[t]he answers don't matter that much."

250.    Metro Pain's Outcome Assessment Tests generally report patients suffer from some level of disability in one or more tested body parts.  Although tests performed over the course of treatment should reflect patient improvement, subsequent tests of Metro Pain's patients continue to reflect disabilities and, in some instances, worsening of disabilities.

251.    Even assuming a physician reviewed the test results, and there is no indication this occurred, Metro Pain inappropriately billed for the tests under CPT Code 99358.  CPT Code 99358 indicates "Prolonged Provider Services without Direct (Face-to-Face) Patient Contact" and "may include review of extensive records and tests."  This code is to be used "to report the first hour" of services and is reimbursable at a rate of $204.41.  Given patients complete these questionnaires outside the examining physician's presence and each patient's responses are tracked and charted through a computer program, any Metro Pain physician who reviews the results could not reasonably spend 30 minutes doing so, much less an hour.  Moreover, information reported in the Outcome  Assessment  Tests  is  duplicative  of  that  gathered  during  initial  and  follow-up

examinations.  Metro Pain thus improperly double billed for patient evaluations during the office visit, and then again for contemporaneously provided "outcome assessment tests."

252.    The Outcome Assessment Tests were thus not performed for any legitimate purpose.  Rather, they were conducted to financially enrich Metro Pain and to create additional documentation that could be used to justify the Predetermined Treatment Protocol and services by providers who paid for access to patients at the locations Metro Pain controlled.

### b.    EDX Testing

253.    Metro Pain patients were also frequently subjected to NCV and EMG Tests.  At least some of these NCV and EMG Tests were performed by providers with whom Metro Pain had financial arrangements disguised as leases, but were, in fact, kickbacks in exchange for access to patients, including Northern Medical and Classic Medical.

254.    Both Northern Medical and Classic Medical had leases with Metro Pain.  In virtually identical language, the agreements purported to grant to Northern Medical at 105-10 Flatlands and 204-12 Hillside and to Classic Medical at 717 Southern the "right to license a portion of the Building including an examining room located in the Leased Premises and currently occupied by the Licensee on an exclusive basis and for those periods delineated on Schedule 'A' attached hereto."  While rent payments were purportedly for the use of space, the agreements themselves revealed that payments were for access to patients and based on the value of the services rendered.  For example, although Northern Medical treated patients at 105-10 Flatlands and 204-12 Hillside only three or four days each month, it paid $1,500 per month to Metro Pain pursuant to its written licensing agreements, while chiropractors who rendered services at those same locations five days per week, four weeks per month purportedly paid the same $1,500 per month rent.  Similarly, Classic Medical paid $5,000 per month at 717 Southern and only rendered treatment one to two days each month, while chiropractors treating patients at that location five

days per week, four weeks per month purportedly paid the same amount. Northern Medical's and Classic Medical's "rent" payments to Metro Pain were thus substantially higher and did not reflect market value for the use of space, but the higher dollar value they could earn for EDX Tests compared to what chiropractors and other conservative care providers could earn for such treatment. Moreover, total payments from all providers to Metro Pain for purported rent at each location were more than its rental obligations to the property owner. There can thus be no question providers' payments to Metro Pain were not tied to the fair market value of space, but rather were for access to patients on whom Northern Medical and Classic Medical could perform NCV and EMG Tests.

255. Legitimate electrodiagnostic tests can be performed on patients who report symptoms that may suggest neurological pathology, such as pain in the neck and/or lower back region that radiates to the arms or legs, abnormal weakness in limbs, or significant changes in sensation in limbs. If properly performed and interpreted, NCV and EMG Tests can be used to diagnose the existence, nature, extent, and specific location of nerve abnormalities that may be causing the purported symptoms, including peripheral nerve injuries (*e.g.*, injuries to the nerves in the arms and legs) and radiculopathies (pinched nerve roots that run along both sides of the spine at each vertebra level). According to the recommended policy of the American Association of Neuromuscular & Electrodiagnostic Medicine (the "Recommended Policy"), "EDX studies are individually designed by the EDX consultant for each Patient," and "[t]he examination design is dynamic and often changes during the course of the study in response to new information obtained." Therefore, the decision of which nerves and muscles should be tested with NCV and EMG Tests should be individually tailored to address each patient's unique circumstances based on a history and examination of the patient, as well as the real-time results as the NCV and EMG

Tests are performed.  Under the Recommended Policy, the maximum number of EDX tests that should be required to diagnose radiculopathy in more than 90% of patients is:  (a) NCVs of three motor nerves and two sensory nerves, and (b) EMGs of two limbs.  These maximum numbers "are to be used as a tool to detect outliers so as to prevent abuse and overutilization."  It is often appropriate for providers to perform fewer tests.

256.    The majority of Metro Pain's patients were subjected to NCV and EMG Tests.  *See* Ex. 1.  However, it is exceedingly unlikely so many patients required NCV and EMG Tests.  Indeed, NCV and EMG Tests were purportedly provided to Metro Pain patients to diagnose or rule out radiculopathy.  In a legitimate setting, a patient suspected of suffering from radiculopathy would show signs of neck or back pain accompanied by numbness, tingling, weakness, and/or pain radiating to an extremity.  However, Metro Pain's Initial Evaluation Reports do not identify these complaints for many patients who received NCV and EMG Tests.  Rather, it appears the transient provider performs the NCV and EMG Tests on whatever patients are present, willing, and able on the particular day the provider is performing those tests at the clinic pursuant to the "lease" agreement with Metro Pain.

### c.    Computerized ROM and Muscle Testing

257.    The majority of Metro Pain's patients is also subjected to medically unnecessary computerized ROM and muscle tests ordered by Metro Pain and performed by the Physical Therapy Defendants Nile Rehab PT, Handy PT, Physical Therapy of NY, and AM Patel PT or transient providers with whom Metro Pain has entered into financial arrangements.  *See* Ex. 1.

258.    As discussed above, Metro Pain ordered computerized ROM and muscle tests by checking boxes on its Initial Examination Reports and through separate Metro Pain referral forms.

259.    The measurement of a particular joint's full mobility is that joint's range of motion.  Charts listing generally agreed upon full ranges of motion for each joint are available in many

standard textbooks. A traditional, manually performed range of motion test consists of a non-electronic measurement of a joint's ability to move through its arc of motion, which is then compared to an unimpaired or ideal joint. Active range of motion testing is effectuated by a doctor asking the person to move a joint to its full extent, and measuring the movement by a manual inclinometer or goniometer (devices used to measure angles) or by visual estimation. Active range of motion can be inaccurate if the patient does not provide full effort. Passive range of motion testing is performed by the clinician moving a patient's joints to identify anatomic restrictions of movement.

260. A traditional, manually performed muscle strength test consists of a non-electronic measurement of muscle strength using a generally accepted scale of 0 to 5, accomplished by having the person move a joint against resistance applied by a physician or clinician. For example, if a physician were to measure knee flexion strength, the physician would apply resistance against the patient's posterior foreleg while the patient flexes the knee.

261. A physical examination performed on a patient with soft-tissue trauma will typically require manual range of motion testing and muscle strength testing to assess and diagnose an injury and develop a program to address limitations in motion and strength. Doctors document range of motion and strength impairment to provide an objective frame of reference as it pertains to functional tasks, which allows the doctor to monitor progress. Manual range of motion and strength tests are regularly done as part of patient initial and follow-up evaluations and are billed as part of the overall evaluation charge; they are not billed separately.

262. The computerized ROM test is purportedly performed through the placement of a digital inclinometer (typically affixed by Velcro straps) on various parts of a patient's body while the patient is asked to move the related joint through its available motion. The ROM test is almost

identical to the manual range of motion testing, except that a digital reading is gained rather than a manual one.  This test is also dependent upon patient cooperation and effort, as well as the skill of the examiner.

263.    The computerized muscle test is purportedly performed through the placement of a device against a stationary object, against which the patient contracts a particular muscle three to four separate times.  The muscle test is almost identical to the manual muscle strength testing performed by physicians during an examination, except that a digital reading is gained identifying the pounds of pressure the patient exerts as opposed to a 0 to 5 scale.  The electronic data gathered does not account for whether the patient is applying full effort, and its accuracy is therefore dependent upon patient cooperation, effort, and the skill of the examiner.  Providers performing manual muscle testing, as opposed to computerized testing, are better able to detect whether a patient is exerting full effort in performing the test.

264.    When the computerized ROM and muscle tests are performed, the decision of which joints to test in a ROM test and which muscles to test in the muscle test should be tailored to each patient's unique injury and the clinical findings of that individual patient.  As a result, the particular joints and muscles tested should be individualized for each patient.

265.    While the ROM and muscle tests could be useful tools in some circumstances, for example, as part of a medical research study, their use by Metro Pain was unnecessary and part and parcel of the fraudulent Predetermined Treatment Protocol designed to maximize profits.

