UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE AND CASUALTY COMPANY,

                   Plaintiffs,

           v.

METRO PAIN SPECIALISTS P.C., TRI-
BOROUGH NY MEDICAL PRACTICE P.C.,
LEONID SHAPIRO, M.D., MOHAMED SAYED
AHMED HASSAN, P.T., NILE REHAB
PHYSICAL THERAPY, P.C., MOHAMED
ELSAYED KHALLAF, P.T., HANDY PHYSICAL
THERAPY P.C., IRINA KATAEVA, P.T.,
CITYWORKS PHYSICAL THERAPY P.C.,
MAHMOUD EZZ ELDEEN SHALABY, P.T.,
PHYSICAL THERAPY OF NEW YORK P.C.,
AMRO MAHMOUD BARAKAT, P.T.,
BARAKAT PT, P.C., MOHAMED MAHMOUD
ELMANDOUH, P.T., PROTECTION PHYSICAL
THERAPY P.C., RAOUF AKL, P.T.,
PRIMAVERA PHYSICAL THERAPY, P.C.,
AHMED MAHMOUD ABDELSHAFY
ELMANSY, P.T., SKY LIMIT PHYSICAL
THERAPY, P.C., GEOFFREY ALLERTON
CUSHMAN, P.T., PI PHYSICAL THERAPY,
P.C., SHERWIN CATUGDA PALLER, P.T.,
FLORAL PARK PHYSICAL THERAPY, P.C.,
ALPESHKUMAR MANUGHAI PATEL, P.T., A.
M. PATEL PHYSICAL THERAPY P.C.,
LEONARD LUNA, D.C., KINGS
CHIROPRACTIC WELLNESS, P.C., JONGDUG
PARK, D.C., ALL ABOUT CHIROPRACTIC P.C.,
J PARK CHIROPRACTIC P.C., GIULIO
CARUSO, D.C., BROOK CHIROPRACTIC OF
NY P.C., INTEGRATED CHIROPRACTIC OF
NY P.C., PETER ALBIS, D.C., PDA NY
CHIROPRACTIC P.C., PAUL VICTOR
SCARBOROUGH, D.C., A.O.T. CHIROPRACTIC
P.C., EVOLUTION CHIROPRACTIC P.C.,
STACY JUYOUNG MOON, L.AC., SJM

**MEMORANDUM & ORDER**
21-CV-5523 (MKB)

ACUPUNCTURE P.C., LYUDMILA
KRUPNOVA, L.AC., LK ACUPUNCTURIST
P.C., HYEONGSOCK CHOI, L.AC., CHOICE
ACUPUNCTURE PLLC, CHOI-GO
ACUPUNCTURE PLLC, PETER KOPACH,
L.AC., FIRST ALTERNATIVE PLM
ACUPUNCTURE P.C., EDWIN CASTILLO,
L.AC., EDCAS ACUPUNCTURE P.C., LONGYU
MA, L.AC., HIDDEN DRAGON
ACUPUNCTURE P.C., XIA GUAN, L.AC.,
REBOUND ACUPUNCTURE P.C., REUVEN
ALON *a/k/a* ROB ALON, COLUMBUS
IMAGING CENTER LLC, MEDAID
RADIOLOGY LLC, REGINA MOSHE, M.D.,
YAN MOSHE *a/k/a* YAN LEVIEV,
CITIMEDICAL I, PLLC, HACKENSACK
SPECIALTY ASC LLC *f/k/a* DYNAMIC
SURGERY CENTER LLC, INTEGRATED
SPECIALTY ASC LLC *f/k/a* HEALTHPLUS
SURGERY CENTER LLC, VLADIMIR
NAZAROV, and RIGHT AID MEDICAL SUPPLY
CORP.,

                        Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Automobile")

and State Farm Fire and Casualty Company ("State Farm Fire") commenced the above-captioned

action on October 5, 2021, (Compl., Docket Entry No. 1), and filed an Amended Complaint

against sixty-three Defendants[1] on December 14, 2021, (Am. Compl., Docket Entry No. 63).

---

[1] The sixty-three Defendants include Metro Pain Specialists P.C. ("Metro Pain"), Tri-
Borough NY Medical Practice P.C. ("Tri-Borough"), Leonid Shapiro, M.D. ("Shapiro")
(together, the "Examiner Defendants"); Mohamed Sayed Ahmed Hassan, P.T. ("Hassan"), Nile
Rehab Physical Therapy, P.C. ("Nile Rehab PT"), Mohamed Elsayed Khallaf, P.T. ("Khallaf"),
Handy Physical Therapy P.C. ("Handy PT"), Irina Kataeva, P.T. ("Kataeva"), Cityworks
Physical Therapy P.C. ("Cityworks PT"), Mahmoud Ezz Eldeen Shalaby, P.T. ("Shalaby"),
Physical Therapy of New York P.C. ("Physical Therapy of NY"), Amro Mahmoud Barakat, P.T.
("Barakat"), Barakat PT, P.C. ("Barakat PT"), Mohamed Mahmoud Elmandouh, P.T.
("Elmandouh"), Protection Physical Therapy P.C. ("Protection PT"), Raouf Akl, P.T. ("Akl"),

Plaintiffs allege, *inter alia*, that Defendants wrongfully obtained no-fault insurance reimbursements for medically unnecessary healthcare services in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)–(d) ("RICO") and are liable for common law fraud, aiding and abetting fraud, and unjust enrichment, (*id.* ¶¶ 1, 338–480), and seek damages and a declaratory judgment, (*id.* ¶¶ 338–484).

On December 23, 2021, Plaintiffs moved to (1) stay, until resolution of litigation, all arbitrations pending before the American Arbitration Association ("AAA") and all lawsuits pending in New York state courts between Defendants and Plaintiffs seeking "no-fault insurance

---

Primavera Physical Therapy, P.C. ("Primavera PT"), Ahmed Mahmoud Abdelshafy Elmansy, P.T. ("Elmansy"), Sky Limit Physical Therapy, P.C. ("Sky Limit PT"), Geoffrey Allerton Cushman, P.T. ("Cushman"), PI Physical Therapy, P.C. ("PI PT"), Sherwin Catugda Paller, P.T. ("Paller"), Floral Park Physical Therapy, P.C. ("Floral Park PT"), Alpeshkumar Manughai Patel, P.T. ("Patel"), A. M. Patel Physical Therapy P.C. ("AM Patel PT") (together, the "Physical Therapy Defendants"); Leonard Luna, D.C. ("Luna"), Kings Chiropractic Wellness, P.C. ("Kings Chiropractic"), Jongdug Park, D.C. ("Park"), All About Chiropractic P.C. ("All About Chiropractic"), J Park Chiropractic P.C. ("J Park Chiropractic"), Giulio Caruso, D.C. ("Caruso"), Brook Chiropractic of NY P.C. ("Brook Chiropractic"), Integrated Chiropractic of NY P.C. ("Integrated Chiropractic"), Peter Albis, D.C. ("Albis"), PDA NY Chiropractic P.C. ("PDA Chiropractic"), Paul Victor Scarborough, D.C. ("Scarborough"), A.O.T. Chiropractic P.C. ("AOT Chiropractic"), Evolution Chiropractic P.C. ("Evolution Chiropractic") (together, the "Chiropractic Defendants"); Stacy Juyoung Moon, L.Ac. ("Moon"), SJM Acupuncture P.C. ("SJM Acupuncture"), Lyudmila Krupnova, L.Ac. ("Krupnova"), LK Acupuncturist P.C. ("LK Acupuncturist"), Hyeongsock Choi, L.Ac. ("Choi"), Choice Acupuncture PLLC ("Choice Acupuncture"), Choi-Go Acupuncture PLLC ("Choi-Go Acupuncture"), Peter Kopach, L.Ac. ("Kopach"), First Alternative PLM Acupuncture P.C. ("First Alternative Acupuncture"), Edwin Castillo, L.Ac. ("Castillo"), Edcas Acupuncture P.C. ("Edcas Acupuncture"), Longyu Ma, L.Ac. ("Ma"), Hidden Dragon Acupuncture P.C. ("Hidden Dragon Acupuncture"), Xia Guan, L.Ac. ("Guan"), Rebound Acupuncture P.C. ("Rebound Acupuncture") (together, the "Acupuncture Defendants"); Reuven Alon, also known as Rob Alon ("Alon"), Columbus Imaging Center LLC ("Columbus Imaging"), Medaid Radiology LLC ("Medaid Radiology"), Regina Moshe, M.D. ("Dr. Moshe"), Yan Moshe, also known as Yan Leviev ("Moshe"), Citimedical I, PLLC ("Citimedical I") (together, the "MRI Defendants"); Hackensack Specialty ASC LLC, formerly known as Dynamic Surgery Center LLC ("Dynamic Surgery"); Integrated Specialty ASC LLC, formerly known as HealthPlus Surgery Center LLC ("HealthPlus Surgery") (together, the ASC Defendants"); Vladimir Nazarov ("Nazarov"), and Right Aid Medical Supply Corp. ("Right Aid") (together, the "DME Defendants").

benefits for services or supplies provided by Defendants to Metro Pain or Tri-Borough patients" and (2) enjoin Defendants, until resolution of litigation, from commencing any new arbitrations or New York state court proceedings against Plaintiffs seeking the same.[2]  Twenty-nine of the sixty-three Defendants opposed the motion.[3]  For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' motion.  The Court grants the motion to stay (1) all pending arbitrations, (2) all future arbitrations, and (3) all future state court proceedings.  The Court denies the motion to stay all pending state court proceedings.

---

[2] (Pls.' Mot. to Stay ("Pls.' Mot."), Docket Entry No. 77; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 80; Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 106; Pls.' Second Reply in Supp. of Pls.' Mot. ("Pls.' Second Reply"), Docket Entry No. 165.)

[3] Twenty-nine of the sixty-three Defendants filed six separate opposition papers. (Reuven Alon, Columbus Imaging Center LLC, Hackensack Specialty ASC LLC, Integrated Specialty ASC LLC, Medaid Radiology LLC, Yan Moshe Defs.' Opp'n to Pls.' Mot. ("Alon Defs.' Opp'n"), annexed to Decl. in Opp'n as Ex. 2, Docket Entry No. 93-2; Metro Pain Specialists P.C., Leonid Shapiro, M.D., Tri-Borough NY Medical Practice P.C. Defs.' Opp'n to Pls.' Mot. ("Metro Pain Defs.' Opp'n"), Docket Entry No. 94; Citimedical I, PLLC, Regina Moshe, M.D. Defs.' Decl. in Opp'n ("Citimedical I Defs.' Decl.), Docket Entry No. 103; Raouf Akl, P.T., Mohamed Mahmoud Elmandouh, P.T., Floral Park Physical Therapy, P.C., Handy Physical Therapy P.C., Mohamed Sayed Ahmed Hassan, P.T., Mohamed Elsayed Khallaf, P.T., Nile Rehab Physical Therapy, P.C., Sherwin Catugda Paller, P.T., Physical Therapy of New York P.C., Primavera Physical Therapy, P.C., Protection Physical Therapy P.C., Mahmoud Ezz Eldeen Shalaby, P.T. Defs.' Opp'n to Pls.' Mot. ("Akl Defs.' Opp'n"), Docket Entry No. 104; First Alternative PLM Acupuncture P.C., Peter Kopach, L.Ac. Defs.' Opp'n to Pls.' Mot. ("First Alternative Defs.' Opp'n"), Docket Entry No. 158; Amro Mahmoud Barakat, P.T., Barakat PT, P.C., Alpeshkumar Manughia Patel, P.T., A.M. Patel Physical Therapy P.C. Defs.' Opp'n to Pls.' Mot. ("Barakat Defs.' Opp'n), Docket Entry No. 233.)  Three Defendants filed responses stating that they do not oppose Plaintiffs' motion in view of their minimal pending proceedings and the fact that they do not currently treat patients of Metro Pain or Tri-Borough.  (A.O.T. Chiropractic P.C., Evolution Chiropractic P.C., Paul Victor Scarborough, D.C. Defs.' Response to Pls.' Mot. ("A.O.T. Defs.' Response"), Docket Entry No. 105.)

## I.    Background

### a.    New York's no-fault insurance scheme

Under New York's no-fault law, automobile insurers provide mandatory coverage for certain no-fault benefits, including necessary expenses for medical treatment up to $50,000.[4] N.Y. Ins. Law §§ 5102(a)(1), 5102(b), 5103.  "[I]ndividuals injured in car accidents assign their statutory benefits to licensed medical professionals, who submit claims for medically 'necessary' treatments directly to the injured party's insurance carriers."  *United States v. Zemlyansky*, 908 F.3d 1, 7 (2d Cir. 2018) (first quoting N.Y. Ins. Law § 5102; and then citing 11 N.Y. Comp. Codes R. & Regs. § 65-3.11).  A regulation implementing section 5106(b) of the New York Insurance Law states that "[i]n the event any person making a claim for first-party benefits and the [insurance] [c]ompany do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration."  11 N.Y. Comp. Codes R. & Regs. § 65-1.1(d); *see also Allstate Ins. Co. v. Mun*, 751 F.3d 94, 97–98 (2d Cir. 2014) (quoting 11 N.Y. Comp. Codes R. & Regs. § 65-1.1(a), (d)).

