22-1318 (L)
*State Farm Mutual v. Tri-Borough*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

―――――――――

August Term, 2023

Argued: January 11, 2024    Decided: October 24, 2024

Docket Nos. 22-1318-cv, 22-1362-cv, 22-1386-cv

―――――――――

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY,

*Plaintiffs-Appellees-Cross-Appellants,*

— v. —

TRI-BOROUGH NY MEDICAL PRACTICE P.C., METRO PAIN SPECIALISTS P.C., LEONID SHAPIRO, M.D., REUVEN ALON, AKA ROB ALON, COLUMBUS IMAGING CENTER LLC, MEDAID RADIOLOGY LLC, YAN MOSHE, AKA YAN LEVIEV, HACKENSACK SPECIALTY ASC LLC, FKA DYNAMIC SURGERY CENTER LLC, INTEGRATED SPECIALTY ASC LLC, FKA HEALTHPLUS SURGERY CENTER LLC,

*Defendants-Appellants-Cross-Appellees.*[1]

―――――――――

――――――――――――

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above.

B e f o r e :

KEARSE, LYNCH, and NARDINI, *Circuit Judges*.

————————————

Defendants-Appellants-Cross-Appellees, who are health care providers and related individuals and entities that treat automobile accident victims, appeal from an order of the United States District Court for the Eastern District of New York (Brodie, *Ch. J.*) granting in part a motion for a preliminary injunction made by Plaintiffs-Appellees-Cross-Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Insurance Company (collectively, "State Farm"). This appeal concerns benefits provided under New York's Comprehensive Motor Vehicle Insurance Reparations Act ("No-Fault Act") to reimburse covered individuals injured in automobile accidents for necessary health expenses, without regard to fault. State Farm alleges that Defendants engaged in a scheme to fraudulently obtain No-Fault benefits and pursued baseless arbitrations and state-court proceedings to seek reimbursement of unpaid bills. The district court granted the motion for a preliminary injunction in part by enjoining Defendants from proceeding with the pending arbitrations and from initiating new arbitrations and state-court proceedings, but denied an injunction of the pending state-court proceedings. In resolving this appeal, we address four key issues: (1) our appellate jurisdiction; (2) the propriety of the preliminary injunction; (3) whether the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, allows enjoining the arbitrations; and (4) whether an exception to the Anti-Injunction Act, 28 U.S.C. § 2283, allows enjoining the pending state-court proceedings. We **REVERSE** the district court's orders denying a preliminary injunction of the pending state-court proceedings, **AFFIRM** its orders in all other respects, and **REMAND** the matter for further proceedings consistent with this opinion.

————————————

ROBERT T. SMITH, Katten Muchin Rosenman LLP, Washington, DC (Mary C. Fleming, Ally Jordan, Katten Muchin

2

Rosenman LLP, Washington, DC; Jonathan L. Marks, Katten Muchin Rosenman LLP, Chicago, IL; Christopher T. Cook, Katten Muchin Rosenman LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees-Cross-Appellants*.

PETER STROILI (Kevin Joseph Windels, Matthew Lee, *on the brief*), Kauffman Dolowich & Voluck LLP, New York, NY, *for Defendants-Appellants-Cross-Appellees Tri-Borough NY Medical Practice P.C., Metro Pain Specialists P.C., and Leonid Shapiro, M.D.*

KEITH J. ROBERTS, Brach Eichler LLC, Roseland, NJ (Charles H. Horn, The Russell Friedman Law Group, LLP, Garden City, NY, *on the brief*), *for Defendants-Appellants-Cross-Appellees Reuven Alon, AKA Rob Alon, Columbus Imaging Center LLC, Medaid Radiology LLC, Yan Moshe, AKA Yan Leviev, Hackensack Specialty ASC LLC, FKA Dynamic Surgery Center LLC, and Integrated Specialty ASC LLC.*

———————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Insurance Company (collectively, "State Farm") provide automobile insurance coverage in New York and are required under New York's Comprehensive Motor Vehicle Insurance Reparations Act ("No-Fault Act") to reimburse covered individuals injured in automobile accidents for necessary health expenses, without regard to fault. *See* N.Y. Ins. Law §§ 5101–5109. Insureds

3

can assign their No-Fault benefits to health care providers, who can then seek reimbursement directly from State Farm for treatment provided to the insureds. In this case, State Farm alleges that Defendants, who are health care providers and related individuals and entities that treat automobile accident victims, engaged in a massive scheme to fraudulently obtain No-Fault benefits by providing medically unnecessary treatment and services pursuant to illegal "pay-to-play" financial arrangements, seeking reimbursement of such claims from State Farm, and then bringing thousands of baseless arbitrations and state-court proceedings when State Farm denied the claims.

State Farm accordingly brought this lawsuit in the United States District Court for the Eastern District of New York, asserting claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state law. State Farm then sought a preliminary injunction to prevent Defendants from pursuing the pending arbitrations and state-court proceedings and from bringing any new actions. Granting State Farm's motion for a preliminary injunction in part, the district court (Margo K. Brodie, *Ch. J.*) stayed the pending arbitrations and enjoined Defendants from commencing any new arbitrations or state-court proceedings, but declined to enjoin the pending state-court

4

proceedings. Defendants appeal, contending that the district court abused its discretion in granting a preliminary injunction and that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, bars an injunction of the arbitrations. State Farm cross-appeals, arguing that the pending state-court proceedings can be enjoined under exceptions to the Anti-Injunction Act ("AIA"), 28 U.S.C. § 2283.

First, as to Defendants' appeal, we conclude that the district court did not exceed its discretion in granting a preliminary injunction and correctly determined, albeit for different reasons than our own, that the arbitration agreements here are unenforceable under the FAA. Second, as to State Farm's cross-appeal, we disagree with the district court's conclusion that the AIA bars an injunction of the pending state-court proceedings here. Accordingly, we **REVERSE** the district court's orders declining to enjoin the pending state-court proceedings, **AFFIRM** its orders in all other respects, and **REMAND** the matter for further proceedings consistent with this opinion.

## BACKGROUND

### I.    New York's No-Fault Insurance Regime

New York's No-Fault Act requires insurers to compensate victims of automobile accidents for their injuries regardless of fault. *See* N.Y. Ins. Law

§§ 5101–5109. The No-Fault regime aims "to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium savings to New York motorists." *Med. Soc'y of New York v. Serio*, 100 N.Y.2d 854, 860 (2003). The No-Fault Act provides compensation for "basic economic loss," which covers, as relevant here, "necessary" health expenses up to $50,000 per person. N.Y. Ins. Law § 5102(a).

The Act's implementing regulations allow covered individuals to assign their statutory benefits to licensed health care providers in exchange for services, and the providers in turn can submit claims directly to the insurance companies for medically necessary expenses. N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11(a) ("An insurer shall pay benefits . . . directly to the applicant or . . . upon assignment by the applicant[,] . . . shall pay benefits directly to providers of health care services . . . ."). Providers, however, are ineligible to receive reimbursement of No-Fault benefits in a number of circumstances, including if they "fail[] to meet any applicable New York State or local licensing requirement . . . or meet any applicable licensing requirement necessary . . . in any other state." *Id.* § 65-3.16(a)(12). For example, a medical services corporation may be

6

operated only by a licensed professional, such as a physician. *See, e.g.*, N.Y. Bus. Corp. Law §§ 1503(b), 1507, 1508(a). Providers are also prohibited from paying or receiving kickbacks in exchange for patient referrals or in connection with the performance of professional services. *See, e.g.*, N.Y. Educ. Law § 6530(11), (18)–(19); N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(b)(3)–(4).

In the event of a dispute regarding an insurer's obligation to pay No-Fault benefits, the No-Fault Act specifies that "[e]very insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, or additional first party benefits, . . . to arbitration," and such arbitrations are held "pursuant to simplified procedures." N.Y. Ins. Law § 5106(b). Insurers must accordingly include a mandatory personal injury protection endorsement in their liability policies providing for the option to arbitrate. *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1.

## II.    **Factual Background**[1]

### A.    *The Parties*

Plaintiffs are insurance companies that issue automobile insurance policies

---

[1] As explained further below, the factual background is derived from the First Amended Complaint ("FAC"). *See infra* note 5.

in New York. Defendants are health care providers and related individuals and entities that treat automobile accident victims and have submitted claims to State Farm seeking reimbursement of No-Fault benefits or worked with other Defendants who have submitted such claims. Defendants include physicians, physical therapists, chiropractors, and acupuncturists, as well as related corporations and medical centers. Although there are numerous Defendants in the case, only two groups of Defendants have pursued this appeal. The first group of Defendants-Appellants includes Dr. Leonid Shapiro ("Shapiro"), Metro Pain Specialists P.C. ("Metro Pain"), and Tri-Borough NY Medical Practice P.C. ("Tri-Borough Medical") (collectively, "Metro Pain Defendants"). Shapiro is a licensed anesthesiologist in New York and New Jersey who purportedly owns and controls several health care entities, including Metro Pain and its successor entity Tri-Borough Medical, as well as PMR Medical P.C. ("PMR Medical"). Shapiro has also incorporated and/or has ownership interests in companies that provide medical documentation and technology services to attorneys and medical clinics. In addition to his ownership of various entities, Shapiro has served as the medical director of certain ambulatory surgery centers ("ASCs"), including Excel Surgery Center LLC ("Excel Surgery"), Hackensack Specialty

8

ASC LLC, f/k/a Dynamic Surgery Center LLC ("Dynamic Surgery"), and

Integrated Specialty ASC LLC, f/k/a HealthPlus Surgery Center LLC

("HealthPlus Surgery"), as well as the Director of Anesthesiology for NJMHMC

LLC, d/b/a Hudson Regional Hospital ("Hudson Regional"), and the primary

provider of anesthesia services at SCOB LLC d/b/a SurgiCare of Brooklyn

("SurgiCare").

Metro Pain is a medical practice that operates approximately thirty

multidisciplinary clinics in the New York area serving individuals injured in

automobile accidents. Metro Pain staffs those clinics with physicians and other

health care providers, such as physical therapists, acupuncturists, and

chiropractors, who sublease space from Metro Pain. Four of its locations operate

as "gatekeeper" clinics where Metro Pain conducts initial examinations of

patients and then refers them for further treatment and services, which are often

performed at Metro Pain clinics by the various providers who work there.[2] Metro

Pain has accordingly submitted claims to State Farm for reimbursement under

the No-Fault program for treatment and services provided to patients. Metro

---

[2] The four gatekeeper clinics are located at (a) 105-10 Flatlands Ave., Brooklyn, NY 11236; (b) 204-12 Hillside Ave., Hollis, NY 11423; (c) 717 Southern Blvd., Bronx, NY 10455; and (d) 2451 E. Tremont Ave., Bronx, NY 10461.

