December 5, 2024

**VIA ECF**

Hon. Peggy Kuo, U.S.M.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *State Farm Mut. v. Metro Pain*, 1:21-cv-05523 - Joint Ltr. re Discovery Issues

Dear Judge Kuo:

    This firm is counsel to non-party Nazar Burak ("Movant") in regards to multiple subpoenas served on him by Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "Plaintiffs") in this matter. Pursuant to this Court's Individual Practice Rule VI.A.1, Plaintiffs and Movant respectfully write to request the Court's assistance in addressing an outstanding discovery issue regarding the most recent subpoena directed to Movant, dated November 8, 2024. The parties have met and conferred and have been unable to resolve the issues. At issue is whether the Court should quash Plaintiffs' subpoena to Movant demanding tax returns from 2016 through present of multiple entities owned by Movant.[1]

## Relevant Background

    This case was commenced by Plaintiffs on October 5, 2021 against multiple medical practices and individuals, alleging a range of fraud claims in relation to no-fault insurance benefits. *See* ECF Dkt. No. 1. Plaintiffs previously subpoenaed Movant on April 17, 2024, in an effort to obtain financial documentation regarding multiple entities owned by Movant. A copy of the April 17, 2024 subpoena is attached hereto as **Exhibit A**. Movant responded to the subpoena and provided financial and other records in his possession custody and control. Thereafter, Plaintiffs provided Movant's counsel with a second subpoena dated November 8, 2024. A copy of the November 8, 2024 subpoena is attached hereto as **Exhibit B**. It demands tax returns for eight (8) entities owned by Movant: MNBT Corp; MDNN Corp.; NBPB Corp; Lestat Corp.; Nimax Group Corp.; Expedited Services LLC; Spetsnaz LLC; and ELP Services LLC (collectively, the "Burak Entities").

## Movant's Position

    The November 8, 2024 subpoena demands copies of "all state and federal tax returns filed by or on behalf" of eight (8) entities owned by Movant, from November 1, 2016 to the present. These demands are not proportional to the needs of the case, and Plaintiffs already possess the information being sought in the subpoena. For these reasons, the subpoena should be quashed.

---

[1] Plaintiffs respectfully seek leave *nunc pro tunc* to submit this oversized brief. Additional pages are required due to the complexity of the issues raised herein. Movant does not object to Plaintiffs' request.

Tax returns constitute "other protected matter" under Rule 45(d)(3)(A)(iii). *Ellis v. City of New York*, 243 F.R.D. 109, 111–12 (S.D.N.Y. 2007) ("[C]ourts have been reluctant to require disclosure of tax returns because of both the private nature of the sensitive information contained therein and the public interest in encouraging the filing by taxpayers of complete and accurate returns." (quoting *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06-CV-6198, 2007 WL 1521117, at *7 (S.D.N.Y. May 24, 2007))). Thus, courts "have imposed a heightened standard for the discovery of tax returns." *New Falls Corp. v. Soni*, No. 16-CV-6805, 2020 WL 2836787, at *7 (E.D.N.Y. May 29, 2020).

A party seeking the production of tax returns must satisfy a two-part test: (1) the tax returns must be relevant to the subject matter of the action, and (2) a compelling need must exist because the information is not readily obtainable from a less intrusive source. *See Grabis v. Navient Sols., LLC*, Case No. 13-10669-JLG (Bankr. S.D.N.Y. Nov. 20, 2018) (citing *Sadofsky v. Fiesta Prods.*, LLC, 252 F.R.D. 143, 150 (E.D.N.Y. 2008). Courts in this jurisdiction have held that a "compelling need does not exist where the requesting party is in possession of financial documents from which the information sought may be obtained readily, even where the requesting party may need to compile numerous records in its possession to ascertain the information sought from the tax returns." *Grant v. HER Imps. NY, LLC*, No. 15-CV-5100 (DLI) (LB), 2018 WL 1686103 at *10 (E.D.N.Y. Mar. 20, 2017). Further, "[d]epositions have been considered a less intrusive source for obtaining such information." *Id*. *See also* C*aputi v. Topper Realty Corp.*, No. 14-cv-2634 (JFB) (SIL), 2015 WL 893663, at *2 (E.D.N.Y. Feb. 25, 2015) (denying motion to compel tax returns where movant failed to demonstrate relevance since non-movant already disclosed W-2s for the relevant time period and there was no other relevant information movant could retrieve from the requested tax returns); *Bhatt v. Patel*, No. 18-CV-2063 (ILG) (SJB), 2020 WL 13048694, at *3 (E.D.N.Y. Oct. 19, 2020) (granting motion to quash where it was unclear how a non-party's tax return could shed light on plaintiff's hours' worked or wages in a wage and hour violations case).

