# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company, | ) ) ) ) | Case No. 1:21-cv-05523-MKB-PK |
| Plaintiffs, | ) ) ) | Hon. Margo K. Brodie |
| v. | ) ) | Magistrate Judge Peggy Kuo |
| Metro Pain Specialists, P.C., et al., | ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS
## AGAINST DEFENDANT YAN MOSHE

## TABLE OF CONTENTS

Page

I. BACKGROUND ...............................................................................................................1

    A. Defendants Defrauded Plaintiffs into Paying More than $22 Million in Insurance Benefits Through the Submission of Fraudulent Bills ...........................1

    B. Moshe Intentionally Destroyed Emails......................................................................3

        1. Moshe Was Well Versed in Civil Litigation and Preservation Requirements ...................................................................................................3

        2. Moshe's yanmoshe@yahoo.com Email Account ......................................5

        3. Moshe's Claimed Unique "Preservation" Practice ...................................5

        4. Discovery to Obtain Emails.......................................................................7

        5. Email Destruction and First Spoliation Hearing........................................8

        6. Plaintiffs' Efforts to Address Missing Emails ...........................................8

        7. Destruction of Emails in yanmoshe@yahoo.com Account Becomes Clear .........................................................................................................10

        8. Second Order Required for Moshe's Limited Deposition ........................11

        9. Moshe's "Special Process" to Collect the yanmoshe@yahoo.com Emails .....................................................................................................12

        10. Moshe's Non-Credible Explanations for Missing Emails ........................13

        11. Plaintiffs' Efforts to Recover Missing Emails from Other Sources ..........14

II. LEGAL STANDARD......................................................................................................15

III. ARGUMENT..................................................................................................................16

    A. Moshe Not Only Failed to Take Reasonable Steps to Preserve ESI, He Intentionally Deleted It .........................................................................................16

    B. The Lost ESI Cannot Be Restored or Replaced Through Additional Discovery ...............................................................................................................20

    C. Moshe Acted With the Intent to Deprive Plaintiffs of the Use of the Information Contained in the ESI in this Case .........................................................21

       D.     Plaintiffs Have Been Prejudiced by the Loss of the ESI ......................................24

       E.     Plaintiffs Seek Sanctions for Moshe's Spoliation of the ESI ..............................28

IV.    CONCLUSION.................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Sonotec*,
   2025 WL 2614993 (E.D.N.Y. Sep. 10, 2025)................................................................21, 31

*Arista Recs. LLC v. Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009)................................................................................32

*Coan v. Dunne*,
   602 B.R. 429 (D. Conn. 2019)...........................................................................................28

*Gutman v. Klein*,
   2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008)....................................................................31

*Karsch v. Blink Health Ltd.*,
   2019 WL 2708125 (S.D.N.Y. June 20, 2019) ...................................................................21

*Miller v. Time-Warner Commc'ns, Inc.*,
   1999 WL 739528 (S.D.N.Y. Sep. 1999).............................................................................31

*PDV USA, Inc. v. Interamerican Consulting Inc.*,
   2026 WL 203036 (S.D.N.Y. Jan. 27, 2026) ............................................................. *passim*

*Prelvukaj v. Naselli*,
   2023 WL 3570659 (E.D.N.Y. May 18, 2023) ...............................................15, 20, 24, 28

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010)...............................................................................................30

*State Farm Mut. Auto. Ins. Co. v. Grafman*,
   274 F.R.D. 442 (E.D.N.Y. 2011) .......................................................................................30

*StoneX Grp., Inc. v. Shipman*,
   2024 WL 1509346 (S.D.N.Y. Feb. 5, 2024).................................................................24, 25

*StoneX Grp., Inc. v. Shipman*,
   2024 WL 3356989 (S.D.N.Y. July 10, 2024) ...............................................................30, 31

*West v. Goodyear Tire & Rubber Co.*,
   167 F.3d 776 (2d Cir. 1999)...........................................................................................16, 28

**Rules**

Fed. R. Civ. P. 37(e)(1)................................................................................................15, 24

iii

Fed. R. Civ. P. 37(e)(2) .................................................................................................... *passim*

Case 1:21-cv-05523-MKB-PK    Document 730    Filed 04/13/26    Page 5 of 38 PageID #: 11333

Pursuant to Federal Rule 37(e), Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "Plaintiffs") seek sanctions for the spoliation of evidence by Defendant Yan Moshe ("Moshe").  Moshe not only failed to take reasonable steps to preserve electronically stored information in his personal email account, yanmoshe@yahoo.com, he intentionally deleted evidence relevant to and supportive of Plaintiffs' claims against him with intent to deprive Plaintiffs of the information's use.  As the information cannot be obtained from another source through discovery, the elements of Rule 37(e)(2) are met and the Court should impose an appropriate sanction to address the loss and make clear that this conduct will not be tolerated.

## I.      BACKGROUND

### A.      Defendants Defrauded Plaintiffs into Paying More than $22 Million in Insurance Benefits Through the Submission of Fraudulent Bills

In the operative Second Amended Complaint, Plaintiffs allege a scheme to defraud insurers of money paid for purported medical treatment to individuals who have been in automobile accidents.  Moshe plays a central role in this scheme, along with defendants Reuven Alon ("Alon"), Dr. Regina Moshe ("Dr. Moshe"), Vadim Dolsky ("Dolsky"), and Dr. Leonid Shapiro ("Shapiro").

Shapiro and Dr. Moshe purport to own medical practices that cater to No-Fault patients in the New York area.  Shapiro is an anesthesiologist who purports to own Metro Pain Specialists P.C. and Tri-Borough NY Medical Practice P.C. (collectively the "Metro Pain Clinics"), and Dr. Moshe is an internist who purports to own Citimedical I, PLLC ("Citimedical I"), Citimed Services, P.A. ("Citimed Services"), Citimedical Services P.C. ("Citimedical Services"), and Citimed Complete Medical Care P.C. ("Citimed Complete") (collectively, the "Citimed Clinics"). In fact, Moshe secretly owns and controls the Citimed Clinics.  Patients are treated at the Metro Pain Clinics and Citimed Clinics pursuant to a predetermined treatment protocol, under which

patients receive the same diagnoses and unnecessary services. The Metro Pain Clinics and Citimed Clinics: (1) bill for medically unnecessary examinations and other services reimbursable under patients' No-Fault policies; (2) refer and prescribe patients additional unnecessary goods and services billed by other health care providers with whom they have financial relationships; and (3) steer patients to ambulatory surgery centers ("ASCs") owned by Moshe for procedures.

Moshe is a layperson who is not permitted to own or control a medical practice, though he can own ASCs. The Metro Pain Clinics and Citimed Clinics exclusively refer patients to and perform surgical procedures at Moshe's ASCs, including Hackensack Specialty ASC LLC f/k/a Dynamic Surgery LLC ("Dynamic Surgery"), Integrated Specialty ASC LLC f/k/a HealthPlus Surgery Center LLC ("HealthPlus Surgery"), SCOB LLC a/k/a SurgiCare of Brooklyn ("Surgicare"), and Citimed Surgery Center LLC ("Citimed Surgery") (collectively, the "Moshe ASCs"). While at the Moshe ASCs, patients receive additional goods and services that can be billed by defendants, including urine drug testing performed by Moshe's NJMHMC LLC d/b/a Hudson Regional Hospital ("Hudson Regional Hospital") and Advanced Comprehensive Laboratory LLC d/b/a Top Lab ("TopLab"), a laboratory in which Dolsky was an owner; and anesthesia rendered first by Citimed Services and then Premier Anesthesia Associates P.A. ("Premier Anesthesia"), a company initially owned by Shapiro but later owned on paper by defendant Nizar Kifaieh, M.D. ("Kifaieh") but secretly owned by Moshe.

