# *Exhibit 1*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
STATE FARM MUTUAL AUTOMOBILE
INSURANCE, et al.,

        Plaintiffs,

                       Case No.:

   -against-              1:21-cv-05523
                       (MKB)(PK)

METRO PAIN SPECIALISTS P.C., et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - x


        Videotaped deposition of YAN MOSHE,
taken pursuant to notice, was held at
the law offices of KATTEN MUCHIN
ROSENMAN, LLP, 50 Rockefeller Plaza, New
York, New York, New York, commencing
January 6, 2026, 9:53 a.m., on the above
date, before Leslie Fagin, a Court
Reporter and Notary Public in the State
of New York.
                 - - -


MAGNA LEGAL SERVICES - (866) 624-6221
www.MagnaLS.com



APPEARANCES:


KATTEN MUCHIN ROSENMAN, LLP
Attorneys for Plaintiffs
          50 Rockefeller Plaza
          New York, New York 10020
BY:       CHRISTOPHER COOK, ESQUIRE
          MICHAEL CARDOZA, ESQUIRE (Via Zoom)
          JONATHAN MARKS, ESQUIRE


LONDON FISCHER, LLP
Attorneys for Defendants DR. REGINA MOSHE,
CITMEDICAL I, PLLC, CITIMED SERVICES, P.A.,
CITIMEDICAL SERVICES P.C., CITIMED COMPLETE
MEDICAL CARE, P.C., CITIMED MANAGEMENT
SERVICES INC., and DR. ANAM AZEEM
          59 Maiden Lane
          New York, New York 10038
BY:       THOMAS LEGHORN, ESQUIRE


BRACH EICHLER, LLC
Attorneys for Defendants YAN MOSHE, YAN MOSHE
SURGICAL CENTERS and HUDSON REGIONAL HOSPITAL
          101 Eisenhower Parkway, Suite 201
          Roseland, New Jersey 07068
BY:       ANTHONY JULIANO, ESQUIRE (Via
          Zoom)
          KEITH ROBERTS, ESQUIRE



ALSO PRESENT:

JEREMY KOVACS, Videographer



MAGNA
LEGAL SERVICES

Case 1:21-cv-05523-MKB-PK    Document 730-1    Filed 04/13/26    Page 4 of 61 PageID #: 11370

Y. Moshe

account?

A.    Yes.

Q.    When did you open that email account?

A.    I do not remember.

Q.    Do you currently use the Moshe Yahoo account?

A.    Yes.

Q.    Is that an account you use regularly?  Do you use that account all the time?  How often do you use that account?

A.    Regularly.

Q.    Do you pay any fee or charge to use the Moshe Yahoo account?

A.    I don't know.

Q.    Do you have the password for the Moshe Yahoo account?

A.    I do.

Q.    Have you always had the password to the Moshe Yahoo account since its been opened?

A.    Yes.

Q.    Does anyone other than you have the password to the Moshe Yahoo account?



Page 8

Y. Moshe

A.   No.

Q.   At any point in time, has anyone other than you had the password to the Moshe Yahoo account?

A.   My IT people.

Q.   Who are the IT people who have had the password to the Moshe Yahoo account other than you?

A.   Simon and his team members.

Q.   What is Simon's last name?

THE WITNESS:  Keith, can you help out here?

MR. ROBERTS:  Yes.  Farous, F-A-R-O-U-S.

Q.   Simon Farous?

A.   Correct.

Q.   Mr. Roberts, as skilled as he is, is not allowed to testify.

Now that your attorney refreshed your recollection, is Simon Farous the person who has had a password to the Moshe Yahoo account?

A.   Yes.

Q.   Other than Simon Farous, is there



Page 9

Y. Moshe

anyone else who has had the password to the Moshe Yahoo account?

A.    Some people from his team.

Q.    Do you know who those other people are?

A.    No.

Q.    How many other people in number?

A.    I don't know, but I know he was working on it with his team, but a few people so I'm not sure exactly who they are.

Q.    Any of those people would be people working for Simon Farous?

A.    Yes.

Q.    When did Simon Farous first have the password to the Moshe Yahoo account?

A.    At the time when the search was requested.

Q.    Do you know when that was?

A.    No.

Q.    Would that have been within the last year?

A.    Yes.

Q.    So since approximately -- it would have been in 2024 or later?


MAGNA
LEGAL SERVICES

Page 10

Y. Moshe

A.   I don't want to guess.  You asked me not to guess.  It was the time when the search was requested.

Q.   But at no point prior to when the search was requested has Simon Farous or any other person had the password to the Moshe Yahoo account, correct?

A.   Correct.

Q.   So who has permission then to send emails from the Moshe Yahoo account?

A.   No one.

Q.   Other than you?

A.   Other than me.

Q.   And the only persons who had access to see the emails from the Moshe Yahoo account has been you up until it was Simon Farous who -- and his team who had a chance to conduct the search, is that correct?

A.   Correct.

Q.   From what devices have you accessed the Moshe Yahoo account?

A.   My cell phone and my iPad.

Q.   Any other devices?

A.   Throughout the time, I had many


MAGNA
LEGAL SERVICES

Y. Moshe

they were sent, the date they were received, the email address from which they were sent or the email address to which they were sent?

A.    Of course.  Everything has a record.

Q.    You knew that?

A.    Of course.

Q.    For what purposes did you use the Moshe Yahoo account?

A.    This is my personal email account, but, unfortunately, some people send some business emails to it as well because when they design my business card, they put in my personal email address on it as well.