266.    In particular, patients at the Metro Pain clinics allegedly received traditional, manual ROM testing and muscle strength testing as part of their initial and follow-up examinations with, at least, Metro Pain, the Chiropractor Defendants, and the Physical Therapy Defendants.  Nevertheless, patients were also subjected to computerized ROM and muscle tests.  The

computerized ROM and muscle tests were not tailored to patients' individual needs, did not provide any meaningful data over the manual ROM and muscle strength tests allegedly performed, and were irrelevant to the monitoring of the restoration of function for purposes of treatment.  In the relatively minor soft-tissue injuries allegedly sustained by the patients, the difference of a few degrees in the patients' range of motion reading or pounds of resistance in the patients' muscle strength testing is unimportant to the diagnosis or treatment of such patients.

267.    Finally, many bills for computerized muscle tests submitted by the Physical Therapy Defendants and others include multiple charges of CPT Code 95831 with a separate charge for each purported measurement, as well as a separate charge for CPT Code 95833.  In some cases, the rendering providers, including the Physical Therapy Defendants, claim to have taken as many as six separate measurements, resulting in total charges of $332.32 per patient. According to the applicable fee schedule, however, a healthcare provider seeking reimbursement for muscle tests may only use CPT Code 95831 and bill 5.16 relative value units (translating into $43.60) for each "extremity" or "trunk section" tested, but should use CPT Code 95833 and bill a maximum of 14.88 relative value units ($125.73) if the entire body is tested.  As a result, even if the muscle tests had value and were reimbursable, rendering providers improperly inflated the charges on each bill seeking payment for the testing of more than three separate muscles.

268.    Moreover, rendering providers routinely unbundled computerized ROM and muscle tests performed on the same date, when the fee schedule requires providers who perform these two tests on the same date to bill under the time-based code CPT Code 97750, which allows for a single charge of $45.71 for every 15 minutes of testing performed.

269.    Amendments to the New York fee schedule effective October 1, 2020, eliminated providers' ability to receive any reimbursement for computerized ROM and muscle testing.

94

Although Metro Pain found such testing necessary to the treatment and care of its patients prior to October 1, 2020, as soon as providers could no longer bill separately for it, Metro Pain stopped recommending it and providers stopped performing it beginning October 1, 2020.

### d. Functional Capacity Tests

270.    Some Metro Pain patients, principally those treated at 717 Southern or 2451 E. Tremont, are also subjected to one or more rounds of medically unnecessary functional capacity tests.  *See* Ex. 1.  Documentation for these tests refer to them interchangeably as functional capacity tests and physical capacity tests, though only one test is involved.  Most Metro Pain Initial Examination Reports include treatment plans with a list of services that can be checked to order them, including "Functional Capacity Test" or  "FCE [Functional Capacity Evaluation] to determine patient's degree of disability and readiness to return to work."  *See, e.g.*, Exs. 2B, 2C, 2D.  The tests were typically performed by Physical Therapy Defendant AM Patel PT or transient providers with whom Metro Pain has entered into financial arrangements.

271.    Functional capacity tests are meant to gauge whether a patient has sufficient strength, endurance, and ability to perform the patient's job, to assist in vocational rehabilitation, to determine a patient's maximal functional level at the time they are fully improved, and to assist in setting any limits on job tasks a patient can perform.  In accordance with the applicable fee schedule, functional capacity tests should only be used "at the point of maximal medical improvement," and only when the patient:  1) is preparing to return to a previous job; 2) has been offered a new job; or 3) is working with a rehabilitation provider and a vocational objective is established.  The reasons for the functional capacity tests must be documented and reports must include patient demographics including work history, indications for the evaluation, and a narrative with recommendations.  Because these tests are most often used to evaluate work tolerance and the necessity for work restrictions, they should be individually tailored for each

patient and geared toward a specific diagnostic goal, such as determining if the patient can go back to their specific job or needs work restrictions or even a different job.

272.    The functional capacity tests performed on Metro Pain patients were medically unnecessary, were not individually tailored, and were administered in a formulaic fashion involving the same sets of tasks to almost every patient regardless of their unique circumstances, response to treatment, work status, or work type.  It is not claimed or documented that tested patients are "at the point of maximal medical improvement," but nonetheless tests are administered after which the Predetermined Treatment Protocol continues.  Records likewise do not include indications patients are preparing to return to a previous job, have been offered a new job, are working with a rehabilitation provider, or have established a vocational objective.

273.    Indeed, in certain instances, a physician associated with Metro Pain would execute a "Referral for Physical Capacity Evaluation" with preprinted and boilerplate language that makes no mention of work or job status:

> My comprehensive medical exam does not give me the specific details needed to measure specific function loss.  My medical exam includes a complete detailed history, orthopedic, neurological, muscle testing, and ranges of motion.  The physical capacity evaluation is more specific and more detailed than my comprehensive exam in relation to functional loss.  This specialized objective test incorporates muscle testing and static lift testing. . . . The main reason I chose this type of testing is because no other test addresses functionality. . . . The patient's treatment plan will be modified based upon the result of the functional evaluation.

*See* Ex. 20.

274.    Documentation of the functional capacity tests submitted to State Farm Mutual and State Farm Fire is limited, cursory, and difficult to interpret.  Patients purportedly perform six types of lifts, wherein the pounds of force they exert are recorded.  These measurements are imported into a software program that generates the report, bar graphs, and the patients' rating compared to normative averages, but there is no interpretation of their purported meaning.  Some

purport to reflect patients with measurements below the lowest 10th percentile, and indicate a minimum of the 25th percentile is required to return to work.  If these do, in fact, indicate a performance worse than the lowest 10th percentile, they would reflect a level of impairment that would be unusual in one patient with the types of injuries purportedly documented, let alone for a large number of patients.

275.    Tests were performed on most patients treated at 717 Southern or 2451 E. Tremont, but rarely on patients treated at 105-10 Flatlands or 204-12 Hillside.  It makes little sense Metro Pain would determine functional capacity tests were medically appropriate for patients at certain locations, but not appropriate for a substantially similar patient population treated at other locations.

276.    Patients' treatment is never altered as a result of the functional capacity tests.

277.    Further, Defendants submit charges for the functional capacity tests using CPT Code 97750, the code for physical performance testing, not functional capacity tests, which would properly be billed using CPT Code 97800.  In this way, they fraudulently conceal they are performing functional capacity tests and that their tests are ineligible for reimbursement because they have not met the reimbursement requirements for functional capacity tests in the applicable fee schedule.

278.    Amendments to the New York fee schedule effective October 1, 2020, eliminated providers' ability to receive any reimbursement for physical capacity evaluations under 97750. Although Metro Pain found such testing necessary to the treatment and care of its patients prior to October 1, 2020, as soon as providers could no longer bill separately for it, Metro Pain stopped recommending it and providers stopped performing it beginning October 1, 2020.

### d.    Pf-NCS Tests

279.    Most patients also receive medically unnecessary Pf-NCS Tests performed either by Chiropractor Defendants AOT Chiropractic and Evolution Chiropractic or a transient provider who has a financial arrangement with Metro Pain.  Ex. 1.  Some Metro Pain Initial Examination Reports include treatment plans with a list of services that can be checked to order, including "CPT tests" and "VSNCT tests," which are both Pf-NCS Tests.  *See, e.g.*, Ex. 2B.  These tests are performed for the purported purpose of diagnosing the existence, nature, extent, and location of abnormalities in a patient's sensory nerves and nerve roots.  However, such tests cannot reliably accomplish any such purpose.

280.    Pf-NCS Tests are noninvasive tests that, according to proponents, purport to diagnose abnormalities in the sensory nerves and sensory nerve roots.  They do not and cannot provide any diagnostic information regarding the motor nerves and motor nerve roots.  Pf-NCS Tests are performed by administering electrical voltage through specific sites to stimulate sensory nerves in the arms, legs, hands, feet, and face.  The intensity of the electrical voltage is increased until the patient reportedly perceives a sensation from the stimulus caused by the voltage.  "Findings" are then made by comparing the minimum intensity of electrical voltage at which the patient announces he or she perceives some sensation to the purported normal ranges.

281.    The sensory nerves are comprised of several different kinds of nerve fibers, including the A-beta fibers, the A-delta fibers, and the C fibers.  According to proponents, Pf-NCS Tests allegedly can diagnose the existence, nature, extent, and location of any abnormal condition in each of these noted nerve fibers by using three different frequencies of electrical current.

282.    Defendants know, however, that Pf-NCS Tests are unable to truly diagnose the existence, nature, severity, or specific location of any abnormalities in the sensory nerves or any of the nerve fibers.  Among other things, Defendants know Pf-NCS Tests cannot localize sensory

loss to any specific place within the nervous system.  Electrical current or voltage must travel between two points and complete a circuit.  Pf-NCS Tests involve electrical current or voltage traveling from a probe placed at the test site through the limb being tested, through the torso to a ground electrode placed under the patient's back.  Because the electrical current or voltage can affect any nerve in proximity to the electrical path from the probe to the ground electrode, there is no way to know the electrical stimuli are producing a sensation in any particular nerve.  Moreover, even if electrical current or voltage were stimulating a particular nerve, and a patient's statement of diminished sensation were indicative of an injury, there would be no ability to determine where along the path of that nerve from the limb to the brain — which includes the peripheral nerve, nerve roots, nerves in the spinal cord, and nerves in the brain — an injury existed.  As a result, Pf-NCS Tests cannot diagnose radiculopathies (injury at the nerve root) as any statement of diminished or heightened sensation could just as easily imply nerve injury somewhere along the nerve pathway other than at the nerve root.  Additionally, no reliable evidence proves valid normal ranges of intensity required to evoke a sensation in fact exist to compare with the unique results from an individual's Pf-NCS Tests to arrive at a legitimate finding.