Plaintiffs seek damages from Defendants for submitting allegedly "fraudulent bills and supporting documentation" for services that were "ineligible for reimbursement and/or medically unnecessary."  (Am. Compl. ¶ 1.)  The alleged services include examinations, treatment, medical imaging, testing, orthotic devices and durable medical equipment, pain management, and orthopedic procedures and related services provided to individuals involved in motor vehicle accidents and eligible for no-fault benefits under Plaintiffs' policies.  (*Id.*)

---

[4]  Because it is helpful to understand the facts of the case, the Court provides a brief overview of New York's no-fault insurance scheme before discussing the relevant facts.  *See generally Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 281–83 (E.D.N.Y. 2013) (providing a detailed overview of New York's no-fault scheme).

### b.  The parties

#### i.   Plaintiffs

State Farm Automobile "is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York." (*Id.* ¶ 25.)  State Farm Fire "is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York." (*Id.* ¶ 26.)

#### ii.  Defendants

Shapiro is a licensed anesthesiologist in New York and New Jersey.  (*Id.* ¶ 27.)  He "purportedly owns Metro Pain" and "is also the owner of numerous other medical and anesthesia professional corporations closely associated with Metro Pain," including Neurological Diagnostics P.C. ("Neurological Diagnostics"), PMR Medical P.C. ("PMR Medical"), Premier Anesthesia Associates P.A. ("Premier Anesthesia"), and Hudson Premier Healthcare Partners LLC.  (*Id.* at ¶¶ 2, 27.)  Shapiro also incorporated and/or has an ownership interest in at least two businesses providing services to attorneys and medical clinics, LegalMDConsult.com LLC ("LegalMDConsult") and Scan to Data LLC ("Scan to Data").  (*Id.*)  Shapiro served as medical director of Excel Surgery Center LLC ("Excel Surgery"), Dynamic Surgery, and HealthPlus Surgery, and Director of Anesthesiology at NJMHMC LLC, doing business as Hudson Regional Hospital ("Hudson Regional").  (*Id.* ¶¶ 2, 28.)

Metro Pain is a corporation organized under the laws of New Jersey with its principal place of business in New Jersey.  (*Id.* ¶ 29.)  Metro Pain's medical practices operate at as many as thirty multidisciplinary clinics in the New York area that cater to individuals who have been in automobile accidents.  (*Id.* ¶ 2.)  Shapiro is the sole original shareholder, director, officer, and

incorporator of Metro Pain.  (*Id.* ¶ 29.)

Tri-Borough is a corporation organized under the laws of New York with its principal place of business in New Jersey.  (*Id.* ¶ 31.)  Shapiro is the sole original shareholder, director, officer, and incorporator of Tri-Borough.  In May of 2021, Shapiro began operating Tri-Borough as a successor entity to Metro Pain.  (*Id.*)

The Physical Therapy Defendants are eleven citizens of New York and New Jersey who serve as licensed physical therapists in New York and eleven corporations, owned by the physical therapists, organized under the laws of New York with their principal places of business in New York and New Jersey that have submitted bills to Plaintiffs for physical therapy services.  (*Id.* ¶¶ 32–53.)

The Chiropractor Defendants are five citizens of New York who serve as licensed chiropractors in New York and eight New York corporations, owned by the chiropractors, that have submitted bills to Plaintiffs for chiropractic services.  (*Id.* ¶¶ 54–66.)

The Acupuncture Defendants are seven citizens of New York and New Jersey who serve as licensed acupuncturists in New York and eight New York corporations, owned by the acupuncturists, that have submitted bills to Plaintiffs for acupuncture services.  (*Id.* ¶¶ 67–81.)

The MRI Defendants include Alon, Dr. Moshe, Moshe, and three New York and New Jersey corporations owned by these individuals that have submitted bills to Plaintiffs for MRI services "purportedly performed for patients [of] Metro Pain."  (*Id.* ¶¶ 82–87.)  Alon is a citizen of New Jersey and is a cousin and business associate of Moshe.  (*Id.* ¶ 82.)  He is neither a physician nor a radiologist.  (*Id.*)  He owns Columbus Imaging and Medaid Radiology, as well as nonparty Beshert Corp. ("Beshert"), "a purported advertising and marketing company to which Metro Pain has made substantial payments."  (*Id.*)  Dr. Moshe is a citizen of New York and is a

physician licensed in New Jersey and New York.  (*Id.* ¶ 85.)  She "purportedly owns" MRI providers Citimedical I, Citimedical Services P.C. ("Citimedical Services"), and Citimed Complete Medical Care P.C. ("Citimed Complete") (collectively, "Citimedical"), and an anesthesia provider Citimed Services P.A. ("Citimed Services").  (*Id.* ¶¶ 2, 85.)  Moshe is a citizen of New York and is Dr. Moshe's brother.  (*Id.* ¶ 86.)  He is not a health care professional. (*Id.*)  Moshe owned, controlled, and was in a position to derive economic benefit from Citimedical and Citimed Services.  (*Id.*)  Moshe also "owns and controls a purported medical receivables financing company, Med Capital LLC ('Med Capital'), a billing company Star Solution Services Inc, and a series of ambulatory surgery centers ('ASCs')," including Excel Surgery, Dynamic Surgery, HealthPlus Surgery, SCOB LLC, doing business as SurgiCare of Brooklyn ("SurgiCare"), Hudson Regional, and Citimed Surgery Center, LLC ("Citimed Surgery").  (*Id.* ¶ 2.)

The ASC Defendants are two New Jersey corporations "purportedly own[ed]" by Moshe and his wife, Margarita Moshe, that have "submitted bills to [Plaintiffs] for services purportedly performed for patients [of] Metro Pain."  (*Id.* ¶¶ 88–89.)

The DME Defendants include Nazarov and Right Aid.  (*Id.* ¶¶ 90–91.)  Nazarov is a citizen of New York and is not a health care professional.  (*Id.* ¶ 90.)  He "purportedly owns [Right Aid]."  (*Id.*)  Right Aid is a New York corporation that has submitted bills to Plaintiffs for orthotic devices and durable medical equipment ("DMEs") (together with orthotics, "Supplies") "purportedly provided to patients [of] Metro Pain."  (*Id.* ¶¶ 1, 91.)

### c.  The alleged fraudulent scheme

Beginning in November of 2016, Shapiro, Alon, and Moshe "together established a scheme to profit from patients' [n]o-[f]ault [b]enefits through the submission of fraudulent

claims." (*Id.* ¶¶ 8, 21.)  Shapiro "operated numerous multidisciplinary clinics through Metro

Pain in and around Queens, Brooklyn, and [the] Bronx, New York, directed at individuals who

have been in automobile accidents." (*Id.* ¶ 9.)  Among these locations, Metro Pain operated four

"gatekeeper" clinics that rendered "predetermined examinations to justify additional treatment

and services, and then decid[ed] what additional care patients receive and who would provide

additional care in exchange for payment."[5] (*Id.*)  The examinations "virtually always conclude

patients require a treatment plan consisting of a combination of physical therapy, chiropractic

care, and acupuncture, as well as other services," which "are then performed by physical

therapists, chiropractors, and acupuncturists in the clinics, not because they are necessary, but

pursuant to 'pay to play' financial arrangements with Metro Pain and others who are working

with Metro Pain." (*Id.* ¶ 10.)  In particular, some providers are permitted to treat patients of

Metro Pain "because they make payments to Metro Pain in exchange for patient referrals,

typically disguised as 'rent' pursuant to a sublease for space in the clinic." (*Id.*)

Through this scheme, patients were subjected to a predetermined treatment protocol (the

"Predetermined Treatment Protocol") at the gatekeeper locations. (*Id.* ¶ 17.)  The Predetermined

Treatment Protocol included: (a) "initial examinations that are not legitimately performed to

determine the true nature and extent of patient injuries, but rather are performed as a pretext to

justify a variety of unnecessary treatment and services;" (b) "a treatment plan involving physical

therapy, chiropractic care, acupuncture, and other services rendered by providers who have

financial arrangements with Metro Pain;" (c) treatment by the Physical Therapy Defendants, the

---

[5] The four locations included (a) 105-10 Flatlands Ave., Brooklyn, New York 11236
("105-10 Flatlands"); (b) 204-12 Hillside Ave., Hollis, New York 11423 ("204-12 Hillside"); (c)
717 Southern Blvd., Bronx, New York 10455 ("717 Southern"); and (d) 2451 E. Tremont Ave.,
Bronx, New York 10461 ("2451 E. Tremont").  (Am. Compl. ¶ 9.)

9

Chiropractor Defendants, the Acupuncture Defendants, the MRI Defendants, and/or the DME

Defendants "who have entered into financial arrangements with Metro Pain and who purportedly

examine patients, diagnose injuries to support additional treatment, and provide medically

unnecessary [services, tests, treatments, and Supplies];" (d) medically unnecessary diagnostic

tests, prescription gels and patches, and pain management and orthopedic consultations followed

by procedures performed by the ASC Defendants with anesthesia provided by Citimed Services

or Premier Anesthesia.  (*Id.*)

For example, Metro Pain "refers virtually every patient who receives more than one

office visit for [magnetic resonance imaging]" ("MRI").  (*Id.* ¶ 11.)  The majority of the MRIs

are performed by Alon's Columbus Imaging and Medaid Radiology or by Moshe's lay-

controlled Citimedical I and are "medically unnecessary, expensive . . . , and do not lead to an

alteration in treatment."  (*Id.*)  Metro Pain also orders other treatments and services as a part of

the pay to play arrangements, including (1) "unnecessary cervical collars and/or lumbar

orthoses" and between five and twenty-one other Supplies for "every patient who receives more

than one office visit"; (2) diagnostic tests[6] performed by Metro Pain, and physical therapists and

chiropractors with which it has financial arrangements, that are "unnecessary, do not lead to an

alteration in treatment, and for some tests are duplicative of information obtained during the

purported examinations"; (3) "expensive and unnecessary prescription gels and patches"; and (4)

"unnecessary pain management and orthopedic consultations followed by procedures performed

by Metro Pain at Moshe's ASCs, where they also receive anesthesia from Citimed Services,

---

[6]  The diagnostic tests include Outcome Assessment Tests, nerve conduction studies and
electromyography tests ("NCV and EMG Tests"), computerized range of motion ("ROM") and
muscle tests, functional capacity tests, and pain fiber nerve conduction studies ("Pf-NCS Tests").
(Am. Compl. ¶ 12.)

Premier Anesthesia, or PMR Medical."[7]  (*Id.* ¶¶ 12–13.)

Alon provides Metro Pain with access to patients through Beshert and profits by, among others, Metro Pain's payments to Beshert and referral of patients for profitable MRIs performed at Columbus Imaging and Medaid Radiology.  (*Id.* ¶ 15.)

Moshe profits through Metro Pain's referral of patients for MRIs performed at Citimedical I and for anesthesia performed by Citimed Services, as well as procedures performed at his ASCs.[8]  (*Id.* ¶ 16.)  Moshe compensates Shapiro in part through payment for Shapiro's role as medical director of his ASCs, including Dynamic Surgery and HealthPlus Surgery, granting Shapiro primary, if not exclusive, ability to perform and bill for anesthesia at Moshe's ASCs, and a loan against Metro Pain's receivables of $2.5 million.  (*Id.*)

Plaintiffs contend that in furtherance of this scheme, Defendants submitted, or caused to be submitted to Plaintiffs, bills and supporting documents falsely representing that the examinations, treatment, MRIs, Supplies, tests, pain management and orthopedic procedures, and related services were medically necessary and reimbursable when, in fact, they were performed to exploit patients' [n]o-[f]ault [b]enefits and not because they were medically necessary or reimbursable.  (*Id.* ¶ 18.)

As a result of Defendants' conduct, patients were not appropriately examined, subjected to unnecessary tests and treatments, and suffered a reduction in their no-fault benefits that would

---

[7]  In May of 2021, Shapiro stopped treating insureds through Metro Pain and began treating them through Tri-Borough, a successor entity.  (Am. Compl. ¶ 14.)  Tri-Borough "operates at many of the locations at which Metro Pain had operated, treats the same patients that Metro Pain had treated through physicians previously employed by Metro Pain, and performs the same types of treatment and makes the same types of referrals as Metro Pain."  (*Id.*)

[8]  Plaintiffs allege that Moshe owns and controls both Citimedical I and Citimed Services because his sister, Dr. Moshe, owns the entities in name only.  (Am. Compl. ¶ 2.)

have otherwise been available for legitimate treatments.  (*Id.* ¶ 20.)[9]

### d.  Arbitration and litigation

As a part of the scheme, "when [Plaintiffs] deny or do not otherwise pay submitted bills, Defendants routinely file lawsuits or demand arbitration, often over a single provider's bill for a single date of service."  (Pl.'s Mem. 6.)  In total, Defendants have filed over 2,450 arbitrations and approximately 480 lawsuits in state court seeking payment for allegedly fraudulent unpaid bills.  (*Id.*)  There are currently 1,569 arbitrations and 215 lawsuits pending.  (*Id.*)  Defendants are likely to file new arbitrations and lawsuits during this action to recover additional sums as to claims for services that have not been paid because approximately $6.7 million of Defendants' total submitted bills are currently unpaid and not yet subject to arbitration or court proceedings. (*Id.*)

### e.  Procedural history

On May 5, 2021, Plaintiffs filed a Complaint alleging that Defendants wrongfully obtained no-fault insurance reimbursements relating to healthcare services in violation of the RICO, 18 U.S.C. §§ 1962(c)–(d) and are liable for common law fraud, aiding and abetting fraud, and unjust enrichment.  (Compl.)  On December 14, 2021, Plaintiffs filed an Amended Complaint and added Defendant Tri-Borough.  (Am. Compl.)