Pain, however, ceased operations around April 2021, and Shapiro began operating Tri-Borough Medical as its successor entity in May 2021, assuming its role and functions in nearly all respects. Like Metro Pain, Tri-Borough Medical is a medical practice serving individuals injured in automobile accidents, and it operates at many of Metro Pain's prior locations, treating the same patients through the physicians and other health care professionals previously employed by Metro Pain. State Farm alleges that Shapiro operates Tri-Borough Medical as a successor entity to Metro Pain in part to induce State Farm and other insurers to reimburse claims for No-Fault benefits that they would not have paid to Metro Pain.

The second group of Defendants-Appellants includes Reuven Alon (also known as Rob Alon) ("Alon"), Columbus Imaging Center LLC ("Columbus Imaging"), Medaid Radiology LLC ("Medaid Radiology"), Yan Moshe (also known as Yan Leviev) ("Moshe"), Dynamic Surgery, and HealthPlus Surgery (collectively, "MRI and ASC Defendants"). Alon is a businessman, not a physician, who allegedly owns Columbus Imaging and Medaid Radiology, which provide MRI services for Metro Pain patients, and which have submitted bills to State Farm for such services. Alon also owns the Beshert Corp.

("Beshert"), which is an advertising and marketing company directed at No-Fault medical providers, attorneys, and victims of automobile accidents. Beshert also functions as a referral network among No-Fault providers and attorneys and requires its members to refer patients to other members in that network.

Moshe is Alon's cousin and a businessman who allegedly owns several health care entities, but he is not a physician or a licensed health care professional. Moshe allegedly owns many ASCs, including Excel Surgery, Dynamic Surgery, HealthPlus Surgery, and Hudson Regional, which serve individuals injured in automobile accidents. State Farm further alleges that Moshe secretly owns and controls companies that provide MRI services including Citimedical I, PLLC ("Citimedical I"), Citimedical Services P.C., and Citimed Complete Medical Care P.C., as well as anesthesia provider Citimed Services P.A. (collectively, "Citimed Companies"), all of which are owned on paper by Moshe's sister, Dr. Regina Moshe ("Dr. Moshe"). Finally, Moshe owns and controls Med Capital LLC ("Med Capital"), which is a medical receivables financing company.

B.    *The Alleged Fraudulent Scheme*

Beginning in November 2016 and continuing since then, Shapiro, Alon, and Moshe allegedly devised a scheme to profit from New York's No-Fault regime by submitting fraudulent claims for reimbursement to State Farm. State Farm alleges that Shapiro, Alon, and Moshe jointly orchestrated the scheme, and that the relationship among them is symbiotic such that they each play important roles to mutually benefit one another and further the scheme.

The alleged fraudulent scheme generally operates as follows: As a first step, Metro Pain and Tri-Borough Medical conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions, but rather are predetermined to find various injuries requiring extensive treatment. Then, Metro Pain and Tri-Borough Medical refer patients for further unnecessary treatment to health care providers within their clinics or to Moshe's and Alon's health care centers. Alon advances the scheme by providing Shapiro's and Moshe's health care entities access to patients through Beshert, which receives compensation in return for those marketing services. Moshe profits through Metro Pain's and Tri Borough Medical's referral of patients for unnecessary treatment at his ASCs and some of the Citimed

12

Companies. In return, Moshe compensates Shapiro by paying him $400,000 in salary for serving as the "medical director" of his ASCs and granting him the primary, if not exclusive, ability to provide anesthesia services at his ASCs. Moshe also advanced the scheme by providing Shapiro with a $2.5 million loan against Metro Pain's receivables. Some Defendants then submit claims for reimbursement to State Farm for the medically unnecessary treatment and services provided to patients and attempt to conceal their scheme by, *inter alia*, "submitting multiple bills from multiple providers and by changing providers operating at each address." Joint Appendix ("J.A.") 158.

As a final step in the alleged scheme, Defendants routinely initiate litigation in state court and arbitration actions if State Farm denies Defendants' claims for reimbursement. As of December 2021, Defendants had commenced over 2,450 arbitrations and approximately 480 suits in state court seeking reimbursement of No-Fault benefits from State Farm to further the alleged scheme.[3] *Id.* at 255. State Farm contends that those arbitrations and state-court proceedings are baseless and advance the scheme in two ways. First, the proceedings help monetize the scheme as further attempts to obtain No-Fault

_____

[3] As of January 8, 2024, 103 of those state-court proceedings remained pending.

benefits. Second, the proceedings obscure the fraud because the proceedings often concern individual claims for individual patients, making it difficult to prove a pattern of medically unnecessary services across multiple patients. As a result of this elaborate and extensive alleged scheme, State Farm claims that it has suffered more than $15 million in damages.

More specifically, State Farm alleges that the No-Fault claims are fraudulent for three key reasons: (1) predetermined treatment protocols, (2) kickbacks and "pay-to-play" financial arrangements, and (3) violations of licensing requirements.

### 1.     *Predetermined Treatment Protocols*

First, State Farm alleges that Defendants provide treatment and services that are not medically necessary. As mentioned above, the Metro Pain Defendants operate several multidisciplinary clinics, at least four of which operate as gatekeeper clinics that conduct initial examinations of patients to determine additional treatment and services. State Farm alleges that the initial examinations are not legitimately performed to diagnose a patient's condition and genuine needs but are rather performed to justify unnecessary care through identical treatment plans. Regardless of the patient's actual needs, the

predetermined treatment protocols "virtually always conclude [that] patients require a treatment plan consisting of a combination of physical therapy, chiropractic care, and acupuncture, as well as other services" offered by the Metro Pain Defendants or other providers with whom it has financial arrangements. *Id.* at 51. In addition, the Metro Pain Defendants refer virtually every patient who receives more than one office visit to Alon's and Moshe's companies for MRIs, the majority of which were medically unnecessary. Similarly, some of Metro Pain's patients receive unnecessary cervical collars, lumbar orthoses, prescription gels, and patches, as well as pain management and orthopedic consultations that are followed by procedures performed by Metro Pain and Tri-Borough Medical at Moshe's ASCs where they receive anesthesia from Shapiro's or Moshe's anesthesia companies. Finally, State Farm asserts that the Metro Pain Defendants routinely order unnecessary diagnostic tests for patients that do not affect their treatment, and that some of those tests are duplicative of information already obtained through the initial predetermined treatment protocols. The Metro Pain Defendants then bill State Farm for those allegedly unnecessary treatment and services to fraudulently take advantage of patients' No-Fault benefits. As a result of the predetermined treatment protocols,

15

State Farm claims that victims injured in automobile accidents are not appropriately examined and diagnosed, and that they receive treatment for conditions they do not have, resulting in a diversion of the No-Fault benefits that patients could have otherwise used for legitimate care.

> 2.   *Kickbacks and "Pay-to-Play" Financial Arrangements*

In addition to providing medically unnecessary treatment and services, some Defendants allegedly provide kickbacks in exchange for patient referrals and have entered into other illegal "pay-to-play" financial arrangements with each other. State Farm alleges that Defendants disguise some of those kickbacks as rent. Specifically, the Metro Pain Defendants lease spaces to operate its gatekeeper clinics and then sublease those spaces to physicians and other health care professionals who provide services like chiropractic, acupuncture, and physical therapy treatment after patients' predetermined initial examinations with Metro Pain and Tri-Borough Medical. Those providers accordingly pay Metro Pain "rent" for the sublease, but State Farm alleges that the payments are intended to compensate Metro Pain for referring its patients to the providers for further treatment. For example, State Farm alleges that Metro Pain paid a monthly rent of approximately $8,500 for a particular clinic, but it received about

$9,500 in "rent" payments from providers subleasing that space, which State Farm contends was not tied to the fair market value of the space. As further support, State Farm points to discrepancies in clinic usage by various providers, alleging that many providers paid the same amount in "rent" to Metro Pain even though some of them only treated patients for one to four days a month at Metro Pain's clinics, whereas others treated patients at the same locations five days a week, four weeks a month. State Farm accordingly asserts that such payments to Metro Pain must have been for other than, or more than, simply rent, such as patient referrals.

Aside from disguised rent payments, State Farm alleges that there are many other illegal financial arrangements among Defendants that further the scheme. Pursuant to one such arrangement, Metro Pain performs every pain management and orthopedic procedure for its patients at Moshe-owned facilities such as Dynamic Surgery, HealthPlus Surgery, SurgiCare, Citimed Surgery, and Hudson Regional, and those patients receive anesthesia from Shapiro- or Moshe-owned providers. That arrangement resulted from an alleged kickback relationship between Shapiro, Moshe, Alon, and Alon's marketing company Beshert, through which Metro Pain obtains access to patients in exchange for

17

referring patients to Moshe's Dynamic Surgery and HealthPlus Surgery ASCs, and Moshe compensates Shapiro in return. Another alleged "pay-to-play" financial arrangement is the participation agreement Beshert has with its members. Pursuant to that agreement, members pay Beshert monthly dues, with Shapiro and Metro Pain paying dues as high as $10,000 each month, and Moshe's Dynamic Surgery and HealthPlus Surgery, the only two ASCs in the Beshert network, paying $50,000 each month. As required by that membership, Metro Pain exclusively uses Moshe's ASCs for procedures and routinely refers patients for MRIs at other facilities in the Beshert network. Due to such "pay-to-play" financial arrangements and kickbacks, State Farm alleges that some Defendants are not eligible to collect No-Fault benefits.

### 3.    *Violation of Licensing Requirements*

Finally, State Farm alleges that Defendants' claims are fraudulent because many Defendants operate in violation of licensing requirements. For example, although on paper Dr. Moshe owns Citimedical I and Citimed Services, her brother Moshe effectively owns and controls them in violation of New York licensing laws, such that any claims submitted by those companies are ineligible for reimbursement. As another example, State Farm alleges that Metro Pain

18

entered into several financial arrangements with Moshe's company Med Capital, which agreed to lend up to $2.5 million to Shapiro's Metro Pain and PMR Medical. As a result of those arrangements, State Farm claims that Moshe was able to control and direct Metro Pain despite being a layperson.