Plaintiffs have already obtained financial records from Movant's entities. Unlike in *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 2017 WL 176403, at *3 (E.D. Mich. Nov. 3, 2017), where the Plaintiff had only received redacted and incomplete tax returns, Movant has supplied additional records including invoices. As stated above, Movant responded to Plaintiffs' April 17, 2024 subpoena with documents in his possession custody and control. Also, Plaintiffs have already subpoenaed Movant's entity's bank accounts. On October 16, 2024 Plaintiffs subpoenaed both TD Bank and Popular Bank demanding bank records for the same eight (8) entities owned by Movant. A copy of the October 16, 2024 subpoenas are attached hereto as **Exhibit C** and **Exhibit D**. For State Farm to insist on reviewing the tax returns, without ascertaining if the bank records contain the information they are seeking, is improper. In *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., Inc.*, 2006 WL 2460641, at *1–2 (E.D.N.Y. Aug. 23, 2006), also cited by the Plaintiffs, the court explicitly noted that the bank records did not provide the information that the Plaintiffs were seeking. No such finding has been made here. Finally, Plaintiffs are scheduled to depose Movant on December 18, 2024.

Plaintiffs cannot establish what, if any, additional information Plaintiffs will receive from attaining the tax statements. Movant is not a defendant in this lawsuit. The records already received by Plaintiffs' counsel would provide the appropriate information that Plaintiffs are seeking – that is, to establish the movement of funds between Movant's entities and parties to this

2

lawsuit.  To now seek Movant's tax returns — is simply improper and doesn't meet the high threshold imposed by Courts regarding same.

### Plaintiffs' Position

The Burak Entities' tax returns are highly relevant and there is a compelling need for their production.  Discovery has revealed these entities received more than $20 million from entities owned or controlled by defendants Dr. Regina Moshe, Reuven Alon, Yan Moshe, and their family members ("Defendants").  They are funded almost entirely by Defendants, who account for more than 96% of the Burak Entities' receipts.  The Burak Entities purport to provide transportation for patients and construction services for defendant Moshe's real estate empire.  But money flows out of the Burak Entities in ways inconsistent with legitimate businesses — i.e., converted to cash or other untraceable assets, as casino gambling transfers, and in sequentially numbered checks to individuals who convert those checks to cash.  Plaintiffs subpoenaed financial records from the Burak Entities and intend to depose Burak.  But the Burak Entities did not produce, and claim not to have, any of the financial records normally associated with a legitimate business operation.  Accordingly, the tax returns have become the only business record from which Plaintiffs may be able to discern key information about the Burak Entities and their role.  Plaintiffs ask that the tax returns' production be required prior to the Burak deposition scheduled for December 18, 2024.