To advance the scheme, Moshe and his co-conspirators required a steady flow of patients, which they obtained through several sources. Initially, Alon formed a purported "marketing" and "advertising" business, Beshert Corp. ("Beshert"), which operated as a referral network among No-Fault providers and attorneys. Moshe and other defendants also paid a criminal enterprise that bribed 911 operators and hospital personnel for the names and telephone numbers of auto-accident

2

victims.  A call center operated by conspirators used this information to contact patients and direct them to medical clinics, including the Metro Pain Clinics and Citimed Clinics.  Patients were also obtained through cross-referral arrangements with personal injury attorneys.

Since at least November 2016, Moshe and the other defendants have submitted or caused to be submitted to Plaintiffs fraudulent bills for services that were not medically necessary and that misrepresented compliance with applicable licensing laws. *See generally* 2d Am. Compl. ¶¶ 23–27 (Dkt. 388).  Defendants have defrauded Plaintiffs of more than $22 million.  *Id.* ¶ 21.

### B.    Moshe Intentionally Destroyed Emails

Given Moshe's role as the leader of the scheme at issue, discovery into his communications is critical to this action.  Importantly for purposes of this motion, Moshe has long known such critical communications included his emails and that he had an obligation to preserve and produce them, including emails in his personal email account yanmoshe@yahoo.com.

### 1.    Moshe Was Well Versed in Civil Litigation and Preservation Requirements

Even before this case was filed, Moshe had extensive experience with litigation, having been sued on numerous occasions.  Public filings indicate that prior to the current action, Moshe had been a named defendant in no less than ten civil proceedings.  At a limited deposition on the subject of his emails in this case, Moshe admitted he knew that in litigation documents are requested and must be produced, such documents include emails, after a lawsuit is filed he has an obligation to preserve emails, and there are consequences for failing to preserve emails.  Ex. 1 at 37:4–39:4.

Moshe confirmed at that same deposition he was a named defendant in *American Transit Insurance Company v. Moshe*, filed in New York Superior Court on December 27, 2018 (the "American Transit Action").  *See* Ex. 1 at 39:17–22.  The case named many of the same defendants sued in this action, including defendants Alon, Dr. Moshe, Shapiro, Dynamic Surgery, Columbus

Imaging Center LLC, Citimedical I, Citimed Services, Metro Pain, and others, and involved many of the same issues. *See* Ex. 2. Like the instant litigation, the American Transit Action alleged Moshe was an unlicensed layperson who improperly owned and controlled medical professional corporations Citimedical I and Citimed Services, *id*. ¶ 85, and asserted relevant evidence that included funds being siphoned out of the Citimed Clinics through purported rental arrangements and the existence of illegal referral arrangements through Alon's "Beshert network," which funneled patients into the Moshe ASCs for surgical procedures. *Id*. ¶¶ 87, 111, 116. Moshe claims when the American Transit Action was filed, his attorneys advised him to preserve emails and, consistent with that directive, he stopped deleting emails in his email accounts. *See* Ex. 1 at 42:10–43:13. The American Transit Action remained active against Moshe at least until November 2021, *see* Exhibit 3, and thus any obligation to preserve emails based on that action would have continued until at least November 2021.

Moshe was sued again by GEICO on February 27, 2020, in the case *GEICO v. Moshe*, filed in the U.S. District Court for the Eastern District of New York (the "GEICO Action"). That action, like the American Transit Action and this case, named many of the same defendants, including Dr. Moshe and Shapiro, and alleged Moshe was an unlicensed layperson who improperly owned and controlled Citimedical I, Citimed Services, and Premier Anesthesia. Ex. 4 ¶¶ 150–230, 278–307. While Moshe claimed he did not remember what he did with his emails based on the GEICO Action, he admitted he was aware of the complaint. Ex. 1 at 44:13–45:8. The case would have likewise created an obligation to preserve his emails, which would have continued at least until it was resolved in January 2021. *See* Ex. 5.

Thus, by the time the current action was filed on October 5, 2021, Moshe was well versed not only in litigation, but in the allegations asserted against him, the other defendants allegedly

4

involved in the conduct at issue, his obligation to preserve emails when litigation is filed, and the possibility he might have to produce his emails in litigation and they could be used as evidence against him.  Moshe stated at his deposition he was aware of the complaint in this action about the time it was filed, knew it created obligations to preserve emails, and took steps to do so with respect to the yanmoshe@yahoo.com account.  Ex. 1 at 46:16–21, 49:20–51:16.

### 2.    Moshe's yanmoshe@yahoo.com Email Account

Moshe described the yanmoshe@yahoo.com account as his personal email account.  He claimed he tried not to conduct business through the account but admitted business activity was conducted through the account because people with whom he did business sent emails to it.  Ex. 1 at 17:9–15.  Moshe's attorney instructed him not to answer questions as to whether the account contained emails involving a long list of relevant entities and individuals.  *See* Ex. 1 at 25:5–28:19, 30:3–31:15.  But emails produced in this case and information obtained from Yahoo indicate Moshe regularly used the account to communicate with the defendants and others alleged to have been involved in the scheme at issue.  *See* Exs. 6, 16.  Moshe admitted that until his business' IT staff was tasked with pulling emails from the account,[1] he was the only person who had access to the account and had the password for it.  *See* Ex. 1 at 7:20–23, 10:5–9.

According to Moshe, his ordinary practice for the yanmoshe@yahoo.com account was to delete any email that did not require follow up after he read it and to delete any email that required follow up as soon as all follow up had been completed.  *See* Ex. 1 at 34:13–22, 35:4–36:12.

### 3.    Moshe's Claimed Unique "Preservation" Practice

Moshe claimed that when this lawsuit was filed, he changed his preservation practices.  *See*

---

[1] Moshe could not recall when the IT staff of Hudson Regional Hospital collected emails from the yanmoshe@yahoo.com account.  *See* Ex. 1 at 113:10–16.  However, correspondence from Moshe's counsel confirms it had yet to be collected as of June 19, 2024.  *See* Ex. 7.

Ex. 1 at 49:20–50:6. He testified he received a "preservation of rights letter" from his attorney which listed people whose email communications he was to preserve. *Id.* at 50:10–16, 52:11–53:2, 56:19–57:6. While Plaintiffs requested Moshe produce any litigation hold order provided to him, the only one he produced is directed to employees of Hudson Regional Hospital and dates from April 2024, more than 2 ½ years after this lawsuit was filed. *See* Ex. 8. Thus, it is unknown whose emails Moshe considered subject to the "preservation of rights" requirement at the time the complaint was filed, though he stated at least his sister Dr. Moshe was included. *See* Ex. 1 at 59:14–60:4. According to Moshe, any time a subpoena was issued in the case that identified additional relevant persons, he received supplemental instructions adding names to the list of persons whose emails he considered subject to the "preservation of rights" requirement. *See id.* at 60:18–61:8. Despite Plaintiffs' request, no such additional instructions were located or produced. Moshe explained he did ***not*** preserve all emails in the yanmoshe@yahoo.com account or even all emails with the identified persons. Rather, Moshe deleted emails as long as, in his opinion, "they had nothing to do with State Farm's case." *Id.* at 56:3–13. Importantly, nothing was done to download the emails to another medium to preserve them, require the absolute preservation of all emails in the account, require the preservation of all emails with relevant individuals, or to allow anyone other than Moshe unfettered decision-making authority over what would be deleted and what would be preserved. *See id.* at 47:25–48:8, 49:24–50:4, 57:19–24, 65:15–66:4, 104:17–105:4. These circumstances gave Moshe a remarkable opportunity that in hindsight is staggering. As he brazenly admitted, "I think I can make the decision for myself [about what to delete]. I know what you [Plaintiffs] are looking for so I preserved everything in this case so you got no case." *Id.* at 82:10–13. Simply stated, Moshe made sure he was in a position to delete damaging emails to ensure Plaintiffs would have "no case" against him.