Q.    You say unfortunately.  Was it not your intent then to use the Moshe Yahoo account for business purposes?

A.    It was not at all, but some emails came through.

Q.    Do you have other email addresses that you intended to use for business purposes?

A.    Yes.

Q.    What email addresses did you intend



Page 25

Y. Moshe

MR. MARKS:  I will ask questions, you can lodge your objections and instruct him as you see fit.

Q.    Will emails of the Moshe Yahoo account discuss 1963 Concourse Holdings?

MR. ROBERTS:  I will object to that.  We are here to --

MR. MARKS:  Objection.

Are you going to allow him to answer or not?

MR. ROBERTS:  No, I will not allow him to answer questions now that are going afield.  You are going to what the content is of emails that we don't even know exist.

MR. MARKS:  Are you instructing him not to answer?

MR. ROBERTS:  Yeah, I am.

Q.    Are you going to follow your attorney's instruction not to answer?

A.    Do I have a choice?

Q.    You do have a choice, but I need to make a record that you are following your attorney's instructions.


MAGNA
LEGAL SERVICES

Y. Moshe

A.    Of course.

Q.    Your answer is yes, you are following your attorney's instructions?

A.    That's what I'm here for.  If it wasn't for my attorney, I wouldn't be here.

MR. ROBERTS:  I'm not suggesting by the objection that the witness will not answer the question.  The witness is not here to answer that question today, big difference.

Q.    Let's make the record on these questions.

Will emails in the Moshe Yahoo account discuss 1910 East Gun Hill Holdings?

MR. ROBERTS:  Objection.

MR. MARKS:  Are you instructing the witness not to answer?

MR. ROBERTS:  I believe I did, yes.

Q.    Are you going to follow your attorney's instruction?

A.    I believe I do.

Q.    So we can cut to the chase here, will the emails from the Moshe Yahoo account discuss any of the following entities, 65-55



Page 27

Y. Moshe

Woodhill Realty, 63-36 Holdings, 9220 165 Holdings, 55-B Green Avenue, 31343 Realty Holdings, 9901 Holdings, Tersher Development, 1010 North Broadway Holdings, 190 Midland Avenue Realty Holdings, 29 East 29th Street Holdings, 321 Essex Holdings, 43 Meadowlands Holdings?

MR. ROBERTS:  I'm objecting and instructing the witness not to answer on the limited basis that the question is not appropriate for today.

I'm not making the objection based upon any other basis and I'm not saying that the witness would never answer these questions at a deposition in the future, but I believe it exceeds the scope of today's deposition.

Q.   Are you following your attorney's instruction and not answering the question?

A.   Yes, going forward in this deposition, I will listen to my attorney's advice unless he tells me otherwise.

Q.   So the record is clear, will the Moshe Yahoo account contain emails discussing



Y. Moshe

Citimed Services, P.A. or Citimed Services, P.C.?

A.    You already asked me that question.

Q.    I didn't ask with respect to these two entities.

A.    You did.

MR. ROBERTS:  Same objection, the content of the deposition exceeds the scope and for good reason.

We didn't even know these emails exist or, if so, they were so far afield in my mind of how that question would be appropriate for the scope of today's deposition so I would instruct him not to answer.

Q.    Are you following your attorney's instruction to not to answer?

A.    As I advised before.

Q.    Anticipating this, let me ask this question so the record is clear.

Have you sent emails to or have you sent emails from the Yan Moshe account to or received email into the Yan Moshe account from Leonid Shapiro?



Y. Moshe

A.   Yes, as we did before.

Q.   Have you sent emails from Yan Moshe at Yahoo.com to or received emails to Yan Moshe at Yahoo.com from any of the following individuals, Regina Moshe, Vadim Dolskey, Mark Gladstein, Reuvon Alon, Nizar Kifaieh, Isaias Barrera-Perez, Roma Yusupov, Olivia Yusupov, Ariel Sezanayev, Vladimir Matatov, Jelani Wray, Beshert Corp., Marina Katayeva, Michelle Simon, Estevan Roman, Roman Yunusov, Tatyana Rabinovich, Patrick Situ, Yenny Escano, Complete Radiology Solutions, Alkies Lapas, Contemporary Diagnostic Imaging, CDI Management Group, All Star Services Inc., Five Star Services Inc., Nizar Burak, Expert Billing Solutions, New York Spine Institute, Sovereign Health Medical, Pinnacle Health Consultants, Greenbills, John Mitamura, Norman Rowe, Advanced Comprehensive, Anthony Rose or Todd Chambers?

MR. ROBERTS:  I will object and instruct the witness not to answer.

I made it clear on the record the limited scope of today's deposition.



Y. Moshe

I'm not instructing the witness would never answer those questions, but only for the purposes of today's deposition, given the application to the court and given the very specific ruling by the court which is clear in the text order, these questions would be appropriate for Mr. Moshe's general discovery deposition which will subsequently proceed in the future of this case to be scheduled.

Q. Are you going to follow your attorney's instructions and not answer the question?

A. I will.

Q. You identified other email accounts that you had during the period of October 2021 to the present.

The recovery account for the Yan Moshe at Yahoo.com account is Yan Moshe at iCloud.com?

A. It's not.

Q. Do you have an account at Yan Moshe at iCloud.com?

A. I do.



                    Y. Moshe

Q.   Do you know as you sit here now what those email accounts are?

A.   I don't.

Q.   I want to talk about, again, Yan Moshe at Yahoo.com.

At any point in time, have you had a policy or practice regarding the preservation of emails?