283.    Moreover, data from Pf-NCS Tests can be manipulated in a number of ways to produce any desired result.  In particular, "findings" at each site are either plotted by hand on a graph or analyzed by computer to draw conclusions and make diagnoses.  The data, however, can be adjusted by a variety of factors, including a belief (which has no support in medical science) that a particular patient is naturally hypoesthetic or hyperesthetic, and a "correction factor."  Even if the Pf-NCS Tests had some medical or diagnostic value, no reliable evidence proves any of these adjustments is necessary or appropriate or anything more than an opportunity for the individual

analyzing the test results to reach a predetermined conclusion and use a manufactured finding of an abnormal condition to justify additional treatment that can be billed to insurers.

284.    Additionally, contrary to documents that rendering providers, including Chiropractor Defendants AOT Chiropractic and Evolution Chiropractic, submitted to State Farm Mutual and State Farm Fire, (a) even if valid normal ranges of intensity required to evoke a sensation existed, no reliable evidence proves a current perception threshold greater than the normal range would indicate a hypoesthetic condition (the sensory nerves have decreased function) or that a current perception threshold less than the normal range would indicate a hyperesthetic condition (the sensory nerves are in a hypersensitive state); (b) even if an abnormal current perception threshold indicated either a hypoesthetic or hyperesthetic condition, no reliable evidence proves the extent or cause of any such conditions could be identified from the Pf-NCS Test;[4] (c) no reliable evidence proves Pf-NCS Tests provide any information beyond what can be gleaned from a routine history and physical examination; (d) no reliable evidence proves Pf-NCS Tests provide any information that would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots; (e) the Pf-NCS Tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an automobile accident; and (f) there is no valid basis or support for the statements and claims in the reports on the Pf-NCS Tests.

285.    As a result of these concerns, there is no designated CPT Code for Pf-NCS Tests. Further, the Center for Medicare and Medicaid Services ("Medicare") reviewed the efficacy of current perception threshold tests, which are essentially the same as Pf-NCS Tests, and issued a

---

[4]  Numerous pathological and physiological conditions other than peripheral nerve damage can cause hyperesthesia and hypoesthesia.

national coverage determination concluding current perception threshold tests are not medically reasonable and necessary for diagnosing sensory neuropathies (*i.e.*, abnormalities in the sensory nerves) or radiculopathies, and therefore are not compensable.

286.    Metro Pain's patients' treatment is never altered as a result of Pf-NCS Tests.

287.    Finally, providers improperly code and bill for the Pf-NCS Tests to maximize reimbursement amounts the State Farm Companies and other insurers pay.  Rendering providers, including certain Chiropractor Defendants, bill State Farm Mutual and State Farm Fire for Pf-NCS Tests under CPT Code 95999, which under the New York fee schedule governing No-Fault claims, is an "Unlisted neurological or neuromuscular diagnostic procedure."  A separate charge using this code is submitted for each nerve purportedly tested.  The bills purport to report testing of at least one nerve, and often as many as 18 separate nerves, resulting in charges from $72.83 to $1,310.76 for a single test.  However, providers are prohibited from billing an unlisted code for otherwise ineligible services, such as the Pf-NCS Tests administered here.

288.    Amendments to the New York fee schedule effective October 1, 2020, eliminated chiropractors' ability to receive any reimbursement under CPT Code 95999.  Although Metro Pain and the providers with whom it had financial arrangements found Pf-NCS Tests necessary to the treatment and care of Metro Pain patients prior to October 1, 2020, as soon as providers could no longer bill separately for it, Metro Pain stopped recommending it and other providers stopped performing it beginning October 1, 2020.

### 8.    Prescription Drugs

289.    Metro Pain also prescribes and allows its patients to receive expensive and unnecessary prescription topical diclofenac gel and lidocaine/lidoderm patches. *See*, *e.g.*, Ex. 21.

290.    Metro Pain's Initial Examination Reports and/or Follow-Up Examination Reports include form language physicians can check or circle to order medications from a predetermined

list.   Among the preprinted medications that can be ordered are diclofenac 3% gel and lidocaine/lidoderm 5% patches or ointment.  *See, e.g.*, Exs. 2, 7.

291.    Price should always be a factor considered by a prescribing physician and, if a drug price becomes significant when compared to alternatives, a prescriber should weigh the benefits of prescribing the drug against the benefits of prescribing a less expensive alternative.

292.    Diclofenac is a nonsteroidal anti-inflammatory drug, or "NSAID," available in pill and topical form.  In topical form, it is available in various strengths, and is most beneficial to treat localized inflammation and pain when oral medications are determined to be ineffective. Diclofenac gel can be purchased over the counter in 1% concentrations under the name Voltaren Gel for about $20 for a 150-gram tube.  Despite the availability of an over-the-counter version of the medication at a reasonable price, Metro Pain's Initial Examination Reports and Follow-Up Examination Reports do not provide for diclofenac sodium concentrations at less than 3%, but rather specify in preprinted text diclofenac 3%.  When the medication is ordered in initial exams, there would have been no way for the prescriber to determine whether oral medications or other alternatives were ineffective before ordering diclofenac 3% gel.  Pharmacies providing diclofenac 3% gel to Metro Pain patients charged between $900 and $1,194 per 100 gram tube.

293.    Lidocaine is a topical analgesic also commonly available for over-the-counter purchase in patch form.  Packages including five lidocaine 4% patches can be purchased over-the-counter for less than $10. Despite the availability of an over-the-counter version of the medication at a reasonable price, Metro Pain's Initial Examination Reports and Follow-Up Examination Reports do not provide for lidocaine patches at 4%, but rather specify in pre-printed text lidocaine/lidoderm 5% patches.  Pharmacies providing lidocaine/lidoderm 5% patches to Metro Pain patients charged between $251 and $680 for 30 patches.  Moreover, there is no reliable

medical literature or peer-reviewed, randomized clinical studies supporting the prescription or use of lidocaine 5% to effectively treat musculoskeletal pain, as lidocaine does not absorb into deep muscle tissue.

294.    There would be no reason to prescribe and provide diclofenac 3% or lidocaine 5% at substantial cost when there are alternatives of those medications at lower concentrations as well as other medications known to be effective, if not more effective, at a fraction of the cost.

295.    Given the existence of improper financial arrangements between Metro Pain and providers of services at the locations at which it operated, it is highly likely such arrangements existed between Metro Pain and the pharmacies that provided medications to its patients.  If such financial arrangements existed, the pharmacies would not have been eligible to collect No-Fault Benefits in New York, and it would be inequitable and contrary to the public policy of New York to allow the pharmacies or Metro Pain to retain any benefits obtained from such arrangements.

9.    **Injections and Orthopedic Surgery Procedures and Related Services Performed Pursuant to Illegal Kickbacks**

296.    Metro Pain also subjects some patients treated at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont to pain management and orthopedic consultations, recommends procedures, and then performs the procedures at Moshe ASCs where anesthesia is provided by Premier Anesthesia and PMR Medical.  *See* Ex. 22.

297.    During initial and follow-up examinations, Metro Pain refers some patients for pain management and orthopedic consultations.   Metro Pain's pain management doctors and orthopedists typically perform these consultations, and Shapiro testified they visit Metro Pain clinic locations once every two weeks.   Based on the examinations, Metro Pain typically recommends patients receive one or more pain management or orthopedic procedures, including

epidural steroid injections or facet injections in the lumbar and/or cervical spinal region, or arthroscopy of the shoulders or knees.

298.    Every pain management and orthopedic procedure Metro Pain performs on patients treated at 105-10 Flatlands, 204-12 Hillside, 717 Southern, and 2451 E. Tremont takes place at a Moshe-owned facility:  Dynamic Surgery, HealthPlus Surgery, Surgicare, or Hudson Regional. These facilities bill the State Farm Companies fees associated with each procedure Metro Pain performs.

299.    In addition, Metro Pain patients who receive these procedures also receive anesthesia billed to the State Farm Companies.  The anesthesia provided to Metro Pain's patients is almost always rendered by one of three anesthesia companies:  Premier Anesthesiology, formed by Shapiro; PMR Medical, formed by Shapiro;[5] or Citimed Services, owned on paper by Moshe's sister, Dr. Moshe, but actually owned and controlled by Moshe.