---

[9] In addition, Plaintiffs allege that Citimedical I, Dynamic Surgery, and HealthPlus Surgery submitted or caused to be submitted to Plaintiffs bills and supporting documents falsely representing that they were eligible for reimbursement under the no-fault laws.  (Am. Compl. ¶ 19.)  Plaintiffs contend that: Citimedical I's MRI services were rendered by independent contractors, and thus were ineligible for reimbursement; Citimedical I was owned and controlled by Moshe, a layperson, in violation of New York licensing laws and rendering its charges ineligible for reimbursement; and Dynamic Surgery and HealthPlus Surgery also failed to adhere to licensing requirements governing the operation of ASCs in New Jersey during any period Shapiro served as a nominal medical director, and therefore any charges submitted for services when the ASCs did not have true, qualified medical directors fulfilling the duties enumerated by law were ineligible for reimbursement.  (*Id.*)

Plaintiffs seek more than $15.4 million in damages in amounts paid for (a) examinations by Metro Pain and Tri-Borough; (b) examinations and treatment by the Physical Therapy Defendants; (c) examinations and treatment by the Chiropractor Defendants; (d) examinations and treatment by the Acupuncture Defendants; (e) MRIs by the MRI Defendants; (f) Supplies ordered by Metro Pain and Tri-Borough or dispensed by the DME Defendants; (g) diagnostic tests performed by Metro Pain, Tri-Borough, the Physical Therapy Defendants, and the Chiropractor Defendants; (h) professional fees and facility fees for procedures performed by Metro Pain and Tri-Borough at the ASC Defendants; (i) all services rendered by Citimedical I, including MRI services rendered by independent contractors; and (j) all services rendered by Dynamic Surgery and HealthPlus Surgery during the period when Shapiro served as a nominal medical director. (*Id.* ¶ 21.)

Plaintiffs move to (1) stay, until resolution of the instant litigation, all arbitrations pending before the AAA between Defendants and Plaintiffs seeking no-fault insurance benefits for services or supplies provided by Defendants to patients of Metro Pain or Tri-Borough; (2) stay, until resolution of the instant litigation, all lawsuits pending in the state courts of New York between Defendants and Plaintiffs, seeking no-fault insurance benefits for services or supplies provided by Defendants to patients of Metro Pain or Tri-Borough; and (3) enjoin Defendants until the resolution of the instant litigation from commencing any new arbitrations or New York state court proceedings against Plaintiffs, seeking no-fault insurance benefits for services or supplies provided by Defendants to patients of Metro Pain or Tri-Borough; and twenty-nine of the sixty-three Defendants oppose the motion.[10]

---

[10] (Pls.' Mot; Pls.' Mem.; Alon Defs.' Opp'n; Metro Pain Defs.' Opp'n; Citimedical I Defs.' Decl.; Akl Defs.' Opp'n; A.O.T. Defs.' Opp'n; First Alternative Defs.' Opp'n; Barakat Defs.' Opp'n.)

## II.   Discussion

### a.   Standard of review

"The preliminary injunction standard applies where . . . a party seeks to stay pending no-fault insurance claims and to enjoin the filing of further claims during the pendency of a lawsuit seeking to invalidate those claims."  *Gov't Emps. Ins. Co. v. Beynin*, No. 19-CV-6118, 2021 WL 1146051, at *4 (E.D.N.Y. Mar. 25, 2021) (collecting cases); *see also Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 449 (E.D.N.Y. 2020) (analyzing a motion to stay and enjoin no-fault collection proceedings under the preliminary injunction standard), *appeal dismissed* No. 20-CV-225 (2d Cir. May 11, 2020).  "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'"  *Benisek v. Lamone*, 585 U.S. ---, ---, 138 S. Ct. 1942, 1943 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see also Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2021) (same).  The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held."  *Benisek*, 585 U.S. at ---, 138 S. Ct. at 1945 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  A party seeking a preliminary injunction "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest."  *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273–74 (2d Cir. 2021); *see also Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (noting that to obtain a preliminary injunction, "the movant has to 'show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the

14

preliminary relief'" (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010), *cert. denied*, 141 S. Ct. 1075 (2021))).

### b. The Federal Arbitration Act does not apply to Plaintiffs' no-fault insurance policies

Plaintiffs argue that courts "ha[ve] the authority to enjoin no-fault arbitration proceedings" because the arbitration clauses at issue "were mandated under New York no-fault statutes rather than bargained for." (Pls.' Mem. 23–24 (quoting *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 492–93 (E.D.N.Y. 2021).) Plaintiffs contend that, because the Federal Arbitration Act only requires courts to enforce privately negotiated agreements to arbitrate, it poses no barrier to the Court's authority to stay pending or future no-fault arbitration actions. (*Id.*)

Defendants argue that "the [Federal Arbitration] Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." (Metro Pain Defs.' Opp'n 12 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).) Defendants contend that no distinction exists for arbitrations that are mandated by New York's legislature rather than the result of a bargained-for agreement between parties. (*Id.*) In the alternative, Defendants contend that Plaintiffs "'bargain[ed] for' the right to arbitrate claims that fall within the policies' arbitration clause by choosing to do business in New York and offering the arbitration clause required by New York's Insurance Law." (*Id.* at 13 (quoting *Gov't Emps. Ins. Co. v. Grand Med. Supply, LLC*, No. 11-CV-5339, 2012 WL 2577577, at *2 (E.D.N.Y. July 4, 2012)).)

The Federal Arbitration Act governs disputes where: "(1) there is a written arbitration agreement; (2) diversity provides an independent basis for federal jurisdiction; and (3) the

underlying transaction involves interstate commerce." *ACEquip Ltd. v. Am. Eng'g Corp.*, 315 F.3d 151, 154 (2d Cir. 2003) (first citing 9 U.S.C. § 2; and then citing *In re Chung & President Enters.*, 943 F.2d 225, 229 (2d Cir. 1991)); *see also New Prime Inc. v. Oliveira*, 586 U.S. ---, ---, 139 S. Ct. 532, 536 (2019) ("The Federal Arbitration Act requires courts to enforce private arbitration agreements.").  The Supreme Court has interpreted the Act as reflecting "a liberal federal policy favoring arbitration agreements," *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)), and "plac[ing] [arbitration] agreements 'upon the same footing as other contracts,'" *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. ---, ---, 140 S. Ct. 1637, 1643 (2020) (second alteration in original) (quoting *Volt Info. Scis., Inc. v. Board of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989)).  "It thereby follows that parties are not required to arbitrate unless they have agreed to do so."  *Meyer*, 868 F.3d at 73 (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)).

The Federal Arbitration Act "requires courts to enforce privately *negotiated* agreements to arbitrate."  *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 649 (2d Cir. 2011) (emphasis added) (first citing 9 U.S.C. § 1, *et seq.*; then quoting *Volt Info. Scis., Inc.*, 489 U.S. at 478; and then citing *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 176 (2d Cir. 2003)). Although the Federal Arbitration Act "prevents federal district courts from enjoining private arbitrations where an arbitration clause is present in the governing contract," a "mandatory arbitration clause . . . prescribed by [s]ection 5106(b) of New York Insurance Law, does not result in arbitrations that are 'truly voluntary' because it is mandated by statute and not by voluntary agreement of the parties."  *Gov't Emps. Ins. Co. v. Mayzenberg*, No. 17-CV-2802, 2018 WL 6031156, at *3 (E.D.N.Y. Nov. 16, 2018).  "[U]nlike a bargained-for arbitration

16

clause, the parties . . . [we]re not permitted to choose where the arbitrations [will] take place,

who will serve as the arbitrators, or any other procedural components of the arbitration." *Id.*

(citing 11 N.Y. Comp. Codes R. & Regs. § 65-4.5); *see also Liberty Mut. Ins. Co. v. Excel*

*Imaging, P.C.*, 879 F. Supp. 2d 243, 263 (E.D.N.Y. 2012) (concluding that the "right to arbitrate

is a creation of state no-fault law" and the defendants "presented no evidence that the . . .

insurance contracts bargained for the right to arbitrate affirmative fraud claims through their

private agreements"); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 380 (E.D.N.Y. 2012)

(noting that "the parties cannot be said to have evinced an intention or bargained for the right to

arbitrate affirmative fraud claims through their private agreements" where "local law mandates

that disputes be arbitrable" and the plaintiff's contracts "merely adhere[d] to this mandate,

parroting the words of the statute or silently adopting its provisions").

Because the Federal Arbitration Act "requires courts to enforce privately *negotiated*

agreements to arbitrate," *UBS Fin. Servs., Inc.*, 660 F.3d at 649 (emphasis added), and the

arbitration clauses in Plaintiffs' contracts were mandated under New York no-fault statutes rather

than bargained for, "the Federal Arbitration Act is inapplicable and [the Court] has the authority

to enjoin no-fault arbitration proceedings." *Relief Med., P.C.*, 554 F. Supp. 3d at 493; *see*

*Beynin*, 2021 WL 1146051, at *9 (noting that the court was "persuaded by the rationale in

*Mayzenberg*" that "it has the authority to stay pending no-fault proceedings"); *Gov't Emps. Ins.*

*Co. v. Zilberman*, No. 20-CV-209, 2021 WL 1146086, at *1 (E.D.N.Y. Mar. 25, 2021) (granting

motion to stay no-fault insurance arbitrations and civil court collection actions); *Gov't Emps. Ins.*

*Co. v. Moshe*, No. 20-CV-1098, 2020 WL 3503176, at *1 n.2 (E.D.N.Y. June 29, 2020) ("[The

defendants] also argue that the Federal Arbitration Act prohibits granting a preliminary

injunction staying the pending arbitrations.  However, courts have concluded that the [Federal

Arbitration Act] does not apply to no-fault insurance collections arbitrations." (first citing *Mayzenberg*, 2018 WL 6031156, at \*4; and then citing *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 233 (E.D.N.Y. 2018))); *Wellmart RX, Inc.*, 435 F. Supp. 3d at 456 ("[T]he court does not consider . . . the Federal Arbitration Act . . . as barring its authority to enjoin pending and future arbitrations, or future state law collection suits." (first citing 9 U.S.C. § 2; and then citing *Mayzenberg*, 2018 WL 6031156, at \*3–4, 9)); *Parisien*, 352 F. Supp. 3d at 232–33 ("To the extent that [the defendants] may be heard to challenge this [c]ourt's authority to enjoin the pending or future arbitration proceedings under the Federal Arbitration Act . . . , the [c]ourt rejects this argument for the reasons it stated in [*Mayzenberg*, 2018 WL 6031156, at \*3–4].'" (citing 9 U.S.C. § 1, *et seq.*)).

The Court declines to accept Defendants' assertion that *Grand Med. Supply, LLC*, which characterized arbitration clauses demanded by New York's no-fault statute as "bargained for" elements of the contract by virtue of the parties choosing to do business in New York, is controlling. *Grand Med. Supply, LLC*, 2012 WL 2577577, at \*2. As the Court noted in *Relief Med., P.C.*:

> [A]lthough the Federal Arbitration Act "prevents federal district courts from enjoining private arbitrations where an arbitration clause is present in the governing contract," a "mandatory arbitration clause . . . prescribed by [s]ection 5106(b) of New York Insurance Law, does not result in arbitrations that are 'truly voluntary' because it is mandated by statute and not by voluntary agreement of the parties."

554 F. Supp. 3d at 492–93 (quoting *Mayzenberg*, 2018 WL 6031156, at \*3); *see* Arbitration Fairness Act, S. 2591, 115th Cong. (2018) ("Arbitration can be an acceptable alternative when consent to the arbitration is truly voluntary, and occurs after the dispute arises."). Unlike voluntary and bargained-for arbitration clauses, "the parties [here are] not permitted to choose where the arbitrations take place, who will serve as the arbitrators, or any other procedural

18

components of the arbitration." *Relief Med., P.C.*, 554 F. Supp. 3d at 493 (first quoting *Mayzenberg*, 2018 WL 6031156, at *3; and then citing 11 N.Y. Comp. Codes R. & Regs. § 65-4.5).