State Farm also alleges that Shapiro was not a true and qualified medical director of Dynamic Surgery and HealthPlus Surgery, in violation of licensing requirements. Specifically, State Farm alleges that Shapiro was "in no position to perform his regulatory duties as a medical director because his own professional corporations were significantly expanding." *Id.* at 102. State Farm elaborates that Moshe had a pattern and practice of hiring nominal medical directors even before Shapiro. Accordingly, State Farm alleges that any claims submitted by those ASCs when Shapiro served as the nominal medical director are ineligible for reimbursement and that the alleged violations of various licensing requirements altogether render claims submitted by some Defendants fraudulent.

## III.    Procedural Background

State Farm filed this lawsuit in October 2021 and amended its complaint in December 2021 ("First Amended Complaint" or "FAC"). The FAC brought

19

twenty-six claims against various Defendants under the following causes of action: (1) common law fraud; (2) aiding and abetting fraud; (3) unjust enrichment; (4) violation of RICO, 18 U.S.C. § 1962(c)–(d); and (5) declaratory relief under 28 U.S.C. § 2201. In December 2021, State Farm moved to stay all pending arbitrations and state-court proceedings brought by Defendants against it and to enjoin Defendants from commencing any new arbitrations or state court lawsuits concerning benefits provided by Defendants to patients of Metro Pain or Tri-Borough Medical. In May 2022, the district court granted the motion in part, enjoining all (1) pending arbitrations, (2) new arbitrations, and (3) new state-court proceedings, but declined to stay the pending state-court proceedings. *State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.* ("*State Farm I*"), No. 21-CV-5523 (MKB), 2022 WL 1606523, at *2 (E.D.N.Y. May 20, 2022).

In June 2022, State Farm moved for reconsideration of the district court's order declining to stay the pending state-court proceedings, and the district court denied that motion in August 2022. Defendants appealed while the motion for reconsideration was pending. State Farm then cross-appealed.[4]

---

[4] State Farm first filed a notice of appeal on June 29, 2022 while its motion for reconsideration was pending. After the district court resolved that motion, State Farm filed an amended notice of appeal on August 10, 2022, which included the

## JURISDICTION

Before we can address the propriety of the preliminary injunction, we must ensure that the case is properly before this Court. Although the parties did not raise the issue of appellate jurisdiction in their briefs, we have an independent obligation to ensure that we have jurisdiction over the appeal. *See Stafford v. Int'l Bus. Machs. Corp.*, 78 F.4th 62, 68 (2d Cir. 2023). Thus, after oral argument, this Court ordered the parties to brief the issue of this Court's appellate jurisdiction. Having reviewed the parties' submissions, we conclude that this appeal is not moot and that we have jurisdiction over the district court's orders. But before explaining the basis for our jurisdiction, we review certain aspects of the procedural history that bear directly on the question of our appellate jurisdiction.

In January 2023, while the appeal was pending in this Court, State Farm moved for leave to file a Second Amended Complaint ("SAC") in which it added sixteen new Defendants and further details about the alleged fraud. To cover the newly-added Defendants, State Farm also moved for a temporary restraining order and to modify the scope of the previously entered preliminary injunction. Chief Judge Brodie granted the temporary restraining order in February 2023 and

district court's reconsideration decision.

determined that the existing preliminary injunction already applied to the new

Defendants under Federal Rule of Civil Procedure 65(d)(2)(C), which makes an

injunction enforceable against "persons who are in active concert or participation

with" the already-enjoined Defendants. Chief Judge Brodie then referred State

Farm's motion for leave to file the SAC to Magistrate Judge Peggy Kuo who

granted the motion, and State Farm filed the SAC on August 17, 2023.

Then, in September 2023, Chief Judge Brodie denied State Farm's motion to

modify the scope of the existing preliminary injunction. Referring back to her

prior decision granting the temporary restraining order, Chief Judge Brodie

stated that because the existing injunction already covered the newly-added

Defendants, there was no need to modify the injunction. She elaborated that

"each of the newly-added entities is closely associated with or controlled by one

or more of the existing Defendants, while each of the newly-added individuals

owns an entity alleged to have provided unnecessary treatments under the

challenged scheme." *State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*

("*State Farm II*"), No. 21-CV-5523 (MKB), 2023 WL 7181653, at *4 (E.D.N.Y. Sept.

13, 2023). Thus, the district court declined to modify the preliminary injunction,

which remains unchanged since the district court granted it in May 2022.

22

Those developments occurred while the appeal was pending in this Court, so the precise question before us is whether the SAC renders this appeal moot. We conclude that the appeal is not moot. To avoid mootness, there must be an "actual controversy" through which the parties can obtain some relief from the court, and that controversy must exist "through all stages of the litigation." *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotation marks omitted). "A case becomes moot . . . when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* at 91 (internal quotation marks omitted). In other words, and as relevant here, the preliminary injunction must still be effective, and there must be something left for the court to do.

Generally, "[o]nce an amended pleading is interposed, the original pleading no longer performs any function in the case." *Laza v. Reish*, 84 F.3d 578, 581 (2d Cir. 1996) (internal quotation marks omitted). Building upon that understanding, a growing number of unpublished decisions from this Court have concluded that the "filing of an amended complaint will generally moot a pending appeal when . . . the appeal would require the Court to analyze factual allegations contained in the superseded complaint." *Medidata Sols., Inc. v. Veeva*

23

*Sys. Inc.*, 748 F. App'x 363, 365 (2d Cir. 2018) (summary order); *see also Tripathy v. McClowski*, No. 21-3094, 2022 WL 2069228, at *2 (2d Cir. June 9, 2022) (summary order) (holding that the appeal of a preliminary injunction was moot because the amended complaint filed while the appeal was pending requested new injunctive relief); *Adamou v. Doyle*, 674 F. App'x 50, 52 (2d Cir. 2017) (summary order) (ruling that the "appeal became moot upon the filing of the . . . amended complaint because the operative facts changed" and the Court therefore "lack[ed] jurisdiction to review an order that was based on an old universe of facts").

As these cases suggest, the filing of an amended complaint will generally moot the appeal of a preliminary injunction, because an amended complaint will commonly "change[]" the "operative facts," *Adamou*, 674 F. App'x at 52, on which the district court based the injunction. As a result, once a new set of facts is alleged, there is typically no point in assessing whether the now-superseded "universe of facts," *id.*, supported the injunction.

But that will not invariably be the case. Two of our sister courts of appeals, in determining whether such appeals are moot, have analyzed whether the revised pleadings in fact affect the substantive basis for a district court's order. *See Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d

24

670, 674–75 (7th Cir. 2019) (concluding that the appeal was not moot because the "new pleadings did no more than to add" a party and "had no effect on [the plaintiff's] basic grievance"); *see also Johnson v. 3M Co.*, 55 F.4th 1304, 1309 (11th Cir. 2022) (determining that the court had jurisdiction over the appeal of an immunity order because the "key point" was that the amended complaint did not change the allegations on which the immunity defense was based, "leav[ing] the status of th[e] appeal of the immunity order unaffected").

We agree with that reasoning and conclude that whether a revised pleading renders an appeal moot turns on whether that pleading materially changes the substantive basis for the appeal. Here, the SAC borrows heavily from the FAC, with the primary difference between the two complaints being that the SAC adds sixteen Defendants and further details about the alleged fraudulent scheme. The newly-added Defendants do not meaningfully alter the substantive basis of the appeal because, as the district court found, they are either closely associated with or controlled by the existing Defendants, or provided unnecessary treatments under the scheme. Neither party disputes that finding on appeal.

25

As for the additional allegations included in the SAC, the most significant difference appears to be that the scheme is now described as revolving around Moshe instead of the Metro Pain Defendants. But even that does not alter State Farm's basic grievance that Defendants allegedly operate a complex scheme to fraudulently obtain No-Fault benefits by, *inter alia*, providing unnecessary treatment and services and kickbacks for patient referrals. Moreover, both the SAC and FAC allege that Moshe played an important role in the scheme, with the SAC merely placing greater emphasis on his role. Any other additional allegations in the SAC operate to further strengthen State Farm's claims. Tellingly, the May 2022 preliminary injunction remains predicated on the FAC, as the district court declined to amend it in any way based on the additional allegations in the SAC. Thus, although the FAC is no longer the operative complaint governing further proceedings in the district court, the issues on appeal remain unaffected by that change, and the propriety of the injunction does not turn on any change effected by the SAC.

The preliminary injunction thus remains in place, unmodified, and continues to constrain Defendants by preventing them from commencing new

arbitrations and state-court litigation and proceeding with the pending

arbitrations. In other words, Defendants are still aggrieved by the preliminary

injunction even after the filing of the SAC. Accordingly, we conclude that this

appeal is not moot, and we have jurisdiction over it.[5]

## MERITS DISCUSSION

### I.    Standards of Review

We review the grant or denial of a preliminary injunction for abuse of

discretion. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). "A

district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its

decision rests on an error of law . . . or a clearly erroneous factual finding, or

(2) its decision—though not necessarily the product of a legal error or a clearly

erroneous factual finding—cannot be located within the range of permissible

decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)

---

[5] Although the SAC does not divest us of appellate jurisdiction, we review only
the FAC in this opinion to determine the propriety of the preliminary injunction
because the district court granted the injunction based on the FAC. *See Deeper Life
Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 81 (2d Cir. 1991) (where a district
court issued a preliminary injunction and the plaintiff thereafter amended the
complaint, the Court "considered only the original complaint" on appeal). In any
event, our conclusion that the district court did not abuse its discretion in
granting a preliminary injunction is not altered by the SAC, which primarily
includes *additional* detail beyond the allegations already included in the FAC.

(footnote omitted). That said, "[w]here allegations of error in a preliminary injunction involve questions of law, our review is *de novo*." *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015). Thus, we review the district court's decision to grant the preliminary injunction here for abuse of discretion but review its interpretation of the FAA and AIA *de novo*. *See Cedeno v. Sasson*, 100 F.4th 386, 393 (2d Cir. 2024) (FAA); *Wyly v. Weiss*, 697 F.3d 131, 137 (2d Cir. 2012) (AIA).

## II.    Analysis

We first consider Defendants' appeal, which challenges (1) the propriety of the preliminary injunction issued by the district court and (2) the district court's conclusion that the arbitrations can be enjoined, notwithstanding the FAA. Then, we consider State Farm's cross-appeal, which challenges the district court's conclusion that the pending state-court proceedings cannot be enjoined under the AIA.