The Burak Entities appear to have been used to siphon more than $20 million in proceeds out of the scheme, hide the flow of money, and make those funds available to the scheme's participants to further the fraud.  The SAC alleges, among other things, defendants Moshe, Alon, Dr. Moshe, and others operate the Metro Pain and Citimedical Clinics and steer patients to defendant ambulatory surgery centers and a hospital owned by Moshe for surgical procedures and related services. Moshe is also alleged to secretly own the Citimedical Clinics and to extract proceeds from those clinics, including through payments for rent, renovations, maintenance, and repair of buildings he owns and from which the Citimedical Clinics operate.  Burak is a nonparty who owns the Burak Entities — five companies that purportedly transport patients to and from clinic locations and the Moshe ASCs, and three construction companies involved in the renovation, maintenance, and repair of Moshe's buildings out of which the Citimedical Clinics and other defendants operate.

Plaintiffs initially subpoenaed financial records from the eight Burak Entities.  After initially failing to respond, which required a motion to compel [Dkt. 616], on behalf of all eight entities Burak produced a total of 1,685 pages consisting of: certificates of incorporation for each of the eight entities, some invoices and records of payments on those invoices for five entities, some W-2s and 1099s for two entities, billing agreements for two entities, and three pages of invoices for billing services provided to one entity.  For three of the entities, the only records provided were the certificates of incorporation.  Burak claims not to have any other records, including any of the basic business records that any functioning business should have, such as records of receipts and disbursements, general ledgers, employment records, and records related to corporate formalities

3

and ownership. Burak claims he deletes business-related communications shortly after receiving them, and therefore has no electronic communications.[2]

Given the dearth of business records, Plaintiffs subpoenaed bank records. These records established the Burak Entities received over $20 million from Defendants and Defendant-owned entities, Defendants funded the Burak Entities by accounting for 96% of their receipts, and large sums flowed out of the Burak Entities through transactions inconsistent with the operation of legitimate transportation or construction companies. The Burak Entities appear to incur only intermittent or nominal expenses for equipment, materials, vehicles, office space, gas, tolls, or parking. Rather, their financial transactions often appear designed to hide the intended recipient and purpose. For example, bank records reflect $1.54 million in cash withdrawn at ATMs and banks, $2.11 million in checks to individuals that were converted to cash at check cashing facilities, $1.53 million in gambling related transfers, and more than 2,400 purchases of exactly $106.61 or multiples thereof at Apple.com including multiple instances in which more than 20 such purchases were made on a single day.

The three Burak Entities engaged in construction and one of his transportation companies made payments to Isaias Barrera Perez who testified his construction companies worked exclusively for Burak. But Perez had no recollection of three of them, Spetsnaz, ELP Services, or Lestat, who owned them or what services he provided to them in exchange for more than $128,000 they paid him. *See* Ex. E at 200:23–206:2 (Perez Tr.); Ex. F (Perez Exs. 180–181). According to Perez, Burak personally handed him checks, more than $7.5 million of which Perez cashed. Perez described occasions in which Burak handed him eight checks from an account of Expedited Services totaling $198,400, directed Perez to convert the checks to cash at a check cashing facility, and then met Perez at remote locations to receive the cash, including on the street and in a parking lot. *See* Ex. E at 193:8–200:20 (Perez Tr.). The Expedited Services checks were sequentially numbered, but dated out of order in an apparent effort to conceal their true purpose (e.g., Check No. 1210 for $24,800, dated 6/1/2022; Check No. 1211 for $25,600, dated 6/2/2022; Check No. 1212 for $23,400, dated 6/1/2022; Check No. 1213 for $24,600, dated 6/1/2022). *See* Ex. G (Perez Exs. 178–179). The source of these checks, Expedited Services, may be linked to defendant Moshe and used by Moshe to generate cash. When the balance on the Expedited Services account gets low, it is replenished with funds from Moshe entities and shortly after being deposited those funds leave the account, including through checks converted to cash.[3]

Against this backdrop, tax returns for the Burak Entities can provide critical information not otherwise available to understand the entities and their roles. A legitimate business would typically have records reflecting the source and category of receipts; the nature, amount and category of

---

[2] Burak also failed to produce any records for his entity Azan Group Corp., which received more than $6.2 million from defendants since June 2021. Azan Group Corp. is not at issue in this letter because Plaintiffs did not discover its existence until after serving the subpoena at issue.