6

### 4.    Discovery to Obtain Emails

Shortly after the complaint was filed and served, on April 1, 2022, Plaintiffs served document requests on, among others, Moshe and his entities (the "1st RFPs"). The 1st RFPs clearly identified emails as documents required to be produced and included requests for communications regarding a variety of subjects such as agreements with other defendants, payments to and from defendants, and medical services provided to insureds. *See* Ex. 9, Definitions 2 & 4, RFP Nos. 27(a)–(p), 31. Moshe admitted he was aware of the requests about the time they were issued and knew they sought emails in the yanmoshe@yahoo.com account. *See* Ex. 1 at 61:14–62:21, 63:6–13. At the time, nothing was done to collect or produce emails from the account in response to the 1st RFPs. *See id.* at 64:16–65:7. Significantly, nothing was done to preserve the account or remove it from Moshe's absolute control to decide for himself what to delete, except that now Moshe could have no doubt but that emails in the account had been specifically requested and at some point they were going to be available to Plaintiffs.

Securing any document production from Moshe and his entities has been difficult and time consuming, as it has been for all defendants. Extensive delays and numerous requests for extensions meant Moshe and his entities did not produce any documents in response to the 1st RFPs until July 2022, and this production contained no emails. By March 2023, emails still had not been produced. On March 17, 2023, Plaintiffs wrote Moshe's attorney pointing out emails were still missing and asking him to agree to Plaintiffs' proposed ESI protocol to ensure full production of relevant ESI. *See* Ex. 10 at 5. Further back and forth with Moshe's counsel did not resolve the issue, and on August 24, 2023, Plaintiffs filed a joint letter with the Court to address the missing emails and other issues. *See* Dkt. 397 at 2. On August 25, 2023, the Court issued an order which required Moshe to produce all responsive documents to Plaintiffs' discovery requests by September 8, 2023. *See* 8/25/2023 Text Order. By its terms, this order required the production

7

of emails in the yanmoshe@yahoo.com account, which were by Moshe's admission responsive to the 1st RFPs.  *See* Ex. 1 at 63:6–13.

### 5.    Email Destruction and First Spoliation Hearing

Emails of Moshe and his entities, including from the yanmoshe@yahoo.com account, were not produced by the ordered date, and on September 20, 2023, the Court granted Plaintiffs' motion to show cause as to why Moshe should not be held in contempt.  *See* 9/20/2023 Text Order; Dkt. 435.  In a letter filed in advance of a hearing on October 31, 2023, Moshe's then attorneys advised the Court that emails of some non-party entities owned by Moshe had been destroyed.  *See* Dkt. 451 at 2.  Though the record is unclear, the emails reportedly destroyed involved five real estate holding companies owned by Moshe — 1963 Concourse Holdings LLC, 910 East Gun Hill Holdings LLC, 65-55 Woodhaven Realty LLC, 63-36 Holdings LLC, and 9220 165 Holdings LLC.  *See id*.  At the time, no mention was made of the yanmoshe@yahoo.com account, nor was there any suggestion of any issue with that account.  At his deposition, Moshe claimed to have no knowledge of any such destruction of emails involving his real estate entities, claimed not to know why his attorneys told the Court anything had been destroyed, and claimed he was continuing to follow his "preservation" practice at the time of the October 31, 2023 hearing.  *See* Ex. 1 at 75:8–76:13.  Moshe's protests notwithstanding, there could be no question that by the time of the hearing, the issue of Moshe's emails and questions surrounding their destruction had assumed heightened significance.  Indeed, on October 12, 2023, Plaintiffs filed a motion for sanctions against Moshe and others based on the spoliation of emails, *see* Dkt. 454, which during the October 31, 2023 show cause hearing, the Court denied as premature but granted Plaintiffs "leave to obtain discovery on the issue of spoliation."  10/31/2023 Text Order.

### 6.    Plaintiffs' Efforts to Address Missing Emails

Over the next series of months, Plaintiffs endeavored to address two issues with respect to

the emails: (a) understand the facts and circumstances surrounding the destruction of the emails involving the Moshe real estate holding companies, the only email accounts they understood at the time to have been compromised; and (b) obtain emails from Moshe which had yet to be produced. Court-ordered deadlines were set by which Moshe was to produce emails and provide information. At least eight deadlines were missed requiring extensions from the Court. *See* 11/22/2023 Text Order (ordering compliance by 1/31/2024); 2/22/2024 Text Order (ordering compliance by 4/8/2024); 4/5/2024 Text Order (ordering compliance by 5/23/2024); 5/29/2024 Text Order (ordering compliance by 6/14/2024); 7/25/2024 Text Order (ordering compliance by 9/15/2024); 9/16/2024 Text Order (ordering compliance by 10/31/2024); 10/31/2024 Text Order (ordering compliance by 12/2/2024); 12/3/2024 Text Order (ordering compliance by 2/3/2025). During this period, in February 2024, Plaintiffs' counsel, concerned about the destruction which had already been reported, obtained an agreement from Moshe's attorneys that any collection and review of emails would be performed by Moshe's attorneys. *See* Ex. 11 (correspondence from Plaintiffs' counsel confirming agreement that "counsel will collect and review emails . . . not the individual defendants or their employees"). Despite this assurance, it is now clear that during this period, nothing was done to preserve the yanmoshe@yahoo.com account or remove it from Moshe's absolute control to decide for himself what to delete.

On March 29, 2024, Plaintiffs received metadata for the yanmoshe@yahoo.com account from Yahoo. The data identified approximately 84,000 emails present and accessible to Moshe as of February 15, 2024.[2] On April 26, 2024, Plaintiffs issued a second set of document requests to Moshe (the "2nd RFPs"), this time specifically requesting over 12,000 specifically identified emails from the yanmoshe@yahoo.com account which had been identified in the Yahoo metadata.

---

[2] While produced on March 29, 2024, the metadata was only current through February 15, 2024.

*See* Ex. 12.  On that date, April 26, 2024, Moshe's in-house attorney at defendant Hudson Regional Hospital sent to him and related defendants the sole litigation hold that has been produced in this case.  *See* Ex. 8.  The litigation hold directive ███████████████████████ than the "preservation" procedures Moshe claimed he had been following since the case was filed.  While Moshe claims he only had to preserve emails with persons on lists from his attorneys which Moshe decided in his personal judgment had something "to do with State Farm's case," █████████████

███████████████████████████████████████████████████

███████████████████████████████████████  *See* Ex. 8.

The 2nd RFPs to Moshe did not lead to the complete production of emails from the yanmoshe@yahoo.com account.  Rather, what followed were no less than five Court-ordered deadlines by which Moshe was required to complete his production of emails, repeated assurances by Moshe that work to collect and produce emails was continuing and emails would be produced, additional requests for extensions of the deadlines, and further delay in production.

**7.      Destruction of Emails in yanmoshe@yahoo.com Account Becomes Clear**

It was not until more than a year and a half after receiving the 2nd RFPs, on August 29, 2025, that Moshe finished producing emails from the yanmoshe@yahoo.com account and represented in writing that his production was complete, which he confirmed at deposition.  *See* Ex. 13 (affidavit from Moshe stating "[a]ll items collected [from the yanmoshe@yahoo.com account] were provided to my counsel"); *see also* Ex. 14 (letter from Moshe's counsel confirming "all ESI collected and reviewed has been produced"); Ex. 1 at 116:6–14.

From that account, Moshe produced approximately 600 of the more than 84,000 emails that were accessible to him on February 15, 2024 according to Yahoo metadata.  The production does not include more than 11,000 of the emails specifically identified in the 2nd RFPs.  In addition, the production was missing approximately 46,605 emails (a) sent to relevant persons or

10

entities in the case or (b) received from relevant persons or entities in the case, which, according to Yahoo metadata, were in the yanmoshe@yahoo.com account and accessible to Moshe on February 15, 2024.[3]

Importantly, Yahoo's metadata provides insight only into emails lost after February 15, 2024.  Given Moshe's testimony about how he handled the yanmoshe@yahoo.com account, additional emails in the account were destroyed before February 15, 2024, though it is more difficult to gauge how many or who they involved.  Plaintiffs have identified at least 5,790 emails produced by other defendants and non-parties exchanged with the yanmoshe@yahoo.com account before February 15, 2024 that Moshe did not produce and that are not identified in the Yahoo metadata as present in the account on February 15, 2024.  It follows these emails were deleted before February 15, 2024.  The number and persons involved in these emails destroyed before February 15, 2024 are unknowable.