A.   Other than what Yahoo uses?

Q.   Other than what Yahoo uses.

A.   No.

Q.   Have you had any practice or routine, policy that you followed with respect to deleting emails in that account?

A.   I receive an email, I read it, I delete it.  I receive an email, it might be a spam.  Without opening it, I just delete it.

Q.   Is that a practice you have followed since the account, since you opened the account?

A.   For the most part, yes.

Q.   At any point in time, have you changed that practice?

A.   Maybe I didn't get a chance to



Y. Moshe

delete, maybe I didn't go to account for a while.

Q.    So the practice is as soon as you read an email, you delete it, that's your practice?

A.    No.

Q.    How long --

A.    If I don't need the email, I delete it.

Q.    Under what circumstances would you decide you need the email for the future?

A.    If I need to follow up on it.

Q.    And at some point in time, would you then delete an email that you needed to follow up on -- strike that.

I want to understand, you have an email, you followed up on it, then what happens to that email?

A.    There is an email chain, right, it goes back and forth, back and forth.  Once the subject is done and I no longer need it, I might just delete it and it deletes all 30 messages or 40 message, whatever that might be, it deletes the chain.



Y. Moshe

Q.    Would it be your practice then, once you no longer need the chain, to delete it or do you just don't do anything with it?

A.    If an issue is closed out, there might be an issue that we are working on. The issue is still not closed out, it's still an open issue, we are still dealing with it. I will keep the email once the issue is resolved and that item is put to rest.  I don't need it, that last email, then I probably delete it.

Q.    When you say probably, is it an affirmative practice that you have adopted that if an issue is resolved and closed, you will go in and delete the email?

A.    Not specifically go in and delete, but if I am on that subject and it's closed out, I will delete it.  It might be lingering there somewhere also.

Q.    Over the years, you have been involved in litigation, is that correct?

A.    Correct.

Q.    And businesses that you have been involved in have been involved in litigation,



Y. Moshe

that's correct?

A.    Correct.

Q.    You know from being involved in litigation that from time to time, documents are requested in litigation?

A.    You are assuming that I know that.

Q.    I'm asking you.

A.    I do know that, yes.

Q.    And do you know that in litigation, when those documents are requested, you have to produce those documents in litigation, do you know that?

A.    Yes.

Q.    And do you know that in litigation, when documents are requested, it sometimes includes emails, do you know that?

A.    Yes.

Q.    Do you know when lawsuits are filed, that you sometimes have an obligation to preserve the documents that you may need to produce in litigation, are you aware of that obligation?

A.    Yes.

Q.    Are you aware that that obligation,



Y. Moshe

that when a lawsuit is filed, that you may have an obligation to preserve emails that may be responsive to document requests that may be served?

A. Yes.

Q. Are you aware that government, from time to time, conducts criminal investigations?

A. Yes.

Q. Are you aware that from time to time, the government can issue subpoenas for documents?

A. Yes.

Q. Are you aware that sometimes when the government issues subpoenas in connection with criminal investigations, those subpoenas sometimes call for emails?

A. Possibly.

Q. Are you aware that that can sometimes happen and they may sometimes ask for emails?

A. Possibly.

Q. Are you aware if you have documents and you have an obligation to preserve and



Y. Moshe

you destroy them, that can result in penalties, are you aware of that?

A. Yes.

Q. Are you aware that those penalties can include civil penalties?

A. Possibly, I don't know the law.

Q. Are you aware that they can also sometimes include criminal penalties, are you aware of that?

A. Possibly.

Q. You were sued in December 2018 in the lawsuit American Transit Insurance Company in New York Superior Court, is that correct?

A. I don't remember.

Q. Do you remember being sued about December of 2018 by American Transit Insurance?

A. I do remember being sued by American Transit, but I do not remember the date.

Q. Do you remember that generally speaking, the allegations included, among other things, that you were alleged to have



Y. Moshe

depose him on that, just not twice.

Q.   You are following your attorney's instructions?

A.   Yes, yes.  I'm just thinking, how do I make a standing order that I follow his advice?

Q.   You have to answer the questions.

A.   All right.

Q.   Did you produce records from the Moshe Yahoo account in the American Transit litigation?

A.   I do not remember.

Q.   Did you take any steps following the filing of the American Transit litigation to preserve any emails in the Moshe Yahoo account?

A.   I was advised to preserve my emails by my attorney and we preserved them, they were in the account.

Q.   So you did take steps following the lawsuit to preserve the emails?

A.   No, I didn't download them anywhere or did anything.  They were in the account. Whatever was not deleted at that time was not



Page 43

Y. Moshe

deleted.

Q. So you had previously said, I have a practice of deleting emails when they come in and when I finish up the work, I delete them. That was your practice, correct?

A. Correct.

Q. So when the American Transit lawsuit was filed, you stopped that practice?

A. If there were those defendants that were in that lawsuit and it was in the preservation rights letter from my attorney, then I followed it.

Q. So in the American Transit lawsuit, you said you got a preservation direction from your attorney and you followed that preservation direction, is that what you are saying?

A. Yes.

Q. The preservation direction you got from your attorney identified specific types of communications you were not to delete, correct?

A. Correct.

Q. And those are the emails that you



Page 44

Y. Moshe

stopped deleting from your Moshe Yahoo account, is that correct?

A.   If I was still communicating with those people.  The emails might have been deleted already prior to that notice.

Q.   Understood.  So going forward, you stopped deleting emails to the extent that they were designated by the communication you got from your attorney after the filing of the American Transit lawsuit, correct?

A.   Correct.

Q.   Similarly then, in February of '20, you were sued by Geico, is that correct?

A.   Correct.

Q.   And in the Geico -- did you change any practices with respect to the Yan Moshe at Yahoo account after the filing of the Geico litigation?