300.    Particularly given the inconvenience for patients who had to travel from New York to New Jersey for procedures and the alarming health and safety violations at Dynamic Surgery and HealthPlus Surgery, Metro Pain's performance of these procedures at Dynamic Surgery and HealthPlus Surgery and the provision of anesthesia by Premier Anesthesia was the result of relationships and arrangements between and among Shapiro, Alon, and Moshe, which are alleged in detail in Paragraphs 152 through 169.

301.    Metro Pain's performance of these procedures at Dynamic Surgery and HealthPlus Surgery was thus the result of (a) a kickback relationship between Moshe, Alon, Beshert, and

---

[5] While PMR Medical was incorporated under New Jersey law on February 13, 2011, it first began rendering anesthesia at SCOB and Citimed Surgery in New York in August 2020.  PMR Medical did not register as a business authorized to perform services in New York until February 25, 2021.  PRM Medical was thus neither licensed in New York nor authorized to perform services there prior to February 25, 2021, and its services rendered in New York prior to that date were not eligible for reimbursement.

Shapiro pursuant to which Metro Pain obtained access to patients in exchange for an agreement to refer patients to Dynamic Surgery and HealthPlus Surgery; and (b) a kickback relationship pursuant to which Moshe compensated Shapiro in exchange for patient referrals to Dynamic Surgery and HealthPlus Surgery.

302.     Based on such financial arrangements, Metro Pain and the ASC Defendants were not eligible to collect No-Fault Benefits in New York, and it is inequitable and contrary to the public policy of New York to allow them to retain any benefits obtained.

### E.     Citimedical I Operates in Violation of New York Licensing Requirements and Misrepresented the Status of Independent Contractors as Employees

303.     In addition to rendering medically unnecessary MRIs and obtaining patient referrals pursuant to kickback relationships, Citimedical I operates in violation of New York licensing requirements and misrepresented its engagement of independent contractors to render MRI services.

### 1.     Citimedical I Illegally Operates Under Layperson Control

304.     In New York, only a licensed physician may (a) practice medicine, (b) own and control professional corporations and professional limited liability corporations organized to provide physician services, and (c) employ and supervise other physicians.  With few exceptions, New York law requires a licensed physician to own and operate MRI testing facilities.

305.     As discussed above in Paragraphs 159 through 165, although Dr. Moshe is Citimedical I's paper owner, it is in fact operated by and for the benefit of Moshe in violation of New York licensing laws.  The charges Citimedical I submitted for MRIs and any other treatment or services were thus ineligible for reimbursement under the No-Fault Laws.  11 N.Y.C.R.R. § 65-3.16(a)(12).

### 2. Citimedical I Misrepresented the Status of Independent Contractors as Employees

306.     New York law states that a medical entity, including an MRI facility, is only eligible for compensation if its services are provided by an owner or employee of the company. *See* 11 N.Y.C.C.R. § 65-3.11.  In fact, the New York State Department of Financial Services promulgated a claim form healthcare providers may submit to insurers — the NF-3 Form — that requires a healthcare provider to disclose whether the services being billed were rendered by an employee or an independent contractor.

307.     Citimedical I fraudulently submitted bills and supporting documents to the State Farm Companies misrepresenting it rendered MRI services through its employees, when in actuality it rendered services through independent contractors and, in some instances, through the same independent contractors as those engaged by Columbus Imaging and Medaid Radiology.

308.     As Dr. Moshe had no experience as a radiologist, Citimedical I needed to hire radiologists to read them.  Citimedical I entered into contracts with separate entities, including Complete Radiology Reading Service LLC ("Complete Radiology") and Contemporary Diagnostic Imaging LLC ("Contemporary Diagnostic") to provide radiologists and other MRI-related services.

309.     Citimedical I's profit and loss statement for January through December 2016 reflect that it paid more than $162,000 to Complete Radiology Reading Services LLC.  According to Complete Radiology's website:

> [Complete Radiology Reading Services] provides quality, off-site general and subspecialty radiology coverage.  By obviating the need for a full-time radiologist salary (with the additional costs of vacation, conference, pension and health), as well as professional liability insurance, radiology practices and hospitals can maximize their return by limiting costs. Our costs are reasonable, our radiologists are compassionate and experienced, and our procedures and systems are simple to use.

310.    Complete Radiology is owned by Allen Rothpearl, M.D., who is a radiologist alleged in numerous federal civil RICO complaints to have operated under Moshe's control.

311.    Contemporary Diagnostic is owned by Alkies Lapas, D.O., who has also served as the medical director for both Columbus Imaging and Medaid Radiology and is currently the Chairman of Radiology at Moshe's Hudson Regional.   When asked about Contemporary Diagnostic, Dr. Moshe claimed Citimedical paid both the entity Contemporary Diagnostic and the individual radiologists directly and considered the individual radiologists to be "W-2 employees."

312.    In fact, at all times, radiologists performing reads for Citimedical I were independent contractors.   Contemporary Diagnostic and Complete Radiology were separate entities performing services for which Citimedical I billed, the radiologists were affiliated with those entities and did not even work in a Citimedical I location, the radiologists were not under the supervision of Citimedical I, Citimedical I did not set the radiologists' schedules or terms of employment, and Citimedical I did not even decide which radiologist performed the reads.

313.    Furthermore, Citimedical I and numerous other MRI facilities, including Columbus Imaging and Medaid Radiology, *all* identified Brijesh Vangala Reddy, M.D. as a rendering physician on imaging bills associated with Metro Pain patients.   Citimedical I also identified Dr. Reddy as an employee during the same period he was working for numerous other MRI providers. For example, Dr. Reddy rendered MRI services for Medaid Radiology on April 22, 2019, Citimedical I on April 23, 2019, All County, LLC on April 24, 2019, and Dynamic Medical Imaging P.C. on April 25, 2019.   Tellingly, Citimedical I and All County, LLC each identified Dr. Reddy as an employee, whereas Medaid Radiology identified Dr. Reddy as an independent contractor, and Dynamic Medical Imaging P.C. failed to disclose Dr. Reddy's employment status

at all.  In addition to the above, Dr. Reddy also rendered imaging services to numerous Metro Pain patients during this period through Sky Radiology P.C., of which he is the purported owner.

314.    Imaging bills from Citimedical I also identify as rendering physicians and purported employees John Lyons, M.D., Stephen Toder, M.D., and Priyesh Patel, M.D.  Each physician also rendered MRI services through Columbus Imaging and/or Medaid Radiology during similar periods, and Dr. Patel also renders imaging services to Metro Pain patients through at least two other entities:  Nexray Medical Imaging P.C. and Contemporary Diagnostic.

315.    Accordingly, Citimedical I engaged at least one or more of the following physicians as independent contractors, and any MRI services these physicians provided on behalf of Citimedical I were not eligible for reimbursement under the No-Fault Laws:  Drs. Reddy, Lyons, Toder, and Patel.

**F.    Dynamic Surgery and HealthPlus Surgery Failed to Operate in Compliance with New Jersey Law, and Facility Fees for Metro Pain Procedures Were Ineligible for Reimbursement**

316.    Moshe did not operate Dynamic Surgery and HealthPlus Surgery in compliance with New Jersey licensing laws, including the requirement that each hire and be supervised by a qualified medical director to perform enumerated duties under New Jersey law.  *See, e.g.*, N.J.A.C. §§ 8:43A-7.2–7.3; N.J.A.C. § 8:43A-3.2.  Rather, Moshe hired doctors to serve as nominal "medical directors" while Moshe directed and controlled the operations of Dynamic Surgery and HealthPlus Surgery.

317.    As alleged in Paragraphs 159 through 167, Moshe has a demonstrated pattern and practice of paying doctors to serve as nominal medical directors of his ASCs.  Beginning with Excel Surgery, NJDOH investigated and substantiated significant licensing violations.  During testimony before the NJ State Board, the medical director from 2013 to early 2014 admitted he ultimately ended his association with Excel Surgery because Moshe was exercising excessive

control over the medical operations.  Specifically, he stated Moshe directed the hiring of medical staff, Moshe installed his partner's unqualified ex-wife as the director of nursing over the medical director's objections, and Excel was using office employees who had no formal medical training to assist with surgical procedures.

318.    Moshe's hiring of nominal medical directors continued with Dynamic Surgery, which Moshe formed in late 2016 to operate at 321 Essex Street, Hackensack, New Jersey — the same facility where Excel Surgery operated.  In 2017, Moshe hired Shapiro to serve as Dynamic Surgery's medical director.  NJDOH proceeded to cite Dynamic Surgery for numerous regulatory violations, including the failure to ensure implementation of patient grievance policies and procedures, ensure patients receiving anesthesia did not drive themselves home following their procedures, develop and implement policies and procedures regarding the control of controlled dangerous substances (required by N.J.A.C. § 8:43A-9.3(b)(7)), and develop and implement policies and procedures regarding infection prevention and control (required by N.J.A.C. §§ 8:43A-14.1–14.3).  Furthermore, during the period Shapiro served as medical director of Dynamic Surgery, Metro Pain was expanding its operations and Shapiro was operating other medical entities, including but not limited to Premier Anesthesia,[6] which began to provide anesthesia services at Moshe ASCs, including Dynamic Surgery and HealthPlus Surgery in May 2018.