Accordingly, the Federal Arbitration Act does not apply to Plaintiffs' no-fault insurance policies and the Court exercises jurisdiction over the request for a preliminary injunction of no-fault insurance arbitration proceedings.

### c. Anti-Injunction Act

Plaintiffs argue that the Anti-Injunction Act applies only to "suits already instituted," and does "not preclude injunctions against the institution of state court proceedings" or "a federal court's ability to stay arbitrations — either pending or anticipated." (Pls.' Mem. 17 (first quoting *Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965); then citing *Pathways, Inc. v. Dunne*, 329 F.3d 108, 114 (2d Cir. 2003); and then citing 28 U.S.C. § 2283).) With respect to pending state-court actions, Plaintiffs argue that the Anti-Injunction Act does not bar injunction because two of its three exceptions — where the injunction is necessary in aid of the federal court's jurisdiction and where it is expressly authorized by Congress — are applicable and permit the Court to enjoin state proceedings. (*Id.*)

Defendants oppose the application of the two exceptions to the Anti-Injunction Act relied on by Plaintiffs. First, Defendants argue that "where the injunction to stay the state actions 'would serve no other purpose than to prevent duplicative litigation and the preclusive effect of state rulings, the aid-of-jurisdiction exception to the Anti-Injunction Act does not apply,'" (Alon Defs.' Opp'n 20 (quoting *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props., LLC*, 445 F.

Supp. 2d 356, 366 (S.D.N.Y. 2006)); First Alternative Defs.' Opp'n 1–2[11]), and no special

exception exists for the RICO claims alleged by Plaintiffs, (Metro Pain Defs.' Opp'n 14).

Second, Defendants argue that Plaintiff's civil claims under RICO do not meet the expressly-

authorized exception because the claims fail to satisfy the *Mitchum* test, which requires Congress

to authorize a specific and uniquely federal right or remedy that can be given its intended scope

only by the stay of a state court proceeding.  (First Alternative Defs.' Opp'n 2–3 (citing *Mitchum*

*v. Foster*, 407 U.S. 225 (1972)).[12]

"The Anti-Injunction Act, subject to some exceptions, prohibits injunctive relief that

would interfere, directly or indirectly, with pending state proceedings." *Pathways, Inc.*, 329 F.3d

at 113 (citing *County of Imperial v. Munoz*, 449 U.S. 54, 58–59 (1980)); *see also In re Baldwin-*

*United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 335 (2d Cir. 1985)

(noting that "the Anti-Injunction Act . . . bans injunctions against actions pending in state court,

subject to specified exceptions" (citing 28 U.S.C. § 2283)); *SR Int'l Bus. Ins. Co.*, 445 F. Supp.

2d at 362 n.7 ("The Anti-Injunction Act applies only to state proceedings that have already been

initiated." (citing *In re Baldwin-United Corp.*, 770 F.2d at 335)).  The Anti-Injunction Act

contains three exceptions: it "bars a federal court from enjoining a proceeding in state court

unless that action is 'expressly authorized by Act of Congress, or where necessary in aid of its

---

[11]  Because the pages of the First Alternative Defendants' Opposition are not consecutively paginated, the Court refers to the page numbers assigned by the Electronic Case Filing ("ECF") system.

[12]  Defendants do not argue that the Anti-Injunction Act applies to limit a federal court's authority to enjoin pending or future arbitrations, or future state-court litigation.  Therefore, the Court's analysis is limited to whether the Anti-Injunction Act bars the Court from enjoining Defendant's pending state-court actions.

jurisdiction, or to protect or effectuate its judgments.'"[13] *Dr.'s Assocs., LLC v. Tripathi*, 794 F. App'x 91, 93 (2d Cir. 2019) (quoting *Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 425 (2d Cir. 2004)); *Relief Med., P.C.*, 554 F. Supp. 3d at 495 (same).  Because the statutory prohibition against such injunctions in part "rests on the fundamental constitutional independence of the [s]tates and their courts, the exceptions should not be enlarged by loose statutory construction."  *United States v. Schurkman*, 728 F.3d 129, 135 (2d Cir. 2013) (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970)); *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 99 F. Supp. 3d 288, 300 (E.D.N.Y. 2015) (same), *appeal dismissed* No. 15-CV-1551 (2d Cir. Jan. 19, 2016).

> **i.    The in-aid-of-jurisdiction exception does not apply to pending state court actions**

Plaintiffs argue that the in-aid-of-jurisdiction exception to the Anti-Injunction Act applies and the Court may enjoin pending state court proceedings because the "the [s]tate-court suits deprive the Court of the power to fully resolve this action with the required flexibility."  (Pls.' Mem. 20.)  In support, Plaintiffs argue that, as a practical matter, the theory of fraud underlying actions pending before state courts "must be proved by establishing a pattern of fraud across all claims," and Plaintiffs "will be hamstringed in presenting their theories of fraud by the limited and piecemeal nature of [state] proceedings."  (*Id.* at 18.)  Plaintiffs also argue that the Court's jurisdiction is threatened not because state courts may be the first to reach judgment but because state actions "will reach judgment without the benefit of the full factual record," which will "then preclude this Court from properly adjudicating the claims in this action due to principles of res judicata or collateral estoppel."  (*Id.* at 18–19.)

---

[13] 28 U.S.C. § 2283 provides, in full, that "[a] court of the United States may not grant an injunction to stay proceedings in a [s]tate court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

First, Defendants argue that the pendency of a parallel proceeding in state court is insufficient to invoke the exception.  (First Alternative Defs.' Opp'n 1.)  Second, they argue that Plaintiffs "cannot satisfy the 'necessary in aid' of the court's jurisdiction exception" because a no-fault insurer "is not prevented from asserting its fraud defenses in the state court proceedings."   (Metro Pain Defs.' Opp'n 14 (quoting *Mayzenberg*, 2018 WL 6031156, at *9).) Lastly, Defendants argue that an adverse finding against Plaintiffs in state court would have no res judicata impact on any other case because the issue to be raised in such an action would presumably "concern the medical necessity" for a specific set of facts particular to the matter. (First Alternative Defs.' Opp'n 2.)

The in-aid-of-jurisdiction exception to the Anti-Injunction Act permits the issuance of injunctions where "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atl. Coast Line*, 398 U.S. at 295; *United States v. Am. Soc'y of Composers, Authors, & Publishers*, 442 F.2d 601, 603 (2d Cir. 1971); *In re HSBC Bank, USA, N.A.*, 99 F. Supp. 3d at 301; *see also Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922) ("[A federal court] may enjoin the parties from proceeding in a state court of concurrent jurisdiction where the effect of the action would be to defeat or impair the jurisdiction of the federal court."). While the phrasing of the exception is broad, courts have narrowly construed it to imply "something similar to the concept of injunctions to 'protect or effectuate' judgments." *Atl. Coast Line*, 398 U.S. at 295; *Oriska Ins. Co. v. Power P.E.O., Inc.*, 340 F. Supp. 2d 238, 239 (N.D.N.Y. 2004).  The exception is only applicable where the federal action has yet to go to final judgment.  *See In re Baldwin-United Corp.*, 770 F.2d at 337.

The mere pendency of a parallel proceeding in state court, in and of itself, is insufficient

22

grounds to invoke the in-aid-of-jurisdiction exception, even where the state proceeding threatens to preclude the federal court from reaching the same issue through res judicata or collateral estoppel. *See Atl. Coast Line.*, 398 U.S. at 295–296 ("In short, the state and federal courts had concurrent jurisdiction in this case, and neither court was free to prevent either party from simultaneously pursuing claims in both courts. . . . Therefore the state court's assumption of jurisdiction over the state law claims . . . did not hinder the federal court's jurisdiction so as to make an injunction necessary to aid that jurisdiction."); *Ret. Sys. of Ala.*, 386 F.3d at 429 ("[A] federal district court, even assuming it has some interest in avoiding delay in its own proceedings, has no interest — no interest that can be vindicated by the exercise of the federal injunction power — in being the first court to hold a trial on the merits."); *In re Baldwin-United Corp.*, 770 F.2d at 336 ("[T]he mere existence of a parallel lawsuit in state court that seeks to adjudicate the same *in personam* cause of action does not in itself provide sufficient grounds for an injunction against a state action in favor of a pending federal action.").

Historically, the in-aid-of-jurisdiction exception usually involved "*in rem* actions where the federal court has jurisdiction over a res and the state court action may effectively deprive the federal court of the opportunity to adjudicate as to that res." *Mayzenberg*, 2018 WL 6031156, at *8 (citing *Kline*, 260 U.S. 226); *see also Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 641 (1977) ("The traditional notion is that in personam actions in federal and state court may proceed concurrently, without interference from either court, and there is no evidence that the [in-aid-of-jurisdiction exception] was intended to alter this balance. . . . Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principles of res adjudicata."); *Wyly v. Weiss*, 697 F.3d 131, 137–38 (2d Cir. 2012) (noting that because "an *in personam* action involves a controversy over liability

rather than over possession of a thing[,] . . . an *in personam* action generally 'does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending'" (internal citations omitted)).

More recently, several courts have read the in-aid-of-jurisdiction exception more broadly in complex multi-district actions and class action settlements where parallel state actions might trigger a breakdown in settlement negotiations. For example, in *In re Baldwin-United Corp.*, a consolidated multi-district class action against various broker-dealers who sold securities of a bankrupt corporation, the plaintiffs successfully negotiated a settlement with eighteen of the twenty-six broker-dealers for payments of approximately $140 million in exchange for a release of all the plaintiffs' claims against the settling defendants. 770 F.2d at 331, 332. In response to state attorneys general who concluded that the compensation was inadequate and sought to enforce state laws authorizing them in their representative capacities to seek restitution and monetary recovery, the Second Circuit concluded that an injunction protecting settling defendants was "unquestionably 'necessary or appropriate in aid of' the federal court's jurisdiction."[14] *Id.* at 332, 338. The Court determined that:

---

[14] Other circuits have similarly broadened the in-aid-of-jurisdiction exception to include in personam actions involving complex multi-district actions and class action settlements. *See* C. Wright & A. Miller, Federal Practice & Procedure § 4225 (3d ed.) ("Commentators have urged that the 'necessary in aid of its jurisdiction' exception be read more broadly, so that it would encompass more than the in rem situation. . . . There have been some signs of such flexibility in the recent cases."); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1102 (9th Cir. 2008) ("Courts have held that the existence of advanced federal in personam litigation may, in some instances, permit an injunction in aid of jurisdiction."); *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 881–82 (11th Cir. 1989) ("'[A]ny state court judgment would destroy the settlement worked out over seven years, nullify this court's work in refining its [f]inal [j]udgment over the last ten years, add substantial confusion in the minds of a large segment of the state's population, and subject the parties to added expense and conflicting orders' . . . . This lengthy, complicated litigation is the 'virtual equivalent of a res.'" (internal citations omitted)). In these instances, courts have held that a preliminary injunction is proper under the Anti-Injunction Act's in-aid-of-jurisdiction exception where parallel state actions might trigger a

> [T]he need to enjoin conflicting state proceedings arises because the jurisdiction of a multi[-]district court is 'analogous to that of a court in an in rem action or in a school desegregation case, where it is intolerable to have conflicting orders from different courts'. . . . In effect, unlike the situation in the *Kline v. Burke Construction Co.* line of cases, the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control. . . .
>
> Given the extensive involvement of the district court in settlement negotiations to date and in the management of this substantial class action, we perceive a major threat to the federal court's ability to manage and resolve the actions against the remaining defendants should the states be free to harass the defendants through state court actions designed to influence the defendants' choices in the federal litigation.

*Id.* at 337–38 (internal citations omitted); *see also In re HSBC Bank, USA, N.A.*, 99 F. Supp. 3d at 304 ("Thus, 'where a federal court is on the verge of settling a complex matter, and state court proceedings may undermine its ability to achieve that objective,' the situation is sufficiently analogous to an *in rem* action that a stay of parallel *in personam* state court proceedings is appropriate." (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 134 F.R.D. 32, 37 (E.D.N.Y. & S.D.N.Y. 1990))); *In re Joint E. & S. Dist. Asbestos Litig.*, 134 F.R.D. at 37 ("An injunction of all proceedings is necessary to implement the terms of the settlement and to protect the court's jurisdiction over the class action.").

In addition, courts have enjoined in personam state court proceedings where a litigant's

---

breakdown in settlement negotiations.  *See In re Diet Drugs*, 282 F.3d 220, 233–39 (3d Cir. 2002) (multi-district class action with a provisionally-certified class and preliminarily-approved settlement where injunction prevented partial opt-out of subclass); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1018, 1024–25 (9th Cir. 1998) (class action with preliminarily-approved settlement where stay on state class actions prevented one plaintiff from opting out an entire subclass of plaintiffs from the same state), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 195, 202–04 (3d Cir. 1993) (class action with imminent settlement and fairness hearing where injunction prevented mass opting out of the plaintiffs of one state for duplicative state proceedings); *Battle*, 877 F.2d at 880–81 (class action at judgment stage where injunction prevented state court litigation that would interfere with administration of post-judgment proceedings).