### A.    *Preliminary Injunction*

First, Defendants challenge the preliminary injunction insofar as it stays the pending arbitrations and enjoins them from commencing any new arbitrations or state-court proceedings. A preliminary injunction "'is an extraordinary and drastic remedy, one that should not be granted unless the

movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005), quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, a party must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *North American Soccer League, LLC v. United States Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018). Because under the "serious questions" standard a party would have to demonstrate both serious questions on the merits and a balance of hardships decidedly favoring the moving party, the "overall burden is no lighter than the one [the party] bears under the 'likelihood of success' standard." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

Defendants argue that the district court abused its discretion in granting the preliminary injunction. We disagree.

### 1.    *Irreparable Harm*

The irreparable harm requirement is "'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo*

*AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009), quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). This requirement must therefore be satisfied before the other requirements for an injunction can be considered. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). To make this showing, the moving party "'must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *Faiveley*, 559 F.3d at 118, quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). Thus, irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). But "[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore*, 409 F.3d at 510. Therefore, the moving party must show that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling*, 295 F.3d at 214 (internal quotation marks omitted).

In this case, the district court determined that State Farm satisfied the irreparable harm requirement because "the global and intertwined nature of the fraud is effectively obscured in the fragmented state-court proceedings and arbitrations due to an incomplete factual record, in addition to the risk of inconsistent judgments, frustration of declaratory judgment relief, and possible preclusive effect." *State Farm I*, 2022 WL 1606523, at *19 (internal quotation marks and alterations omitted). The district court also noted that the parties are currently in the midst of thousands of pending arbitrations, and Defendants are likely to initiate new arbitrations and lawsuits to recover unpaid claims.

We discern no error, much less an abuse of discretion, in the district court's conclusion that State Farm satisfied the irreparable harm requirement. To begin, State Farm plausibly alleges that the arbitrations and state-court proceedings often involve single claims for a single date of service, so that these fragmented proceedings end up obscuring what State Farm contends is an elaborate and complex fraudulent scheme. Although a state court or arbitrator reviewing an individual claim may conclude that the claim involves necessary medical treatment under the No-Fault Act, State Farm sufficiently alleges that the massive fraudulent scheme here becomes apparent only when the claims are analyzed

altogether. That is, to prove up allegations of a predetermined treatment protocol, a reviewing court or arbitrator must consider whether Defendants have repeatedly provided the same treatment or services to several patients regardless of their actual medical needs, which is exceedingly difficult to establish in a proceeding on a single claim. Put another way, Defendants' alleged fraudulent scheme is not readily apparent when viewed on an individual claim-by-claim basis, and the arbitrations and state-court proceedings therefore help to insulate the alleged fraud from detection.

That risk of harm is amplified by the potential preclusive effect of the state-court proceedings and arbitrations. It is settled law that state-court judgments can have a preclusive effect in federal court. *See Whitfield v. City of New York*, 96 F.4th 504, 522 (2d Cir. 2024) (noting that federal courts are required "to give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered" (internal quotation marks omitted)). It is likewise settled "that res judicata and collateral estoppel apply to issues resolved by arbitration where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award." *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267–68 (2d Cir. 1997)

(internal quotation marks omitted); *see also Benjamin v. Traffic Exec. Ass'n E. Railroads*, 869 F.2d 107, 110 (2d Cir. 1989) ("[T]he findings of arbitration boards can serve as the basis for collateral estoppel in a federal court proceeding."). In fact, the No-Fault Act specifically provides that "[a]n award by an arbitrator shall be binding." N.Y. Ins. Law § 5106(c). Because the arbitrations and state-court proceedings here could determine that certain claims were reimbursable based on findings of medical necessity for individual patients, those decisions could have a preclusive effect in this action, thereby preventing complete relief to State Farm if it is so entitled. *See Benjamin*, 869 F.2d at 114 (noting a sister circuit's decision holding that "arbitration findings may be given collateral estoppel effect over issues in a RICO claim"). Of course, whether such findings will in fact be preclusive will depend on the precise circumstances of the proceedings. For example, courts determining the preclusive effect of arbitrations consider whether the procedures employed adequately protected the rights of the parties and whether an arbitrator's decision and rationale can be determined with "clarity and certainty." *See Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48–49 (2d Cir. 2003) (internal quotation marks and emphasis omitted). But it is premature at this point to attempt to ascertain the definitive preclusive effect of such proceedings

33

because our task at this juncture is solely to determine whether there is a sufficient showing of a risk of irreparable harm absent an injunction. We believe there is.

Those harms also threaten to continue absent an injunction. To establish irreparable harm, the moving party must show "a *continuing* harm which cannot be adequately redressed by final relief on the merits." *Kamerling*, 295 F.3d at 214 (internal quotation marks omitted and emphasis added). Without the preliminary injunction currently in place, Defendants would continue bringing new actions to recover the remaining unpaid claims for No-Fault benefits, which total around $9 million as of December 2021. State Farm contends that Defendants use those very proceedings "to monetize their fraud against the State Farm Companies," such that they are "essentially financing their fraudulent practices with proceeds paid by" State Farm. Appellees' Br. 37–38. Thus, we conclude that State Farm has sufficiently demonstrated a risk of irreparable harm that threatens to continue absent an injunction.

*Allstate Insurance Co. v. Harvey Family Chiropractic*, on which Defendants place principal reliance, is not to the contrary. 677 F. App'x 716 (2d Cir. 2017) (summary order). In that case, an insurer brought a RICO action alleging that the

34

defendants presided over an enterprise that fraudulently received No-Fault

benefits because the key defendant was illegally organized. *See id.* at 717. The

insurer also sought a preliminary injunction preventing the defendants from

proceeding with pending state-court proceedings and from commencing any

new arbitrations or lawsuits, which the district court denied on the basis that it

lacked the authority to issue the injunction under the AIA. *See id.* We affirmed in

a summary order on a different ground, concluding that plaintiffs had failed to

establish the irreparable harm required for a preliminary injunction because there

was no evidence that "plaintiffs cannot be fully compensated through money

damages for the alleged harm suffered from the defendants' fraudulent claims."

*Id.* at 718. We explained that "mere injuries . . . in terms of money, time and

energy . . . are not enough to establish irreparable harm." *Id.* (internal quotation

marks omitted).

Although both cases involve allegations of fraudulent claims for No-Fault

benefits, *Harvey* is readily distinguishable from the instant action.[6] To begin, the

[6] Separately, we note that our summary orders do not have precedential effect
because such orders "frequently do not set out the factual background of the case
in enough detail to disclose whether its facts are sufficiently similar to those of a
subsequent unrelated case to make our summary ruling applicable to the new
case." *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011); *see also* 2d Cir. Local R.
32.1.1(a). *Harvey* is one such case, with its brief description of the facts limiting

35

nature and complexity of the fraudulent scheme in each case is meaningfully different. The insurer in *Harvey* alleged that the No-Fault claims submitted by the defendants there were fraudulent because the key defendant was illegally organized, *see id.* at 717, whereas, here, State Farm alleges that Defendants have engaged in a massive and highly complex scheme involving predetermined treatment protocols to justify unnecessary treatment across a myriad of providers, kickbacks for patient referrals, and violations of licensing laws. That distinction affects the irreparable harm analysis because the allegation in *Harvey* (illegal organization) can be more easily established in arbitrations and state-court proceedings for individual claims in comparison to the complex allegations here which are obscured in such piecemeal proceedings. Moreover, *Harvey* primarily focused on economic harms and did not discuss the potential preclusive effects of the arbitrations and state-court proceedings. *See id.* at 718.

Furthermore, we review the decision to grant or deny a preliminary injunction for abuse of discretion, not *de novo*. *Sunward Elecs.*, 362 F.3d at 24. *Harvey* is therefore also distinguishable because the district court there *denied* a preliminary injunction, whereas the district court here *granted* an injunction, and

---

the meaningful comparisons we can draw to the instant action.

we analyze whether those decisions can "be located within the range of permissible decisions." *Zervos*, 252 F.3d at 169. We think the district court's decision here can, and we therefore conclude that the district court did not abuse its discretion in concluding that State Farm satisfied the irreparable harm requirement.

### 2.    Serious Questions on the Merits

Second, State Farm must demonstrate "either a likelihood of success on the merits" or "serious questions on the merits." *North American Soccer League*, 883 F.3d at 37. "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup*, 598 F.3d at 35. This standard is also frequently referred to as the "fair ground for litigation" standard. *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995).

Before resolving whether this standard is satisfied here, we address Defendants' contention that the district court erred in relying on unsworn and unverified allegations to determine that there were serious questions going to the

merits. We have previously explained that "'there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it.'" *Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997), quoting *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989). Although there should generally be an evidentiary hearing when essential facts are in dispute, *see id.*, "[a] party may . . . waive its right to an evidentiary hearing," *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998).

Defendants do not appear to have requested an evidentiary hearing on the preliminary injunction motion in the district court, and they have thus forfeited their right to such a hearing. Moreover, although the district court could have cultivated a fuller record by conducting an evidentiary hearing, it has greater flexibility to resolve the motion on the papers when it relies on the "serious questions" standard as opposed to the more rigorous "likelihood of success" standard. The "serious questions" standard allows courts to "assess[] the merits of a claim at the preliminary injunction stage" by affording considerable "flexibility in the face of varying factual scenarios and the greater uncertainties

38

inherent at the outset of particularly complex litigation." *Citigroup*, 598 F.3d at 35 (internal quotation marks omitted). Put another way, this standard "accommodates the needs of the district courts in confronting motions for preliminary injunctions in factual situations that vary widely in difficulty and complexity." *Id.* at 38. And while we have noted above that the alternative showings that can warrant a preliminary injunction are overall of comparable difficulty, as to the substantive components of those alternatives, we have repeatedly recognized that "there can be no doubt . . . that the likelihood-of-success standard is more rigorous than the serious-questions standard." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 n.22 (2d Cir. 2019) (collecting cases), vacated and remanded on other grounds sub nom. *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020); *see also Citigroup*, 598 F.3d at 38 (describing the "serious questions" standard as "the more flexible standard for a preliminary injunction"). The significance of this flexibility is that courts applying the "serious questions" standard have the discretion to rely on the pleadings and accompanying affidavits, particularly when no party has requested an evidentiary hearing, to resolve preliminary injunction motions, provided that the movant has raised "questions going to the merits so serious, substantial, difficult

and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). "A determination not to hold an evidentiary hearing is reviewed for abuse of discretion." *United States v. Amico*, 486 F.3d 764, 779 (2d Cir. 2007). The district court here did not abuse its discretion in determining that the record before it was sufficient to allow it to decide, without a hearing and solely on the papers before it, that there was a fair ground for litigation.