[3] Moshe entities routinely funded the Expedited Services account. For example, on June 1, 2022, when the Expedited Services account balance was less than $400, Expedited Services deposited two sequentially numbered checks from Moshe entity defendant Integrated Specialty, two sequentially numbered checks from Moshe entity defendant SCOB, and one check from Moshe entity Hudson Regional Hospital totaling $338,000. Then, on June 22, 2022, when the Expedited Services' account balance had fallen to below $200, it replenished its account with $355,000 in payments from Moshe Facilities. Between these two rounds of deposits, money flowing out of the account included ten checks to BIP Services Corp. and W-MT Group Inc. each of which was converted to cash totaling $298,400.

expenses; and documentation of business transactions. The inflow and outflow of funds would also be consistent with the needs of a legitimate business. Here, the complete absence of ordinary business records means Plaintiffs cannot establish or confirm whether the entities are engaged in legitimate construction or transportation services or, as appears more likely, functioning as a pass through to launder proceeds of Defendants' scheme and generate cash. Plaintiffs cannot, and should not, be required to rely on the testimony of Burak. His businesses keep staggeringly incomplete records and engage in highly suspicious transactions with Defendants involving significant amounts of cash. As his entities are almost exclusively funded by Defendants, he is not only intimately involved in Defendants' conduct, but financially dependent on them. There can be no expectation he will testify truthfully and completely. Under such circumstances, the tax returns are critical and likely to be the only source of several key pieces of information, including but not limited to: (1) the amount of annual income for each entity and how that income is categorized; (2) the amount claimed in expenses and how those expenses are categorized, which is particularly significant given the many expenditures made for questionable purposes such as cash conversions, casino transfers, and payments through Apple.com, and the intermittent or nominal expenditures for items one would expect, such as equipment, materials, gas, vehicles or office space; (3) the amounts attributed to purported wages, which is particularly significant given the likely claim workers were paid in cash, (4) the identity of owners, who received distributions, and the amount of distributions, which is important because significant outflows in cash went to untraceable sources and it is likely someone other than Burak benefitted from the businesses; (5) the official and represented business address for each entity, which is important as the entities appear to claim multiple addresses and are likely linked to addresses owned or controlled by Moshe;[4] and (6) the accountant who prepared the returns, which may be shared with Defendants, providing further evidence of their connection to Defendants. Indeed, the tax returns are likely to be the only documents summarizing the operations of the Burak Entities and will constitute Burak's representation under applicable statutory penalties to the federal government regarding those operations.

In similar circumstances involving significant movement of money, payments to advance a scheme, and the lack of other records, courts have found a compelling need for production of tax records. *See State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 2017 WL 176403, at *2 (E.D. Mich. Nov. 3, 2017) (ordering production of nonparty tax returns and ledgers); *see also State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., Inc.*, 2006 WL 2460641, at *1–2 (E.D.N.Y. Aug. 23, 2006) (ordering production of third party financial records, including tax returns, as relevant to health-care-fraud scheme). These documents are critical to "establish[ing] who actually owns [the Burak Entities] and purportedly works there, which is critical to unraveling the relationships between Defendants and third parties involved in the scheme." *Pointe*, 2017 WL 5176403, at *3. Indeed, as described above, information to date indicates Burak's corporate entities operate as an extension of the alleged RICO enterprise. To the extent Burak has concerns regarding the disclosure of sensitive information in the tax returns, he may designate them confidential under the Confidentiality Order entered in this matter [Dkt. 229].

Accordingly, any motion to quash should be denied.

---

[4] Burak produced business agreements for only two entities. These identify a business address shared by Moshe entity defendant Hudson Regional Hospital. But the certificates of incorporation for these entities reflect completely different addresses.

                                                Respectfully submitted,

                                                ***/s/ Anthony M. Juliano***

                                                Anthony Juliano

AJ:nr