### 8. Second Order Required for Moshe's Limited Deposition

Following these developments, Plaintiffs endeavored to take Moshe's deposition based on the Court's October 31, 2023 order which authorized discovery into the issue of spoliation. Despite the earlier order, Moshe refused to appear for a separate deposition, insisting he would answer any questions about his emails as part of his substantive deposition in the case.  *See* Dkt. 680 at 4–5.  Following yet another motion to compel, the Court held "Yan Moshe is ordered to testify at a limited scope deposition concerning the circumstances of why emails from his Yahoo account are no longer available. This deposition is in addition to the full deposition of Mr. Moshe

---

[3] Exhibit 6 identifies emails (a) sent to relevant persons or entities in the case or (b) received from relevant persons or entities in the case, which, according to Yahoo metadata, were in the yanmoshe@yahoo.com account and accessible to Moshe on February 15, 2024, but is limited to emails Plaintiffs could not obtain from other sources.  Exhibit 6 identifies 36,459 emails.  Plaintiffs obtained 10,146 emails, identified in the Yahoo metadata, from other defendants and relevant non-parties.

under Federal Rule of Civil Procedure 30(d), which will occur later in the discovery process and at which he is obligated to testify." 9/26/2025 Text Order.

### 9. Moshe's "Special Process" to Collect the yanmoshe@yahoo.com Emails

At the limited deposition regarding emails ordered by the Court, Moshe testified about the "process" used to collect and produce emails undertaken sometime after Plaintiffs' 2nd RFPs were served on April 26, 2024. *For emails from accounts belonging to his businesses*, Moshe's attorneys retained an outside vendor to collect the emails and then the attorneys reviewed the collected emails and produced them. *For emails in the yanmoshe@yahoo.com account*, Moshe employed a different process. *See* Ex. 1 at 136:23–137:6. Contrary to the agreement made by Moshe's attorneys in February 2024, Moshe's attorneys were not involved in the collection process. Rather, after the 2nd RFPs sought specific emails from the yanmoshe@yahoo.com account, Moshe turned the collection of emails for that account over to individuals he employed in Hudson Regional Hospital's IT department. These individuals ran the process, collected the emails, and provided what they found to Moshe's attorneys for ultimate production to Plaintiffs. *See id.* at 114:3–23; *see also* Ex. 13 ¶ 3. The decision of what to turn over was made by Moshe's IT personnel, and, as he admitted, they worked for him. *See* Ex. 1 at 139:2–8.

Moshe admitted it was his decision to use a different process for collecting emails in the yanmoshe@yahoo.com account. *See id.* at 141:2–7. Moshe said he chose this special process "[b]ecause [the yanmoshe@yahoo.com account] contains a lot of my personal information and I didn't want any third-party place or my law firm [to] have all of that information because it's a lot of personal information. Today, the law firm works for me, tomorrow they work for my competitor, so I want to make sure that they don't have my personal stuff that relates to my family or my life, not work life." *Id*. at 137:8–17. But at the same time, Moshe claimed those who worked in his IT department "are true third-party," *id.* at 140:2–5, he did not know the last name of his IT

12

Director until he was reminded of the name by his attorney, *id.* at 8:11–17, and he did not know the names of the team members who worked on the collection of his emails or even how many there were, *id*. at 8:25–9:11.  While claiming he wanted to keep information from his attorneys who might breach their attorney-client obligations by sharing such valuable information with competitors, he insisted there was unlikely to be anything of importance in the emails because "I'm not an email person."  *Id.* at 117:7–11, 137:13–17.

### 10.    Moshe's Non-Credible Explanations for Missing Emails

When asked to explain why emails that Yahoo's metadata identified as present in the account on February 15, 2024, were no longer in the account to be produced, Moshe insisted no emails had been deleted but that Yahoo was wrong when it identified emails in the account through metadata.  According to Moshe, the missing items are not emails but what he variously described as "confirmations of . . . conferences we attended or events we attended," a "calendar meeting," "a calendar request meeting," or "calendar invites and scheduling and repetitive emails."  Ex. 1 at 117:22–24, 119:12–18, 120:14–18, 121:10–19.  While it is unclear what he is referencing, he appears to be claiming *all* of the 46,605 missing items are not substantive email communications but calendar invitations to schedule a meeting or event which contain no other content.

There are several factual problems with his claim.  First, Yahoo's explanation of its metadata states the emails "would have been available to anyone who had access to the account at the time the records were gathered," something contradicted only by Moshe's unsupported assertions.  *See* Ex. 15.  Second, of the 46,605 items Moshe could not produce, over 10,100 were obtained by Plaintiffs from other sources, and virtually all of those are in fact substantive emails.  During his deposition, Moshe was confronted with just one example of these, an email from Tatyana Rabinovich, the Practice Administrator of the Citimed Clinics, to Moshe at his yanmoshe@yahoo.com email address dated May 26, 2016.  Moshe admitted he recognized and

13

remembered the email. Ex. 1 at 152:12–19. But given every opportunity to explain why he did not produce the email, he could offer nothing more than "I've given you everything we have and if it was not produced, I do not have it." *Id*. at 155:12–16.

Third, Moshe did produce calendar invitations when he had them, and if the missing items were calendar invitations, there was no reason for Moshe not to have provided them. Moshe produced approximately 68 calendar invitations from the yanmoshe@yahoo.com. account.

### 11.    Plaintiffs' Efforts to Recover Missing Emails from Other Sources

Plaintiffs have gone to great lengths to attempt to secure the missing emails from other sources. They have issued subpoenas to as many as 25 other parties to the emails seeking their email exchanges with the yanmoshe@yahoo.com account and have reviewed emails produced by all other defendants in an effort to find the missing emails. This work has permitted Plaintiffs to identify approximately 10,100 of the 46,605 responsive emails identified in Yahoo's metadata as destroyed after February 15, 2024. However, at least 36,459 emails can no longer be recovered. Exhibit 6 identifies emails (a) sent to relevant persons or entities in the case or (b) received from relevant persons and entities in the case, which, according to Yahoo metadata, were in the yanmoshe@yahoo.com account and accessible to Moshe on February 15, 2024, and could not be obtained from other sources. This number represents the bare minimum lost through destruction after February 15, 2024. There is no way to know about or recover emails destroyed before February 15, 2024, which are not in the Yahoo metadata and have not been produced by others.

It is impossible to know what the missing emails contained. Even now Moshe continues to block efforts to understand the scope of the missing emails, as his attorney refused to allow him to answer questions as to whether Moshe used the account to conduct business for relevant entities. Ex. 1 at 26:23–27:12. However, a review of Yahoo metadata confirms a substantial number of missing emails were exchanged between Moshe and individuals alleged to have had a significant

14

role in the scheme. *See* Ex. 6. Moreover, Plaintiffs have reviewed the approximately 10,100 emails recovered from other sources which were identified in the Yahoo metadata and deleted after February 15, 2024, as well as approximately 5,790 emails produced by other sources not identified in the Yahoo metadata and deleted before February 15, 2024. A review of emails recovered from other sources which Moshe could not produce establishes the yanmoshe@yahoo.com account was used to discuss substantive business activity, manage the operations of the Citimed Clinics, direct patient care, secure patients, and otherwise carry on the scheme. *See, e.g.*, Ex. 16. Given the substantive value of the limited information which can be secured, it must be accepted missing items contain even more significant information and were intentionally deleted.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 37(e) governs the spoliation of electronically stored information ("ESI"). Under Rule 37(e)(2), if (a) "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it," (b) the lost ESI "cannot be restored or replaced through additional discovery," and (c) the Court finds the party responsible for the lost ESI "acted with the intent to deprive another party of the information's use in the litigation," then the Court may "instruct the jury that it may or must presume the information was unfavorable to the party; or . . . enter a default judgment." *See Prelvukaj v. Naselli*, 2023 WL 3570659, at *9 (E.D.N.Y. May 18, 2023). If the party responsible for lost ESI acted with intent to deprive another party of the use of information, and Rule 37(e)(2) applies, no showing of prejudice to the other party is required. *PDV USA, Inc. v. Interamerican Consulting Inc.*, 2026 WL 203036, at *9 (S.D.N.Y. Jan. 27, 2026) ("If an intent to deprive is found, 'no separate showing of prejudice is required'").