A.   I do not think we got that far because they paid out on that case right away, they settled it out.

Q.   Did you do anything following the Geico litigation with respect to the Yan Moshe at Yahoo.com account?



Page 45

Y. Moshe

A.   I don't remember exactly.  If I received the preservation rights letter, I followed it, but that case closed out very quickly.

Q.   So you don't remember one way or the other whether you did anything?

A.   Correct.

Q.   You are aware of the complaint that was filed in this case?

A.   Yes.

Q.   That complaint was filed on October 5, 2021, are you aware of that?

A.   I'm aware of the complaint, I don't know exactly.

MR. ROBERTS:  Say the date again, please.

MR. MARKS:  October 5, 2021.

MR. ROBERTS:  Thank you.

Q.   With respect to the American Transit case, did you change -- at any point during that litigation, did you change how you preserved the Yahoo -- the Moshe Yahoo account from what you had previously testified to?



Page 46

Y. Moshe

A.   When I received the preservation of rights letter from my attorney, it identified which communication needs to be reserved.  If I received an email from people on that list, I preserved that email.  If there were other people, I followed my regular routine the way that I do with my account.

Does that answer the question, was that clear?

Q.   It does, yes.  And at no point over the course of the litigation did you change that practice, that you didn't do anything different than what you just testified to?

A.   Yes.

Q.   When the lawsuit was filed in this case, were you aware that you were going to need to produce documents in this case?

A.   Are you talking about your case?

Q.   Yes.

A.   Yes, that's the assumption.

Q.   Were you aware when this lawsuit was filed, that the documents you were going to produce were going to include emails?

A.   I can't agree to that.  I don't



                    Y. Moshe

know what you would ask for.

Q.   So you didn't know, it might include emails, it might not, you didn't know that?

A.   Right.

Q.   Is it your testimony that you -- did you know at the time the -- did you have any belief at the time this lawsuit was filed that you might need to produce emails from the Yan Moshe at Yahoo.com account?

A.   I would not assume so when the subpoenas came in.

Q.   When the lawsuit was filed, the only thing that happened is the lawsuit was filed.

        At the time the lawsuit is filed, did you believe there was a possibility that you were going to have to produce emails from the Yan Moshe at Yahoo.com account?

A.   I don't want to assume.  I didn't really think about it.

Q.   Didn't think about it?

A.   No.

Q.   At the time this lawsuit was filed,



Page 48

Y. Moshe

did you do anything to preserve emails in the Yan Moshe at Yahoo.com account?

A.    Before I got a preservation of documents letter from my attorney?

Q.    At the time the lawsuit was filed, did you do anything?

A.    No.

Q.    You didn't do anything?

A.    Nothing.  I think I was served, like, a few months later, everyone got it, I didn't get it.

(Deposition Exhibit 418, document from Jennifer Strong of The Russell Friedman Law Group, marked for identification, as of this date.)

Q.    I'm showing you what has been marked as deposition Exhibit 418.

This is a lawyer from Jennifer Strong of Russell Friedman Law Group filed in court on November 15th which says, This firm was recently retained by defendants, Rubin Long, Columbus Imaging, Medic Radiology and Yan Moshe in the above-referenced matter. Please accept this correspondence as formal



Y. Moshe

request by responding defendants on consent of plaintiffs for an extension of time to respond or otherwise move with regard to plaintiff's complaint until November 24, 2021.

This is a letter -- first of all, did you retain at Russell Friedman Law Group to retain you in this litigation?

A.   Yes.

Q.   Are you aware on November 15th, they indicated that they represented you, at least as of November 15th in connection with this lawsuit, correct?

A.   That's what the letter says, yes.

Q.   At least as of November 15th, you hired a law firm to represent you in this litigation?

A.   Correct.

Q.   So at least as of November 15, 2021, you were aware of this litigation, correct?

A.   Correct.

Q.   So as of November 15th, now that we have the time, did you do anything about that


MAGNA
LEGAL SERVICES

Page 50

Y. Moshe

time to preserve the emails in the Yan Moshe at Yahoo.com account?

A.   No, I just didn't delete them.

Q.   You stopped deleting them?

A.   I stopped deleting them.

Q.   Why did you do that?

A.   At some point, my attorney notified me I need to keep them.

Q.   Did your attorney notify -- did you get that -- was that instruction in writing or did they tell you orally, don't do that anymore?

A.   I think the instruction was in writing, they send a preservation of rights letter.

Q.   Was the instruction, don't delete anything, from the Yan Moshe at Yahoo.com account or was it only don't delete specific things from the Yan Moshe at Yahoo.com account?

MR. ROBERTS:  Hold on.  I'm going to assert privilege.  I think you are expressly asking what his lawyer advised him to do.



Y. Moshe

MR. MARKS:  Fair point.  Let me ask the question differently.

Q.   At the time of the lawsuit being filed, what preservation practice did you undertake?  Did you undertake to preserve everything in -- strike that.

At the time the lawsuit was filed, was your practice to stop deleting everything in the Yan Moshe at Yahoo.com account or was your practice to only stop deleting certain emails from the Yan Moshe at Yahoo.com account?

A.   I followed my attorney's advice. It was an email that I received to preserve communication and I followed it.

Q.   Again, I don't want to know what your communication was with your attorney.  I want to know what you did.  What did you do?