319.    Moshe also installed Shapiro as the medical director of HealthPlus Surgery, which Moshe acquired in late 2016, and shortly thereafter began to operate at 190 Midland Avenue in Saddle Brook, New Jersey.  Shapiro thus served as the medical director of HealthPlus Surgery and Dynamic Surgery concurrently, while also operating his numerous other businesses.  As during

---

[6] Shapiro was also purportedly managing Neurological Diagnostics, PMR Medical, Hudson Healthcare Partners P.C., LegalMDConsult.com LLC, Scan to Data, and West Hudson Anesthesia P.A. during this same period.

Shapiro's tenure as medical director of Dynamic Surgery, NJDOH cited HealthPlus Surgery with a litany of regulatory violations that resulted in its temporary closure in September 2018. Specifically, an NJDOH investigation into HealthPlus Surgery's operations revealed it may have exposed patients to hepatitis B, hepatitis C, and HIV. When closing HealthPlus Surgery, NJDOH noted a series of sanitary and regulatory violations at HealthPlus Surgery, including the following:

(i) Failure to develop written job descriptions and ensure personnel were assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. § 8:43A-3.5(a);

(ii) Failure to ensure the development and implementation of policies regarding the administration, control, and storage of medications, including the preparation and use of parenteral medications, as required by N.J.A.C. §§ 8:43A-9.3(b)(4), 9.5(b);

(iii) Failure to develop and implement policies and procedures regarding the control of controlled dangerous substances, as required by N.J.A.C. § 8:43A-9.3(b)(7); and

(iv) Failure to develop and implement policies and procedures regarding infection prevention and control, as required by N.J.A.C. §§ 8:43A-12.6(a)(16)(ii), 14.1–14.3.

320. Dynamic Surgery and HealthPlus Surgery knowingly and intentionally chose not to adhere to licensing requirements governing the proper and safe operation of ASCs in New Jersey, including the failure to hire a qualified medical director to carry out the duties enumerated under New Jersey law. Thus, the claims of Dynamic Surgery and HealthPlus Surgery submitted to the State Farm Companies are ineligible for reimbursement.

**G. Defendants' Further Efforts to Advance the Fraudulent Scheme**

321. Defendants are obligated legally and ethically to act honestly and with integrity. Nonetheless, Defendants submitted or caused to be submitted bills and supporting documentation that are fraudulent in that they represent services were performed and were medically necessary and reimbursable when, in fact, they were not.

322.     Defendants submitted or caused to be submitted bills and supporting documentation to the State Farm Companies for the examinations, treatment, MRIs, Supplies, tests, prescriptions, and pain management and orthopedic procedures and related services detailed above.  These bills and supporting documentation are fraudulent because the services were not medically necessary and/or reimbursable.

323.     Further, the success of Defendants' scheme depends on concealing the existence of the improper financial arrangements among Defendants and the Predetermined Treatment Protocol from the State Farm Companies and other insurers to induce insurers to pay Defendants' fraudulent charges.   Defendants take affirmative steps to conceal the scheme by, among other things, submitting multiple bills from multiple providers and by changing providers operating at each address.  Defendants submit bills in this manner because they know insurers like the State Farm Companies rely on the contents of each individual bill and related supporting documentation to make a payment determination.

### H.     Defendants Failed to Verify Their Claims to the State Farm Companies

324.     To verify some of the claims they received, State Farm Mutual and State Farm Fire requested, on multiple occasions, EUOs and/or documents from Defendants.  Each request was timely made and based upon the application of objective standards justifying the information and documentation sought by the State Farm Companies, including seeking relevant documentation. The State Farm Companies had, and continue to have, a reasonable basis to request additional verification from Defendants pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12) and Insurance Law § 5102(a)(1).

325.     The failure or refusal to provide additional verification constitutes a material breach of the State Farm Companies' insurance policies and the No-Fault Laws under which the claims

have been made and, as such, relieves the State Farm Companies from any obligation to pay Defendants on any of the claims.

326.    In each instance where Defendants refused to provide proper verification, the State Farm Companies issued a timely denial on the prescribed NF-10 form stating in relevant part that Defendants failed to comply with their obligations to present proper proofs of claim and their claims were denied because they failed to satisfy a condition of coverage.

327.    All of the State Farm Companies' denials of Defendants' bills and charges were timely, proper, and consistent with the No-Fault Laws.

I.      **Justifiable Reliance by State Farm Mutual and State Farm Fire**

328.    State Farm Mutual and State Farm Fire are under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The bills and supporting documents Defendants submitted and caused to be submitted to State Farm Mutual and State Farm Fire in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual and State Farm Fire to justifiably and reasonably rely on them.

329.    As a result, State Farm Mutual and State Farm Fire have incurred damages of at least $15.4 million.

330.    Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

## V.      CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
**(Against Metro Pain, Shapiro, Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, Cityworks PT, Luna, Kings Chiropractic, Moon, SJM Acupuncture, Krupnova, LK Acupuncturist, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 105-10 Flatlands)**

331.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

332.    Defendants, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated at 105-10 Flatlands.

333.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 8, 17, 18A, and 22 that:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

334.    Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

335.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

336.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $600,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SECOND CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUD
**(Against Metro Pain, Shapiro, Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, Cityworks PT, Luna, Kings Chiropractic, Moon, SJM Acupuncture, Krupnova, LK Acupuncturist, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 105-10 Flatlands)**

337.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

338.    Defendants conspired, agreed to, and acted in concert to defraud State Farm Mutual and State Farm Fire, and did defraud State Farm Mutual and State Farm Fire, through the submission of false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire as described above in the First Claim for Relief.

339.    Defendants substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Defendants submitted or caused to be submitted bills and supporting documentation that

contained false and fraudulent misrepresentations of material fact to State Farm Mutual and State Farm Fire.

340.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 8, 17, 18A, and 22 that:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

341.    Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

342.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

343.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $600,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(Against Metro Pain, Shapiro, Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, Cityworks PT, Luna, Kings Chiropractic, Moon, SJM Acupuncture, Krupnova, LK Acupuncturist, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 105-10 Flatlands)**

344. State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

345. State Farm Mutual and State Farm Fire conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated at 105-10 Flatlands, and these Defendants voluntarily accepted and retained the benefit of those payments.

346. Because the Defendants knowingly billed for or received money for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

347. As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $600,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Defendants for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

**FOURTH CLAIM FOR RELIEF**
**RICO VIOLATION OF 18 U.S.C. § 1962(c)**
**(Against Metro Pain, Shapiro, Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, Cityworks PT, Luna, Kings Chiropractic, Moon, SJM Acupuncture, Krupnova, LK Acupuncturist, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 105-10 Flatlands)**

348.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

349.    Defendants constitute an association-in-fact "enterprise" (the "105-10 Flatlands Fraudulent Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 105-10 Flatlands Fraudulent Treatment Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurance companies by submitting and causing to be submitted bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable for patients treated at 105-10 Flatlands.

350.    Although different members have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual and State Farm Fire through fraudulent insurance claims — with sufficient longevity to accomplish that common purpose.  Specifically, Metro Pain and Shapiro, together with others, acquired control of 105-10 Flatlands where patients could be treated, entered into financial arrangements with providers pursuant to which they would provide services to patients, purported to perform initial examinations and diagnostic tests as a pretext to justify unnecessary treatment and services, and concluded patients require treatment plans consisting of a combination of purported physical

therapy, chiropractic care, and acupuncture, as well as other services which could be rendered by Metro Pain and providers with whom Metro Pain had financial arrangements, including MRIs, Supplies, tests, pain management and orthopedic procedures, and ASC services rendered in connection with Metro Pain procedures. Alon provides Metro Pain and other Defendants with access to patients through the Beshert "network." Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, and Cityworks PT purported to perform and bill for physical therapy and other services rendered to patients treated at 105-10 Flatlands not because it was necessary, but pursuant to financial arrangements with Metro Pain and others. Luna and Kings Chiropractic purported to provide and bill for chiropractic care rendered to patients treated at 105-10 Flatlands not because it was necessary, but pursuant to financial arrangements with Metro Pain and others. Moon, SJM Acupuncture, Krupnova, and LK Acupuncturist purported to provide and bill for acupuncture treatment rendered to patients treated at 105-10 Flatlands not because it was necessary, but pursuant to financial arrangements with Metro Pain and others. Dr. Moshe and Citimedical I purported to provide and bill for MRIs rendered to patients treated at 105-10 Flatlands not because they were necessary, but pursuant to financial arrangements with Metro Pain and others. Moshe, Dynamic Surgery, and HealthPlus Surgery purported to provide and bill for services associated with Metro Pain procedures rendered to patients treated at 105-10 Flatlands not because they were necessary, but pursuant to financial arrangements with Metro Pain and others.

351. Each Defendant's participation and role was necessary to the success of the scheme. No one Defendant was capable of carrying out the scheme without the participation of the other Defendants. The Defendants have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through fraudulent insurance claims.