"right, if any, to litigate the issues in a state court appears more theoretical than real." *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 317–19 (E.D.N.Y. 2012) (quoting *Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1002 (4th Cir. 1970)) (concluding that, if a litigant cannot properly assert their federal claims in state court, then "the [c]ourt would not be precluded by the Anti-Injunction Act from granting the requested injunctive relief"); *McNeill v. N.Y.C. Hous. Auth.*, 719 F. Supp. 233, 256 (S.D.N.Y. 1989) (holding that "the [c]ourt may stay [state] court proceedings" under the in-aid-of-jurisdiction exception to the Anti-Injunction Act where the state court proceedings "do not give [the] plaintiffs an adequate forum" to assert their challenges).[15]

Other courts have refused to adopt this broad interpretation of the exception. *Compare Parisien*, 352 F. Supp. 3d at 232 (holding that the Court "has statutory authority to enjoin the pending state court actions" where "the fragmentation of the dispute into more than 2,300 individual actions would nullify [the plaintiffs'] efforts to prove fraud at a systemic level, impair a federal declaratory judgment action over which the [c]ourt has taken jurisdiction precisely to eliminate such fragmentation, and deprive [the plaintiffs] of an avenue toward complete relief in any court"), *with Schurkman*, 728 F.3d at 138 (holding that where the parties have not shown a likelihood to settle, "the situation would fall within the *Kline* . . . rule" that "an in personam state court action may not be enjoined merely because it is duplicative of, or conflicts with, a prior federal judgment."), *and In re HSBC Bank, USA, N.A.*, 99 F. Supp. 3d at 309 ("[T]he Second Circuit and the [d]istrict [c]ourts in this Circuit have, consistent with *Baldwin-United*, declined to enjoin competing *in personam* actions under the in aid of jurisdiction exception to the Anti–Injunction Act absent an indication that the action before the [c]ourt was on the verge of

---

[15]  *cf. Sierra v. City of New York*, 528 F. Supp. 2d 465, 468 (S.D.N.Y. 2008) (holding that the in-aid-of-jurisdiction exception had "no applicability to the instant case, since, as noted, [the] plaintiff could fully preserve in state court her defense").

settlement."); *see also 273 Lee Ave. Tenants Assoc. by Sanchez v. Steinmetz*, No. 16-CV-6942, 2017 WL 11508017, at *6 (E.D.N.Y. Oct. 3, 2017) (declining to apply the exception where a litigant "cannot present his or her federal claims in [a] state court eviction proceeding" because it "would require the [c]ourt to ignore . . . the fact that the Second Circuit has declined to recognize" such a broad construction and "the [c]ourt is not aware of[] any other court in this [d]istrict that has reached a similar conclusion" (first alteration in original) (quoting *Sinisgallo*, 865 F. Supp. 2d at 318)).

Because of the narrow reach of the holding in *Baldwin-United*, the Court declines to expand the in-aid-of-jurisdiction exception beyond its existing contours to permit the stay of pending state court actions. *See Schurkman*, 728 F.3d at 137–38 ("In crafting that exception [in *Baldwin-United*], however, we relied on the exceptional circumstances of that case — the case's extraordinary complexity and multidistrict nature, the fact that [eighteen] of the [twenty-six] defendants had already settled, and the fact that there was a 'substantially significant prospect that [the remaining eight] defendants [would] settle in the reasonably near future.'" (last alteration in original)); *Wyly*, 697 F.3d at 139 ("We have never held that a district court's involvement in complex litigation justifies, without more, issuance of an injunction 'in aid of' the court's jurisdiction, and we decline to create such a rule here."); *Ret. Sys. of Ala.*, 386 F.3d at 427–28 ("Clearly, our decision in *Baldwin-United* did not create a blanket rule or presumption that a federal court in any multidistrict action may enjoin parallel state proceedings. . . . [I]t was crucial to our analysis that most of the defendants had already settled, and that there was a 'substantially significant prospect that [the other eight defendants] will settle in the reasonably near future.'" (last alteration in original)); *SR Int'l Bus. Ins. Co.*, 445 F. Supp. 2d at 362 (describing *Ret. Sys. of Ala.* as clarifying "the limited scope of *Baldwin-United*" and rejecting the

view that "a case's complexity, duration, and public importance permit a federal court to enjoin a state proceeding simply because the state court might decide issues within the federal court's jurisdiction before the federal court does").  Therefore, because the parties have neither agreed to a settlement nor reached the verge of settling, the Court declines to apply the in-aid-of-jurisdiction exception to stay the pending state court actions.  *See Hinds County., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 132 (S.D.N.Y. 2011) (holding that injunction of state proceedings "would be neither lawful nor appropriate" because, unlike in *Baldwin-United*, the court had not yet certified a class and there were more than a dozen defendants not a party to a settlement); *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238, 2005 WL 2100930, at *4 (E.D.N.Y. Aug. 31, 2005) (declining to enjoin a state court case because although the federal action was "no doubt a large, complex federal class action," it was not "on the verge of settling" but had already settled); *Oneida Indian Nation of N.Y. State v. County of Oneida, N.Y.*, 132 F. Supp. 2d 71, 75 (N.D.N.Y. 2000) (distinguishing *Baldwin-United* and declining to enjoin a state court action because "settlement negotiations in this case have ceased, and there is no foreseeable hope that this land claim litigation will be resolved through such a process"); *Maryland Cas. Co. v. W.R. Grace & Co.*, 726 F. Supp. 62, 66 (S.D.N.Y. 1989) (denying an injunction because, unlike in *Baldwin-United*, the case did not involve a class action and was "not so far advanced as to be the equivalent of a res over which the court requires full control"), *aff'd*, 889 F.2d 1231 (2d Cir. 1989); *cf. In re Painewebber Ltd. P'ships Litig.*, No. 94-CV-8547, 1996 WL 374162, at *3 (S.D.N.Y. July 1, 1996) (holding that an injunction on state proceedings was appropriate where the consolidated class action was "analogous to a *res* over which the Court requires full control" because "[a] tentative settlement has been reached in all [fifteen federal] actions and the parties expect that a settlement will be submitted"); *In re Joint E. & S.*

*Dist. Asbestos Litig.*, 134 F.R.D. at 37 (granting an injunction for all pending asbestos litigation against one of the defendants because "[t]he court is in the process of reviewing the settlement agreement of the proposed class action encompassing all asbestos-related claims" and "[a]n injunction of all proceedings is necessary to implement the terms of the settlement and to protect the court's jurisdiction over the class action").

Accordingly, the Court finds that the in-aid-of-jurisdiction exception to the Anti-Injunction Act does not apply to Plaintiffs' request for a preliminary injunction of pending no-fault insurance state court proceedings.

### ii.   The expressly-authorized by an Act of Congress exception does not apply

Plaintiffs argue that the Court should enjoin the pending state actions by Defendants because an injunction is "expressly authorized by [an] Act of Congress." (Pls.' Mem. 21 (quoting 28 U.S.C. § 2283).)  Plaintiffs contend that courts have found that RICO authorizes private parties to obtain preliminary injunctions, (*id.*), and that remedies need not be exclusively federal for the exception to apply, (Pls.' Second Reply 3).

Defendants argue that the Anti-Injunction Act's expressly-authorized exception requires the statute to create a uniquely federal right or remedy that is exclusive of state court jurisdiction. (First Alternative Defs.' Opp'n 2–3.)

"[I]n order to qualify under the 'expressly authorized' exception of the anti-injunction statute, a federal law need not contain an express reference to that statute" because "no prescribed formula is required [and] an authorization need not expressly refer to [section] 2283." *Mitchum*, 407 U.S. at 237 (quoting *Amalgamated Clothing Workers of Am. v. Richman Bros. Co.*, 348 U.S. 511, 516 (1955)).  In *Mitchum*, the Supreme Court found that, "a federal law need not expressly authorize an injunction of a state court proceeding in order to qualify as an

exception," but "an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Id.*; *see Vendo Co.*, 433 U.S. at 632 (same); *Texaco, Inc. v. Pennzoil Co.*, 626 F. Supp. 250, 259 (S.D.N.Y. 1986) (same), *aff'd as modified and remanded*, 784 F.2d 1133 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987).  An Act of Congress is not required to be "totally incompatible" with the prohibition of the anti-injunction statute to qualify under the exception.  *Mitchum*, 407 U.S. at 237–38.  "The test, rather, is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding."  *Id.* at 238; *see Sierra*, 528 F. Supp. 2d at 468 (same).

In the Supreme Court's only other case on the Anti-Injunction Act's expressly-authorized exception, *Vendo Co. v. Lektro-Vend Corp.*, the Court applied *Mitchum*'s two part test, noting that (1) the statute must have created a "uniquely federal right or remedy" enforceable in a federal court of equity, and (2) it must be an "Act of Congress [which] could be given its intended scope only by the stay of a state court proceeding."  433 U.S. at 632.  Although the Second Circuit has yet to address the expressly-authorized exception, district courts in this Circuit and courts in other circuits have adopted this two-part *Mitchum* requirement.  *See Casa Marie, Inc. v. Superior Ct. of Puerto Rico for Dist. of Arecibo*, 988 F.2d 252, 261 (1st Cir. 1993) ("[T]he Supreme Court prescribed a two-part analysis for determining whether a federal statute comes within the Anti-Injunction Act's 'expressly authorized' exception: (1) the statute 'must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity,' and (2) the federal right or remedy must be such that it can be 'given its intended scope only by the stay of a state court proceeding.'" (quoting *Mitchum*, 470 U.S. at 237–38)); *U.S.*

*Steel Corp. Plan for Emp. Ins. Benefits v. Musisko*, 885 F.2d 1170, 1176 (3d Cir. 1989) (same);

*see also Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 250 (4th Cir. 2013) (noting that a federal

statute "expressly authorizes an injunction of state-court proceedings when the statute creates 'a

specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could

be frustrated if the federal court were not empowered to enjoin a state court proceeding'"

(quoting *Mitchum*, 407 U.S. at 237)); *Trs. of Carpenters' Health & Welfare Tr. Fund of St. Louis

v. Darr*, 694 F.3d 803, 808 (7th Cir. 2012) (same); *Tex. Emps.' Ins. Ass'n v. Jackson*, 862 F.2d

491, 503 (5th Cir. 1988); *Texaco*, 626 F. Supp. at 259 (same); *Cartledge v. Miller*, 457 F. Supp.

1146, 1151–53 (S.D.N.Y. 1978) (applying the expressly-authorized exception through the two

prongs of the *Mitchum* test).

 Plaintiffs' claims do not implicate uniquely federal rights or remedies and, as a result, the

expressly-authorized exception to the Anti-Injunction Act is inapplicable.  "[S]tate courts have

concurrent jurisdiction to consider civil claims arising under RICO."  *Tafflin v. Levitt*, 493 U.S.

455, 467 (1990).  Thus, Plaintiffs' civil RICO claims are subject to concurrent jurisdiction of

both state and federal courts.  *See Whitehall Tenants Corp. v. Whitehall Realty Co.*, 133 F.3d 908

(2d Cir. 1997) (noting that the plaintiff's RICO claim could have been brought in its state court

action); *5 Plus 7, Inc. v. British Broad. Corp.*, No. 09-CV-2255, 2010 WL 3924859, at *3 n.2

(E.D.N.Y. Sept. 29, 2010) ("[T]he RICO claim can properly be brought in state court");

*Donovan v. Lewnowski*, No. 03-CV-2985, 2005 WL 2095739, at *5 (E.D.N.Y. Aug. 30, 2005)

("Moreover, it is well settled that plaintiffs could have brought their common-law fraud and civil

RICO claims in state court.").  Therefore, because federal courts do not have exclusive

jurisdiction over Plaintiffs' RICO claims, Plaintiffs cannot satisfy the "uniquely federal" prong

of the *Mitchum* test.  *See Vendo Co.*, 433 U.S. at 632 ("The private action for damages conferred

by the Clayton Act is a 'uniquely federal right or remedy,' in that actions based upon it may be brought only in the federal courts. . . . It thus meets the first part of the test laid down in the language quoted from *Mitchum*."); *Armstrong v. Real Est. Int'l, Ltd.*, No. 05-CV-5383, 2006 WL 354983, at *3 (E.D.N.Y. Feb. 14, 2006) ("To qualify for the first exception to the Anti-Injunction Act, the equitable remedy . . . must be a uniquely federal one that could only be enforceable in federal court."); *see also Bosch v. Lamattina*, No. 08-CV-238, 2008 WL 4820247, at *6 (E.D.N.Y. Nov. 4, 2008) (finding the expressly-authorized exception to the Anti-Injunction Act inapplicable because the plaintiff's allegations of a violation of the Real Estate Settlement Procedures Act "[was] not one only enforceable in federal court"); *Baumgarten v. County of Suffolk*, No. 07-CV-539, 2007 WL 1490482, at *4 (E.D.N.Y. May 15, 2007) (finding the expressly-authorized exception to the Anti-Injunction Act inapplicable because the remedy sought by the plaintiff through her retaliation claim was not one that was "only enforceable in federal court"); *Armstrong*, 2006 WL 354983, at *3 ("Because one may bring a [Truth in Lending Act] claim seeking rescission in a state court, the 'expressly authorized' exception to the Anti-Injunction Act may not be relied upon to enjoin the state eviction.").