We further conclude that the district court did not err in determining that State Farm demonstrated sufficiently serious questions going to the merits. In the 159-page FAC, State Farm alleges in substantial detail that Defendants have participated in an elaborate RICO scheme spanning several years. The allegations describe a web of interconnected relationships among the various Defendants, illegal financial arrangements tying many of the Defendants together, medically unnecessary treatment and services provided to patients, and unauthorized ownership or operation of medical facilities by some Defendants.

In particular, State Farm's allegations describe the (1) history and operation of the four "gatekeeper clinics" and the specific amounts in "rent" kickbacks that providers paid for patient referrals at each of those locations; (2) predetermined

40

treatment protocols utilized at the gatekeeper clinics and unnecessary medical care further provided to patients, including the precise medical procedures, devices, and treatments rendered; (3) operation of medical facilities by unauthorized laypersons like Alon and Moshe; and (4) illegal financial relationships among Defendants for patient referrals, exclusive rights to perform certain procedures, and otherwise fraudulent methods to obtain No-Fault benefits. State Farm also attached approximately 360 pages in exhibits to the FAC demonstrating the alleged predetermined treatment protocols utilized to provide treatment to virtually every patient regardless of their actual needs. Those exhibits include detailed charts on individual patients identifying the claim number, gatekeeper clinic the patient visited, number of office visits, medical findings (*e.g.*, neck pain, low back pain, etc.), and exact treatment and care billed to State Farm (*e.g.*, physical therapy, chiropractic care, acupuncture, MRIs, cervical collars, etc.). The exhibits also include initial examination reports describing patients' treatment plans, documents ordering tests, services, and devices for patients, follow-up reports regularly ordering the continuation of allegedly unnecessary treatment, and other treatment notes from providers.

That is not all. State Farm also attached an affidavit and exhibits to its preliminary injunction motion detailing the number of pending arbitrations and state-court proceedings that Defendants had filed. Defendants responded to State Farm's motion and attached multiple declarations in opposition. The district court then evaluated that record and concluded that the allegations were sufficiently serious, detailed, and complex, making them fair ground for litigation and for additional investigation. We find no error or abuse of discretion in that conclusion.

### 3.   *Balance of Hardships*

Third, we consider whether State Farm demonstrated that the balance of hardships tips decidedly in its favor. *See Citigroup*, 598 F.3d at 35. In determining whether State Farm has satisfied this requirement, "we must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020), quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This factor is "related" to the irreparable harm requirement as "both . . . consider the harm to the parties" with the relevant harm being that which "(a) occurs to the parties' legal interests and (b) cannot be remedied after a final

adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

Defendants argue that in balancing the hardships, the district court failed to consider the financial impact of an injunction on them given the millions of dollars in unpaid bills and the risk of policy exhaustion resulting from the $50,000 limit on patients' No-Fault benefits. But the district court expressly considered the economic impact on Defendants and weighed that hardship against the thousands of arbitrations and state-court proceedings State Farm faces absent an injunction. The district court noted that unlike State Farm, Defendants do not "face a similar level of uncertainty in their competing concern of policy exhaustion" and acknowledged "the impact of the COVID-19 pandemic on the healthcare industry," but concluded that Defendants could recover any balance owed plus interest if they eventually prevail on the merits. *State Farm I*, 2022 WL 1606523, at *20–22. Defendants undoubtedly face some hardship as relatively small companies or individual medical providers. But State Farm raises serious and substantial allegations that demonstrate actual and imminent irreparable harm absent an injunction, whereas Defendants' alleged hardships of economic impact can be remedied by monetary damages should they later

43

prevail. *See Kamerling*, 295 F.3d at 214. Accordingly, Defendants' arguments evince plausible disagreement with the district court's balancing of the hardships, but the balance reached by the district court falls squarely within its discretion. *See Zervos*, 252 F.3d at 169.

### 4.    *Public Interest*

Fourth, we consider whether the preliminary injunction is in the public interest, which concerns the "public consequences in employing the extraordinary remedy of injunction." *Yang*, 960 F.3d at 135–36 (internal quotation marks omitted). Preventing fraud, especially the kind of elaborate and complex RICO scheme alleged here, is plainly in the public interest. *See Allstate Ins. Co. v. Mun*, 751 F.3d 94, 100 (2d Cir. 2014) (stating that "the prevention of insurance fraud for the protection of consumers in New York" is an "important public policy interest" (internal quotation marks omitted)); *Perl v. Meher*, 18 N.Y.3d 208, 214 (2011) ("No-fault abuse still abounds today. In 2010, no-fault accounted for 53% of all fraud reports received by the Insurance Department.").

New York's No-Fault regime is aimed at ensuring prompt compensation for victims of automobile accidents without regard for fault. Insurers are integral components of that expedited regime as they are uniquely positioned to combat

44

the depletion of public resources caused by fraudulent claims for No-Fault benefits. To that end, New York requires most insurers to implement anti-fraud measures by preparing plans "for the detection, investigation and prevention of fraudulent insurance activities" in the state. N.Y. Ins. Law § 409(a). Among other things, the fraud prevention plans must provide for the "coordination with other units of an insurer for the *investigation and initiation of civil actions* based upon information received by or through the[ir] special investigation unit." *Id.* § 409(c)(4) (emphasis added). That public interest in detecting and preventing insurance fraud is thwarted, however, when insurers like State Farm find themselves facing thousands of arbitrations and state-court proceedings for the reimbursement of individual claims for No-Fault benefits into which "[c]omplex fraud and RICO claims . . . cannot be shoehorned." *Mun*, 751 F.3d at 99. Thus, we conclude that the district court did not err in granting a preliminary injunction to preserve State Farm's ability to prove its allegations of a complex fraudulent scheme involving insurance benefits, which is clearly in the public interest. The district court therefore did not abuse its discretion in determining that a preliminary injunction was warranted here.

5.    *Security Bond*

Finally, the MRI and ASC Defendants argue that the district court erred in declining to require State Farm to post a bond.[7] We disagree. Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in *an amount that the court considers proper* to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (Emphasis added). Courts have the discretion, however, to require no security at all depending on the specific circumstances. *See Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004); *see also Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (explaining that district courts have wide discretion in determining whether to require a security).

Here, the MRI and ASC Defendants argue that the district court erred because other district courts have sometimes required plaintiff insurers to post bond in actions involving No-Fault benefits. But that does not mean that the district court's decision here involved an error of law or a clearly erroneous factual finding, or cannot otherwise be located within the range of permissible

[7] The Metro Pain Defendants do not challenge the district court's refusal to require security.

46

decisions. *See Zervos*, 252 F.3d at 169. Rule 65(c)'s security requirement is designed to "assure[] the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011). The district court did not abuse its discretion in finding that "Defendants may readily collect damages from Plaintiffs" should they prevail as there is no evidence to the contrary. *State Farm I*, 2022 WL 1606523, at *22 (referencing Plaintiffs' statement that they "undoubtedly have the ability to pay Defendants' claims, plus any interest owed"). Thus, the district court did not abuse its discretion by not requiring State Farm to post security.

### B.    Federal Arbitration Act

Having determined that the district court's grant of the preliminary injunction meets the standards generally applicable to such provisional relief, we turn to Defendants' remaining contention, that the FAA prohibits injunctions barring them from instituting or proceeding with arbitrations. That is a question of law that we review *de novo*. *See Briggs*, 792 F.3d at 241. Originally enacted in 1925, the FAA aimed to "reverse the longstanding judicial hostility to arbitration

agreements that had . . . been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). Accordingly, Section 2 of the FAA provides that agreements to arbitrate controversies arising out of a contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 of the FAA then "provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration," and Section 4 provides "for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement." *Gilmer*, 500 U.S. at 25; *see also* 9 U.S.C. §§ 3–4. Those provisions evince a "policy [designed] to make arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (internal quotation marks omitted).

New York's No-Fault Act specifies that "[e]very insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) of this section to arbitration pursuant to simplified procedures." N.Y. Ins. Law § 5106(b).

48

The No-Fault Act's implementing regulations further require that insurers include a "[m]andatory personal injury protection endorsement" in their liability policies providing that "[i]n the event any person making a claim for first-party benefits and the [insurer] do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration." N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1. The automobile insurance policies State Farm issued to Defendants' patients complied with the "statutory requirement of providing [State Farm's] insureds with the option to arbitrate the denial of their claims." Tri-Borough Medical Reply Br. at 1.

We apply "a two-part test to determine the arbitrability of claims," considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.* ("*American Express*"), 672 F.3d 113, 128 (2d Cir. 2011). The parties here dispute only the first part of this test, disagreeing about whether the arbitration agreement was "privately negotiated" and therefore valid and enforceable. The Supreme Court has acknowledged that "the purpose behind [the FAA's] passage was to ensure judicial enforcement of privately made agreements to arbitrate," and the FAA

49

therefore provides for the enforcement of "privately negotiated arbitration agreements." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985). That axiom recognizes that "an obligation to arbitrate can be based only on consent," because like any other contract, a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate. *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir. 2008). Thus, it is "essentially only by making a commitment to arbitrate that one gives up the right of access to a court of law in favor of arbitration," which is most frequently done "by entering into an agreement to arbitrate or by entering into a relationship which is *governed* by an agreement to arbitrate." *Id.* (emphasis added).

Here, the district court agreed with State Farm that because the arbitration provision is mandated by New York law, it is not "privately negotiated" and is therefore unenforceable under the FAA. Defendants respond that the arbitration provision is "privately negotiated" because State Farm chose to do business in New York and therefore agreed to be bound by its laws, including the No-Fault Act.

The parties' and district court's focus on the "privately negotiated" requirement, however, is misguided. Because "[p]ersons are generally entitled to

50

have their dispute settled by the ruling of a court of law," the "privately

negotiated" requirement is aimed at ensuring that persons are subjected to

arbitration only if they have *consented* to arbitrate. *See id.* ("It is black letter law

that an obligation to arbitrate can be based only on consent."). In other words,

this requirement is intended to protect parties who may have been coerced or

defrauded into forgoing their opportunity to bring claims in court, not to render

arbitration agreements invalid simply because they were mandated by state

insurance law. *Cf. American Express*, 672 F.3d at 128 (noting that a company had

"consented to arbitrate with its customers" "by virtue of its membership in" a

self-regulatory organization).