Under Rule 37(e)(1), if (a) "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable

15

steps to preserve it," (b) the lost ESI "cannot be restored or replaced through additional discovery" and (c) the Court finds "prejudice to another party from loss of the information," the Court "may order measures no greater than necessary to cure the prejudice." *See PDV USA*, 2026 WL 203036, at *8. In addition to the sanctions available under Rule 37(e) for the spoliation of ESI, "a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

## III. ARGUMENT

Evidence supports finding not only did Moshe fail to take reasonable steps to preserve ESI that should have been preserved but he also acted with intent to deprive Plaintiffs of the information's use by intentionally deleting it. As the information cannot be obtained from another source through discovery, the elements of Rule 37(e)(2) are met, and the Court should grant a default judgment against Moshe or at the very least authorize instructions to the jury to presume the lost information would have been unfavorable. Alternatively, relief may be granted under Rule 37(e)(1) as Plaintiffs have been prejudiced by the lost information.

### A. Moshe Not Only Failed to Take Reasonable Steps to Preserve ESI, He Intentionally Deleted It

The evidence supports a finding that not only did Moshe fail to take reasonable steps to preserve ESI that should have been preserved, he intentionally deleted it.

It cannot be disputed that ESI that should have been preserved has been lost. At a minimum, Moshe cannot produce, and did not have as of August 29, 2025, 46,605 emails concerning defendants and relevant non-parties identified by Yahoo's metadata as present in the account on February 15, 2024. *See* pp. 9–11 *supra*. Claims by Moshe that all of the missing items are not "emails" but calendar invites are simply not credible. When missing items were obtained from other sources, they turned out to be emails, and when Moshe did have calendar invites, he

16

produced them. *See* 13–14 *supra*. Importantly, Yahoo's metadata provides insight only into emails lost after February 15, 2024. Moshe admitted he regularly deleted emails. It is difficult to know how many emails not identified in the Yahoo metadata were destroyed before February 15, 2024. Plaintiffs have identified at least 5,790 emails produced by other defendants and non-parties exchanged with the yanmoshe@yahoo.com account before February 15, 2024 that Moshe did not produce and that are not identified in the Yahoo metadata. There can be no question other unobtainable emails were deleted before February 15, 2024.

There should also be no doubt that emails should have been preserved and Moshe knew it. Moshe admitted he was aware of his obligations to preserve ESI, knew those obligations extended to the yanmoshe@yahoo.com account, and knew emails from the account would be and ultimately were requested in this case. *See* pp. 3–5 *supra*. Moshe has been involved in numerous civil court proceedings and had recently been sued in cases brought by other insurers, American Transit and GEICO, involving similar parties and issues. *See id.* He knew litigation imposed an obligation to preserve emails in his accounts and that his emails could be the subject of discovery during the proceedings. Ex. 1 at 37:4–39:4. In this case, he was aware of the complaint and 1st RFPs about the time they were served, understood they created an obligation to preserve emails that included those in the yanmoshe@yahoo.com account, and appreciated there were specific document requests for emails from that account in this case as early as April 1, 2022. *See* pp. 4–5, 7 *supra*. He claims to have received "preservation of rights" instructions from his attorneys which, if true, would have provided further clarity on his obligation to preserve emails. *See* Ex. 1 at 50:10–16, 52:11–53:2, 56:19–57:6. By October 2023, when his lawyers reported the destruction of emails of his real estate holding companies, issues surrounding his emails, their preservation, and production had become a subject of attention and concern. *See* Dkt. 451 at 2. At that point, any

17

doubt should have been gone about the need to do everything possible to keep and maintain all emails in the yanmoshe@yahoo.com account. No less than nine court orders between August 2023 and December 2024 required Moshe to produce emails from the account.

Despite clear and known obligations, Moshe not only failed to preserve emails, he deleted them. He acknowledged that at all times prior to involving his IT department employees in collecting emails, he was the only person who had access to the account. *See* p. 5 *supra*. During that time, nothing was done to download the emails to another medium to preserve them, require the absolute preservation of all emails in the account, require the preservation of all emails with relevant individuals, or to allow anyone other than Moshe unfettered decision-making authority over what would be deleted and what would be preserved. *See id.* at 6. Rather, Moshe admits he continued to delete emails regularly. *See id.* He claims his actions were appropriate because he only deleted emails that "had nothing to do with State Farm's case." Ex. 1 at 56:3–13. But this self-serving claim cannot be accepted. At least 5,790 emails exchanged with defendants and relevant non-parties which Plaintiffs were able to obtain from other sources were destroyed before February 15, 2024; at least 46,605 emails exchanged with defendants and relevant non-parties which were identified in Yahoo's metadata were destroyed after February 15, 2024. Examples of deleted emails described in Exhibit 16 reflect many emails were not only responsive to Plaintiffs' RFPs, but highly relevant and damaging to Moshe. Indeed, Moshe all but admitted the true motive behind his deletions when he acknowledged, "I think I can make the decision for myself [about what to delete]. I know what you [State Farm] are looking for so I preserved everything in this case so you got no case." Ex. 1 at 82:10–13. Simply stated, Moshe deleted emails that could be used to support Plaintiffs' "case" against him.

After Plaintiffs identified specific emails through Yahoo's metadata and served the 2nd

RFPs, Moshe not only continued his deletions, but brazenly undertook to hide the scope of his destruction. Outwardly, his lawyers assured Plaintiffs only lawyers were going to be involved in collecting emails, promising the collection and review was underway but was taking longer than expected, and seeking and receiving a series of extensions of time through Court orders and agreements. *See* Exs. 7, 11. Indeed, the first Court order requiring production of emails set a deadline of September 8, 2023, there were no less than seven requests for extensions, and the final response was not made until almost two years later on August 29, 2025. *See* Ex. 13. Behind the scenes, Moshe managed to convince his lawyers to allow a different procedure to collect emails from the yanmoshe@yahoo.com account from the process employed for every other Moshe email account. *See* pp. 12–13 *supra.* The lawyers were excluded and collection was turned over to IT personnel who worked for Moshe. *See id.* Moshe's insistence on why this special approach was adopted — to protect his "personal information" from his law firm because "[t]oday, the law firm works for me, tomorrow they work for my competitor, so I want to make sure that they don't have my personal stuff that relates to my family or my life, not work life" — make no sense. Ex. 1 at 137:8–17. Every attorney has ethical obligations which would have prevented them from disclosing confidential information improperly, let alone to a competitor at a later date, an obligation anyone with Moshe's litigation experience would have known. Any risk his lawyers, who were bound by the rules of ethics, might disclose personal information was certainly lower than the risk employees in his IT Department might do so after they left Moshe's employ. Indeed, Moshe described those employees as "true third-party," *id.* at 140:2–5, did not even recall the last name of his IT Director until he was reminded of the name by his attorney, *id.* at 8:11–17, and did not know the names of the team members who worked on collecting his emails or how many were involved, *id*. at 8:25–9:11. The different process was not based on concern about the risk of the

19

disclosure of personal information, but on the need for Moshe to control the collection and production process, keep damaging information from his attorneys, which he knew would be turned over to Plaintiffs, and obstruct Plaintiffs from prosecuting their claims.