A.   Followed his advice.

Q.   What did you do?

A.   Followed his advice.

Q.   What specifically did you do?

A.   You want to know the details of what he advised me?



Page 52

Y. Moshe

Q. I want to know the details of what you did.

A. I followed his advice not to delete the emails that are related to this case.

Q. What did you understand to be related to this case?

A. That everything that relates to these criminal people and this complaint should be kept.

Q. So how did you decide what to keep and what not to delete?

A. You guys have names that are listed.

Q. What names, what names did you use to decide what you were going to delete and not delete?

A. I had the case there and all the related parties.

Q. So what did you look at?

A. An email, an attachment of email.

Q. An email from your attorney?

A. Correct.

Q. It was a list of names?

A. There was a list of communication



Page 53

                    Y. Moshe

that needs to be preserved.

Q.   Was it a list of individuals --

MR. ROBERTS:  Same objection.  I think what you are trying to do, I understand, but it's really an end run, you know, around what the privilege is I'm asserting.

We can certainly have, you know, we can certainly have an argument over this, we can certainly raise it before the court, but without him divulging what the specific instruction was, he really doesn't have a way to answer that question.  He's answered it multiple times.

MR. MARKS:  I understand and I don't want to know what his attorney instructed him to do.

MR. ROBERTS:  But precisely what he did gives you that answer, he told you he followed the specific instruction.

MR. MARKS:  No.  What he is doing is he is avoiding answering the question by saying he did what his attorney said,



Y. Moshe

the State Farm case.

Q.   What emails did you delete?

A.   There are thousands of emails.  I do not remember what I deleted, but they had nothing to do with State Farm's case.

Q.   How did you decide what emails you were going to delete and what emails you didn't delete?

A.   Because they have nothing to do with work and nothing to do with State Farm and nothing to do with any of the defendants in the lawsuit.

Q.   That was the decision you made yourself about what you were going to delete and not going to delete?

A.   Correct, that's what I was advised by my attorney.

Q.   You had a list of what you considered the things you could delete and the things you couldn't delete, correct?

A.   Correct.

Q.   That list of what you decided --

A.   Let's go back for a second. There was no list of what I can



Y. Moshe

delete and not delete.  There was a list of people that I should not delete communication with and the rest I can delete.  There wasn't a list you can delete this and not delete this.

Q.   There was a list of what you had to keep and there was a list that you couldn't delete?

A.   No, there was a list of what I needed to keep for this case and I kept it.

MR. MARKS:  We are making a request now for that list of what -- of the categories and specific emails that he was instructed to preserve.

MR. ROBERTS:  You are going to paper me on that, right?

MR. MARKS:  Yes.

Q.   Did -- other than stop deleting emails that were on a list provided to you by your attorneys, did you do anything else to preserve emails in the Yan Moshe at Moshe.com account?

A.   No.

Q.   Other than you stopping the



Y. Moshe

A.    I will go back to my answer before. Once I received the preservation of rights letter, any communication with those individuals on your complaint we preserved, we kept in the account, we did not delete.

The letter came in from my attorney and it went to my GC and GC reviewed the letter and gave me the opinion on all these things that need to be preserved, that's it.

Q.    I'm asking how it worked in practice, you have your account --

A.    I would get an --

Q.    You would get an email, it comes in, maybe you remember the names on the list, maybe not.

Do you have to go back to look at this list?  What I'm trying to understand is if you -- have you got a cheat sheet or something, did you go back to the list, do you physically actually look at this list as an email comes in to make a decision?

A.    There are only a handful of people that I'm communicating with that are on that list.  For example, if I'm getting an email



                    Y. Moshe

from Regina, I do not delete it because I

know this is gold for you so I keep it for

you.  It's very simple.

        Q.    So you don't consult the list?

        A.    I don't need the list.  I know

these people very well.

        Q.    What about the nonparties that are

referenced in the complaint, do you know

those?

        A.    If those were provided at the time,

because you have amended your complaint many

times, added many people and your subpoena

changed many times.

              If it was advice on that letter, we

will provide you with that letter so you can

see who they are.

        Q.    So was the list updated then over

time?

        A.    I'm sure a few times, we got that

email.

        Q.    So the answer is yes, it was

updated over time?

        A.    Yes.

        Q.    Do you know how many times it was



Y. Moshe

updated?

A.    No idea.  You coming up with new subpoenas every day.  I'm surprised you didn't subpoena my grandma.

Q.    Every time subpoenas were issued, the list was updated?

A.    Yes.

(Deposition Exhibit 419, plaintiff's first set of document requests to defendant, Yan Moshe, dated April 1, 2022, marked for identification, as of this date.)

Q.    Showing you what has been marked as Deposition Exhibit 419 which is plaintiff's first set of document requests to defendant, Yan Moshe.  This is dated April 1, 2022.

Were you aware of this document request at or about the time it was served?

A.    Yes.

Q.    Were you aware that its definition of communications on page 2, go to the second page, defines communications among the things included among communications is on the third line, electronic mail.



Y. Moshe

Do you see that?

A.    Yes.

Q.    And then if you look under documents, among the things included in documents around the middle of that paragraph, it includes emails.

Do you see that?

A.    Yes.

Q.    Then if you look at question 27 which is on page 9, it says, Communications reflecting and relating to, and there are a long list of things there.

Do you see that?

A.    Yes.

Q.    So were you aware then at or about April 1, 2022 that plaintiffs had served document requests on you that sought, among other things, email communications, were you aware of that?

A.    Yes.

Q.    And you knew that to respond to this request, you were going to have to produce emails, were you aware of that?

A.    Well, I think my attorneys had to



                    Y. Moshe

try to object to this discovery.