352.    Each Defendant is or has been employed by and associated with the 105-10 Flatlands Fraudulent Treatment Enterprise.

353.    Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 105-10 Flatlands Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because the records reflect: (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 8, 17, 18A, and 22.

354.    As part of the scheme, Defendants have sought and continue to seek to collect on the fraudulent insurance claims submitted to State Farm Mutual, State Farm Fire, and other insurance companies.

355.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $600,000 based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(c) for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), plus interest, and any other relief the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
## RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1962(d)
**(Against Metro Pain, Shapiro, Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, Cityworks PT, Luna, Kings Chiropractic, Moon, SJM Acupuncture, Krupnova, LK Acupuncturist, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 105-10 Flatlands)**

356.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 and Paragraphs 349 through 355 above.

357.    Defendants knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 105-10 Flatlands Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent because the records reflect:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations,

treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 8, 17, 18A, and 22.

358.    Each Defendant knew of, agreed to, and acted in furtherance of the common and overall objectives of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services, which were medically unnecessary and/or not reimbursable, to State Farm Mutual, State Farm Fire, and other insurers.

359.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $600,000 based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(d) for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### SIXTH CLAIM FOR RELIEF
### COMMON LAW FRAUD
**(Against Metro Pain, Shapiro, Shalaby, Physical Therapy of NY, Kataeva, Cityworks PT, Park, All About Chiropractic, J Park Chiropractic, Choi, Choice Acupuncture, Choi-Go Acupuncture, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 204-12 Hillside)**

360.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

361.     Defendants, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated at 204-12 Hillside.

362.     The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 9, 17, 18B, and 22 that: (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

363.    Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

364.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

365.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $850,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### SEVENTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD
**(Against Metro Pain, Shapiro, Shalaby, Physical Therapy of NY, Kataeva, Cityworks PT, Park, All About Chiropractic, J Park Chiropractic, Choi, Choice Acupuncture, Choi-Go Acupuncture, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 204-12 Hillside)**

366.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

367.    Defendants conspired, agreed to, and acted in concert to defraud State Farm Mutual and State Farm Fire, and did defraud State Farm Mutual and State Farm Fire, through the submission of false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire as described above in the Sixth Claim for Relief.

368.    Defendants substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Defendants submitted or caused to be submitted bills and supporting documentation that

contained false and fraudulent misrepresentations of material fact to State Farm Mutual and State Farm Fire.

369.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 9, 17, 18B, and 22 that:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

370.    Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

371.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

372.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $850,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## EIGHTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
**(Against Metro Pain, Shapiro, Shalaby, Physical Therapy of NY, Kataeva, Cityworks PT, Park, All About Chiropractic, J Park Chiropractic, Choi, Choice Acupuncture, Choi-Go Acupuncture, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 204-12 Hillside)**

373.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

374.    State Farm Mutual and State Farm Fire conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated at 204-12 Hillside, and these Defendants voluntarily accepted and retained the benefit of those payments.

375.    Because the Defendants knowingly billed for or received money for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

376.    As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $850,000.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Defendants for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

## NINTH CLAIM FOR RELIEF
## RICO VIOLATION OF 18 U.S.C. § 1962(c)
**(Against Metro Pain, Shapiro, Shalaby, Physical Therapy of NY, Kataeva, Cityworks PT, Park, All About Chiropractic, J Park Chiropractic, Choi, Choice Acupuncture, Choi-Go Acupuncture, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 204-12 Hillside)**

377.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

378.    Defendants constitute an association-in-fact "enterprise" (the "204-12 Hillside Fraudulent Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 204-12 Hillside Fraudulent Treatment Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable for patients treated at 204-12 Hillside.

379.    Although different members have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual and State Farm Fire through fraudulent insurance claims — with sufficient longevity to accomplish that common purpose.  Specifically, Metro Pain and Shapiro, together with others, acquired control of 204-12 Hillside where patients could be treated, entered into financial arrangements with providers pursuant to which they would provide services to patients, purported to perform initial examinations and diagnostic tests as a pretext to justify unnecessary treatment and services, and concluded patients require treatment plans consisting of a combination of purported physical

therapy, chiropractic care, and acupuncture, as well as other services which could be rendered by Metro Pain and providers with whom Metro Pain had financial arrangements, including MRIs, Supplies, tests, pain management and orthopedic procedures, and ASC services rendered in connection with Metro Pain procedures. Alon provides Metro Pain and other Defendants with access to patients through the Beshert "network." Shalaby, Physical Therapy of NY, Kataeva, and Cityworks PT purported to perform and bill for physical therapy and other services rendered to patients treated at 204-12 Hillside not because it was necessary, but pursuant to financial arrangements with Metro Pain and others. Park, All About Chiropractic, and J Park Chiropractic purported to provide and bill for chiropractic care rendered to patients treated at 204-12 Hillside not because it was necessary, but pursuant to financial arrangements with Metro Pain and others. Choi, Choice Acupuncture, and Choi-Go Acupuncture purported to provide and bill for acupuncture treatment rendered to patients treated at 204-12 Hillside not because it was necessary, but pursuant to financial arrangements with Metro Pain and others. Dr. Moshe and Citimedical I purported to provide and bill for MRIs rendered to patients treated at 204-12 Hillside not because they were necessary, but pursuant to financial arrangements with Metro Pain and others. Moshe, Dynamic Surgery, and HealthPlus Surgery purported to provide and bill for services associated with Metro Pain procedures rendered to patients treated at 204-12 Hillside not because they were necessary, but pursuant to financial arrangements with Metro Pain and others.

380. Each Defendant's participation and role was necessary to the success of the scheme. No one Defendant was capable of carrying out the scheme without the participation of the other Defendants. The Defendants have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through fraudulent insurance claims.

381.     Each Defendant is or has been employed by and associated with the 204-12 Hillside Fraudulent Treatment Enterprise.

382.     Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 204-12 Hillside Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because the records reflect: (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 9, 17, 18B, and 22.

383.     As part of the scheme, Defendants have sought and continue to seek to collect on the fraudulent insurance claims submitted to State Farm Mutual, State Farm Fire, and other insurance companies.

384.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $850,000 based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(c) for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), plus interest, and any other relief the Court deems just and proper.

**TENTH CLAIM FOR RELIEF**
**RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against Metro Pain, Shapiro, Shalaby, Physical Therapy of NY, Kataeva, Cityworks PT, Park, All About Chiropractic, J Park Chiropractic, Choi, Choice Acupuncture, Choi-Go Acupuncture, Dr. Moshe, Citimedical I, Moshe, Dynamic Surgery, HealthPlus Surgery, and Alon Concerning Patients Treated at 204-12 Hillside)**

385.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 and Paragraphs 378 through 384 above.

386.    Defendants knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 204-12 Hillside Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent because the records reflect:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations,

treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 9, 17, 18B, and 22.

387.    Each Defendant knew of, agreed to, and acted in furtherance of the common and overall objectives of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services, which were medically unnecessary and/or not reimbursable, to State Farm Mutual, State Farm Fire, and other insurers.

388.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $850,000 based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(d) for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

## ELEVENTH CLAIM FOR RELIEF
## COMMON LAW FRAUD
**(Against Metro Pain, Shapiro, Barakat, Barakat PT, Elmandouh, Protection PT, Akl, and Primavera PT, Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, PDA Chiropractic, Castillo, Edcas Acupuncture, Kopach, First Alternative Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, and HealthPlus Surgery Concerning Patients Treated at 717 Southern)**

389.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

390.     Defendants, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated at 717 Southern.

391.     The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 10, 17, 18D, and 22 that:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

392.     Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

393.     Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

394.     As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1.37 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## TWELFTH CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUD
**(Against Metro Pain, Shapiro, Barakat, Barakat PT, Elmandouh, Protection PT, Akl, and Primavera PT, Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, PDA Chiropractic, Castillo, Edcas Acupuncture, Kopach, First Alternative Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, and HealthPlus Surgery Concerning Patients Treated at 717 Southern)**

395.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

396.     Defendants conspired, agreed to, and acted in concert to defraud State Farm Mutual and State Farm Fire, and did defraud State Farm Mutual and State Farm Fire, through the submission of false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire as described above in the Eleventh Claim for Relief.

397.     Defendants substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Defendants submitted or caused to be submitted bills and supporting documentation that

contained false and fraudulent misrepresentations of material fact to State Farm Mutual and State Farm Fire.

398.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 10, 17, 18D, and 22 that:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

399.    Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

400.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

401.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1.37 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## THIRTEENTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
**(Against Metro Pain, Shapiro, Barakat, Barakat PT, Elmandouh, Protection PT, Akl, and Primavera PT, Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, PDA Chiropractic, Castillo, Edcas Acupuncture, Kopach, First Alternative Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, and HealthPlus Surgery Concerning Patients Treated at 717 Southern)**

402.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

403.    State Farm Mutual and State Farm Fire conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated at 717 Southern, and these Defendants voluntarily accepted and retained the benefit of those payments.