Accordingly, the Court finds that the expressly-authorized exception to the Anti-Injunction Act does not apply to Plaintiffs' request for a preliminary injunction of pending no-fault insurance state court proceedings.  The Court therefore denies Plaintiffs' motion to stay all no-fault insurance collection proceedings pending in state court and considers only Plaintiffs' motion to stay all pending arbitrations and to enjoin future arbitrations and future state court proceedings.

#### d.  Preliminary injunction

Plaintiffs argue that the Court should enjoin future state court litigation and pending and future arbitrations because the relief requested "satisfies the traditional standards" governing such an inquiry.  (Pls.' Mem. 8.)

Defendants argue that Plaintiffs fail to satisfy the preliminary injunction requirements, and further argue that a preliminary injunction would inflict an enormous financial injury to the healthcare providers.  (*See* Alon Defs.' Opp'n 9–19; Metro Pain Defs.' Opp'n 3–10; Citimedical I Defs.' Decl. ¶¶ 7–11; Akl Defs.' Opp'n 7–15.)

As stated above, a party seeking a preliminary injunction "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest."  *SAM Party of N.Y.*, 987 F.3d at 273–74; *see also Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (noting that to obtain a preliminary injunction, "the movant has to 'show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief'" (quoting *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35)).

> #### i.  Likelihood of success on the merits or sufficiently serious questions going to the merits

Plaintiffs argue that they have "shown a likelihood of success on the merits — and at a minimum, there are sufficiently serious questions going to the merits to make them fair grounds for litigation."  (Pls.' Mem. 11.)  In support, Plaintiffs argue that they have provided detailed allegations of "Defendants' fraudulent treatment and kickback scheme," which includes a "predetermined treatment protocol in which Defendants provided medically unnecessary and

33

fraudulent examinations, treatments, testing, and supplies" reflecting "an intention to maximize the amount that can be collected and to exploit the New York fee schedule governing [n]o-[f]ault claims." (*Id.* at 11–12.)  Plaintiffs also argue that they have alleged that "treatment is rendered pursuant to illegal kickbacks in exchange for patient referrals, and that no provider would have been granted access to these patients without paying to play." (*Id.* at 12.)

Defendants argue that Plaintiffs fail to present any factual basis or supporting evidence demonstrating a serious question or a likelihood of success on the merits. (Alon Defs.' Opp'n 13; Metro Pain Defs.' Opp'n 6; Citimedical I Defs.' Decl. ¶ 7; Akl Defs.' Opp'n 13–15.)  In support, Defendants argue that, unlike previous cases in this district where preliminary injunctions were granted as a result of pleadings that identified "several specific payments," provided "specific examples" of financial arrangements, and elicited testimony supporting the allegations, Plaintiffs rely only on a "tenuous link" between legitimate businesses and service providers that does not contain any detailed facts as to the alleged Predetermined Treatment Protocol or the kickback scheme. (Alon Defs.' Opp'n 13–14; Metro Pain Defs.' Opp'n 6; Akl Defs.' Opp'n 14.)  Defendants also argue that Plaintiffs fail to prove their allegations "with the required specificity on a claim-by-claim basis" through identification of specific patient cases and fail to provide "any support with regard to baseless allegations." (Metro Pain Defs.' Opp'n 7; Alon Defs.' Opp'n 15.)

"The 'serious questions' standard permits a district court to grant a preliminary injunction . . . where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (alteration in original) (quoting *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35).  "The

value of an approach encompassing the serious questions standard 'lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'"  *Beynin*, 2021 WL 1146051, at *6 (quoting *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35).  District courts in this Circuit have generally found that "[l]ikelihood of success is not the focus at the early stages of a case [involving an alleged scheme to defraud an insurer of assigned no-fault benefits] because any likelihood of success inquiry would be premature."  *Relief Med., P.C.*, 554 F. Supp. 3d at 498 (alterations in original) (quoting *Gov't Emps. Ins. Co. v. Zaitsev*, No. 20-CV-3495, 2021 WL 3173171, at *1 (E.D.N.Y. July 27, 2021)); *see Gov't Emps. Ins. Co. v. Landow*, No. 21-CV-1440, 2022 WL 939717, at *12 (E.D.N.Y. Mar. 29, 2022) (same); *Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab'y, LLC*, No. 20-CV-2391, 2020 WL 7042648, at *5 (E.D.N.Y. Dec. 1, 2020) (same); *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 217 (E.D.N.Y. 2013) (same).  "Instead, [district courts] look to whether there is a serious question going to the merits to make them a fair ground for trial."  *Relief Med., P.C.*, 554 F. Supp. 3d at 498 (alteration in original) (quoting *Zaitsev*, 2021 WL 3173171, at *1); *see also Zilberman*, 2021 WL 1146086, at *2 (applying the "serious question" standard in no-fault proceeding); *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *5 (same); *Wellmart RX, Inc.*, 435 F. Supp. 3d at 453–55 (same); *Parisien*, 352 F. Supp. 3d at 234 (same).

A medical professional corporation is prohibited from "directly or indirectly offering [or] giving . . . any fee or other consideration to or from a third party for the referral of a patient . . . in connection with the performance of professional services."  8 N.Y. Comp. Codes R. & Regs. § 29.1; *see also Gov't Emps. Ins. Co. v. Jacques*, No. 14-CV-5299, 2017 WL 9487191, at *2 (E.D.N.Y. Feb. 13, 2017) ("New York also prohibits paying kick-backs for patient referrals." (citing 8 N.Y. Comp. Codes R. & Regs. § 29.1(b)(3))), *report and recommendation adopted*,

35

2017 WL 1214460 (E.D.N.Y. Mar. 31, 2017); *Arthur Ave. Med. Servs., PC v. GEICO Ins. Co.*,

148 N.Y.S.3d 356, 361 (Civ. Ct. 2021) ("[A medical] corporation may not share professional

service fees with third parties, such as referral fees." (citing 8 N.Y. Comp. Codes R. & Regs. §

29.1(B)(4))).  "If a medical professional corporation engages in . . . unprofessional conduct, it is

rendered ineligible for a requested no-fault reimbursement by virtue of 11 [N.Y. Comp. Codes R.

& Regs.] § 65-3.16(a)(12)." *Mayzenberg*, 2018 WL 6031156, at *7 (quoting *Gov't Emps. Ins.

Co. v. Badia*, No. 13-CV-1720, 2015 WL 1258218, at *9 (E.D.N.Y. Mar. 18, 2015)); *see also*

*Jacques*, 2017 WL 9487191, at *2 ("To be eligible for reimbursement payments under the no-

fault law, a provider of healthcare services must comply with applicable licensing requirements."

(citing 11 N.Y. Comp. Codes R. & Regs. § 65-3.16(a)(12))).  "New York law [also] provides

that defendants may be held liable for medically unnecessary services under New York's [no-

fault] insurance laws." *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *7 (citing

*Long Island Radiology v. Allstate Ins. Co.*, 830 N.Y.S.2d 192, 194 (App. Div. 2007)).  "[A]

complaint alone can be sufficient to grant an injunction, [and] [t]his is particularly true where . . .

the complaint comprehensively details regulatory violations, unnecessary medical services, and

unlawful referrals." *Moshe*, 2020 WL 3503176, at *2 (collecting cases).

  The Amended Complaint alleges that Defendants (1) used a Predetermined Treatment

Protocol at four locations where Metro Pain, and its successor entity Tri-Borough, acted as

gatekeeper, subjecting patients to "initial examinations that are not legitimately performed to

determine the true nature and extent of patient injuries, but rather are performed as a pretext to

justify a variety of unnecessary treatment and services," (Am. Compl. ¶¶ 17, 186–89, 190–99);

(2) based on the findings and diagnoses of these examinations, proscribed "identical treatment

plans" to patients "that include[] at least physical therapy, chiropractic care, acupuncture, MRIs

of at least two or more regions, and Supplies, and very often diagnostic testing, . . . commonly

prescribed medications[,] as well as consultations for pain management and orthopedic

treatment," (*id.* ¶¶ 193–95); (3) referred patients to providers who paid kickbacks for the

referrals under the guise of "rent" agreements, absent which "no provider would have been

granted access to these patients," (*id.* ¶¶ 17, 117–19, 127–29, 136–38, 145–46, 152); (4) through

these financial arrangements, provided medically unnecessary examinations, treatment, MRIs,

Supplies, tests, prescriptions, and pain management and orthopedic procedures by the Physical

Therapy Defendants, Chiropractor Defendants, Acupuncture Defendants, MRI Defendants, DME

Defendants, and ASC Defendants, (*id.* ¶¶ 17, 200–308); and (5) "submitted or caused to be

submitted bills and supporting documentation" to Plaintiffs for the services detailed above while

"concealing the existence of the improper financial arrangements . . . to induce insurers to pay

Defendants' fraudulent charges," (*id.* ¶¶ 329–30).  These allegations sufficiently demonstrate a

serious question going to the merits.  *See Zaitsev*, 2021 WL 3173171, at *2 (finding a serious

question going to the merits where the complaint "detailed allegations of a complex scheme of

fraudulent activity," including, *inter alia*, that the defendants "submitted charges . . . for

healthcare services that were medically unnecessary," "provided the alleged fraudulent

healthcare services pursuant to illegal kickback and self-referral arrangements," and

"misrepresented that they were in compliance with all relevant laws and regulations"); *Beynin*,

2021 WL 1146051, at *7 (finding a serious question going to the merits where the plaintiffs'

complaint "detail[ed] a complicated scheme of alleged fraudulent activity" that "[gave] rise to an

'inference . . . that the treatments [we]re [] not being provided on the basis of medical necessity'"

(third, fourth, and fifth alterations in original)); *Zilberman*, 2021 WL 1146086, at *2 (finding a

serious question going to the merits where the "complaint provide[d] an extremely detailed

overview of a complicated scheme" in which, *inter alia*, the defendants were alleged to have

"provided fraudulent healthcare services that were not medically necessary" and "relied upon

illegal kickback arrangements"); *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at

*6 (finding a serious question going to the merits where "the billed-for services were 'medically

unnecessary and were provided — to the extent that they were provided at all — pursuant to pre-

determined fraudulent protocols designed to financially enrich the [d]efendants'"); *Moshe*, 2020

WL 3503176, at *2 (noting that a "plethora of precedent demonstrates courts routinely find a

'serious question going to the merits' under similar circumstances" (first citing *Gov't Emps. Ins.

Co. v. Strut*, No. 19-CV-728, 2020 WL 1820500, (W.D.N.Y. Apr. 10, 2020); then citing

*Parisien*, 352 F. Supp. 3d at 234; and then citing *Elzanaty*, 929 F. Supp. 2d at 222); *Gov't Emps.

Ins. Co. v. Cean*, No. 19-CV-2363, 2019 WL 6253804, at *5 (E.D.N.Y. Nov. 22, 2019) (finding

a serious question as to the merits where the plaintiff alleged "facts relating to [the defendants']

fraudulent activity in its [c]omplaint, describing fraudulent medical treatment, deceitful billing

protocols, and an illegal kickback and referral scheme").