 That understanding of the "privately negotiated" requirement finds

further support in other cases concluding that even adhesion contracts containing

arbitration provisions that were offered on a take-it-or-leave-it basis are not

necessarily invalid. *See, e.g.*, *Gilmer*, 500 U.S. at 33 (holding that an arbitration

agreement was enforceable even when an employer required arbitration because

there was no indication that the employee was "coerced or defrauded into

agreeing to the arbitration clause"); *Ragone v. Atl. Video Manhattan Ctr.*, 595 F.3d

115, 122 (2d Cir. 2010) (rejecting the argument that an arbitration agreement was signed under "procedurally unconscionable" conditions because it was offered on a take-it-or-leave-it basis). We have even enforced arbitration agreements against non-signatories in certain situations. *See Ross v. Am. Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007) (noting that this Court has "recognized a number of common law principles of contract law that may allow non-signatories to enforce an arbitration agreement"). Thus, the crux of the "privately negotiated" requirement is to ensure that parties consent to arbitration and are not coerced or defrauded into agreeing to arbitrate.

There was no such coercion here. It is undisputed that State Farm and the insureds knowingly agreed to enter into insurance policies that included a provision to arbitrate certain disputes regarding No-Fault benefits. There is no allegation that the arbitration provision was extracted by fraud, coercion, duress, or in some other unconscionable way that would render the provision invalid. Moreover, State Farm *chose* to do business in New York, and that choice requires it to comply with New York law (including the No-Fault Act). Thus, State Farm and the insureds both "*agreed in advance* to submit such grievances to arbitration," *AT & T Techs., Inc. v. Commc'ns Workers of Am*, 475 U.S. 643, 648–49

52

(1986) (emphasis added), and their relationship is "*governed* by an agreement to arbitrate," *Sokol*, 542 F.3d at 358 (emphasis added).

State Farm would have us hold that an agreement to arbitrate is not "privately negotiated" solely because governing law mandates such arbitration. In its view, and in the view of the district court, an arbitration agreement lacks consent where applicable law requires parties to arbitrate because the provision was not "bargained for." We decline to adopt an interpretation of the "privately negotiated" requirement that would have such sweeping consequences. Not only would such an interpretation call into question the validity of all sorts of arbitration agreements that are required by federal or state law, but those consequences may even extend to other types of contractual terms that are mandated by law. That cannot be what Congress intended in enacting the FAA. Thus, given that both State Farm and the insureds consented to policies that include arbitration provisions, we conclude that the provisions here are "privately negotiated" under the FAA.

But although we depart from the district court's conclusion on this specific issue, we nonetheless agree with the district court that it was permitted to enjoin the arbitrations, notwithstanding the FAA, because of the unique circumstances

in this case. Although the FAA provides for the enforcement of arbitration agreements, *see* 9 U.S.C. §§ 2–4, there are exceptions to that general rule. Developed by the Supreme Court, the "effective vindication" doctrine is a judge-made exception to the FAA that invalidates, "on public policy grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (internal quotation marks, alterations, and emphasis omitted).[8] The "effective vindication" exception to the FAA originated in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, where the Supreme Court noted that although statutory claims can be the subject of arbitration agreements, "not . . . all controversies implicating statutory rights are suitable for arbitration." 473 U.S. 614, 627 (1985). The Court further explained that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the

---

[8] The "effective vindication" doctrine is different from the analysis of whether the FAA's mandate has been overridden by a "contrary congressional command." *See Italian Colors*, 570 U.S. at 233–35 (stating that the Court's "finding of no 'contrary congressional command' does not end the case" as the respondents had also invoked the "effective vindication" doctrine). The Supreme Court has already held that civil "RICO's text and legislative history fail to reveal any intent to override the provisions of the Arbitration Act." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 239 (1987). Thus, we only consider whether the "effective vindication" doctrine applies here.

statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* at 628; *see also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022) ("An arbitration agreement thus does not alter or abridge substantive rights; it merely changes how those rights will be processed."). Therefore, "so long as the prospective litigant *effectively may vindicate* its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi Motors*, 473 U.S. at 637 (emphasis added).

The "effective vindication" exception serves as a way to "reconcile[] the . . . FAA . . . with all the rest of federal law" and "prevent arbitration clauses from choking off a plaintiff's ability to enforce congressionally created rights." *Italian Colors*, 570 U.S. at 240 (Kagan, J., dissenting). The exception therefore furthers the purposes of the FAA, which "reflects a federal policy favoring" the enforcement of valid contracts for arbitration – "that is, arbitration as a streamlined 'method of resolving disputes,' not as a foolproof way of killing off valid claims." *Id.* at 243–44, quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U. S. 477, 481 (1989). The exception accordingly stems from the principle that other federal statutes are on equal footing with the FAA.

Although the Supreme Court has so far declined to apply the "effective vindication" exception in any case before it, it has repeatedly reaffirmed the existence of the exception. *See, e.g., 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273–74 (2009); *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90–91 (2000); *Gilmer*, 500 U.S. at 28; *see also Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 298 (2d Cir. 2013). In *Italian Colors*, for example, plaintiffs argued that "[e]nforcing the waiver of class arbitration bars effective vindication . . . because they have no economic incentive to pursue their antitrust claims individually in arbitration." 570 U.S. at 235. The Supreme Court recognized the existence of the "effective vindication" exception but rejected its application in that case because "the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy." *Id.* at 236 (emphases omitted). But *Italian Colors* did not foreclose application of the doctrine entirely, explaining that the exception "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights" and "would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable." *Id.* Those are but two examples of circumstances where the doctrine may apply, with

56

the key determination being whether "the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." *Mitsubishi Motors*, 473 U.S. at 637.

Since *Italian Colors*, we have applied the "effective vindication" doctrine in other contexts. In *Gingras v. Think Finance, Inc.*, for example, this Court considered arbitration agreements in which "borrowers [we]re forced to disclaim the application of federal and state law in favor of tribal law." 922 F.3d 112, 126 (2d Cir. 2019). We noted that "the Supreme Court has made clear that arbitration agreements that waive a party's right to pursue federal statutory remedies are prohibited," and the arbitration agreements were therefore unenforceable because they appeared to "foreclose [borrowers] from vindicating rights granted by federal and state law." *Id.* at 127, citing *Italian Colors*, 570 U.S. at 235–36. Most recently, this Court applied the "effective vindication" exception in *Cedeno*, where we held that "courts will not enforce provisions in arbitration agreements that prevent a party from effectively vindicating their statutory rights and securing their statutory remedies." 100 F.4th at 396. In *Cedeno* we considered whether an arbitration agreement was unenforceable because it "purport[ed] to limit [employee benefit plan] participants or beneficiaries to seeking relief in

arbitration solely for the benefit of their own individual plan accounts, and preclude[d] relief that would benefit other account holders." *Id.* at 389. Emphasizing that "[a] core concern of the FAA is protecting the enforceability of agreements to vindicate substantive rights through an arbitral *forum* using arbitral *procedures*," we determined that certain provisions of the arbitration agreement there were unenforceable because they waived certain statutory remedies under the Employee Retirement Income Security Act of 1974 and therefore prevented plaintiffs from vindicating their federal statutory rights. *Id.* at 395, 408 (emphases in original).

Bearing in mind a healthy regard for the federal policy in favor of enforcing valid arbitration agreements, we recognize that the "effective vindication" exception applies in rare cases where an arbitration agreement "prevent[s] parties from effectively vindicating their statutory rights." *Id.* at 395. We believe this is just the kind of unusual case the exception intended to address. Among other claims, State Farm brings federal statutory claims under RICO, which can be the subject of arbitration agreements generally. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 238 (1987). Critically, here, State Farm alleges that the thousands of arbitrations, like the state-court proceedings discussed

below, demonstrate a pattern of baseless and repetitive claims that themselves

help to perpetuate and monetize a RICO violation. Specifically, State Farm

contends that Defendants routinely commence frivolous arbitrations after State

Farm denies their claims in order to fraudulently obtain No-Fault benefits that

are then used to finance the RICO scheme. Additionally, because the fragmented

arbitrations often concern a "single bill for a single date of service," State Farm

argues that the arbitrations are intended to obscure the fraud and prevent State

Farm from proving up its claims. Appellees' Br. 19. That renders the arbitrations

effectively powerless to resolve State Farm's RICO claims, both because their

piecemeal nature obscures the alleged massive and complex scheme and because

the pursuit of the arbitrations itself helps to further the RICO scheme. *Cf. Mun*,

751 F.3d at 99 (describing that "[c]omplex fraud and RICO claims . . . cannot be

shoehorned" into "New York's arbitration process for no-fault coverage [which]

is an expedited [and] simplified affair").

Although the *terms* of the arbitration agreement here do not expressly

prohibit State Farm from bringing federal statutory claims, enforcement of the

agreement would have the *effect* of preventing State Farm from effectively

vindicating its RICO claims given the unusual circumstances in this case. *See*

*Cedeno*, 100 F.4th at 395 ("[T]erms in an arbitration agreement that have the *effect* of prospectively waiving a party's statutory remedies are not enforceable." (emphasis added)). Thus, for many of the reasons described in our discussion of the AIA below, we conclude that the arbitrations materially interfere with State Farm's ability to seek relief under RICO, so much so that if the thousands of arbitrations here were allowed to proceed, State Farm would be prevented from "effectively vindicating" its RICO cause of action.[9]

    We recognize the strong federal policy favoring parties' ability to agree on arbitration as a mechanism for dispute resolution. *See Morgan*, 596 U.S. at 418. Ultimately, however, arbitration is an issue of contract, and the "effective vindication" exception intends to balance the liberal federal policy favoring the enforcement of valid arbitration agreements with the recognition that other

---

[9] Moreover, given our conclusion below that the state-court proceedings can be enjoined under a narrow exception to the AIA, Defendants would be left in the anomalous position of contending that private arbitrations are more sacred and protected than state-court proceedings and should therefore not be enjoined. That is an odd position considering the "longstanding public policy against federal court interference with state court proceedings." *Younger v. Harris*, 401 U.S. 37, 43 (1971). In fact, "[s]ince the beginning of this country's history Congress has . . . manifested a desire to permit state courts to try state cases free from interference by federal courts." *Id.* The AIA furthers that objective by generally prohibiting injunctions of pending state-court proceedings subject to narrowly tailored exceptions, including the exception we apply in this case below.

federal statutes are on equal footing with the FAA. It does so by permitting

interference with arbitration in limited circumstances where, as here, arbitration

would deny State Farm the effective vindication of its federal statutory claims

under RICO. We therefore conclude that the "effective vindication" exception to

the FAA applies here, allowing the district court to stay the pending arbitrations

and enjoin any new arbitrations. We emphasize that this case presents unusual

circumstances that drive our conclusion that the "effective vindication" exception

is applicable; namely, the thousands of allegedly baseless arbitrations that help to

further the massive and complex RICO scheme alleged here. Thus, as to

Defendants' appeal, we conclude that the district court did not abuse its

discretion in granting a preliminary injunction barring the arbitrations.