Thus, at a minimum, there can be no question Moshe failed to take reasonable steps to preserve ESI that should have been preserved. By his own admission, he took no affirmative steps whatsoever to preserve and did nothing other than stop deleting emails that in his mind "had nothing to do with State Farm's case." *See* pp. 5–6 *supra.* This admission standing alone is sufficient. "When the duty to preserve ESI attaches, the party must take reasonable steps to preserve it. 'Where a party fails to timely institute 'a formal litigation hold and . . . otherwise informally preserve ESI,' the Court can conclude that it did not undertake reasonable steps to preserve ESI." *Prelvukaj*, 2023 WL 3570659, at *8 (quotation omitted); *see also id.* at *5 ("When the obligation to preserve is triggered, the party must 'do more than refrain from intentionally destroying relevant evidence; the litigant must also 'take affirmative steps to prevent inadvertent spoliation'") (quotation omitted). But the evidence goes even further to establish Moshe affirmatively destroyed evidence and should easily meet the first prong of Rule 37(e).

**B.    The Lost ESI Cannot Be Restored or Replaced Through Additional Discovery**

Despite diligent efforts, Plaintiffs cannot replace lost ESI through other discovery. As detailed in the declaration of Christopher T. Cook attached to this motion, Plaintiffs have gone to substantial effort and expense to locate emails missing from the yanmoshe@yahoo.com account. They have issued subpoenas to 25 non-parties seeking their email exchanges with the yanmoshe@yahoo.com account and have reviewed emails produced by all other defendants in an effort to find the missing emails. This work has permitted Plaintiffs to obtain approximately 10,100 of the 46,605 responsive emails identified in the Yahoo metadata as present in the account on February 15, 2024. In addition, Plaintiffs obtained at least 5,790 emails destroyed before

20

February 15, 2024. These emails were produced by other defendants and non-parties exchanged with the yanmoshe@yahoo.com account before February 15, 2024 that Moshe did not produce and that are not identified in the Yahoo metadata as present in the account on February 15, 2024. However, at least 36,459 emails destroyed after February 15, 2024 can no longer be recovered. The number of emails destroyed before February 15, 2024 is unknown.

Such efforts have been recognized as more than sufficient to meet the second prong of Rule 37(e). *See Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *17 n. 21 (S.D.N.Y. June 20, 2019) ("the Court recognizes that—depending on the retention policies of the providers and the electronic housekeeping practices of the individual custodians—it may not be possible, even with substantial effort and expense, to reconstruct what was once on the [plaintiff's server] from these sources").

**C.    Moshe Acted With the Intent to Deprive Plaintiffs of the Use of the Information Contained in the ESI in this Case**

To obtain relief under Rule 37(e)(2), the only other element Plaintiffs must establish is that Moshe acted with intent to deprive Plaintiffs of the information contained in the ESI. "A party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2). . . . Furthermore, conscious failure 'to take any reasonable steps to preserve' relevant communications satisfies the level of intent required of Rule 37(e)(2)." *Adler v. Sonotec*, 2025 WL 2614993, at *8 (E.D.N.Y. Sept. 10, 2025) (quotations omitted). Factors courts in the Second Circuit have considered in determining whether a party acted with the intent to deprive include:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*PDV USA*, 2026 WL 203036, at *9 (internal citations omitted). Each element is present here.

21

First, the lost ESI can "fairly be supposed to have been material to the proof" of Plaintiffs' case. A review of Yahoo metadata confirms that a substantial number of missing emails were exchanged between Moshe and individuals alleged to have had a significant role in the scheme. *See* Ex. 6. A review of emails recovered from other sources which Moshe could not produce establishes that the yanmoshe@yahoo.com account was used to discuss substantive business activity, manage the operations of the Citimed Clinics, direct patient care, secure patients, and otherwise carry on the scheme. *See* Ex. 16. Included among the emails recovered from other sources are many that advance Plaintiffs' theories and are damaging to Moshe's defense. *See id*. Based on such limited information, it can and should be assumed that deleted items were similar in kind and character and likely even more damaging than those that could be recovered.

Second, Moshe "engaged in . . . affirmative act[s] causing the evidence to be lost." As discussed, not only was there a complete failure to preserve emails in the account through a failure to download the emails to another medium, require absolute preservation of all emails in the account, require preservation of all emails with relevant individuals, or provide anyone other than Moshe unfettered decision-making authority over preservation, but emails were affirmatively destroyed. *See* p. 6 *supra.* Even Moshe admits he regularly deleted emails after the case was filed. Ex. 1 at 56:3–13. It is unknown what emails were deleted before the February 15, 2024 Yahoo metadata report, but it has been confirmed that after February 15, 2024 at least 46,605 emails with relevant persons were affirmatively deleted. Moreover, Moshe affirmatively assumed control of the process to collect emails from the yanmoshe@yahoo.com account. *See* pp. 12–13 *supra*.

Moshe undertook these affirmative acts "while [he] knew or should have known of [his] duty to preserve the evidence." Moshe's extensive litigation experience, his admitted familiarity with the rules regarding preservation, his awareness of the complaint and document requests, the

"preservation of rights" communications he claims to have received from his lawyers shortly after the case was filed, and the series of Court orders requiring ESI production can leave no doubt that Moshe knew he had to preserve emails throughout the relevant period and even before the action was filed. By the time of the October 31, 2023 hearing regarding email destruction, he should have been on notice not only of the obligation to preserve but that the issue of ESI preservation had become a serious matter of significant concern to all of the parties and the Court.

Lastly, "the affirmative act[s] causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by" Moshe. Moshe claimed the items lost after March 28, 2024, which were identified in the Yahoo metadata, were not substantive emails but calendar invites. But that claim does not comport with the fact that missing items obtained from other sources turned out to be emails, and when Moshe did have calendar invites, he produced them. When confronted with just one of these missing items, which was unquestionably a substantive email Moshe admitted receiving, Moshe could offer no explanation other than that he did not have it. Ex. 1 at 155:12–16. Moshe's story for why he removed his attorneys from the email collection process for the yanmoshe@yahoo.com account — a fear they might share personal information with his competitors — is not credible. He entrusted the contents of the account to his IT Department personnel who were equally, if not more likely, to betray his confidences after they left his employ. His claim that he only deleted emails that had "nothing to do with State Farm's case," is contradicted by deleted emails obtained from other sources that have everything to do with Plaintiffs' case. *See* Ex. 16.

The far more plausible explanation for Moshe's affirmative acts is that they were bad faith actions to deprive Plaintiffs of evidence. His extensive experience with litigation and knowledge from prior cases of the issues likely to be raised and allegations asserted against him almost

23

certainly led him to the conclusion that emails in the yanmoshe@yahoo.com account were going to be sought, would be damaging to his position, and the only way to prevent such damage was to delete them. He all but admitted as much when he said, "I think I can make the decision for myself [about what to delete]. I know what you [State Farm] are looking for so I preserved everything in this case so you got no case." Ex. 1 at 82:10–13.

Moshe's non-credible testimony supports finding intent. *See StoneX Grp., Inc. v. Shipman,* 2024 WL 1509346, at *14 (S.D.N.Y. Feb. 5, 2024) (relying on fact "Shipman has repeatedly lied in connection with his spoliation of that ESI, including under oath during two depositions").

### D.    Plaintiffs Have Been Prejudiced by the Loss of the ESI

While prejudice to a moving party is not required to obtain relief under Rule 37(e)(2), should the Court elect to evaluate relief under Rule 37(e)(1), consideration should be given to whether Plaintiffs have been prejudiced by the loss of the ESI. Additionally, the significance of lost ESI supports finding Moshe's deletion of ESI was intentional.