Q.    You were aware at least that this document request at least asked for emails?

A.    Yes.

Q.    And you were aware, whether your attorney was going to object to it or not, this document request at least would have asked for emails that were in the Yan Moshe at Moshe.com account?

A.    Yes.  You asked for a lot of things.  It doesn't mean I have to give all of it.

Q.    Whether you are going to give it or not, this document request, among other things, asked for emails in the Yan Moshe at Moshe.com account, correct?

A.    Yes.

Q.    Did you do anything after April 1, 2022 until, say, August 25 of 2023 to collect anything from the Yan Moshe at Moshe.com account that would have been responsive to this document request which is Deposition Exhibit No. 419?

A.    Yes.  You provided a list of terms



Y. Moshe

that you wanted us to search and my IT director got a third-party device to search for those emails and search names and all those things and we turned over what we were able to find.

Q.    I'm talking about between April 1, 2022 and August 25, 2023.

A.    No, not at that time, just kept them.

MR. ROBERTS:  Your question was collect?

MR. MARKS:  Right, collect.

Q.    Did you do anything to collect?

A.    No, I did not.

Q.    Did anyone, between April 1, 2022 and August 25, 2023, do anything to collect emails from the Yan Moshe at Moshe.com account to collect anything that would be responsive to Exhibit 419?

A.    No.

Q.    Did anyone do anything to preserve emails in the Yan Moshe at Moshe.com account that would be responsive to 419 between April 1, 2022 and August 25, 2025?



Page 65

Y. Moshe

A.    Yes, I preserved by not deleting.

Q.    You preserved by not deleting?

A.    Correct.

Q.    But other than that, did anyone do anything --

A.    No.

MR. ROBERTS:  By the way, other than what the record will reflect by his counsel.

Q.    Well, are you aware of anyone doing anything between April 1, 2022 and April 25 -- August 25, 2023 -- let me ask the question again so it's clear.

Did anyone, to your knowledge, do anything between April 1, 2022 and August 25, 2023 to preserve emails in the Yan Moshe at Yahoo.com account that would be responsive to Deposition Exhibit 419?

MR. ROBERTS:  Now, his question is preserve.  It switches between collect and preserve.

Q.    Preserve.

A.    I preserved them by not deleting them.


MAGNA
LEGAL SERVICES

Y. Moshe

Q.    To your knowledge, did anyone do anything other than that?

A.    Not to my knowledge.

(Deposition Exhibit 420, order of the court, marked for identification, as of this date.)

Q.    I'm showing you what has been marked as Deposition Exhibit No. 420 which is an order of the court in this case and in relevant portions, it reads -- it refers to letters describing discovery disputes, then it says, In these letters, plaintiffs state the defendants have failed to fully respond to document requests and interrogatories and outline in detail how those responses are deficient.

It then says, Defendants have the obligation, when responding to requests for production, to ascertain first whether the requested documents exist and if they do exist, to produce them to plaintiffs or state a valid basis for withholding them.  If such documents do exist, defendants must confirm their nonexistence.  Defendants state they



MAGNA
LEGAL SERVICES

Y. Moshe

nonparties before they could reasonably have expected them to be sought by plaintiffs in this action, much less the issuance of plaintiff's subpoenas.

Do you see that?

A.    Yes.

Q.    This letter appears to describe some emails that were destroyed.  That was a discussion that ultimately became the subject of a hearing that took place on October 31, 2023.  I have some questions about that email.

Are you familiar with the apparent destruction of emails that is being described by your attorneys in this letter?

A.    No.

Q.    Were you aware of whether there were emails that were requested concerning Popular Bank, construction and remodeling of premises by nonparties that had been requested by plaintiffs that were destroyed?

A.    Nothing was destroyed after the preservation of rights letter.

Q.    Do you have any idea then why your



Y. Moshe

lawyer would have written to the court on or about October 5, 2023 referencing the destruction of emails?

A.    Is it my emails, is he talking about my emails?

Q.    I don't know.  That's what I'm trying to find out.

A.    My emails were not deleted after the preservation of rights letter. Communication with all the defendants are kept in that email account which was provided to you.

Q.    Did you use your personal account -- strike that.

Did you use the Yan Moshe at Yahoo.com account to conduct business -- strike that.

Did you use the Yan Moshe at Moshe.com account to communicate regarding construction or remodeling of the premises owned by the nonparties referenced in this letter?

MR. ROBERTS:  I'm going to object. Same objection as before.  I don't have



Y. Moshe

to do with State Farm.

Q.   How did you decide what has to do with State Farm and what doesn't?

A.   My tax abatement, some of the repairs that are happening in the lobby that has nothing to with my tenants sitting there or my parking lot attendant has nothing to do with sitting there.

I think I can make the decision for myself.  I know what you are looking for so I preserved everything in this case so you got no case.

MR. LEGHORN:  Can we take a break?

THE VIDEOGRAPHER:  We are going off the record.  The time is 11:20 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:46 a.m.

BY MR. MARKS:

Q.   Did you destroy emails in the Yan Moshe at Yahoo.com account concerning 910 East Gun Hill Holdings?

A.   No.

Q.   Did you destroy emails in the Yan



Page 104

Y. Moshe

On or about February 15th, which is the last page, a letter was sent from Christopher Cook to Shannon Carol?

MR. ROBERTS:  Well, Mr. Juliano.

MR. MARKS:  The last page.

MR. ROBERTS:  You are on February 15, 2024?

MR. MARKS:  Yes.

Q.  That letter identifies various accounts that plaintiffs wanted to be searched as part of the ESI search.

First of all, at some point shortly after February 15, 2024, did you see this letter?