404.    Because the Defendants knowingly billed for or received money for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

405.    As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $1.37 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Defendants for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

## FOURTEENTH CLAIM FOR RELIEF
## RICO VIOLATION OF 18 U.S.C. § 1962(c)
**(Against Metro Pain, Shapiro, Barakat, Barakat PT, Elmandouh, Protection PT, Akl, and Primavera PT, Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, PDA Chiropractic, Castillo, Edcas Acupuncture, Kopach, First Alternative Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, and HealthPlus Surgery Concerning Patients Treated at 717 Southern)**

406.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

407.    Defendants constitute an association-in-fact "enterprise" (the "717 Southern Fraudulent Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 717 Southern Fraudulent Treatment Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable for patients treated at 717 Southern.

408.    Although different members have performed different roles at different times, they operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual and State Farm Fire through fraudulent insurance claims — with sufficient longevity to accomplish that common purpose. Specifically, Metro Pain and Shapiro, together with others, acquired control of 717 Southern where patients could be treated, entered into financial arrangements with providers pursuant to which they would provide services to patients, purported to perform initial examinations and diagnostic tests as a pretext to justify unnecessary treatment and services, and concluded patients require treatment plans consisting of a combination of purported physical therapy, chiropractic care, and

135

acupuncture, as well as other services which could be rendered by Metro Pain and providers with whom Metro Pain had financial arrangements, including MRIs, Supplies, tests, pain management and orthopedic procedures, and ASC services rendered in connection with Metro Pain procedures. Alon provides Metro Pain and other Defendants with access to patients through the Beshert "network."  Barakat, Barakat PT, Elmandouh, Protection PT, Akl, and Primavera PT purported to perform and bill for physical therapy and other services rendered to patients treated at 717 Southern not because it was necessary, but pursuant to financial arrangements with Metro Pain and others. Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, and PDA Chiropractic, purported to provide and bill for chiropractic care rendered to patients treated at 717 Southern not because it was necessary, but pursuant to financial arrangements with Metro Pain and others.  Castillo, Edcas Acupuncture, Kopach, and First Alternative Acupuncture purported to provide and bill for acupuncture treatment rendered to patients treated at 717 Southern not because it was necessary, but pursuant to financial arrangements with Metro Pain and others.  Alon, Columbus Imaging, and Medaid Radiology purported to provide and bill for MRIs rendered to patients treated at 717 Southern not because they were necessary, but pursuant to financial arrangements with Metro Pain and others.  Moshe, Dynamic Surgery, and HealthPlus Surgery purported to provide and bill for services associated with Metro Pain procedures rendered to patients treated at 717 Southern not because they were necessary, but pursuant to financial arrangements with Metro Pain and others.

409.    Each Defendant's participation and role was necessary to the success of the scheme. No one Defendant was capable of carrying out the scheme without the participation of the other Defendants.  The Defendants have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through fraudulent insurance claims.

410.    Each Defendant is or has been employed by and associated with the 717 Southern Fraudulent Treatment Enterprise.

411.    Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 717 Southern Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because the records reflect: (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 10, 17, 18D, and 22.

412.    As part of the scheme, Defendants have sought and continue to seek to collect on the fraudulent insurance claims submitted to State Farm Mutual, State Farm Fire, and other insurance companies.

413.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1.37 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(c) for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), plus interest, and any other relief the Court deems just and proper.

**FIFTEENTH CLAIM FOR RELIEF**
**RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against Metro Pain, Shapiro, Barakat, Barakat PT, Elmandouh, Protection PT, Akl, and Primavera PT, Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, PDA Chiropractic, Castillo, Edcas Acupuncture, Kopach, First Alternative Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, and HealthPlus Surgery Concerning Patients Treated at 717 Southern)**

414.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 and Paragraphs 407 through 413 above.

415.    Defendants knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 717 Southern Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent because the records reflect:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment,

MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 10, 17, 18D, and 22.

416.    Each Defendant knew of, agreed to, and acted in furtherance of the common and overall objectives of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services, which were medically unnecessary and/or not reimbursable, to State Farm Mutual, State Farm Fire, and other insurers.

417.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1.37 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(d) for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### SIXTEENTH CLAIM FOR RELIEF
### COMMON LAW FRAUD
**(Against Metro Pain, Shapiro, Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, AM Patel PT, Scarborough, AOT Chiropractic, Evolution Chiropractic, Ma, Hidden Dragon Acupuncture, Guan, Rebound Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, HealthPlus Surgery, Nazarov, and Right Aid Medical Supply Concerning Patients Treated at 2451 E. Tremont)**

418.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

419.    Defendants, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated at 2451 E. Tremont.

420.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 11, 17, 18C, and 22 that:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

421.     Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

422.     Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

423.     As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1.38 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SEVENTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUD
**(Against Metro Pain, Shapiro, Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, AM Patel PT, Scarborough, AOT Chiropractic, Evolution Chiropractic, Ma, Hidden Dragon Acupuncture, Guan, Rebound Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, HealthPlus Surgery, Nazarov, and Right Aid Medical Supply Concerning Patients Treated at 2451 E. Tremont)**

424.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

425.     Defendants conspired, agreed to, and acted in concert to defraud State Farm Mutual and State Farm Fire, and did defraud State Farm Mutual and State Farm Fire, through the submission of false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire as described above in the Sixteenth Claim for Relief.

426.     Defendants substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Defendants submitted or caused to be submitted bills and supporting documentation that

contained false and fraudulent misrepresentations of material fact to State Farm Mutual and State Farm Fire.

427.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1, 11, 17, 18C, and 22 that:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons.

428.    Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were false and fraudulent when they were made.

429.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

430.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1.38 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### EIGHTEENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(Against Metro Pain, Shapiro, Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, AM Patel PT, Scarborough, AOT Chiropractic, Evolution Chiropractic, Ma, Hidden Dragon Acupuncture, Guan, Rebound Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, HealthPlus Surgery, Nazarov, and Right Aid Medical Supply Concerning Patients Treated at 2451 E. Tremont)**

431.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

432.    State Farm Mutual and State Farm Fire conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated at 2451 E. Tremont, and these Defendants voluntarily accepted and retained the benefit of those payments.

433.    Because the Defendants knowingly billed for or received money for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

434.    As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $1.38 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Defendants for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

### NINETEENTH CLAIM FOR RELIEF
### RICO VIOLATION OF 18 U.S.C. § 1962(c)
**(Against Metro Pain, Shapiro, Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, AM Patel PT, Scarborough, AOT Chiropractic, Evolution Chiropractic, Ma, Hidden Dragon Acupuncture, Guan, Rebound Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, HealthPlus Surgery, Nazarov, and Right Aid Medical Supply Concerning Patients Treated at 2451 E. Tremont)**

435.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

436.    Defendants constitute an association-in-fact "enterprise" (the "2451 E. Tremont Fraudulent Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 2451 E. Tremont Fraudulent Treatment Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that were not medically necessary and/or not reimbursable for patients treated at 2451 E. Tremont.

437.    Although different members have performed different roles at different times, they operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual and State Farm Fire through fraudulent insurance claims — with sufficient longevity to accomplish that common purpose. Specifically, Metro Pain and Shapiro, together with others, acquired control of 2451 E. Tremont where patients could be treated, entered into financial arrangements with providers pursuant to which they would provide services to patients, purported to perform initial examinations and diagnostic tests as a pretext to justify unnecessary treatment and services, and concluded patients require treatment plans consisting of a combination of purported physical therapy, chiropractic

care, and acupuncture, as well as other services which could be rendered by Metro Pain and providers with whom Metro Pain had financial arrangements, including MRIs, Supplies, tests, pain management and orthopedic procedures, and ASC services rendered in connection with Metro Pain procedures.  Alon provides Metro Pain and other Defendants with access to patients through the Beshert "network."  Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, and AM Patel PT purported to perform and bill for physical therapy and other services rendered to patients treated at 2451 E. Tremont not because it was necessary, but pursuant to financial arrangements with Metro Pain and others.  Scarborough, AOT Chiropractic, and Evolution Chiropractic purported to provide and bill for chiropractic care rendered to patients treated at 2451 E. Tremont not because it was necessary, but pursuant to financial arrangements with Metro Pain and others.  Ma, Hidden Dragon Acupuncture, Guan, and Rebound Acupuncture purported to provide and bill for acupuncture treatment rendered to patients treated at 2451 E. Tremont not because it was necessary, but pursuant to financial arrangements with Metro Pain and others.  Alon, Columbus Imaging, and Medaid Radiology purported to provide and bill for MRIs rendered to patients treated at 2451 E. Tremont not because they were necessary, but pursuant to financial arrangements with Metro Pain and others.  Moshe, Dynamic Surgery, and HealthPlus Surgery purported to provide and bill for services associated with Metro Pain procedures rendered to patients treated at 2451 E. Tremont not because they were necessary, but pursuant to financial arrangements with Metro Pain and others.  Nazarov and Right Aid Medical Supply purported to provide and bill for Supplies ordered by Metro Pain for patients treated at 2451 E. Tremont not because they were necessary, but pursuant to financial arrangements with Mero Pain and others.