Contrary to Defendants' claims that Plaintiffs fail to allege sufficiently specific instances

of treatments and payments to meet their evidentiary burden, (Alon Defs.' Opp'n 13–15; Metro

Pain Defs.' Opp'n 7), the 158-page Amended Complaint contains detailed allegations of

Defendants' fraudulent treatment and kickback scheme, including specific details related to: (1)

the transactional, operational, and ownership history of 105-10 Flatlands, 204-12 Hillside, 2451

E. Tremont, and 717 Southern, in addition to the specific amount of kickback fees paid for

patient referrals at each location, (Am. Compl. ¶¶ 117–51); (2) the relationship among

Defendants with respect to business dealings, ownership of corporate entities, employment, and

financial arrangements, (*id.* ¶¶ 152–74); (3) the operations of the overall scheme granting access

38

to patients in exchange for payments for medically unnecessary services, as described above,

including examples of the initial examination reports, referral and order forms, and examination

follow-up reports, (*id.* ¶¶ 192–98); and (4) the medically unnecessary services allegedly

provided, including specific allegations about the nature of each type of treatment or test

provided.[16]  Because the Amended Complaint details alleged fraudulent practices, the Court

finds that Plaintiffs have satisfied their evidentiary burden.  *Zaitsev*, 2021 WL 3173171, at *2

(holding that the allegations supporting the preliminary injunction "are not conclusory since they

are supported by detailed examples throughout the complaint," including "specific patients and

treatment dates"); *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *4–5 (rejecting

the defendants' argument that "the evidence proffered by [the plaintiff] [wa]s insufficient to

satisfy the elements for injunctive relief" because the plaintiff alleged that the defendants

"perpetrated a fraudulent medical billing scheme where [the] defendants submitted medically

---

[16]  (*See e.g.*, Am. Compl. ¶¶ 202 ("Nearly every patient is subjected to the same physical therapy services purportedly performed on nearly every visit: application of hot and cold packs, electronic muscle stimulation, and either therapeutic massage or manual therapy."), 211 ("[A]lthough [various Chiropractor Defendants] treat patients at different locations . . . , their [c]hiropractic [i]nitial [r]eports include the identical boilerplate treatment plan, which states verbatim . . . ."), 220 ("Patients receive the same acupuncture treatment regardless of their condition or complaints.  On virtually every visit, charges include two units of acupuncture, plus codes reflecting cupping."), 232 ("The MRI Defendants perform MRIs on at least two regions for virtually every patient.  Regardless of the MRI findings, Defendants' treatment of patients does not change.  After receiving MRIs, patients continue with the same Predetermined Treatment Protocol in place before the MRIs were ordered." (internal citation omitted)), 247–48 ("[P]atients typically receive five or more Supplies, with some patients prescribed as many as [twenty-one] Supplies.  Many patients receive at least one cervical collar and one [lumbar support], along with the other items.  It is improbable so many patients would need so many Supplies and would need the same types of Supplies.").  Plaintiffs also submitted twenty-two exhibits that include examples of service and product prescriptions, referral and order forms, and lists of each and every claim — including date of visit, patient ID, prescriptions, and amount billed — where medically unnecessary examinations, treatments, MRIs, Supplies, and tests were allegedly performed as a part of the kickbacks and pay to play arrangements.  (*See* Exs. 1–22, annexed to Am. Compl., Docket Entry Nos. 63-1–63-22.)

unnecessary claims for reimbursement to [the plaintiff] in furtherance of [the] defendants'
financial gain" and "provide[d] specific factual examples of [the] defendants' allegedly
fraudulent scheme and exploitation of the New York [no-fault] insurance system"); *Moshe*, 2020
WL 3503176, at *2 ("While many courts have granted injunctions after considering a more
developed record, a complaint alone can be sufficient to grant an injunction.  This is particularly
true where, as here, the complaint comprehensively details regulatory violations, unnecessary
medical services, and unlawful referrals." (first citing *Strut*, 2020 WL 1820500, at *2; and then
citing *Excel Imaging*, 879 F. Supp. 2d at 254–64)); *Strut*, 2020 WL 1820500, at *2 (rejecting
insufficient proof argument where the complaint provided "numerous examples to support each
of [the plaintiff's] fraud theories, citing specific patients, accident dates, and treatment dates");
*Cean*, 2019 WL 6253804, at *5 (finding a serious question going to the merits where plaintiffs
"alleged, in significant detail, facts relating to [the] [d]efendants' fraudulent activity in its
[c]omplaint, describing fraudulent medical treatment, deceitful billing protocols, and an illegal
kickback and referral scheme"); *Parisien*, 352 F. Supp. 3d at 234 (holding that, in light of the
plaintiffs' allegations and exhibits, "it cannot be said that [the plaintiffs'] request for injunctive
relief 'rest[ed] on mere hypotheticals'" (quoting *Hancock v. Essential Res., Inc.*, 792 F. Supp.
924, 928 (S.D.N.Y. 1992))).

Accordingly, the Court finds that Plaintiffs have shown a serious question as to whether
Defendants are eligible to receive reimbursement for no-fault benefits.[17]

---

[17] Defendants Dr. Moshe and Citimedical I also argue that a reimbursement agreement
dated June 3, 2015, outlines Plaintiffs' exclusive options for resolving their claims, and therefore
"there is very little likelihood of success for the Plaintiff[s] on the claims covered by the []
agreement." (Citimedical I Defs.' Decl. ¶¶ 8–9.)  The agreement solely encompasses claims
with dates of service on or before the contract termination date of June 3, 2018.  (State Farm VP
Agreement ("Reimbursement Agreement") 3, annexed to Citimedical I Defs.' Decl. as Ex. 1,
Docket Entry No. 103-1.)  Under the Reimbursement Agreement, "systemic issues associated

ii.   **Irreparable harm**

Plaintiffs argue that, "[a]bsent an injunction, [Plaintiffs] will be saddled with expensive, time-consuming, piecemeal litigation of claims that may lead to inconsistent results." (Pls.' Mem. 9.)  In support, Plaintiffs argue that "the global and intertwined nature of the fraud is effectively obscured" during individualized, piecemeal litigation or arbitration because the fraud concerning the Predetermined Treatment Protocol "becomes apparent only when the claims are viewed as a whole" due to the scheme's complexity involving "many interrelated parties, complicated flow of funds, and improper shadow owners of medical practices." (*Id.*)  Plaintiffs also argue that state court judgments will have a preclusive effect, "which would prevent meaningful litigation of the fraud in any court, including this one." (*Id.* at 10.)  Lastly, Plaintiffs argue that "[t]he suits and arbitrations themselves are part of Defendants' fraud, and their continuation is an injury [Plaintiffs'] action in this Court seek[s] to prevent." (*Id.*)

---

with the billing and/or treatment practices being employed by Citimedical [I] (i.e. issues that go beyond an individual claim)" must be resolved first through a "meet and confer" period followed by an "expedited arbitration." (*Id.* at 10–11.)  Because Plaintiffs' claims are not related to billing or treatment practices employed by Citimedical I, but rather fraudulent services, improper referrals, and kickback payments in relation to non-parties to the Reimbursement Agreement, the Reimbursement Agreement is inapplicable. *See Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986))); *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005) (holding that nonsignatories could not be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on contract or agency law); *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988) (holding that an arbitration clause was limited to the specific scope identified by the parties); *Borecki v. Raymours Furniture Co.*, No. 17-CV-1188, 2017 WL 5953172, at *2 (S.D.N.Y. Nov. 28, 2017) (holding that an arbitration clause that applied to "'any claim, dispute or controversy . . . that in any way arises from or relates to' 'the goods and/or services you have purchased or are purchasing from us . . . including the . . . negotiation or discussion regarding purchase, discount, price or credit terms'" was narrow and limited to the purchase of goods or services and any associated negotiations, financing, and representations (alterations in original)).

Defendants argue that Plaintiffs' alleged injury cannot be qualified as irreparable harm because "the 'mere injuries . . . in terms of money, time and energy necessarily expended' absent a stay of ongoing state court and arbitration proceedings 'are not enough' to establish irreparable harm" where Plaintiffs could be "fully compensated through money damages." (Alon Defs.' Opp'n 10–11; Metro Pain Defs.' Opp'n 5; Akl Defs.' Opp'n 10–11 (quoting *Allstate Ins. Co. v. Harvey Fam. Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017)).) In addition, Defendants argue that the AAA provides robust options for parties presenting more complicated no-fault disputes, and "Plaintiffs need only avail themselves of these procedures afforded in the AAA forum." (Alon Defs.' Opp'n 11–12.) Defendants also argue that if the preliminary injunction were to be granted, Defendants would suffer severe harm due to the disruptions to their business and inability to collect on a finite policy cap. (*Id.*; Akl Defs.' Opp'n 11–12.)

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). To establish irreparable harm, the "[p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB*, 559 F.3d at 118 (alteration in original) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). Absent "extraordinary circumstances," injunctions are also unavailable "[w]here there is an adequate remedy at law, such as an award of money damages." *Id.* (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)). "Courts have readily held that irreparable harm occurs where . . . an insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in

42

a single, pending declaratory judgment action." *Parisien*, 352 F. Supp. 3d at 233 (first citing *Gov't Emps. Ins. Co. v. Strutsovskiy*, No. 12-CV-330, 2017 WL 4837584, at *6 (W.D.N.Y. Oct. 26, 2017); and then citing *Elzanaty*, 929 F. Supp. 2d at 222); *see also Zaitsev*, 2021 WL 3173171, at *2 ("Courts in this Circuit have found . . . that '[i]rreparable harm occur[ed] where "an insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action."'" (alterations in original) (first quoting *Moshe*, 2020 WL 3503176, at *1; and then collecting cases)).

Defendants' reliance on *Allstate Ins. Co. v. Harvey Family Chiropractic* is misplaced. 677 F. App'x 716, 717 (2d Cir. 2017).  In *Harvey Family Chiropractic*, the Second Circuit summarily affirmed the district court's denial of a preliminary injunction of no-fault proceedings and noted (1) that there was "no evidence in the record that" the plaintiffs could not "be fully compensated through money damages for the alleged harm suffered from the defendants' fraudulent claims" and (2) that "[e]ven if the defendants obtain[ed] other [no-fault] reimbursements in state court and arbitrations while th[e] case is pending, the plaintiffs [were] free to recover those payments [if] they prevail[ed] on their RICO claim." *Id.* at 718.  As other courts in this Circuit have noted, *Harvey Family Chiropractic* "does not address the risk of inconsistent judgments." *Strut*, 2020 WL 1820500, at *3 (citing *Harvey Family Chiropractic*, 677 F. App'x at 718); *see also Moshe*, 2020 WL 3503176, at *2 ("*Harvey* [*Family Chiropractic*] does not preclude granting an injunction to avoid inconsistent judgments." (citing *Wellmart RX, Inc.*, 435 F. Supp. 3d at 451)); *Wellmart RX, Inc.*, 435 F. Supp. 3d at 451 ("[T]he Second Circuit [in *Harvey Family Chiropractic*] said nothing of the risk of inconsistent judgments.").

Plaintiffs' assertion that, absent the requested injunctive relief, "the global and intertwined nature of the fraud is effectively obscured in the fragmented [s]tate-court proceedings and arbitrations" due to "an incomplete factual record," in addition to the "risk of inconsistent judgments," "frustration of declaratory judgment relief," and possible "preclusive effect[]," is sufficient to demonstrate irreparable harm.  (Pls.' Mem. 9–11); *see Zaitsev*, 2021 WL 3173171, at *2 n.3 (noting that although *Harvey Family Chiropractic* concluded that "wasted time and resources do not constitute irreparable harm," "*Harvey* [*Family Chiropractic*] does not preclude granting an injunction to avoid inconsistent judgments" (citing *Moshe*, 2020 WL 3503176, at *2)); *Beynin*, 2021 WL 1146051, at *4–6 (concluding that "the likely inconsistencies amongst the prospective arbitral rulings themselves, and between the prospective arbitral rulings and this [c]ourt's ultimate disposition of the declaratory judgment and fraud-based claims" constituted irreparable harm (collecting cases)); *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *5 (rejecting the defendants' argument based on *Harvey Family Chiropractic* that the plaintiff will not suffer irreparable harm and noting that if the defendants were "permitted to prosecute the ongoing collection proceedings, [the plaintiff] faces imminent and non-speculative risks of inconsistent judgments," which shows irreparable harm); *Mayzenberg*, 2018 WL 6031156, at *5 (noting that unlike the injuries noted in *Harvey Family Chiropractic*, "it is the inconsistency to which hundreds of arbitrations will inevitably give rise, the frustration of the declaratory judgment relief for which [the plaintiff] is likely to succeed on the merits, and the resources spent vacating hundreds of arbitration awards that satisfies the irreparable harm prong"); *Strutsovskiy*, 2017 WL 4837584, at *7 (staying no-fault collection arbitrations pending the resolution of the plaintiff's declaratory judgment action and rejecting the notion that *Harvey Family Chiropractic* barred a preliminary injunction).

44

Defendants are currently prosecuting 1,569 arbitrations, and they are likely to file new arbitrations and lawsuits during this action to recover additional sums of approximately $6.7 million as to claims for services that have not been paid but for which Defendants have submitted bills to Plaintiffs, (Pls.' Mem. 6), which further supports injunctive relief, *see Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *4 ("Moreover, under these circumstances, the court agrees that [the plaintiff] will suffer irreparable injury that 'is neither remote nor speculative' without injunctive relief because [the defendant] continues to commence arbitrations before the AAA." (quoting *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66)); *Cean*, 2019 WL 6253804, at *5 (concluding "that wasting time and resources in arbitrations with awards that might eventually be, at best, inconsistent with judicial rulings and, at worst, essentially ineffective, constitutes irreparable harm"); *Elzanaty*, 929 F. Supp. 2d at 222 (finding that "allowing a large number of proceedings to be heard by a mix of arbitrators, each of whom will likely come to their own independent and potentially contradictory conclusions, will result in harm to [the plaintiff] from which it cannot recover").

Defendants also propose that Plaintiffs resolve their complex disputes within the realm of the AAA forum, (Alon Defs.' Opp'n 11–12), but the consolidation of arbitrations articulated by Defendants does not provide any guarantees for procedural safeguards sufficient to address concerns regarding the complexity of the scheme. *See Mun*, 751 F.3d at 99 ("New York's arbitration process for no-fault coverage is an expedited, simplified affair meant to work as quickly and efficiently as possible. Discovery is limited or non-existent. Complex fraud and RICO claims . . . cannot be shoehorned into this system." (internal citation omitted)); *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *2 (same); *Mayzenberg*, 2018 WL 6031156, at *6 (same); *Beynin*, 2021 WL 1146051, at *6 ("In brief, the [arbitration] process is 'meant to

work as quickly and efficiently as possible,'" such that "the claims brought in this action cannot

be meaningfully pursued in no-fault insurance proceedings" (quoting *Mun*, 751 F.3d at 99));

*Parisien*, 352 F. Supp. 3d at 229 ("Because it is only through this tapestry of facts that the

alleged fraud comes into focus, [the plaintiff] may not as a practical matter have a fair

opportunity to present its claims unless it is permitted to direct the trier of fact to all of the claims

at issue." (emphasis in original)).