### C.    *Anti-Injunction Act*

Finally, we turn to State Farm's cross-appeal. State Farm contends that the

district court erred in declining to include in the preliminary injunction a

provision enjoining Defendants from proceeding with already-pending

state-court litigation, on the ground that the AIA bars federal courts from

enjoining such state-court proceedings. State Farm argues that various exceptions

to the AIA's general prohibition on such injunctions apply to the unusual facts of

this case. For the reasons set forth below, we agree that one of those exceptions applies here.[10]

Almost as old as the Constitution, the AIA today provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The AIA reflects our "dual system of federal and state courts," and its "core message is one of respect for state courts." *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011) (internal quotation marks omitted). Application of the AIA is limited only by the "three specifically defined exceptions" in the statute that are "narrow," so "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed." *Id.* (internal quotation marks omitted).

In this case, the district court declined to enjoin the pending state-court proceedings, concluding that no exceptions to the AIA apply here. Application of the AIA is a question of law that we review *de novo*. *See Wyly*, 697 F.3d at 137. In

---

[10] The AIA "does not prevent a federal court from restraining a party from instituting future state proceedings," so our discussion of the AIA concerns only the pending state-court proceedings. *Pathways, Inc. v. Dunne*, 329 F.3d 108, 114 (2d Cir. 2003).

its cross-appeal, State Farm contends that the district court erred because the first and second exceptions to the AIA, which respectively allow injunctions of state-court proceedings "as expressly authorized by Act of Congress" or "where necessary in aid of its jurisdiction," 28 U.S.C. § 2283, are applicable. We agree with State Farm that the preliminary injunction here falls within the "expressly-authorized" exception, and we therefore have no occasion to decide whether the second exception also applies.

As mentioned, the first exception to the AIA allows federal courts to enjoin state-court proceedings when "expressly authorized by Act of Congress." *Id.* Although that language would seem to require Congress to have (1) expressly authorized (2) injunctions of state-court proceedings in the relevant federal statute, the Supreme Court held in the seminal case of *Mitchum v. Foster* that "no prescribed formula is required" for the exception to apply, and that the federal statute "need not expressly refer to § 2283" nor "expressly authorize an injunction of a state court proceeding in order to qualify as an exception." 407 U.S. 225, 237 (1972) (internal quotation marks omitted). Instead, for the exception to apply, "Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated

if the federal court were not empowered to enjoin a state court proceeding." *Id.*

*Mitchum* accordingly created a two-part test providing that the "expressly-authorized" exception to the AIA applies if Congress "[1] clearly creat[ed] a federal right or remedy enforceable in a federal court of equity, [2] [that] could be given its intended scope only by the stay of a state court proceeding." *Id.* at 238.

In *Mitchum*, the Supreme Court held that an injunction of state-court proceedings under 42 U.S.C. § 1983 fell within the scope of that exception even when the statute merely authorized suits in equity without any mention of state-court proceedings. *See id.* at 243. In arriving at that conclusion, the Court relied on Section 1983's legislative history which provided that "[t]he very purpose of [Section] 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial." *Id.* at 242 (internal quotation marks omitted). Congress was concerned that "state instrumentalities could not protect" the federally created rights, highlighting that both state officers and courts might "be antipathetic to the vindication of those rights." *Id.* More specifically, proponents of Section 1983 had "noted that state courts were being used to harass and injure

individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights." *Id.* at 240. Based on that legislative history, the Supreme Court concluded that injunctions of state-court proceedings under Section 1983 fell within the "expressly-authorized" exception to the AIA. *See id.* at 243.

Since *Mitchum*, the Supreme Court has addressed that issue only in *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977). In *Vendo*, the Court split three ways on whether Section 16 of the Clayton Act fell within the "expressly-authorized" exception. *See id.* Section 16 of the Clayton Act authorizes federal courts to issue injunctions against the "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. Justice Rehnquist authored the lead plurality opinion in *Vendo* and was joined by Justices Stewart and Powell in concluding that even though Section 16 satisfied the first part of the *Mitchum* test as a uniquely federal right or remedy, the statute failed the second part of the test because the Clayton Act could be given its intended scope without staying the state-court proceedings there. 433 U.S. at 632–33 (plurality opinion). The plurality distinguished *Mitchum* by noting that unlike Section 1983, the Clayton Act's legislative history lacked concern about the "possibility that state-court proceedings would be used to

violate the Sherman or Clayton Acts" and that "Congress in no way focused upon a scheme using litigation in the state courts." *Id.* at 634.

Justice Rehnquist's view, however, failed to command a majority of the Court. Instead, a majority of the Court concluded that an injunction of state-court proceedings under Section 16 of the Clayton Act *could* fall within the scope of the "expressly-authorized" exception under "narrowly limited circumstances" that were not present in *Vendo*. *Id.* at 643–45 (Blackmun, J., concurring). Those circumstances include where the "pending state-court proceedings . . . are themselves part of a pattern of baseless, repetitive claims that are being used as an anticompetitive device, all the traditional prerequisites for equitable relief are satisfied, and the only way to give the antitrust laws their intended scope is by staying the state proceedings." *Id.* at 644 (internal quotation marks omitted). In other words, Justice Blackmun, joined by Chief Justice Burger, concluded in a concurring opinion that where the state-court proceedings furthered an antitrust violation, they could be enjoined to give the antitrust laws their full scope. *See id.* at 644–45. Similarly, the dissent, authored by Justice Stevens and joined by Justices Brennan, White, and Marshall, agreed that "[Section] 16 of the Clayton Act . . . expressly authorizes an injunction against a state-court proceeding which

violates the antitrust laws." *Id.* at 654–56, 660–61 (Stevens, J., dissenting). Six

Justices, therefore, agreed that an injunction of state-court proceedings under

Section 16 of the Clayton Act would fall within the "expressly-authorized"

exception where multiple frivolous proceedings further a violation of the

antitrust laws.

Those six Justices disagreed only on whether the facts in *Vendo* satisfied

that standard. Justice Blackmun's concurrence concluded that the "expressly-

authorized" exception did not apply in *Vendo* because there was no "pattern of

baseless, repetitive claims" with "[o]nly one state-court proceeding . . . involved

in th[e] case." *Id.* at 644–45 (Blackmun, J., concurring) (internal quotation marks

omitted). The dissenters, in contrast, would have found the injunction proper

even on those facts. *See id.* at 661–62 (Stevens, J., dissenting). But that

disagreement should not obscure the fact that a solid, six-Justice majority of the

*Vendo* Court agreed that the "expressly-authorized" exception applied at least

where pending state-court proceedings were "themselves part of a pattern of

baseless, repetitive claims" that furthered a violation of a federal statute that

authorized equitable relief[11] *Serrano* at 644 (Blackmun, J., concurring) (internal quotation marks omitted).

In pre-*Mitchum* cases, this Court had similarly concluded that the "expressly-authorized" exception applies where the state-court proceedings themselves further a violation of the federal statute at issue. For example, in *Studebaker Corp. v. Gittlin*, we held that Section 21(e) of the Securities Exchange Act expressly authorized an injunction of a state-court proceeding where that proceeding furthered a violation of the securities laws. *See* 360 F.2d 692, 697-98 (2d Cir. 1966); *Vernitron Corp. v. Benjamin*, 440 F.2d 105, 108 (2d Cir. 1971) (explaining that the "expressly-authorized" exception applied in *Studebaker* because "the prosecution of the state action there . . . would itself have furthered the violation of the Securities Exchange Act"). Although we have not subsequently specifically opined on the narrow path carved by *Vendo*, we now

---

[11] Justice Blackmun's concurrence controls because it took the narrowest ground to decide the case. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks omitted)); *see also Trustees of Carpenters' Health & Welfare Tr. Fund of St. Louis v. Darr*, 694 F.3d 803, 809 (7th Cir. 2012) (describing Justice Blackmun's concurrence in *Vendo* as the "controlling opinion").

join a number of our sister circuits in acknowledging the existence of that path

for unusual cases involving a pattern of baseless state-court proceedings that

further a violation of the relevant federal statute.[12] *Cf., e.g., 1975 Salaried Ret. Plan*

*for Eligible Emps. of Crucible, Inc. v. Nobers*, 968 F.2d 401, 409 (3d Cir. 1992); *Vill. of*

*Bolingbrook v. Citizens Utils. Co. of Illinois*, 864 F.2d 481, 483 (7th Cir. 1988); *Los*

*Angeles Mem'l Coliseum Comm'n v. City of Oakland*, 717 F.2d 470, 472 (9th Cir.

1983).

Applying *Mitchum* and *Vendo*, we agree with State Farm that a preliminary

injunction of the hundreds of pending state-court proceedings here falls within

the "expressly-authorized" exception to the AIA. Under the *Mitchum* test, we first

consider whether RICO is a "specific and uniquely federal right or remedy,

enforceable in a federal court of equity." 407 U.S. at 237. The RICO statute

provides for private civil actions by "[a]ny person injured in his business or

property by reason of a violation of section 1962 of this chapter" and specifies

---

[12] There are some similarities between the *Vendo* concurrence's narrow path for allowing an injunction of state-court proceedings under the "expressly-authorized exception" to the AIA and the "effective vindication" exception to the FAA which renders certain arbitration agreements unenforceable. Both approaches are driven by concerns of affording federal statutes their full force and effect and apply in rare circumstances where state litigation or arbitration may prevent that.

that "district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962." 18 U.S.C. § 1964(a), (c). We have accordingly held that "a federal court is authorized to grant equitable relief to a private plaintiff who has proven injury" under RICO. *Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016); *see also Gingras*, 922 F.3d at 124 ("RICO authorizes private rights of action for injunctive relief.").