"To demonstrate prejudice, a moving party need only make 'plausible, concrete suggestions' as to what the lost evidence may have contained." *Prelvukaj*, 2023 WL 3570659, at *9. A party moving for spoliation sanctions "need not establish the loss of a 'smoking gun'; rather, 'it is sufficient if the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case.'" *PDV USA*, 2026 WL 203036, at *8 (internal citation omitted).

The quantity of lost ESI is unknown, though the volume is unquestionably substantial. It is undisputed that Moshe cannot produce, and did not have as of August 29, 2025, 46,605 emails concerning defendants and non-parties identified by Yahoo's metadata as present in the account on February 15, 2024, and of those emails, at least 36,459 cannot be obtained from other sources. It is unknown how many emails were destroyed before February 15, 2024, who they involved or what they concerned, but Plaintiffs have identified at least 5,790 emails produced by other

defendants and non-parties exchanged with the yanmoshe@yahoo.com account before February 15, 2024 that Moshe did not produce.

Also unknown is what the missing emails contained.  Moshe's efforts to block Plaintiffs from understanding the scope of destruction should be construed against him.  *See Shipman*, 2024 WL 1509346, at *14 (false testimony about emails which blocked effort to understand scope of loss supported finding of intent).  Although the Court issued an order on October 31, 2023 authorizing Plaintiffs to "obtain discovery on the issue of spoliation[,]" and then when Moshe refused to appear for a limited deposition, on September 26, 2025 ordered him to "testify . . . concerning the circumstances of why emails from his Yahoo account are no longer available," Moshe's attorney refused to allow him to testify whether he communicated with or about many relevant entities through the yanmoshe@yahoo.com account.  Ex. 1 at 26:23–27:12.

However, consideration of the issues and allegations in this case, the persons whose communications with Moshe would almost certainly have had bearing on those issues, the emails involving those persons and Moshe which have been lost, and the emails involving those persons and Moshe which have been obtained from other sources, can only lead to the conclusion that Plaintiffs have been substantially prejudiced by the loss of the ESI.  Consider the following by issue and what is known from the lost emails and limited recovered emails:

- Were the Citimed Clinics secretly owned by Moshe rather than his sister Dr. Moshe, who was only a nominal owner on paper?

  - Lost emails include: 2,495 exchanges with Dr. Moshe; 5,041 with accounts of employees of the Citimed Clinics; 102 with Dolsky, a codefendant responsible for siphoning proceeds out of the Citimed Clinics to Moshe; 6,579 with Popular Bank, a financial institution that assisted Moshe with loans in which he orchestrated the pledge of the Citimed Clinics' assets as collateral.  *See* Ex. 6.
  - Deleted emails recovered from other sources include: emails documenting █████████

25



*See* Ex. 16.

- Were services rendered to patients of the Citimed Clinics and Moshe ASCs medically unnecessary?

  o Lost emails include: 70 exchanges with doctors who worked at the Citimed Clinics; 1,979 with personal injury attorneys; 5,041 with accounts of employees of the Citimed Clinics. *See* Ex. 6.
  o Deleted emails recovered from other sources include: emails documenting ██████ ████████████████████████████████████████ *See* Ex. 16.

- Were imaging services rendered to patients of the Citimed Clinics by independent contractors and therefore ineligible for reimbursement?

  o Lost emails include: 2,495 exchanges with Dr. Moshe; 5,041 with accounts of employees of the Citimed Clinics; 100 emails with Alkies Lapas and Contemporary Diagnostic Imaging; and 53 emails with Complete Radiology Reading Services. *See* Ex. 6.
  o Deleted emails recovered from other sources include: emails reflecting ██████ ████████████████████████████ *See* Ex. 16.

- Was Moshe involved in a scheme to improperly solicit patients and pay kickbacks for patients of the Citimed Clinics and Moshe ASCs which would support a finding that services were rendered to these patients as a result of financial arrangements rather than because they were medically necessary?

  o Lost emails include: 6 exchanges with Jelani Wray, who was convicted in a scheme involving bribes paid for patient information to 911 operators and hospital personnel; 276 exchanges with employees of Beshert, an "advertising" agency operated as a patient referral source; 757 exchanges with Alon, a codefendant responsible for securing patients for the scheme. *See* Ex. 6.
  o Emails recovered from other sources include: emails showing ███████████ ██████████████████████████████████ *See* Ex. 16.

- Was Citimed Surgery secretly owned and controlled by Moshe rather than his sister Dr. Moshe, who was only a nominal owner on paper?

26

- Lost emails include: 2,495 exchanges with Dr. Moshe; 664 with Pinnacle Health Consultants, the entity charged with obtaining a license for Citimed Surgery. *See* Ex. 6.
- Deleted emails recovered from other sources include: an email ███████████ ████████████████████████████████████████████████████ *See* Ex. 16.

- Was Premier Anesthesia secretly owned and controlled by Moshe rather than Kifaieh, who was only a nominal owner beginning in August 2018?

  - Lost emails include: 3,792 exchanges with Kifaieh; 5,532 with John Grywalski; 1,497 with Polina Koren. *See* Ex. 6.
  - Deleted emails recovered from other sources include: an email ███████████ ████████████████████████████████████████████████████ *See* Ex. 16.

- Did Moshe make material misrepresentations and fail to disclose that at all times he fully owned and controlled Surgicare and therefore its claims were ineligible for reimbursement?

  - Lost emails include: 664 exchanges with Pinnacle Health Consultants, the entity charged with managing Surgicare's licensing and membership interest transfers; 462 with Sovereign Medical Services, the entity Moshe purchased Surgicare from. *See* Ex. 6.
  - Deleted emails recovered from other sources include: emails reflecting ██████ ████████████████████████████████████████████████████ *See* Ex. 16.

- Did Moshe install Shapiro as a nominal medical director at HealthPlus Surgery and Dynamic Surgery and fail to operate them in compliance with the law such that their claims were ineligible for reimbursement?

  - Lost emails include: 877 emails exchanged with Shapiro during the period when Shapiro was the purported medical director of these facilities (May 3, 2016 through May 2, 2022). *See* Ex. 6.

The review confirms lost emails would almost certainly have contained substantive discussions, been relevant to the issues, and would have been supportive of Plaintiffs' allegations.

That some emails were recovered from other sources does not undermine a claim of prejudice or resolve the issue. While recovered emails help establish what is missing and will support Plaintiffs' case, it can and should be assumed that unrecoverable emails would have been

27

more helpful.  As the court in *Coan v. Dunne,* 602 B.R. 429, 439–40 (D. Conn. 2019) explained:

> [Defendant] argues that, for all the evidentiary value his email accounts may have had, [Plaintiff] still is unable to demonstrate prejudice because [Plaintiff] has successfully obtained some of [Defendant's] emails through discovery on third parties.  But this argument merely turns the question of prejudice from one of *kind* to one of *degree.*  There can be no assurance that [Plaintiff] has received from third-party sources all of the meaningful emails that could and should have been obtained in the first instance from [Defendant].  It is equally plausible to conclude that the emails received from third parties are but the tip of the proverbial iceberg of other powerfully probative email communications by [Defendant] during time periods that are critical in this litigation and that have not emerged from third parties in discovery.

Thus, Plaintiffs have more than established prejudice from Moshe's affirmative acts.

### E.    Plaintiffs Seek Sanctions for Moshe's Spoliation of the ESI

Moshe should not benefit from his intentional destruction of ESI, and the Court should send a strong message that such conduct will not be tolerated by imposing a significant sanction.

"It has long been the rule that spoliators should not benefit from their wrongdoing." *West*, 167 F.3d at 779.  When deciding on the appropriate sanction for spoliation, district courts have broad discretion, but "the sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Prelvukaj*, 2023 WL 3570659, at *7 (internal quotations omitted).  There are four factors district courts in the Second Circuit consider when deciding on the proper sanctions: "(1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *PDV USA*, 2026 WL 203036, at *20 (internal citations omitted).