A.  Yes.

Q.  So were you aware sometime shortly after February 15, 2024 that plaintiffs at least wanted the account at Yan Moshe at Yahoo.com searched?

A.  Yes.

Q.  Did you do anything after February 15, 2024 to preserve the emails in the Moshe Yahoo account other than what you previously testified to, which was to stop deleting



Y. Moshe

emails pursuant to the preservation directive we've discussed?

A.    No.

Q.    To your knowledge, did anyone other than you do anything to preserve emails in the Moshe Yahoo account other than what you were doing to stop deleting emails?

A.    I don't know and I don't remember.

(Deposition Exhibit 423, defendant's second set of document requests to defendant, Yan Moshe, marked for identification, as of this date.)

Q.    Showing you what has been marked as Deposition Exhibit 423.

This is defendant's second set of document requests to defendant, Yan Moshe.

Have you seen this document request before?

A.    Yes.

Q.    You are aware of the document requests and the attachment to it?

A.    Yes.

Q.    You are aware that this request specifically requires the production of



Y. Moshe

Q.    How did you do that?

A.    Searched the names that are listed here in the email box.

Q.    Did you find anything?

A.    If I found something, I forwarded it to my attorney.

Q.    Do you know if you found anything?

A.    I don't remember.

Q.    Was anyone else involved in searching for the emails that would be responsive to 424 other than you?

A.    So it was only me initially, I failed and then it was Simon and his team. Those were the two timelines.  I don't know exactly where this fell.

Q.    So it sounds like the process to respond to both 423 and 424 was the same, if I'm hearing you right, which is that you did an initial search, you failed, you passed it off to Simon and his team, they searched.

Do I have that right?

A.    It's several times I failed in the timeline and once I gave it to him and they worked at it for months and they got what



Y. Moshe

they got.

Q.   So both with respect to the second document request which is 423 and 424, you tried initially to get the documents that were responsive to the request, correct?

A.   Correct.

Q.   And did you try once or multiple times?

A.   Several times, several days.

Q.   Then when you couldn't, both with respect to the second document request and the third document request, you passed it off to Simon and his team, correct?

A.   Correct.

Q.   And then his team attempted several times and we will talk about that process in a second, correct?

A.   Correct.

Q.   And then when they finished their collection, they passed whatever they found on to the lawyers, is that correct?

A.   Correct.

(Deposition Exhibit 425, letter from Yan Moshe's attorneys dated August



Page 116

Y. Moshe

request, second document request or third document request, has been produced, is that correct?

A.   To my understanding, yes.

Q.   You do not currently have any other emails in the Moshe Yahoo account in your possession, custody or control that you have not produced, is that correct?

A.   Correct.

Q.   So in other words, if we don't have it, at least as of August 18, 2025, it doesn't exist, is that correct?

A.   Correct.

Q.   The production that was made as of August 18, 2025, does not include approximately 15,000 emails that are identified in the document request which is the second document request which is Deposition Exhibit 423, it doesn't include that?

A.   But they're not all emails, your 15,000 communication are not all emails.

Q.   That's what I want to understand. What is your explanation?  I just want to



Y. Moshe

hear your explanation for why your production, as of August 18, 2025, does not include the approximately 15,000 emails that have been identified by Yahoo as of March 28, 2025?

A.   Okay, so let me explain.  First of all, based on the emails you have seen, you know I'm not an email person, I do not email a lot and if I do email, it's one or two sentences, very quick, to the point.

No. 2, emails prior to preservation of rights letter were deleted in the normal course of action.  Post preservation rights of letter, they were saved.  A lot of the message confirmations that you have are not necessarily to an email to or from me, it's probably from meetings.  That's why with some people, I have 2,000 email.  I would never, in my right mind, send 2,000 emails to these people.

These are confirmations of emails or conferences we attended or events we attended.  This is all a general calendar that is managed where everyone gets a


MAGNA
LEGAL SERVICES

Y. Moshe

A.    I do not know the exact timeline, but if I was in the obligation to preserve because of my litigation, I preserved, very simple.

Q.    You understood, at least as of October 2021, when this lawsuit was filed, you said you had a preservation order and you followed it?

A.    I don't know the timeline, but if I had a preservation, I followed it.

Q.    You said some of the emails that are identified in this are not, in fact, emails, all they are are confirmation of meetings so there wouldn't actually be an email, is that what you're telling us?

A.    Correct, there wouldn't be an email body, it would be a calendar meeting.

Q.    Let's take a look at I guess Deposition 523.

Can you show us an example of what would -- so we can know -- help us figure out what is the difference between what would be a meeting invite and what would be -- how are we going to know the difference



Y. Moshe

between a meeting invite and what would be an email?

A.    I don't have my glasses so I cannot see this.  This is very small print.  If you have it larger, I can do it on a computer, I can pull it up, but you can see some of them.

Q.    You don't have your glasses with you?

MR. COOK:  We can get you a magnifying glass.

A.    So you see it says data Citimed, for example, right, it says data Citimed?

Q.    Data Citimed, okay.

A.    And then it has all of this email addresses.  This is not an email exchange, it's a calendar request meeting, so someone has to get to this.

Q.    Let's try to make a record of what it is we are talking about here.

A.    So, look, this is an email.

Q.    Hold it.

A.    If you get some magnifying glass so we can be on the same page.  I'm sorry, I didn't know it would be such small print.



Page 121

Y. Moshe

MR. MARKS: Why don't we go off the record for a second.

THE VIDEOGRAPHER: We are going off the record. The time is 12:29.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:34 p.m.