438.    Each Defendant's participation and role was necessary to the success of the scheme. No one Defendant was capable of carrying out the scheme without the participation of the other

Defendants.  The Defendants have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through fraudulent insurance claims.

439.   Each Defendant is or has been employed by and associated with the 2451 E. Tremont Fraudulent Treatment Enterprise.

440.   Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 2451 E. Tremont Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because the records reflect: (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 11, 17, 18C, and 22.

441. As part of the scheme, Defendants have sought and continue to seek to collect on the fraudulent insurance claims submitted to State Farm Mutual, State Farm Fire, and other insurance companies.

442. State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1.38 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(c) for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), plus interest, and any other relief the Court deems just and proper.

### TWENTIETH CLAIM FOR RELIEF
### RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1962(d)
**(Against Metro Pain, Shapiro, Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, AM Patel PT, Scarborough, AOT Chiropractic, Evolution Chiropractic, Ma, Hidden Dragon Acupuncture, Guan, Rebound Acupuncture, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, HealthPlus Surgery, Nazarov, and Right Aid Medical Supply Concerning Patients Treated at 2451 E. Tremont)**

443. State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 and Paragraphs 436 through 442 above.

444. Defendants knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 2451 E. Tremont Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent because the records reflect:  (a) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an

automobile accident and no other contributing factors, when no such conclusion was legitimately reached; (c) the examinations, treatment, MRIs, Supplies, and tests were performed, provided, and medically necessary, when they in fact were not medically necessary; and (d) the examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services were reimbursable, when, in fact, they were not reimbursable, including because they were the result of unlawful kickbacks and "pay to play" arrangements, services were rendered through independent contractors rather than employees, providers did not comply with licensing laws regarding the hiring of and supervision by medical directors, and providers did not comply with licensing laws because of secret ownership and control by laypersons, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for claims referenced in Exhibits 1, 11, 17, 18C, and 22.

445.    Each Defendant knew of, agreed to, and acted in furtherance of the common and overall objectives of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services, which were medically unnecessary and/or not reimbursable, to State Farm Mutual, State Farm Fire, and other insurers.

446.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1.38 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(d) for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

## TWENTY-FIRST CLAIM FOR RELIEF
## COMMON LAW FRAUD
### (Against Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro)

447.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

448.    Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated at Dynamic Surgery and HealthPlus Surgery while Shapiro served as medical director.

449.    The false statements of material fact include the representations in each and every claim Dynamic Surgery and HealthPlus Surgery submitted while Shapiro served as medical director that the services rendered in conjunction with procedures performed there were reimbursable, when, in fact, they were not reimbursable, including because Dynamic Surgery and HealthPlus Surgery did not comply with licensing laws regarding the hiring of and supervision by medical directors and because Shapiro did not execute the duties of medical director.

450.    Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to purported services rendered by Dynamic Surgery and HealthPlus Surgery were false and fraudulent when they were made.

451.    Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

452.     As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $4.74 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### TWENTY- SECOND CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD
### (Against Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro)

453.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

454.     Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro conspired, agreed to, and acted in concert to defraud State Farm Mutual and State Farm Fire, and did defraud State Farm Mutual and State Farm Fire, through the submission of false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire as described above in the Twenty-First Claim for Relief.

455.     Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Defendants submitted or caused to be submitted bills and supporting documentation that contained false and fraudulent misrepresentations of material fact to State Farm Mutual and State Farm Fire.

456.     The false statements of material fact include the representations in each and every claim Dynamic Surgery and HealthPlus Surgery submitted while Shapiro served as medical director that services rendered in conjunction with procedures performed there were reimbursable, when, in fact, they were not reimbursable, including because Dynamic Surgery and HealthPlus Surgery did not comply with licensing laws regarding the hiring of and supervision by medical directors and because Shapiro did not execute the duties of medical director.

457. Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to purported services rendered by Dynamic Surgery and HealthPlus Surgery were false and fraudulent when they were made.

458. Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

459. As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $4.74 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## TWENTY-THIRD CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (Against Moshe, Dynamic Surgery, and HealthPlus Surgery, and Shapiro)

460. State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

461. State Farm Mutual and State Farm Fire conferred a benefit upon Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro by paying Dynamic Surgery's and HealthPlus Surgery's claims for services purportedly provided to patients while Shapiro served as medical director, and these Defendants voluntarily accepted and retained the benefit of those payments.

462. Because Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro knowingly billed for or received money for services that were not reimbursable, including because Dynamic Surgery and HealthPlus Surgery did not comply with licensing laws regarding the hiring of and supervision by medical directors and because Shapiro did not execute the duties of medical

director, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

463.    As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $4.74 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Moshe, Dynamic Surgery, HealthPlus Surgery, and Shapiro for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

### TWENTY-FOURTH CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against Moshe, Dr. Moshe, and Citimedical I)

464.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

465.    Moshe, Dr. Moshe, and Citimedical I acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning any and all treatment and services rendered to patients.

466.    The false statements of material fact include the representations in each and every claim Citimedical I submitted to the State Farm Companies that the treatment and services were reimbursable, when, in fact, they were not reimbursable, including because Citimedical I did not comply with licensing laws prohibiting Moshe's operation and control over the facility and its services.

467.     Moshe, Dr. Moshe, and Citimedical I knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to purported services rendered by Citimedical I were false and fraudulent when they were made.

468.     Moshe, Dr. Moshe, and Citimedical I made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

469.     As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $6.46 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Moshe, Dr. Moshe, and Citimedical I for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### TWENTY-FIFTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against Moshe, Dr. Moshe, and Citimedical I)

470.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

471.     State Farm Mutual and State Farm Fire conferred a benefit upon Moshe, Dr. Moshe, and Citimedical I by paying Citimedical I's claims for treatment and services purportedly provided to patients, and these Defendants voluntarily accepted and retained the benefit of those payments.

472.     Because Moshe, Dr. Moshe, and Citimedical I knowingly billed for or received money for treatment and services that were not reimbursable, including because Citimedical I did not comply with licensing laws prohibiting Moshe's operation and control over the corporation and its services, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

473.     As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $6.46 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Moshe, Dr. Moshe, and Citimedical I for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(Against All Defendants)**

474.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 330 above.

475.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

476.     There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and Metro Pain, Shapiro, Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, Cityworks PT, Luna, Kings Chiropractic, Moon, SJM Acupuncture, Krupnova, LK Acupuncturist, Shalaby, Physical Therapy of NY, Park, All About Chiropractic, J Park Chiropractic, Choi, Choice Acupuncture, Choi-Go Acupuncture, Barakat, Barakat PT, Elmandouh, Protection PT, Akl, Primavera PT, Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, PDA Chiropractic, Castillo, Edcas Acupuncture, Kopach, First Alternative Acupuncture, Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, AM Patel PT, Scarborough, AOT Chiropractic, Evolution Chiropractic, Ma, Hidden Dragon Acupuncture, Guan, Rebound Acupuncture, Dr. Moshe, Citimedical I, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, HealthPlus Surgery, Nazarov, and Right Aid Medical Supply on the other hand, as to all charges for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that have not been paid to date

and through the pendency of this litigation.  State Farm Mutual and State Farm Fire contend these Defendants are not entitled to reimbursement for any of these charges.

477.   Because these Defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm Mutual and State Farm Fire, these Defendants are not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring Metro Pain, Shapiro, Hassan, Nile Rehab PT, Khallaf, Handy PT, Kataeva, Cityworks PT, Luna, Kings Chiropractic, Moon, SJM Acupuncture, Krupnova, LK Acupuncturist, Shalaby, Physical Therapy of NY, Park, All About Chiropractic, J Park Chiropractic, Choi, Choice Acupuncture, Choi-Go Acupuncture, Barakat, Barakat PT, Elmandouh, Protection PT, Akl, Primavera PT, Caruso, Brook Chiropractic, Integrated Chiropractic, Albis, PDA Chiropractic, Castillo, Edcas Acupuncture, Kopach, First Alternative Acupuncture, Elmansy, Sky Limit PT, Cushman, PI PT, Paller, Floral Park PT, Patel, AM Patel PT, Scarborough, AOT Chiropractic, Evolution Chiropractic, Ma, Hidden Dragon Acupuncture, Guan, Rebound Acupuncture, Dr. Moshe, Citimedical I, Alon, Columbus Imaging, Medaid Radiology, Moshe, Dynamic Surgery, HealthPlus Surgery, Nazarov, and Right Aid Medical Supply are not entitled to collect No-Fault Benefits for all charges for examinations, treatment, MRIs, Supplies, tests, and pain management and orthopedic procedures and related services that have not been paid to date and through the pendency of this litigation; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire

demand a trial by jury.

Dated: October 5, 2021

By: *Jonathan L. Marks*
Ross O. Silverman
Jonathan L. Marks
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone: 312.902.5200
Facsimile:  312.902.1061
Email:  ross.silverman@katten.com
          jonathan.marks@katten.com

Christopher T. Cook
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Telephone: 212.940.8800
Email:  christopher.cook@katten.com