      Accordingly, the Court finds that Plaintiffs have shown irreparable harm.

      **iii.  Balance of hardships**

      Plaintiffs argue that "[t]he balance of hardships tip decidedly in" their favor.  (Pls.' Mem.

14.)  In support, Plaintiffs argue that, absent an injunction, "there is a serious risk that [Plaintiffs]

will be unable to prove the full scope of Defendants' fraud" because "Defendants' wide-ranging

fraud is not susceptible to proof in individualized [s]tate-court actions."  (*Id.*)  Plaintiffs also

argue that, "even with a preliminary injunction, Defendants will be able to fully litigate their

claims for recovery of no-fault benefits," and "[a]t worst, an injunction will cause Defendants'

recovery of the no-fault benefits to which they are entitled [to] be delayed."  (Pls.' Mem. 15

(citations omitted).)

      Defendants argue that the balance of hardships weights overwhelmingly in their favor

"due to the very real and present threat of policy exhaustion."  (Alon Defs.' Opp'n 16.)  In

support, Defendants argue that they would be "unable to recover from the no-fault insurer" once

the statutory amount of $50,000 in New York or $15,000 in New Jersey has been paid per

automobile insurance policy regardless of whether Plaintiffs are successful in their action.  (*Id.*)

Defendants also argue that "the imposition of a stay will have an immediate and very likely

irreversible debilitating impact on [their] cash flow and will impair [their] ability to continue

operating." (Metro Pain Defs.' Opp'n 10.)  Further, Defendants argue that the impact has been "exacerbated by the substantial financial burden on the medical industry caused by the [COVID]-19 pandemic," (Alon Defs.' Opp'n 16), and "the potential for recovering accrued interest would not significantly alleviate [Defendants'] hardship," (Metro Pain Defs.' Opp'n 9 (quoting *Allstate Ins. Co. v. Avetisyan*, No. 17-CV-4275, 2018 WL 6344249, at *4 n.6 (E.D.N.Y. Oct. 30, 2018)).)

Under the third prong, a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Yang*, 960 F.3d at 135 (quoting *Winter*, 555 U.S. at 24).  If there are "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation," courts inquire into whether there is "a balance of the hardships tipping decidedly in favor of the moving party." *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 43 (2d Cir. 2020) (quoting *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)); *see also Parisien*, 352 F. Supp. 3d at 234 ("Because the [c]ourt finds that there are 'serious questions going to the merits' in lieu of a 'likelihood of success on the merits,' it must further inquire as to whether . . . there is a 'balance of hardships tipping decidedly' in [the plaintiff's] favor." (quoting *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979))).

Absent a preliminary injunction, Plaintiffs face 1,569 pending arbitrations and almost certainly thousands of additional arbitrations and state-court proceedings to resolve the $6.7 million of Defendants' total submitted bills currently unpaid and not yet subject to arbitration or court proceedings.  (Pls.' Mem. 6.)  Defendants do not face a similar level of uncertainty in their competing concern of policy exhaustion, nor have they identified any set of policies nearing exhaustion.  *See Moshe*, 2020 WL 3503176, at *3 (finding that the balance of hardships weighs

47

in favor of the insurer where the insurer "will face thousands of different proceedings" while the policy exhaustion argument "is speculative at best considering defendants do not identify any policies nearing exhaustion").  Moreover, Defendants are entitled to interest if they prevail.  *See Elzanaty*, 929 F. Supp. 2d at 222 (noting that the defendant will "benefit from the stay if it ultimately prevails in this matter, because it will be entitled to the collection of interest").

A stay of the pending AAA arbitrations and future arbitrations and lawsuits addressing similar claims will save the parties time and resources and promote judicial efficiency.  *See Beynin*, 2021 WL 1146051, at *8 (holding that "consolidation promotes efficiency in cases like this . . . notwithstanding [the defendants'] claim that they will suffer financially," especially where "they have not specified the extent of that hardship — *e.g.*, how much of their income the outstanding and pending claims constitute" (first citing *Cean*, 2019 WL 6253804, at *5; and then citing *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *8)); *Zilberman*, 2021 WL 1146086, at *2 ("[G]ranting the stay and injunction will actually save all parties time and resources.  Rather than adjudicating hundreds of individual claims in a piecemeal fashion, all claims can be efficiently and effectively dealt with in a single declaratory judgment action." (first quoting *Cean*, 2019 WL 6253804, at *5; and then citing *Elzanaty*, 929 F. Supp. 2d at 222)); *Strut*, 2019 WL 6338023, at *8 (stating that "[j]udicial economy tips the balance of those equities decidedly in [the plaintiff's] favor" where the plaintiff would otherwise "have to make payments on claims with serious questions about consistency" (citing *Strutsovskiy*, 2017 WL 4837584, at *7)); *Mayzenberg*, 2018 WL 6031156, at *7 ("[I]t is obviously more efficient and beneficial for [the defendants] if all of their claims are resolved in one action, rather than in hundreds of different proceedings.").

48

While the Court acknowledges the impact of the COVID-19 pandemic on the healthcare industry, a stay of proceedings does not deprive Defendants of their rights as they would be entitled to any balance owed plus interest if they eventually prevail on the claims.  *See Zaitsev*, 2021 WL 3173171, at *3 (noting that the "defendants will not be disadvantaged if the stay is granted since they will be entitled to statutory interest on their unpaid claims should they ultimately prevail" (first citing *Elzanaty*, 929 F. Supp. 2d at 222; and then citing *Mayzenberg*, 2018 WL 6031156, at *7)); *Mayzenberg*, 2018 WL 6031156, at *7 ("[I]f [the defendants] prevail in this action, they are entitled to statutory interest on their unpaid claims."); *Parisien*, 352 F. Supp. 3d at 234–35 ("If the preliminary injunction is granted and [the plaintiff] fails to prove its claims, then, at worst, [the defendants'] recovery of the no-fault benefits to which they are entitled will be delayed; all [the defendants] can hope for in pursuing their parallel state lawsuits and arbitrations is to accelerate their receipt of benefits to which they are already entitled.").

Accordingly, the Court finds that the balance of hardships tips decidedly in Plaintiffs' favor.[18]

### iv.   Public interest

Plaintiffs argue that "[p]reventing fraud is critical to New York's no-fault system because fraud 'is a costly and pervasive drain on the national [and statewide] healthcare system.'"  (Pls.' Mem. 14 (quoting *Parisien*, 352 F. Supp. 3d at 232).)  Plaintiffs also argue that "Defendants — and the public interest — will be well-served by the efficiency of resolving the issues in a single proceeding."  (*Id.* at 15 (citations omitted).)

---

[18]   Defendants request, in the alternative without any legal support, that the Court "deny the stay and injunction and instead allow collections on outstanding claims to proceed" through issuance of payments into "an escrow account pending resolution of this matter" to circumvent policy exhaustion.  (Alon Defs.' Opp'n 19.)  The Court declines to entertain this alternative application.

Defendants argue that Plaintiffs are attempting to "supplant the statutory framework created by New York State for resolving disputed medical bills with [n]o [f]ault insurance carriers straightaway, on which [Defendants] rely for their economic survival and continued ability to treat patients during a pandemic."  (Metro Pain Defs.' Opp'n 10.)

In analyzing the public interest prong, a court must consider "the public consequences in employing the extraordinary remedy of injunction," *Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24), and ensure that the proposed injunction "does not cause harm to the public interest," *SEC v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) (per curiam). There is no indication that granting an injunction would harm the public interest.  *See Beynin*, 2021 WL 1146051, at *10 (noting that "preventing fraud of the sort alleged [in violation of New York's no-fault laws] is in the public interest" (citing *Wellmart RX, Inc.*, 435 F. Supp. 3d at 456)); *Strut*, 2020 WL 1820500, at *3 n.8 (finding that the public interest factor in a preliminary injunction and stay as to no-fault proceedings was neutral); *Mayzenberg*, 2018 WL 6031156, at *10 (noting that "[p]reventing fraud on our health care system is also in the public's interest" where "allegations of fraud on our health care system generally, and even the specific civil RICO scheme alleged here, have become too common").

Because there are serious questions going to the merits of the case, Plaintiffs would suffer irreparable harm absent a stay, the balance of hardships tip decidedly in Plaintiffs' favor, and there is no indication of public harm as a result of a stay, the Court grants Plaintiffs' motion to stay all pending arbitrations and to enjoin all future arbitrations and state court proceedings.

   **e.   Security for the injunction**

Plaintiffs argue that no bond should be required "because there is no likelihood of harm to Defendants in the event the injunction was wrongly issued" and Plaintiffs "undoubtedly have

50

the ability to pay Defendants' claims, plus any interest owed, should Defendants ultimately prevail."  (Pls.' Mem. 24.)

Defendants argue that Plaintiffs should be required to post bond because Defendants have shown "substantial likelihood of harm if the Court grants the relief sought in Plaintiffs' motion," (Alon Defs.' Opp'n 21), and Plaintiffs "could easily afford to post a bond," (Metro Pain Defs.' Opp'n 15).

Rule 65(c) of the Federal Rules of Civil Procedure states that "the court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "The phrase 'in such sum as the court deems proper'[] indicates that the [d]istrict [c]ourt is vested with wide discretion in the matter of security[,] and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm . . . ."  *Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (first quoting *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961); and then citing *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976)); *see also Dr.'s Assocs. LLC v. Hai*, No. 19-CV-1968, 2019 WL 2385597, at *5 (E.D.N.Y. June 6, 2019) ("[A] district court in its discretion may deny a bond altogether if there is 'no proof of likelihood of harm' to the non-movant." (alteration in original) (quoting *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013))).  "The Rule 65(c) security requirement is designed to 'assure[] the [restrained] party that it may readily collect damages from the funds posted in the event that it was wrongfully [restrained], and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff.'"  *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128,

135 (2d Cir. 2014) (alterations in original) (quoting *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011)).

Because Plaintiffs have established a likelihood of harm, a stay is unlikely to prejudice Defendants, and Defendants may readily collect damages from Plaintiffs, the Court declines to require Plaintiffs to post a bond. *See Zaitsev*, 2021 WL 3173171, at *3 (waiving Rule 65(c) requirement where "the requested injunction will not cause [the defendants] any prejudice at all" and "[the insurer] undoubtedly has the ability to pay if defendants prevail" (first quoting *Moshe*, 2020 WL 3503176, at *4; then citing *Wellmart RX, Inc.*, 435 F. Supp. 3d at 456; and then citing *Mayzenberg*, 2018 WL 6031156, at *10)); *Beynin*, 2021 WL 1146051, at *10 (waiving the security requirement of Rule 65(c) where the parties "may well benefit from consolidation and interest" (first citing *Cean*, 2019 WL 6253804, at *5; and then citing *Elzanaty*, 929 F. Supp. 2d at 222)); *Advanced Comprehensive Lab'y, LLC*, 2020 WL 7042648, at *8 (waiving the security requirement of Rule 65(c) "in light of the systemic nature of the fraud alleged in the complaint and the lack of prejudice to [the] defendants resulting from a preliminary injunction" (citing *Mayzenberg*, 2018 WL 6031156, at *10)); *Wellmart RX, Inc.*, 435 F. Supp. 3d at 456 (same); *Moshe*, 2020 WL 3503176, at *4 ("[The insurer] undoubtedly has the ability to pay if [the] defendants prevail. As such, [the] defendants will suffer no harm from the injunction and the bond requirement is waived." (citing *Wellmart RX, Inc.*, 435 F. Supp. 3d at 456)); *Mayzenberg*, 2018 WL 6031156, at *10 (waiving the security requirement of Rule 65(c) where the court "concluded that a preliminary injunction will not result in any prejudice to [the defendants] and would actually benefit them if all of their claims are decided in one proceeding").

### III.  Conclusion

For the foregoing reasons, the Court grants Plaintiffs' motion in part and denies it in part. The Court stays all no-fault insurance collection arbitrations pending before the AAA and enjoins Defendants from commencing any further no-fault insurance collection arbitrations against Plaintiffs, pending the disposition of the declaratory judgment claim.  The Court declines to stay pending no-fault insurance collection lawsuits in state court against Plaintiffs but enjoins Defendants from commencing any new no-fault insurance collection lawsuits against Plaintiffs, pending the disposition of Plaintiffs' declaratory judgment claim.  The Court declines to require Plaintiffs to post a bond.

Dated:  May 19, 2022
        Brooklyn, New York

SO ORDERED:


        s/ MKB
MARGO K. BRODIE
United States District Judge