Substantively, RICO makes it unlawful, *inter alia*, "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt" or to conspire to do so. 18 U.S.C. § 1962(c)–(d). RICO was the "culmination of some two decades of Congressional concern about the infiltration of legitimate businesses by organized crime." *United States v. Ivic*, 700 F.2d 51, 62 (2d Cir. 1983), abrogated on other grounds by *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994). The statute thus reflects "Congress'[s] undeniable desire to strike at organized crime" and was a broad and "aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 494, 498 (1985). RICO was specifically "designed to remedy injury caused by

70

a pattern of racketeering, and concepts such as RICO 'enterprise' and 'pattern of racketeering activity' were simply unknown to common law." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 149–50 (1987) (internal quotation marks and alterations omitted); *see also Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) ("[T]he purpose of civil RICO liability does not extend to deterring any illegal act such as retaliatory firings for which there are state and common law remedies."). Accordingly, RICO creates a uniquely innovative federal remedy that did not exist at common law.

Importantly, RICO's legislative history demonstrates that Congress modeled civil RICO on the Clayton Act, *see Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023) (noting the legislative history), cert. granted on other grounds, 144 S. Ct. 1454 (2024), which all the Justices in *Vendo* agreed was a specific and uniquely federal right or remedy, *see* 433 U.S. at 632 (Rehnquist, J., joined by Stewart, J., and Powell, J.); *id.* at 643-644 (Blackmun, J., concurring, joined by Burger, C.J.); *id.* at 656-57 (Stevens, J., dissenting, joined by Brennan, J., White, J., and Marshall, J.). The Supreme Court has stressed that the "close similarity of [RICO and the Clayton Act] is no accident" as the "'clearest current' in the legislative history of RICO 'is the reliance on the Clayton Act model,'"

71

which applies antitrust concepts to target widespread organized crime. *Agency Holding*, 483 U.S. at 151, quoting *Sedima*, 473 U.S. at 489. Civil RICO and the Clayton Act thus share "similarities in purpose and structure" and "aim to compensate the same type of injury." *Id.* at 151–52.

Moreover, RICO's legislative history reveals that in adopting the RICO statute, Congress was animated by concerns similar to those underlying 42 U.S.C. § 1983 that *Mitchum* found persuasive. One of the major studies that shaped RICO was produced in 1967 by the Katzenbach Commission, which undertook a comprehensive inquiry into the problem of organized crime and made recommendations to address it. *See* President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* (1967). The report emphasized the dangers of organized crime infiltrating legitimate institutions, with one of the principal findings being that organized crime had "corrupted police officials, prosecutors, legislators, judges, . . . and other public officials, whose legitimate exercise of duties would block organized crime and whose illegal exercise of duties helps it." *Id.* at 191. Later, the chief proponents of RICO similarly highlighted the corruption of governmental actors, noting that "wherever organized crime exists, it corrupts public officials and wields

72

extensive political influence which insulate its activities from governmental interferences." 116 Cong. Rec. S601 (daily ed. Jan. 21, 1970) (statement of Sen. Roman Hruska). In other words, "[e]ven the judiciary is not beyond reach." *Id.* at S596 (statement of Sen. John L. McClellan).

RICO's legislative history thus reflects Congress's concern that the state courts might be ineffective against a racketeering enterprise, principally because of the possible involvement of state courts in organized crime. Although there are no allegations of state judicial corruption here, RICO's legislative history shows that Congress was nonetheless concerned about state courts being *used* to further a violation of RICO and accordingly contemplated that state-court proceedings could be enjoined to "prevent and restrain violations" of RICO. 18 U.S.C. § 1964(a). That history is similar to that of 42 U.S.C. § 1983, which evinced concern that "state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights," *Mitchum*, 407 U.S. at 240, and accordingly authorized equitable relief. Therefore, the similarities between RICO's purpose and function and those of the Clayton

Act and 42 U.S.C. § 1983 bolster our conclusion that RICO is a sufficiently specific

and unique federal remedy under the first part of the *Mitchum* test.[13]

---

[13] Defendants argue that because there is concurrent jurisdiction over civil RICO claims in state and federal courts, it is not a uniquely federal right or remedy. Even assuming, for the sake of argument, that exclusive federal jurisdiction is *sufficient* to satisfy the first part of the *Mitchum* test, we conclude that it is not *necessary*. In the only binding precedent from the Supreme Court on that issue, *Mitchum* did not identify any such requirement and concluded that an injunction of state-court proceedings under 42 U.S.C. § 1983, a cause of action that can be brought in both federal and state court, fell within the "expressly-authorized" exception. *See* 407 U.S. at 242-43. *Mitchum* analyzed the purpose and legislative history of Section 1983 to reason that it was a specific and uniquely federal right or remedy. *See id.* at 238–42. We do the same. We acknowledge that the plurality in *Vendo* stated that Section 16 of the Clayton Act met the first part of the test "in that actions based upon it may be brought only in the federal courts," 433 U.S. at 632 (plurality opinion), but that opinion is not controlling for the reasons described above. *See supra* note 11. The *Vendo* concurrence, which *is* the controlling opinion, does not require that there be exclusive federal jurisdiction to conclude that Congress intended to create a uniquely federal right or remedy. *See* 433 U.S. at 643–45 (Blackmun, J., concurring). Moreover, the *Vendo* plurality uses the phrase "in that" to describe why the Clayton Act's exclusive federal jurisdiction means that it satisfied the first part of the *Mitchum* test. *Id.* at 632 (plurality opinion). "In that," however, is "used to introduce a statement that explains or gives more specific information" about a prior statement. *In That*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/in%20that (last visited July 17, 2024). That definition does not suggest that the *Vendo* plurality believed that exclusive federal jurisdiction was *necessary* to satisfy the *Mitchum* test. Thus, we disagree with the district court and Defendants that *Mitchum* requires exclusive federal jurisdiction for Congress to have created a uniquely federal right or remedy.

Turning to the second part of the *Mitchum* test, we conclude that RICO could be given its intended scope only by a stay of the hundreds of pending state-court proceedings here. As discussed in detail above, a majority of the Supreme Court in *Vendo* believed that, where multiple meritless proceedings are a part of a scheme to violate the relevant federal law in order to give that law its intended scope, an injunction of state-court proceedings could fall within the "expressly-authorized" exception. *See* 433 U.S. at 643–45 (Blackmun, J., concurring); *id.* at 645–66 (Stevens, J., dissenting). Per Justice Blackmun's controlling opinion, the narrow path carved by *Vendo* applies only in rare circumstances where the state-court proceedings are "themselves part of a pattern of baseless, repetitive claims that are being used" to further a violation of the relevant federal law. *Id.* at 644 (Blackmun, J., concurring) (internal quotation marks omitted). The instant action presents exactly the kind of injunction that a majority of the *Vendo* Court had contemplated could fall within the "expressly-authorized" exception.

Here, State Farm contends that "Defendants are using a pattern of baseless state no-fault proceedings to monetize and perpetuate their violations of RICO" in order "to harass and injure" State Farm. Appellees' Br. 64. State Farm

elaborates that "the state-court litigation is a component of the overall fraud scheme alleged in the federal action; it is Defendants' means of collecting on their fraudulent claims for reimbursement and provides a financial lifeline for their scheme." *Id.* Thus, State Farm alleges that the hundreds of frivolous state-court proceedings *themselves* help to further the RICO violation because Defendants use the fraudulently obtained No-Fault benefits from those proceedings to continue financing their scheme, thereby constituting a "pattern of baseless, repetitive claims." *Vendo*, 433 U.S. at 644 (Blackmun, J., concurring) (internal quotation marks omitted).

We agree with State Farm that the unusual circumstances here fall squarely within *Vendo*. The state-court proceedings further the alleged RICO violation in two key ways. First, the proceedings help finance the purported scheme because whenever State Farm denies claims for No-Fault benefits, Defendants typically commence allegedly baseless litigation in state court (or arbitration actions) to fraudulently obtain the benefits. Second, because the state-court proceedings often concern individual claims, the piecemeal nature of those proceedings obscures the overall complex scheme, which becomes apparent only when one zooms out to view the alleged predetermined treatment protocols and "pay-to-

76

play" arrangements relevant to several claims. In other words, State Farm plausibly argues that the state courts are unlikely to even recognize the alleged massive RICO scheme because those proceedings often concern individual claims. That renders the "state courts . . . powerless to stop" the alleged RICO violations which the state-court proceedings help monetize and sustain. *Mitchum*, 407 U.S. at 240.

We thus conclude that state litigation of the kind alleged here – involving hundreds of baseless state-court proceedings that are part of a massive fraudulent scheme – may itself further a RICO violation, which in this case consists of alleged repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341.[14] If the pending state-court proceedings are allowed to continue, State

---

[14] We do not determine whether the state-court proceedings here constitute predicate acts under RICO, as the parties do not address that issue, and it is not necessary for us to reach. That said, we briefly address some general points relevant to that issue. This Court held in *Kim v. Kimm* that "allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act." 884 F.3d 98, 104 (2d Cir. 2018). Because the plaintiff there had alleged that the defendant "engaged in a *single* frivolous, fraudulent, or baseless lawsuit," we determined that "such litigation activity *alone* cannot constitute a viable RICO predicate act." *Id.* at 105 (emphases added). We declined, however, "to reach the issue of whether all RICO actions based on litigation activity are categorically meritless." *Id.* The instant action is distinguishable from *Kim*. State Farm does not appear to contend that the state-court proceedings here are predicate acts under 18 U.S.C. § 1961(1), but instead that they help further the RICO violation, which consists of a pattern of

Farm faces the irreparable harm of never having a forum to demonstrate the

existence of Defendants' alleged RICO scheme. Thus, the only way to give RICO

its intended scope in the specific circumstances here is by staying the pending

state-court proceedings.

Given that both parts of the *Mitchum* test are therefore satisfied, we

conclude that enjoining the pending state-court proceedings here falls within the

"expressly-authorized" exception to the AIA. We again note that our decision

today is narrow and limited to the unusual circumstances alleged here, which

involve a massive scheme including hundreds of purportedly meritless state-

court proceedings that help further a RICO violation, such that RICO can only be

given its intended scope if those proceedings are enjoined.[15]

## CONCLUSION

We have considered all of the parties' remaining arguments and conclude

that they are without merit. For the foregoing reasons, we **REVERSE** the district

racketeering activity under the mail fraud statute through other fraudulent
activities alleged in the complaint. In other words, the issue is not whether the
state-court proceedings are *themselves* predicate acts, but rather that they are
allegedly designed to perpetuate and monetize the RICO scheme for the reasons
described above. Thus, we need not consider whether the state-court proceedings
are themselves predicate acts.

[15] We leave it to the district court on remand to craft the particular terms of the
appropriate injunction.

court's orders declining to enjoin the pending state-court proceedings, **AFFIRM**

its orders in all other respects, and **REMAND** the matter for further proceedings

consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

79