Here, the evidence establishes the elements set by Rule 37(e)(2).  Moshe not only failed to take reasonable steps to preserve ESI that should have been preserved, but he acted with intent to

28

deprive Plaintiffs of the information's use in this case because he intentionally deleted relevant information that cannot be obtained from another source through discovery. Accordingly, under Rule 37(e)(2), the Court may "instruct the jury that it may or must presume the information was unfavorable to the party; or . . . enter a default judgment."

In this case, a default judgment is an appropriate and necessary sanction. Moshe's conduct was willful and long lasting. Compelling evidence demonstrates Moshe affirmatively deleted emails with an intent to deprive Plaintiffs of information that would support their case. He then furthered that obstruction by orchestrating a collection process which deliberately excluded his attorneys. He provided false and non-credible explanations for his conduct under oath and refused to answer questions about how he used the account, despite being ordered to appear for a deposition regarding the spoliation issue. He repeatedly ignored Court orders requiring production by set deadlines and used extensions granted based on promises of future compliance to delay and further a scheme to destroy relevant evidence. He committed all of these acts knowing his obligations to preserve the information, expecting information was going to be requested and have to be produced, and seeking to prevent the damage such information would do to his defense.

A lesser sanction would be insufficient. It would insufficiently account for the conduct, deter behavior of this kind, or address his complete disregard of the Court's authority. The conduct occurred with full awareness of litigation-imposed obligations. Indeed, by the time of the October 31, 2023 hearing at which the issue of email destruction was addressed, Moshe was well aware of the issue, the Court's concerns about destruction, and the risks if it continued. Yet even after that date, more than 46,605 emails are documented as having been destroyed.

The scope and impact of the lost evidence cannot be sufficiently addressed by any other sanction. Huge volumes of emails have been lost and involved communications between the lead

29

defendant in the case and virtually every other significant participant in the scheme at issue. While some sense of the emails destroyed after February 15, 2024 is possible to glean, it is impossible to fathom what was destroyed before February 15, 2024. It is unquestionable that lost emails touched every single issue in the case and almost certainly would have advanced Plaintiffs' case. Under such circumstances, any sanction less than default would be insufficient. *See StoneX Grp., Inc. v. Shipman*, 2024 WL 3356989, at *4 (S.D.N.Y. July 10, 2024) ("a lesser sanction such as a jury instruction may be ineffective as a sanction for pervasive dishonest behaviors when the scope of the spoliation is extensive").

Courts in this district have entered the severe sanction of default based on the destruction of evidence under such circumstances. In *State Farm Mut. Auto. Ins. Co. v. Grafman*, 274 F.R.D. 442 (E.D.N.Y. 2011), the court addressed appropriate spoliation sanctions for a defendant who similarly "missed court-ordered deadlines for discovery [and] failed to produce relevant documents[.]" *Id*. at 445. In that case, the defendant similarly spoliated evidence in the form of discarding computers found to contain relevant ESI. *Id.* at 448, 450. There, the court found "[t]here is nothing in the record that would demonstrate that [defendant's] conduct was merely an oversight or was the product of a good faith attempt at compliance." *Id*. at 451. Concluding lesser sanctions "would neither adequately deter nor remedy misconduct of this severity," the court entered a default judgment which was ultimately entered in the amount of over $2.3 million. *Id.*; *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 148 (2d Cir. 2010) (sanction of default judgment was not abuse of discretion where supported by a "pattern of 'prolonged and vexatious obstruction of discovery with respect to . . . highly relevant records'"). As another court in this district observed, "[o]ne who anticipates that compliance with discovery rules and the resulting production of damning evidence will produce an adverse judgment will not likely be

deterred from destroying that decisive evidence by any sanction less than the adverse judgment she is tempted to thus evade." *Gutman v. Klein*, 2008 WL 4682208, at \*12 (E.D.N.Y. Oct. 15, 2008). For this reason, Courts in this circuit have entered default judgments for the intentional destruction of relevant documents, including ESI. *See, e.g.*, *StoneX*, 2024 WL 3356989, at \*4 (holding that the defendant's "false testimony and intentional destruction of [ESI] warrants dismissal of the action"); *Miller v. Time-Warner Commc'ns, Inc.*, 1999 WL 739528, at \*3 (S.D.N.Y. Sept. 22, 1999) (plaintiff's spoliation of evidence and repeated perjury surrounding the circumstances of the spoliation merited dismissal of the action); *Gutman*, 2008 WL 4682208, at \*12 (recommending default judgment as sanction for intentional destruction of computer files).

As an alternative sanction, the Court should consider at the very least instructing the jury it must presume the information was unfavorable to Moshe. Such a sanction would be permissible under Rule 37(e)(2) as an alternate remedy. *See* Fed. R. Civ. P. 37(e)(2)(B); *see also PDV USA*, 2026 WL 203036, at \*21 (finding "an adverse inference instruction is the appropriate sanction" under Rule 37(e)(2)); *Adler*, 2025 WL 2614993, at \*9 (similar).

Any presumptions must reflect fair assumptions that can be made about the missing emails. Given the volume of lost emails, the parties involved, the limited information gleaned from destroyed emails obtained from other sources, evidence of Moshe's intent to keep information from Plaintiffs and prevent its use against him, and the issues in the case, appropriate presumptions to be given to the jury would be:

- Moshe intentionally destroyed emails which established the Citimed Clinics were secretly owned by Moshe rather than his sister Dr. Moshe, who was only a nominal owner on paper.

- Moshe intentionally destroyed emails which established services rendered to patients of the Citimed Clinics and Moshe ASCs were medically unnecessary.

- Moshe intentionally destroyed emails which established imaging services rendered to patients of the Citimed Clinics were performed by independent contractors, and therefore their claims for imaging services were ineligible for reimbursement.

- Moshe intentionally destroyed emails which established Moshe was involved in a scheme to improperly solicit patients and pay kickbacks for patients of the Citimed Clinics and Moshe ASCs, which would support a finding that services were rendered to these patients as a result of financial arrangements rather than because they were medically necessary.

- Moshe intentionally destroyed emails which established Citimed Surgery was secretly owned and controlled by Moshe rather than his sister Dr. Moshe, who was only a nominal owner on paper.

- Moshe intentionally destroyed emails which established Premier Anesthesia was secretly owned and controlled by Moshe rather than Kifaieh, who was only a nominal owner beginning in August 2018.

- Moshe intentionally destroyed emails which established Moshe made material misrepresentations and failed to disclose that at all times he fully owned and controlled Surgicare, and therefore its claims were ineligible for reimbursement.

- Moshe intentionally destroyed emails which established Moshe installed Shapiro as a nominal medical director at HealthPlus Surgery and Dynamic Surgery and failed to operate them in compliance with law such that their claims were ineligible for reimbursement.

*See* Ex. 16. "[A]llowing the adverse inference that the spoliated evidence would have been unfavorable to Defendants, with respect to the contentions Plaintiffs seek to advance, should serve the remedial function of restoring Plaintiffs to the same position they would have been in absent the wrongful destruction of evidence by Defendants." *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 443 (S.D.N.Y. 2009).

## IV.    CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request this Court enter default judgment as to Moshe or impose a similar case terminating sanction, or in the alternative, impose adverse inferences that the lost information contained in the missing emails was unfavorable to Moshe. Plaintiffs additionally request attorneys' fees, both for the significant costs of recovering the destroyed emails from other sources as well as for the costs of bringing this motion.

Dated:  April 13, 2026

Respectfully submitted,

By: */s/ Jonathan L. Marks*

Ross O. Silverman
Jonathan L. Marks
Sarah M. Scruton
Michael L. Cardoza
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: 312.902.5200
Facsimile:  312.902.1061
ross.silverman@katten.com
jonathan.marks@katten.com
sarah.scruton@katten.com
michael.cardoza@katten.com


Christopher T. Cook
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: 212.940.6488
christopher.cook@katten.com

*Attorneys for Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*