BY MR. MARKS:

Q. So you were testifying that you believe that some of the emails that Yahoo identified on March 28, 2024 are not, in fact, emails, they are calendar invites, is that your testimony?

A. Most of the emails that are here are calendar invites and scheduling and repetitive emails that are coming out and generated, most of them, out of the 15,000, as you say.

Q. Are you saying a repetitive email and a calendar invite are the same thing or are they different things?

A. Different things, repetitive emails would include schedule of -- anesthesia schedule, physician schedule, block time,



Page 136

Y. Moshe

have been issued a subpoena.  What I'm trying

to understand, is that the document request

that's in front of you which is Deposition

Exhibit 419?

A.  Okay.

Q.  Is that when you first learned that

your email account, personal email account

would need to be searched in this case?

A.  I don't know, but it was around

that timeline.

Q.  Okay.  So -- okay.

And so you instructed Simon Farous

and Jonathan Lagrano to obtain appropriate

search terms from counsel and collect

responsive items accordingly, is that

correct?

A.  Yes.

Q.  And why is it that you wanted them

to conduct the search rather than the other

process that was being employed to collect

emails for your entities in this case?

MR. ROBERTS:  Hold on.  Can I have

clarification, what other process?

Q.  I will ask you then, was the



                    Y. Moshe

process you employed for collecting emails

with respect to the Yan Moshe account

different than a process you employed for any

other emails in this case?

        A.    Yes.

        Q.    Why?

        A.    Because it contains a lot of my

personal information and I didn't want any

third-party place or my law firm have all of

that information because it's a lot of

personal information.

            Today, the law firm works for me,

tomorrow they work for my competitor, so I

want to make sure that they don't have my

personal stuff that relates to my family or

my life, not work life.

        Q.    What exactly was it about what was

going to be done by Simon and Jonathan that

was going to be different, how was the

process -- exactly how was the process

different?

        A.    The process is not different.  The

information that is not related to this case

would not be disclosed to anyone else so they



Y. Moshe

Q. So the decision of what's related and not related was being made by Simon and Jonathan based on instructions from the attorney, correct?

A. Correct.

Q. Jonathan and Simon work for you?

A. Yes.

Q. How do you know Simon?

A. He works as the IT director for the system.

Q. How long have you known Simon?

A. I think he worked for Care Point sometime and then he worked for us for four, five years.

Q. Are you related by blood or marriage to Simon?

A. No.

Q. Are you related by blood or marriage to Jonathan Lagrano?

A. No.

Q. Do you have any other business with Simon other than him being the Hudson Regional IT director?

A. No.



Y. Moshe

Q.    Do you have any other business with Jonathan Lagrano other than his work for Hudson regional?

A.    No, they are true third-party.

Q.    They work for you, correct?

A.    Yes.

Q.    And when did you hire Simon Farous?

A.    Four, five years ago.

Q.    When did you hire Jonathan Lagrano?

A.    I don't know.

Q.    Do they still work for you?

A.    Yes.

Q.    Both of them?

A.    Yes.

Q.    You were concerned, however, with having your lawyers do this because if your lawyers -- your lawyers work for you now, but your lawyers may not work for you again in the future?

A.    Correct, and there is a lot of personal information, medications, health-related trauma, family related, kids related, there is a lot of personal information.



Page 141

Y. Moshe

Q.   The decision of this process, the decision that you were going to do your Yan Moshe account one way and you were going to do your other accounts another way, whose decision was that?

A.   My decision.

Q.   Did you consult with anyone regarding that decision?

A.   Yes, with my attorneys, as long as they said that we do this fairly and we get a third-party tool that can justify what we do, we have a copy of all the search names, we have it all to prove as a backup that there was no commingling and that I didn't have any influence on Simon and his team when they are doing it, gave it to my attorneys and they dealt with it.

Q.   In order to make sure you didn't have any influence, how did you do that, how did you make sure you didn't have any influence over Simon?

A.   I think it was someone on Keith's team, I said please speak to them, explain what we need and, Simon, please work with



Page 152

Y. Moshe

not say that it was in my mailbox at the time.  You have no proof that says that this email was in my mailbox.  If you do, please show me.

Q.   I will show you what has been marked as Deposition Exhibit 427 which is the email.

(Deposition Exhibit 427, email chain, marked for identification, as of this date.)

Q.   First of all, this appears to be an email from Tatyana Rabinovich dated May 26, 2016 to Yan Moshe at Yan Moshe at Yahoo.com which appears to correspond to the email we are talking about.

First of all, do you recognize this email?

A.   Yes.

Q.   And is this the email that appears to be referenced in that line that we've been talking about in Deposition Exhibit 423?

A.   How would I identify that?

Q.   So you don't know?

A.   How would I -- tell me how to


MAGNA
LEGAL SERVICES

                    Y. Moshe

and give you what you need, but you can't

allege that I'm hiding something from you.

That's what you are going to do now.

     Q.   All I'm asking you for now, sir, is

what is your -- I'm giving you a chance to --

     A.   Thank you, I appreciate it.

     Q.   I'm giving you a chance to give

your explanation for why you didn't produce

it, whatever that explanation is.

          I don't want to argue with you.

What I want to know is what is your

explanation for why you did not produce 427?

     A.   Mr. Marks, I've given you

everything we have and if it was not

produced, I do not have it.

     Q.   Okay.  And I assume that's the same

explanation that you would give for any other

emails that are on Exhibit 423 that you have

not produced?

     A.   Correct.

     Q.   And you have no other explanation

that you would like to provide at this time

for why you are unable to produce those

emails?

